# EXHIBIT B

Lenz & Staehelin
Brandschenkestrasse 24
CH-8027 Zürich
Tel: +41 58 450 80 00
Fax: +41 58 450 80 01

Route de Chêne 30
CH-1211 Genf 6
Tel: +41 58 450 70 00
Fax: +41 58 450 70 01

Avenue de Rhodanie 58
CH-1007 Lausanne
Tel: +41 58 450 70 00
Fax: +41 58 450 70 01

www.lenzstaehelin.com

**By registered mail**

Federal Patent Court
P.O. Box
9023 St. Gallen

Zurich, 25 November 2019

**Proceedings no. O2019_007**

Dear Mr President,
Ladies and Gentlemen,

In the matter of

**Illumina Cambridge Limited**, Chesterford Research Park, Little Chesterford, Saffron Walden, Essex CB10 1XL, United Kingdom

represented by Attorneys-at-law Dr. Andri Hess and/or Julian Schwaller and/or Katrina Frame, Homburger AG, Prime Tower, Hardstrasse 201, 8005 Zurich

assisted by Dr. Claudia Bibus, Swiss and European Patent Attorney, E. Blum & Co. AG, Vorderberg 11, 8044 Zurich

**Plaintiff**

vs.

**Latvia MGI Tech SIA**, Dzirnavu iela 57A-4, Riga, Latvia, LV1010

Represented by Attorneys-at-law Dr. Thierry Calame and/or Lara Dorigo, Lenz & Staehelin, Brandschenkestrasse 24, 8027 Zurich

assisted by Dr. Martin Wilming, Swiss and European Patent Attorney, Hepp Wenger Ryffel AG, Friedtalweg 5, 9500 Wil SG

**Defendant**

regarding

EP 1 530 578 and EP 1 828 412

we herewith submit the

## STATEMENT OF DEFENSE

with the following

## PRAYERS FOR RELIEF

*The Complaint shall be dismissed.*

*All costs and fees, including the expenses for the assisting patent attorneys to be borne by Plaintiff.*

and

## PROCEDURAL MOTIONS

*The proceedings shall first be limited to the question of Defendant's capacity to be sued ("Passivlegitimation") and a preliminary decision (Vorentscheid) shall be rendered in this respect.*

*Until such decision is rendered, the proceedings shall be suspended as regards all other issues.*

## GROUNDS

### OVERVIEW

The present infringement action against Defendant must be dismissed for multiple reasons.

*First*, Plaintiff could not point to a single infringing act of Defendant nor to any manifest risk that Defendant could infringe Plaintiff's patents in Switzerland. The infringement action was filed against Defendant without *any* basis (see N 27 *et seqq.*).

The present proceedings must therefore already be dismissed because Defendant lacks the capacity to be sued (see N 38 *et seqq.*).

*Secondly*, even if it were assumed that infringing acts had occurred, which is contested, Plaintiff has not been able to show infringement. It used unsuitable test material and unsuitable test methods (see N 50 *et seqq.*, N 55 *et seqq.*). What is more, the products of MGI do not make use of all features of the invoked patent claims (see N 60 *et seqq.*).

*Thirdly*, infringement is also excluded because both patents invoked by Defendant are invalid (see N 91 *et seqq.* and N 381 *et seqq.*).

- EP 578 is invalid for lack of inventive step in view of *Ju et al.* and *Zavogorodny et al.* (1991) (see N 91 *et seqq.*). The skilled person had clearly defined criteria at hand for an appropriate choice of the protecting group (see N 105 *et seqq.*. N 148 *et seqq.*), such as the small dimension (see N 153 *et seqq.*), the selective cleavability under mild conditions in an aqueous environment (see N 162 *et seqq.*), the avoidance of irreversible denaturation of the DNA (see N 165 *et seqq.*), the avoidance of protecting groups with ester or ketone units (see N 175 *et seqq.*), the preference for unbranched

protecting groups with no more than 4 atoms (see N 182 *et seqq.*). Yet further, the skilled person well appreciated that the preferred protecting group in *Ju et al.*, i.e. the MOM group, was a protected hemiacetal (see N 189 *et seqq.*).

Upon due consideration of a standard compendium on protecting groups, i.e. *Greene and Wuts*, the list of potential candidates comprises only 12 (!) protecting groups even when only two criteria are being considered, i.e. the small dimension and the exclusion of ester and keto functions; the azidomethyl group is one of these candidates (see N 200 *et seqq.*, 206).  [7]

What is more, the skilled person is not left alone with the minor step of making an appropriate choice from those candidates. Rather, *Zavogordny et al.* (1991) specifically recommends the azidomethyl in the very same technical context (see N 211 *et seqq.*). Thus, the claimed subject-matter of EP 578 was readily obvious for the skilled person.  [8]

- EP 412 is invalid on numerous grounds.  [9]

*(i)* EP 412 is invalid for added matter because its subject matter considerably extends over the application as filed (see N 381 *et seqq.*). In particular, claim 1 as granted had essentially been rewritten in its entirety during prosecution, and the amendments in no way comply with the so-called *gold standard* of the EPO, which is also applied by this Court.  [10]

*(ii)* EP 412 is clearly anticipated by US 6,355,420 B1 and is thus invalid for lack of novelty (see N 401 *et seqq.*).  [11]

*(iii)* EP 412 is invalid for lack of inventive step in view of *WO 00/70073* in combination with *Van Dijk et al.*; in view of *WO 00/18957* in combination with either of *Dittrich et al.* or *Van Dijk et al.*; or in view of *Braslavsky et al.* in combination with either of *Van Dijk et al.* or *Dittrich et al.* (see N 415 *et*  [12]

*seqq.*). Clearly, ascorbic acid had been known in the art of fluorescent based imaging and sequencing (*Bradley*), and it had even been known to be more efficient than DTT (*van Dijk et al.*) or any other oxygen scavenger (*Dittrich et al.*). The skilled person thus had any motivation to consider ascorbic acid in the context of a method of sequencing nucleotides, and would have arrived at the claimed subject-matter without any inventive ingenuity.

With respect to the invalidity of the patents invoked by Plaintiff in these proceedings it must be noted that the Opposition Divisions (ODs) of the EPO in both cases had not been aware of highly relevant prior art and technical data, which is presented in these proceedings, and which clearly contradicts fundamental assumptions made by the ODs. Furthermore, the ODs unfortunately had an erroneous understanding of certain key aspects of the prior art before it, which is why the present Statement of Defense needs to deal with them in detail, to put the technology at stake into correct perspective. 13

Finally, Plaintiff's prayers for injunctive relief are indefinite and thus inadmissible (see N 498 *et seqq.*). 14

As a result, Plaintiff's Complaint must be dismissed in its entirety, to the extent it can be dealt with at all. 15

Defendant's procedural motion to first limit the proceedings to the question of Defendant's capacity to be sued in the present proceedings allows an efficient resolution of this dispute (see N 23, 38 *et seqq.*). 16

The suggested course of action is even more demanded in the light of the fact that Plaintiff's groundless attack against Defendant, which it communicated to international media on the day the Complaint was filed, must ultimately be seen as a measure to discredit Defendant and the competing MGI group, respectively, and to proactively intimidate the market. Such behaviour is unworthy of protection (see N 42 *et seq.*). 17

# I. PROCEDURAL ISSUES

## A. Power of Attorney

The undersigned attorneys are duly authorised. A Power of Attorney was already [18] submitted on 30 September 2019 (act. 7_1).

## B. Timeliness

The present submission is made within the deadline extended with order dated [19] 1 November 2019 (act. 15).

## C. Language (ad act. 1 N 3)

Defendant does not object to the use of the English language by the Parties. [20]

Defendant would welcome it if also the Court were to use English to the extent [21] possible, in particular also for the Technical Opinion and at oral hearings to facilitate reference to the Parties' arguments.

## D. Value in Dispute (ad act. 1 N 4)

Plaintiff's estimate is accepted for the sake of defining a value in dispute, but such [22] acceptance is in no way an admission with respect to any alleged monetary claims of Plaintiff.

## E. Procedural Motion

It is contested that Defendant has the capacity to be sued ("Passivlegitimation") for [23] the reasons set out at N 27 *et seqq.* below. For reasons of procedural efficiency, we request that the question of Defendant's capacity to be sued shall be decided in a preliminary decision to be rendered as soon as possible. With respect to the

remainder of issues at stake the proceedings shall be suspended until a decision on Defendant's capacity to be sued is rendered.

## II. ARGUMENT

### A. Defendant (ad act. 1 N 8-9)

Defendant Latvia MGI Tech SIA is a subsidiary of Shenzhen MGI Tech Co., Ltd. ("MGI") (act. 1_1). Within this organisation, Latvia MGI Tech SIA is one of MGI's thirteen business centres (see act. 1_1). It also provides service and training and acts as one of the group's production and logistics centres (see act. 1_1). 24

MGI strives to enable effective and affordable healthcare solutions for all. It is a strongly research based company with over 900 employees in multiple research and production bases around the world. One of MGI's research focuses are sequencing platforms. It independently developed a series of new sequencers, which deliver high-quality sequencing data fast and at lower prices than sequencers offered by competitors. In particular, it developed a range of high-throughput genome sequencers, which are attacked by Plaintiff in this lawsuit. For the development of the BGISEQ-500 sequencer, MGI was awarded with the NGS Innovation Developer Technology R&D Outstanding Contribution Award by the NGS Innovation Developers Association. 25

Evidence: Excerpts from the Website of MGI Group http://en.mgitech.cn
(Enclosure 1)

Defendant does not commercialise MGI genome sequencers and related kits in Switzerland. 26

**B.** **Plaintiff did not provide any proof of infringing activities of Defendant (ad act. 1 N 87-92)**

Plaintiff did not provide **any** evidence of infringing acts by Defendant. Its unfounded allegations are contested.

<span style="float:right">27</span>

Plaintiff wrongly asserts that **Defendant** *"distributes the BGI group's sequencing platforms, including, for example, the sequencers BGISEQ-500 and MGISEQ-2000, as well as the sequencing reagent kits adapted for use with these platforms, in Europe, including Switzerland"* (act. 1 N 9). It offers act. 1_5 as evidence in this respect. Act. 1_5 is an excerpt of the website of MGI Tech Co., Ltd. It lists the contact details of the various MGI Tech entities. Defendant is listed here under "Latvia" with only its address and no further information. With no word does act. 1_5 say that Defendant is a distributor in Europe, let alone in Switzerland.

<span style="float:right">28</span>

Plaintiff further submits act. 1_1 and act. 1_13 as evidence for the alleged infringing activity of Defendant (act. 1 at N 87). Again, none of these documents contains even a hint that Latvia MGI Tech SIA could offer the allegedly infringing products in Switzerland or that it cooperates with Swiss entities in this respect.

<span style="float:right">29</span>

Plaintiff also wrongly asserts that Defendant sells the allegedly infringing sequencing reagent kits to customers in Switzerland and asserts that *"at least one MGISEQ-2000 sequencer [...] has been supplied to a customer in Switzerland, the Health 2030 Genome Center at Campus Biotech in Geneva"* (act. 1 N 91). No evidence is offered for these allegations.

<span style="float:right">30</span>

Notably, the mere fact that a MGISEQ-2000 sequencer was seen at a research institution in Geneva does not constitute an infringing act. *First*, Defendant was not involved in any way in the supply of such sequencer to the Health 2030 Genome Center at Campus Biotech and Plaintiff was (thus) not able to show the opposite (see

<span style="float:right">31</span>

above at N 28 *et seqq.*). *Secondly*, the sequencer alone does not infringe any of the invoked patent claims of EP 578 and EP 412.

Plaintiff then wrongly asserts that *"In order to operate this sequencer, Health 2030 Genome Center at Campus Biotech in Geneva, and potential other Swiss operators of BGI/MGI's sequencers, must source the appropriate, infringing sequencing reagent kits from Defendant"*. Again, no evidence is offered in support of this allegation; act. 1_18 only mentions that an Illumina employee has seen an MGISEQ-2000 sequencer at the Health 2030 Genome Center in Geneva. However, Plaintiff does not explain which sequencing reagent kits had been used with the MGISEQ-2000 sequencer in Geneva. The declaration of Plaintiff's Jennifer Mummery (act. 1_18) is also silent in this respect.

32

The Health 2030 Genome Center at Campus Biotech in Geneva also uses Plaintiff's sequencers, as confirmed by act. 1_18. Under such circumstances it could well be that reagent kits of Plaintiff or of a third party supplier were used with the MGISEQ-2000 sequencer, as this would be technically possible. In fact, the sequencing devices of the MGI group can be operated with nucleotides from different manufacturers. These devices are therefore not limited to use with nucleotides produced by MGI.

33

What is more, Plaintiff states that it obtained a BGI sequencing reagent kit that it used for test purposes (act. 1 N 93). However, Plaintiff does not explain where or from whom it obtained such kit. Had Plaintiff obtained such kit in Switzerland or from a source linked to Defendant, it would certainly have stated so. Plaintiff was therefore not able to obtain infringing kits in Switzerland, let alone from a source linked to Defendant.

34

In sum, Plaintiff did not offer **any evidence** for infringing acts in Switzerland. What is more, Plaintiff did not even offer a shred of evidence, which would link *Defendant* to any of the alleged infringing acts in Switzerland.

35

Plaintiff's allegations are wrong and contested by Defendant. Defendant has nothing to do with the sequencer at the Health 2030 Genome Center in Geneva. It did neither provide such sequencer nor does it supply the Health 2030 Genome Center with reagent kits to be used with such sequencer. Defendant is also not involved in any other way in distribution activities for Switzerland. [36]

Evidence:  Andis Slaitis, c/o Latvia MGI Tech SIA, General Manager

(as Witness)

As a consequence, the Complaint must already be dismissed for lack of infringing activities of Defendant. [37]

## C.  The Complaint must be dismissed for Lack of Capacity to be sued of Defendant

As is apparent from the preceding section (N 27 *et seqq.*), Plaintiff wrongly sues Defendant in these proceedings. As explained, Defendant has nothing to do with the MGISEQ-2000 sequencer at the Health 2030 Genome Center at Campus Biotech in Geneva, which in itself does not even infringe the Patents. Defendant did also not provide any reagent kits to the Health 2030 Genome Center. [38]

Hence, even if, *for the sake of argument,* the MGISEQ-2000 sequencer in Geneva constituted infringement when operated with kits developed by MGI, which is contested for the reasons set out further below (see N 50 *et seqq.* and N 360 *et seqq.*), Plaintiff would have sued the wrong party. [39]

Defendant thus lacks the capacity to be sued ("Passivlegitimation") and the Complaint must be dismissed already for this reason. [40]

This brief should thus end here, which is why Defendant requests that a decision on its capacity to be sued shall be made at an early stage before continuing the parties' exchange of arguments on the much more elaborate technical issues of non-infringement of the contested embodiments and the invalidity of the Patents invoked [41]

by Plaintiff. The following observations on the technical reasons for finding non-infringement (starting from N 44 *et seqq.*) are therefore only made out of caution.

**D.  Plaintiff's Action is an Attempt to Discredit Defendant and intimidate the Market**

Not only does Plaintiff sue Defendant for patent infringement without any basis, it also aggressively communicates to the media that it did so. Notably, Illumina issued a press release, which was picked up by various business media, on the day it filed its action with the Federal Patent Court, i.e. long before Defendant was even served with such action. [42]

Evidence:  Illumina Press Release of 28 June 2019, "Illumina Files Patent Infringement Suits Related to BGI in Switzerland, Turkey and the US" (www.illumina.com)
(Enclosure 2)

Business Wire, "Illumina Files Patent Infringement Suits Related to BGI in Switzerland, Turkey and the US", 28 June 2019 (www.businesswire.com)
(Enclosure 3)

Bloomberg, "Illumina Files Patent Infringement Suits Related to BGI in Switzerland, Turkey and the US", 28 June 2019 (www.bloomberg.com)
(Enclosure 4)

Against this background, Plaintiff's unfounded actions are to be seen as an aggressive attempt to discredit Defendant and proactively intimidate the market. Such approach cannot be protected, which is a further reason why an early decision is demanded on Defendant's capacity to be sued at all in the present proceedings. [43]

**E.  Technical Background (ad act. 1 N 10-33)**

The general technical background is correctly summarised in act. 1 N 10-33. However, it is deemed necessary and helpful to provide some more technological [44]

background information pertaining to each patent below in N 97 *et seqq.* and N 343 *et seqq.*, respectively.

## F.    Non-Infringement of EP 578

## 1.    Preliminary remarks

### a)    *Subject matter of EP 578 (ad act. 1 N 36-43)*

EP 578 pertains to modified nucleotide molecules with an allegedly inventive 3'-OH blocking group. It will be shown below that the claimed subject-matter was readily obvious to the skilled person.    45

### b)    *Feature analysis of the claims of EP 578 (ad act. 1 N 44-61)*

The feature analysis of the claims of EP 578 as suggested by Plaintiff in act. 1 N 44 is adopted herein.    46

### c)    *The skilled person*

The skilled person in the case at hand is a biochemist (or chemist specialised in biochemistry), with a university degree and several years of practical experience in the biochemical industry. During his studies, he regularly acquired his own practical experience with classical sequencing methods, such as the Sanger method. He is also aware of the more recent methods and may already have used these during his studies or in his further professional career.    47

The person skilled in the art also has solid chemical knowledge regarding the provision of the corresponding basic building blocks, such as nucleotides and nucleosides. This does not usually occur biochemically, i.e. enzymatically, but rather by means of *classic* synthesis methods of organic chemistry. If necessary, the person skilled in the art will therefore call on the specialist knowledge of an organic chemist    48

in order to clarify detailed questions in connection with the chemical synthesis of nucleotides or nucleosides, or will form a team with such a chemist.

He will in addition consult a mechanical engineer or an engineer with the appropriate training for the automated implementation of the method.

49

## 2. The contested sequencing nucleotides, reagent kits and methods do not infringe EP 578 (ad act. 1 N 93-150)

### a) *Plaintiff used unsuitable testing material*

Plaintiff claims that the BGI Kit (the terminology of Plaintiff is used for convenience reasons), which it obtained and tested, contained the reagents needed for performing SBS on a BGISEQ-500 (act. 1 N 93). Plaintiff only discloses blackened photographs of the package of the tested BGI Kit and of vials contained in it. From this information it is not possible to verify what specific reagents were tested by Plaintiff. Furthermore, it is not possible to verify where the kit was purchased (see in this respect also N 34 above).

50

What is more, pursuant to the photograph included at act. 1 N 99, the expiration date for the tested reagents was "2019-02-01". However, according to the declaration of Mary Dothage of Eurofins EAG Materials Sciences, the BGI Kit to be tested was received by Eurofins only on 1 March 2019 (act. 1_16 at N 7). Act. 1_16 does not specify the date when the tests were performed, but it is clear from this report that further testing material was received only on or about 22 April 2019 (act. 1_16 at N 55) and it thus appears that the relevant tests were performed between the end of April 2019 (see act. 1_16 N 57) and 25 June 2019, which is the date of the test report, act. 1_16. The tests of Eurofins were thus conducted **well after the expiration date for the BGI Kit** of 1 February 2019.

51

Alone for this reason, the tests performed by Eurofins cannot be taken into account at least as far as the BGI Kit is concerned, because material was tested that was no

52

longer intended for use with the relevant sequencers and it cannot be ensured that the properties of the tested product were still intact at the time the tests occurred. Defendant thus objects to the use of act. 1_16 and act. 1_17, which is based on act. 1_16.

b) *Plaintiff wrongly assumes that BGI/MGI kits for all BGI/MGI sequencers rely on the same chemistry (ad act. 1 N 110)*

The BGI Kit tested by Plaintiff is also irrelevant in the present case, because it does not contain reagents that would normally be used with a MGISEQ-2000 sequencer, which is the sequencer apparently used at the Health 2030 Genome Center in Geneva. The BGI Kit is primarily intended for use with BGISEQ-500 sequencers, as indicated on the product label (act. 1 N 93, see also product description on the picture in act. 1 N 99).

53

Plaintiff asserts that all BGI/MGI kits can be used for whatever BGI/MGI sequencers because they allegedly all rely on the same chemistry (act. 1 N 110). While this is technically true, the BGI Kit tested would not normally be used with the MGISEQ-2000 sequencer at the Health 2030 Genome Center in Geneva and Plaintiff has provided no evidence whatsoever that the BGI Kits tested have in fact been used in the MGISEQ-2000 sequencer at the Health 2030 Genome Center.

54

c) *Plaintiff used unsuitable test methods*

Plaintiff has offered the following analysis which should allegedly prove the use of modified nucleotide molecule according to claim 1 of EP 578 (act. 1_16 and act. 1_17):

55

- a "click" chemistry test for determining the presence of azide moieties;

- a comparative LC/MS analysis of the purchased BGI Kit.

This evidence is not convincing.

56

With regard to the "click" chemistry test, this is a test designed to detect the presence of azide moieties. Apart from that, the test does not give reliable indications on the molecule's structure. The test is based on a change of colour of the solution as a result of the presence of Cu(II) triazole complexes. In fact, it is well known that the test does not depend on how the azide moiety is structurally arranged within the molecule of interest. Therefore, the test would give a positive result for countless possible modified nucleotide molecules, e.g. when the azide group would be attached directly to the 3' carbon atom. By no means is the presence of an "-O-Z" structure with Z being $-C(R')_2-N_3$ required for the test to give positive results.

57

With respect to the LC/MS analysis, it shall be noted that act. 1_16 and act. 1_17 offer only rudimentary information on the results of the MS measurements. They may confirm the presence of certain peaks (mass/charge). However, they fail to present the relative abundance of the compared species and the overall results of the spectrum. MS measurements are particularly sensitive and prone to deliver a multitude of peaks of very different abundance. Traces of undefined artefacts resulting from the ionisation process or residues from prior measurements performed on the same device are often discovered in the spectrum. The mere existence of "peaks" at the indicated mass/charge of each dNTP is not convincing to prove the presence of 3-AZM-dNTP.

58

As a result, the test methods used by Plaintiff are not suitable to prove infringement of the patent claims at stake. The relevance, accuracy and conclusiveness of act. 1_16 and act. 1_17 is thus contested.

59

*d)*     ***No direct infringement of claims 1 and 25 by nucleotides and kits***

Other than asserted by Plaintiff, the contested nucleotides do not make use of all features of independent claim 1 of EP 578, and the contested kits therefore do not

60

read on all features of independent claim 25 either. With such result, a discussion of infringement of any of the invoked dependent claims is moot.

Plaintiff's infringement analysis is contested already for the reasons set out above (N 50 *et seqq.*). 61

In addition, Plaintiff wrongly contends that features 1.3.3 and features 1.3.5 need not be realised in the third alternative of feature 1.3.2 (act. 1 N 103). 62

According to Plaintiff's submission in act. 1 N 103 *et seq.*, the contested nucleotides do not comprise an R" protecting group, and they are thus not susceptible for a reaction according to the claim by exchanging each R" for H. 63

Plaintiff simply ignores this fact in its infringement analysis. Plaintiff bases its analysis solely on the third alternative of feature 1.3.2, i.e. the structure $-C(R')_2-N_3$, with the R' of this molecule being a hydrogen atom and there thus being an azidomethyl group $CH_2-N_3$. It then asserts – contrary to patent law – that owing to the lack of a R" group in this molecule, features 1.3.3 and 1.3.5, which precisely require this protecting group, have been realised. The blocking group on the third carbon atom of the sugar is the group $-O-CH_2-N_3$ (feature 1.3). This group has the structure $-O-Z$, with Z being $CH_2-N_3$, feature 1.3.1, i.e. being the azidomethyl group (feature 4). This corresponds to the formula $-C(R')_2-N_3$, feature 1.3.2, third case, where R' is a hydrogen atom, feature 1.3.4a. 64

According to Plaintiff's own submission, a protecting group R" according to EP 578, in which each R" can be replaced by H, does not exist in the contested nucleotides. Consequently, features 1.3.3 and 1.3.5 of claim 1 cannot be realised in the contested nucleotides. 65

As a result hereof, the contested kits also do not infringe the independent claim 25 that relates to the use of nucleotides according to EP 578. 66

*e)* *No contributory infringement of method claims 12 and 17 (ad act. 1 N 132-150)*

Plaintiff's allegation as to indirect infringement of method claims 12 and 17 are contested for various reasons. [67]

*First,* Plaintiff wrongly asserts that Defendant distributes BGI/MGI sequencers and sequencing kits for use with such sequencers in Switzerland. Reference can be made to N 27 *et seqq.* above. Alone for this reason, an indirect infringement of method claims 12 and 17 is excluded. [68]

*Secondly,* Plaintiff did not show that the Health 2030 Genome Center in Geneva or any other party in Switzerland uses a BGI/MGI sequencer *with BGI/MGI reagent kits* (see above at N 33 et seq.). As explained above, the sequencing devices of the MGI group can be operated with nucleotides from different manufacturers. These devices are therefore not limited to use with nucleotides produced by MGI. [69]

*Thirdly,* it is not correct that the BGI/MGI Kits cannot be used for any other purposes. The BGI/MGI Kits can also be used for DNA synthesis. The nucleotides could also be an intermediate product in the synthesis of alternative modified nucleotides in circumstances where the chemistry required protection of the 3'-OH group to prevent its modification. [70]

As a result, already for these reasons, there is no contributory infringement by Defendant of method claims 12 and 17 of EP 578. [71]

*f)* **Conclusions**

Plaintiff has neither shown any infringing acts of Defendant (see above at N 27 *et seqq.*) nor that the contested embodiments make use of all of the features of independent device claims 1 and 25 of EP 578 or that they constitute means suitable for being employed for the use of the subject matter of independent method claims 12 and 17. Also for these additional reasons, there is thus no infringement of EP 578. [72]

### 3. EP 578 was erroneously upheld in opposition proceedings

EP 578 had been subject to European opposition proceedings, in which it was maintained as granted by an Opposition Division (OD). Due to the withdrawal of the appeal when summons to oral proceedings had already been issued, the Board of Appeal did not get the chance to correct the (erroneous) first instance decision. [73]

Evidence:  Interlocutory decision of the OD re EP 578, dated 9 December 2015
(Enclosure 5)

Opponent's withdrawal of the appeal, dated 26 July 2017
(Enclosure 6)

Notification of termination of appeal proceedings, dated 2 August 2017
(Enclosure 7)

Defendant therefore deems it appropriate to identify and correct the errors in the decision of the OD in so far as they are relevant for the arguments put forward in the present proceedings. This concern in particular the statements made by the OD with regard to **inventive step** as set forth in N 281 *et seqq.*, N 304 *et seqq.* and N 315 *et seqq.* in more detail. [74]

In brief, opponent in those proceedings based its attack on inventive step *inter alia* on *Ju et al.* as the closest prior art, which was referred to in the opposition proceedings as *D9*. As a further document, *D1* (WO 01/92284) was consulted as closest prior art. Opponent argued that the teaching according to the claim was rendered obvious solely on the basis of *Ju et al.*, but in any case on the basis of the combination of *Ju et al.* with one of documents *D10* (*Oksman et al.* (1992)), *D11* (*Zavgorodny et al.* (2000)) and *D12* (*Zavgorodny et al.* (2000)). The latter disclose the azidomethyl protecting group according to EP 578, albeit only in the context of 3'-modified nucleosides. [75]

Evidence:  *Ju et al.*, WO 02/29003
[*D9* in EPO opposition proceedings]
(Enclosure 8)

*Odedra et al.*, WO 01/92284
[*D1* in EPO opposition proceedings]

(Enclosure 9)

*Oksman et al.* (1992), Solution conformations and hydrolytic stability of 2'-and 3'- substituted 2',3'-Dideoxyribonucleosides, including some potential inhibitors of human immunodeficiency virus; J. Phys. Org. Chem. Vol. 5, pp 741-747
[*D10* in EPO opposition proceedings]

(Enclosure 10)

*Zavgorodny et al.* (2000), S,X-Acetals in nucleoside chemistry: Synthesis of 2'- and 3'-O-Azidomethyl derivatives of ribonucleosides; Nucleosides, Nucleotides and Nucleic Acids, 19(10-12), pp 1977-1991
[*D11* in EPO opposition proceedings]

(Enclosure 11)

*Zavgorodny et al.* (1991), 1-Alkylthioalkylation of Nucleoside Hydroxyl Functions and Its Synthetic Applications: A New Versatile Method in Nucleoside Chemistry; Tetrahedron Letters, Vol. 32, No. 51, pp 7593-7596
[*D12* in EPO opposition proceedings]

(Enclosure 12)

In the opinion of the OD, the skilled person would not have arrived at the protected nucleotides according to claim 1 of EP 578 when starting from *Ju et al.* (see Enclosure 5, section 7.1). He would in particular not have arrived at these nucleotides since – contrary to the opinion of opponent – D9 does not disclose a mild deprotection method, but is rather "silent" in this respect (see Enclosure 5, section 7.1, page 17, fifth paragraph): [76]

> *"D9 is silent about how to proceed with the removal of the blocking group."*

If at all, it was stated by the OD, *Ju et al.* discloses a deprotection method in a medium containing an organic solvent (see Enclosure 5, section 7.1, page 17, third paragraph): [77]

> *"However, the opposition division considers that D9 (figure 14) teaches the removal of the protecting groups in*

19

> *an organic solvent-comprising medium by using a*
> *complex multi-step procedure disclosed in D2."*

The OD was of the view that in contrast to *Ju et al.*, the deprotection in EP 578 [78]
succeeds without denaturing the DNA. Based on *Ju et al.*, the OD therefore defined
the technical problem to be solved as follows (see Enclosure 5, section 7.1, page 17,
fifth paragraph; emphasis added):

> *"Therefore, the problem to be solved is considered to be*
> *the provision of compounds with improved properties*
> *which could be incorporated and wherein the **blocking***
> ***group could also be removed without denaturation of the***
> ***DNA."***

The OD furthermore deals with the warning of *Ju et al.* to use protecting groups with [79]
ester and keto functions. It interprets this with reference to document *D18* to the
effect that *Ju et al.* almost teaches away from using protecting groups with an azido
function (see Enclosure 5, page 17, final paragraph, to page 18, line 3; emphasis
added):

> *"[Ju et al.] (page 6 lines 10-14) states that chemical*
> *groups with electrophiles such as keto groups are not*
> *suitable for protecting the 3'-OH of the nucleotide in*
> *enzymatic reactions due to the existence of strong*
> *nucleophiles in the polymerase. Thus, [Ju et al.] **teaches***
> ***away from using electrophiles of any strength (which***
> ***includes azido groups) as protecting groups.** Furthermore*
> *D18 (bottom of page 10863, column 1) informs the skilled*
> *person that **azido groups as moieties that would***
> ***experience the same cleavage effect as carbonyls and***
> ***that cleavage of azidos has actually been observed in***
> ***vivo."***

Evidence:    *Canard et al.,* 1995, Proc. Natl. Acad. Sci. USA, 92: 10859-10863
             [*D18* in EPO opposition proceedings]

                                                    (Enclosure 13)

*D1* (Enclosure 9), which was also taken as the closest prior art, only discloses [80]
enzymatic cleavage at 37°C in Example 8 (c) (see Enclosure 5, page 18, fifth

paragraph). The resulting technical problem was therefore essentially the same as already formulated with regard to *Ju et al.* (see <u>Enclosure 5</u>, page 18, seventh paragraph; emphasis added):

> *"The objective technical problem to be solved in light of D1 [Enclosure 9] is therefore the provision of an improved 3'-OH blocked nucleotide which is suitable for use in a polymerase reaction under mild neutral aqueous conditions, such that they do not cause damage to the polynucleotide structure."*

The OD obviously deemed the "promise" of the teaching according to EP 578, i.e. that deprotection of the 3'-protecting group would be possible under **mild conditions in an aqueous medium without denaturing the DNA** into the two individual strands, to be the decisive technical effect. In the opinion of the OD, the technical problem was "**plausibly**" solved; moreover, it was stated, there was nothing which would have motivated the skilled person to use the protecting groups disclosed for nucleosides in documents *D10* to *D12* also for nucleotides within the framework of the SBS (see <u>Enclosure 5</u>, page 18, eighth paragraph; emphasis added): 81

> *"It is plausible to assume, that this problem is solved and there are no indications which would have led the skilled person to consider to use the teaching of D10-D12 (also in light of D23, D25 and D20) which concerns **nucleosides** to the teaching of D1 and arrive to the subject-matter of the opposed patent."*

The erroneous decision of the OD to acknowledge non-obviousness is therefore based on the following four key assumptions: 82

(1) The prior art does not provide any motivation to use the azidomethyl function explicitly mentioned in documents *D10* to *D12* (<u>Enclosures 10 to 12</u>) as a protecting group for 3'-modified nucleosides also for SBS-compatible nucleotides. 83

As will be shown in detail below, N 91 *et seqq.*, this key assumption lacks any basis. [84]

(2) The objective technical problem of being able to carry out deprotection under **mild conditions in an aqueous medium without denaturing the DNA** is **"plausibly"** solved with the provision of the azidomethyl protecting group. [85]

As will be shown in detail below, N 281 *et seqq.*, this key assumption is equally baseless. [86]

(3) *Ju et al.* only discloses the deprotection by means of a complex multi-stage process in the organic medium. [87]

As will be shown in detail below, N 304 *et seqq.*, this key assumption is also false. [88]

(4) *Ju et al.* teaches away from the teaching according to the EP 578 since the warning issued therein not to use any ester or keto functions for the 3'-protecting group applies to all electrophilic groups, including the azido function. [89]

As will be explained in detail below, N 315 *et seqq.*, this key assumption is equally incorrect. [90]

## 4. EP 578 is invalid for lack of inventive step

The subject matter of independent claims 1, 12, 17 and 25 of EP 578 as asserted in the present infringement proceedings is not based on an inventive step in light of the prior art submitted herewith. This equally applies to the dependent claims of EP 578, which have been asserted by Plaintiff. [91]

The prior art that already described sequencing methods in detail can be considered as relevant prior art for the examination of inventive step. In particular, *Ju et al.* is a reasonable starting point for the skilled person and will be discussed as closest prior [92]

art hereinbelow. EP 578 is not based on an inventive step in view of a combination of *Ju et al.* with *Zavgorodny et al.* (1991).

In the following, we will demonstrate invalidity of EP 578 first with regard to claim 1 (N 94 *et seqq.*) and then with regard to the further asserted claims (N 258 *et seqq.*).

93

*a)* **Tsien et al. discloses the basic principles of SBS**

More than 10 years before the filing of EP 578, *Tsien et al.* described the basic principles of the SBS method (see <u>Enclosure 14</u>, page 7, line 34, to page 8, line 14):

94

> *"In one aspect, the present invention provides a method for determining the deoxyribonucleotide sequence, of a single stranded DNA subject molecule. This method involves synthesizing, in the presence of a multitude of identical copies of the subject DNA, the DNA molecule which is complementary to it. This synthesis is carried out using deoxyribonucleotide triphosphates (dNTP) in a stepwise serial manner so as to simultaneously build up numerous copies of the complementary molecule, dNTP by dNTP. As each dNTP is added to the growing complementary molecules, it is identified by way of an appropriate label (i.e., reporter group). By noting the identity of the bases present in this complementary molecule and using standard rules of DNA complementation, one can translate from the complementary molecule to the corresponding original subject molecule and thus obtain the deoxyribonucleotide sequence of the subject molecule."*

<u>Evidence:</u>　　*Tsien et al.*, WO 91/06678
　　　　　　　　[D25 in EPO opposition proceedings]

(Enclosure 14)

Of central importance to the SBS method described in *Tsien et al.* is the provision of a nucleotide protected at the 3'-position of the ribose moiety. This is supposed to ensure that the incorporation occurs in a controlled manner, i.e. the reaction does not

95

continue before the incorporated base has been identified (see Enclosure 14, page 12, lines 22 to 29; emphasis added):

> *"In practice, the polymerase and the four labeled dNTPs are added to the reaction zone 14 under conditions adequate to permit the enzyme to bring about addition of the one, and only the one, of the four labeled blocked dNTPs which is complementary to the first available template nucleotide following the primer. The blocking group present on the 3'-hydroxyl position of the added dNTP prevents inadvertent multiple addition."*

i) **SBS method according to *Tsien et al.***

As polymerases suitable for the incorporation of the nucleotide, *Tsien et al.* mentions *inter alia* some of the enzymes cited in EP 578, in particular (see Enclosure 14, page 19, lines 9 to 18; emphasis added):   96

> *"Sequenase™ enzyme (an enzyme derived from bacteriophage T 7 DNA polymerase that is modified to improve its sequencing properties - see Tabor and Richarson, Proc. Nat. Acad. Sei. USA, 84:4767-4771 (1987)—sold by United States Biochemical Corporation, 15 Cleveland, Ohio).*
>
> *Other polymerases which can be used instead of Sequenase™ include but are not limited to **Klenow fragment of DNA polymerase I, AMV reverse transcriptase, and Taq polymerase.**"*

The incorporation reaction must be carried out under the known reaction conditions which are best suited for the polymerase used (see Enclosure 14, page 19, lines 19 to 20). Representative conditions with regard to buffer composition, temperature, duration, etc., are given, for example, for the sequenase and Klenow fragment on page 19 from line 20 to page 20, line 11 of Enclosure 14.   97

*Tsien et al.* also recommends with regard to the polymerase reaction:   98

> *"When other enzymes are employed, one should use the conditions optimal for them since it is generally desirable to run the addition reaction as quickly as possible. To this end, it is often desirable to use temperatures of 42°C for reverse transcriptase; 24°C for Klenow polymerase; 37°C TM o with Sequenase and 72° C with Taq polymerase. In addition, to force the reaction, especially with derivatized dNTP's it may often be helpful to use substantial excesses (over stoichiometry) of the dNTP's, or to modify other conditions such as the salt concentration."*

*Tsien et al.*'s recommendations are largely trivial. The skilled person knows that a certain salt concentration is essential for the stability of double-stranded DNA in solution. The repulsion of the two strands due to the negative charges of the phosphate backbone exceeds the attractive interactions of the base pairs and can lead to a separation of the double helix into the single strands. This process is also referred to as "denaturation". This is prevented by cations in the solution which neutralise the negative charges of the phosphate groups in the backbone. As a rule, KCl or NaCl in a concentration of 10 to 200 mM is used for this purpose.  99

Following identification of the incorporated base, the 3'-protecting group is cleaved off such that the polymerase, in a new cycle, can attach the next nucleotide with a base complementary to the DNA to be sequenced (see <u>Enclosure 14</u>, page 13, lines 14 to 16):  100

> *"In the next step, a reaction is carried out to remove the blocking group and label from the 3' position on the first deoxynucleotide triphosphate"*

The cycle comprising 1) incorporating the nucleotide; 2) identifying the base; and 3) cleaving the 3'-protecting group is repeated until the DNA to be analysed or at least a portion thereof is sequenced.  101

## ii)    Selection criteria for the protecting group

A decisive criterion for the usability of the 3'-protecting group for the SBS is that it can be cleaved off again without affecting the overall reaction over all synthesis and sequencing cycles. Such "reversible" protecting groups for OH groups and corresponding blocking and deprotection methods are known to the person skilled in the art and are common general knowledge; see, for example, the textbook *Greene and Wuts* (1999), which is also cited in EP 578 itself (see paragraph [0090] thereof).

102

Evidence:    Exhibits from Greene and Wuts, Protective Groups in Organic Synthesis; Wiley and Sons (1999)
[*D16* in EPO opposition proceedings]

(Enclosure 15)

It goes without saying that not all of the hydroxyl protecting groups cited as examples in *Greene and Wuts* can be used in the context of SBS, even if they are reversibly removable. *Tsien et al.* were aware of this, which is why they already provided the skilled person with specific indications for the selection of suitable protecting groups (see Enclosure 14, page 20, line 28, to page 21, line 3):

103

> "*The criteria for the successful use of 3'-blocking groups include:*
>
> (1)  *the ability of a polymerase enzyme to accurately and efficiently incorporate the dNTPs carrying the 3'-blocking groups into the cDNA chain,*
>
> (2)  *the availability of mild conditions for rapid and quantitative deblocking, and*
>
> (3)  *the ability of a polymerase enzyme to reinitiate the cDNA synthesis subsequent to the deblocking stage*"

The significance of these criteria is emphasised again at the bottom of page 21 of *Tsien et al.* (see Enclosure 14, page 21, lines 9 to 13):

104

> "For the present invention, 3'-blocked dNTPs are used
> that can be incorporated in a template-dependent fashion
> and easily deblocked to yield a viable 3'-OH terminus."

In the following, *Tsien et al.* lists already known protecting groups for the OH [105]
function at the 3'-position of the nucleotide (see <u>Enclosure 14</u>, page 21, lines 13 to
19):

> "The most common 3'-hydroxyl blocking groups are esters
> and ethers. Other blocking modifications to the 3'-OH
> position of dNTPs include the introduction of groups such
> as -F, -NH 2 , -OCH 3 , -N 3 , -OPO 3- , -NHCOCH 3 , 2-
> nitrobenzene carbonate, 2,4-dinitrobenzene sulfenyl and
> tetrahydro-furanyl ether. Incorporation and chain
> termination have been demonstrated with dNTPs
> containing many of these blocking groups (Kraevskii et
> al., 1987)."

*Kraevskii et al.* (1987) had already shown for some of these protecting groups that [106]
nucleotides blocked therewith at the 3'-position are incorporated by polymerases into
an oligonucleotide strand, whereupon the polymerase chain reaction is interrupted.
The modified nucleotides in question thus act as "terminators" for further nucleotide
incorporation. Reference is made to Table 1 of *Kraevskii et al.* in this respect.

Evidence:     *Kraevskii et al.* (1987), ISSN 0026-8933, pp. 25-29

(Enclosure 16)

Table 1 of *Kraevskii et al.* shows the incorporation with selected DNA polymerases [107]
into the oligonucleotide strand and subsequent termination for a series of 3'-modified
nucleotides from different organisms. The tested terminator substrates include at the
3'-position nucleotides, modified inter alia with -F, -NH2, 3'-OMe, and -N3 (see
<u>Enclosure 16</u>, page 27, final paragraph).

As is immediately apparent to the skilled person owing to the chemical nature of the [108]
protecting groups, *Tsien et al.* – as far as it is refered to *Kraevskii et al.* – does not
initially make a distinction between reversible groups, i.e. such from which the
unprotected OH function can be released again, and non-reversible groups, but

merely lists known terminators of the polymerase chain reaction. This does not come as surprise since, at the time of *Tsien et al.*, SBS had only just been developed and the reversibility of the protecting group was not decisive in the known sequencing methods such as the Sanger method.

For example, of the protecting groups cited in *Tsien et al.* on page 21, lines 15 to 17, at least -F, -NH$_2$ , or -N$_3$[1] are not cleavable or can only be cleaved with difficulty under SBS-compatible conditions, and are therefore not suitable for use in this new sequencing method. In the following, however, *Tsien et al.* then turn to the protecting groups suitable for SBS, i.e. those that can be expeditiously and quantitatively deprotected under mild conditions in accordance with selection criterion (2); see N 103, above.

109

### iii) Deprotection reaction must not interfere with the DNA polymerase reaction

According to *Tsien et al.*, the deprotection procedure should meet the following criteria (see Enclosure 14, page 23, line 33, to page 24, line 2):

110

> *"(a) proceed rapidly,*
>
> *(b) yield a viable 3'-OH function in high yield, and*
>
> *(c) not interfere with future enzyme function or denature the DNA strand."*

Criterion (c) is of particular importance for the SBS method. All polymerases used for SBS require a double-stranded oligonucleotide to resume chain extension. This consists of a duplex of the primer to be extended with a target or matrix strand whose DNA sequence is to be determined.

111

---

[1] It is noted that in the case of *Tsien et al.* (Enclosure 14) and *Kraevskii et al.* (Enclosure 16) the azido group is located directly on the 3'-carbon atom of the ribose moiety. The 3'-oxygen atom is thus no longer present (also referred to as "3'-deoxy"). For example, the compound "3'-azidothymidine" is therefore often referred to as 3'-deoxy-3'-azidothymidine. The chemical properties of this group thus fundamentally differ from those of the azidomethyl group -CH$_2$-N$_3$ according to the patent (see claim 4), which is linked to the 3'-carbon via the remaining oxygen atom. Whereas the 3'-azido group is not reversibly cleavable, this can be easily achieved with the azidomethyl function (–O-CH$_2$-N$_3$) under mild conditions (see *Zavgorodny et al.* (1991), Enclosure 12).

If the primer/matrix duplex is separated, the chain extension cannot be continued. This also compromises sequencing -- unless appropriate measures are taken to prevent the complementary single strands from separating in the first place or to ensure that they can at least be reunited, for example with the help of the "hairpin" technology (see below, N 165 *et seqq.*).

112

The issue of a possible separation of the double-stranded oligonucleotide -- also referred to as the "denaturation" of the DNA -- can occur at all levels of SBS, but manifests itself in particular in the deprotection reaction.

113

As explained above, after successful incorporation and identification of a 3'-protected nucleotide into the oligonucleotide, the protecting group must be cleaved off again, providing a free OH function. The individual steps are usually carried out under different reaction conditions: The conditions of the polymerase reaction (temperature, pH, buffer composition, etc.) are determined by the properties of the polymerase used. The reaction conditions of the deprotection process, on the other hand, result from the chemical nature of the protecting group used (see Enclosure 14, page 24, lines 3 to 5).

114

The reaction solutions must therefore be exchanged between the individual steps. In particular, the deprotection reagent must be completely removed. If this were carried over into the subsequent polymerase step, the added 3'-modified nucleotides could be deprotected prematurely. In this case, the polymerase would uncontrollably incorporate further nucleotides, making sequencing impossible.

115

The DNA is immobilised beforehand on a solid surface in the reaction chamber so that it is not washed away when the reaction solutions are changed or during intermediate rinsing processes. This "solid surface" can, for example, be provided in the form of microbeads, which are mechanically retained in the chamber even when reaction or rinsing solutions flow through or are exchanged. An embodiment of DNA immobilisation is schematically shown in Fig. 1A of *Tsien et al.* and is described in

116

more detail on page 9, line 27, to page 10, line 14, and page 32, line 10 *et seqq.* of Enclosure 14:



According to alternative 1A, a single-stranded primer (4) at its 5' end is first immobilised on the surface of microbeads (1) using known methods via linker groups A - X (2). The double-stranded duplex of immobilised primer (5) and target DNA to be sequenced (6) is then formed by a DNA oligonucleotide (8') complementary to the primer and ligated to the target DNA. After each cycle, the primer was extended by exactly one nucleotide (11 after the first cycle, 12 after the second cycle, etc.).

117

In the alternative according to Fig. 1B, immobilisation is reversed, i.e. the target DNA is immobilised first, and the primer then binds thereto. This makes no difference for the SBS.

118

It is immediately clear from the above N 116 diagram what consequences a [119] denaturation of the primer/target DNA duplex can have during the deprotection reaction: If the two strands are no longer reunited, the target DNA is washed away when the deprotection solution is removed in alternative 1A; in alternative 1B, the extended primer is also washed away. In both cases, this would lead to a termination of the SBS.

This circumstance is taken into account in particular by criterion (c) above, according [120] to which the deprotection reaction should not interfere with the enzyme function in the subsequent incorporation step or should not denaturate the DNA, or must be prevented with suitable countermeasures.

*Tsien et al.* cites "esters" and "ethers" as specific examples of protecting groups for [121] the 3-hydroxyl group of the nucleotide which are reversible and can thus be used in accordance with the invention, and which meet the above criteria (see Enclosure 14, page 21, lines 9 to 28; emphasis added):

> *"Presently preferred embodiments focus on the ester blocking groups such as lower (1-4 carbon) alkanoic acid and substituted lower alkanoic acid esters, for example formyl, acetyl, isopropanoyl, alpha fluoro- and alpha chloroacetyl esters and the like; ether blocking groups such as alkyl ethers; phosphate blocking groups; carbonate blocking groups such as 2-nitrobenzyl; 2,4-dinitrobenzene-sulfenyl and tetrahydrothiofuranyl ether blocking groups."*

Diagram I in Fig. 5 shows, for example, the use of an acetyl function as a protecting [122] group for the 3'-OH of the nucleotide. The protected nucleotide is thus an acetate ester. Diagram II in Fig. 6 sketches the formation of an accordingly protected phosphate ester.

However, the wording *"Presently preferred embodiments"* indicates that *Tsien et al.* [123] in no way deems the possibilities to be exhausted, but rather provides encouragement to look for further, possibly even more advantageous alternatives. The deprotection

method must hereby also be taken into consideration. Depending on the chemical nature of the protecting group, in particular as regards the electronegativity of the substituents in the protecting group, different conditions are required for the cleavage thereof.

In the worst case, these can lead to premature deprotection in groups that can be too "easily" cleaved. The reason for this is that if a complete or partial deprotection already occurs under the almost neutral conditions during the enzymatic polymerase reaction, it is no longer interrupted. As a consequence, an uncontrolled further incorporation of nucleotides occurs, which makes sequence determination impossible.

Conversely, conditions that are too harsh can lead to denaturation, i.e. separation of the formed double-stranded oligonucleotide into the two single strands, during deprotection. This can be the case, for example, if the pH is too high or if the temperature is too high, i.e. above the melting point[2] of the oligonucleotide, during the deprotection.

*Tsien et al.* attempt to circumvent these problems by proposing protecting groups which, instead of base-catalysed hydrolysis, can also be cleaved off again via selective deprotection processes. These precisely defined reaction conditions permit a selective cleaving off of the protecting group, by which the above-mentioned side reactions should be largely avoided during sequencing (see <u>Enclosure 14</u>, page 24, lines 24 to 28):

> *"A wide variety of hydroxyl blocking groups are cleaved selectively using chemical procedures other than base hydrolysis. 2,4-Dinitrobenzenesulfenyl groups are cleaved rapidly by treatment with nucleophiles such as thiophenol and thiosulfate (Letsinger et al., 1964)."*

124

125

126

---

[2] Melting point [$T_m$, $t_m$]: the temperature, in °C, at which 50 % of a double-stranded nucleic acid is denatured into the single-stranded form.

A chemical deprotection method is described in Example 5 on page 38 of *Tsien et al.* [127] A 2,4-dinitrobenzenesulfenyl protecting group is hereby removed under mild conditions in 0.1 M pyridine/pyridinium chloride buffer (pH 7.8), i.e. an aqueous medium, for one minute at 40°C. Thiourea (MG 76.1) in a concentration of 0.05 M (3.8 g/l) is thereby used as the selective deprotection agent. The solubility of thiourea in water at 20°C is 137 g/l; i.e. the deprotection agent is completely dissolved in the aqueous buffer at the concentration used.

Example 5 shows that deprotection with a water-soluble deprotection agent in an [128] aqueous medium can be carried out under mild and almost neutral conditions. This also ensures the solubility of the DNA, which is not denatured.

Accordingly, certain allyl ethers can also be selectively cleaved into acetone / water [129] with Hg(II) (see Enclosure 14, page 24, lines 29 to 30). Tetrahydrothiofuranyl ethers can be removed under neutral conditions using Ag(I) or Hg(II) (see Enclosure 14: page 24, lines 31 to 33). On page 24, line 33, to page 25, line 3, *Tsien et al.* again summarises the advantages of a selectively cleavable 3'-protecting group as follows:

> *"These protecting groups, which are stable to the conditions used in the synthesis of dNTP analogues and in the sequence incorporation steps, have some advantages over groups cleavable by base hydrolysis - deblocking occurs only when the specific deblocking reagent is present and premature deblocking during incorporation is minimized."*

The term "selective" in the context of a reversible protecting group for SBS implies [130] that this should at least meet the following criteria:

1)    No premature cleavage under the physiological conditions of enzymatic incorporation into the oligonucleotide;

2)    no unwanted deprotection already during the organic-chemical new synthesis of the nucleotide;

3)  the reaction conditions during deprotection do not lead to DNA denaturation or precipitation.

*Tsien et al.* proposes enzymatic (see <u>Enclosure 14</u>, page 25, line 13; page 39, Example 6) and photochemical (see <u>Enclosure 14</u>, page 25, line 4) cleavage as further alternatives for selective deprotection methods and corresponding protecting groups. [131]

iv)  **Introduction of the 3'-protecting group occurs at the nucleoside stage**

According to *Tsien et al.*, the premature cleavage of the 3'-protecting group can be prevented or at least minimised when deprotection occurs selectively, i.e. deprotection only takes place if the specific deprotection reagent is present. As mentioned above, this applies not only to the incorporation of the protected nucleotide into the oligonucleotide strand during SBS, but also to the production of the protected nucleotide per se. [132]

A further advantage of a selective deprotection reaction is thus that an undesired cleavage of the protecting group already during the usually multi-stage chemical synthesis of the nucleotide can be avoided. This is all the more true if the protecting group is already introduced at an early stage of synthesis. For this purpose, the protecting group must be selected such that the specific conditions of the deprotection reaction do not conflict with the conditions of the individual synthesis steps. [133]

Synthesis methods for the production of protected and possibly labelled nucleotides for use in enzymatic DNA sequencing methods such as Sanger and SBS were common general knowledge on the priority date of EP 578. The general methods described in *Tsien et al.* for the production of 3'-protected nucleotides via several intermediate stages also make use of the known methods, i.e. the reaction conditions are known. [134]

It is therefore easily possible for the skilled person to further restrict the list of [135] possible OH protecting groups to those having deprotection conditions which do not conflict with the conditions during SBS, in particular during enzymatic incorporation and subsequent deprotection, but also not with the reaction conditions during the chemical synthesis of the nucleotides. This becomes clear from the examples of *Tsien et al.*:

Fig. 5 of *Tsien et al.* (Scheme I) schematically shows, starting from a nucleoside with [136] a free 3'-hydroxl group, the multi-stage synthesis of a nucleotide protected by a 3'-actetyl group. The method is described in more detail on page 22, first paragraph, of *Tsien et al.* and essentially follows known methods – as is immediately apparent from the literature cited in this paragraph.

## FIG. 5



| | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| $R_1$ | DMT | DMT | H | $PO_3H_2$ | $P_3O_9H_4$ |
| $R_2$ | H | $COCH_3$ | $COCH_3$ | $COCH_3$ | $COCH_3$ |

SCHEME I

It is immediately apparent that the 3'-actelyl group ($R_2 = COCH_3$) is already [137] introduced at stage 3 of the chemical synthesis. The introduction of the phosphate groups at the 5'-position occurs later, namely at stage 5, with formation of the nucleoside monophosphate ($R_1 = PO_3H_2$), and stage 6, after addition of two further phosphate groups, to obtain the nucleoside triphosphate ($R_1 = P_3O_9H_4$) as the end product.

The same applies when phosphate is used as the 3'-protecting group (see the detailed synthesis instructions in Example 1 and Fig. 6 (Scheme II) and Fig. 7). Example 2 describes the synthesis of a further 3'-protected nucleotide (compound VIII in Fig. 8), with this protecting group simultaneously serving as a label for identifying the incorporated base. Here again, the 5'-phosphate groups are introduced after the 3'-protecting group during the final stages of synthesis.

138

The early incorporation of the 3'-protecting group during chemical nucleotide synthesis – at least in the sense that this should take place before the introduction of the 5'-phosphate groups – is advantageous in particular for the following reasons:

139

1)  5'-phosphate derivatives of nucleosides are often unstable, and should thus be introduced as late as possible in the synthesis pathway, possibly only just before the actual use of the nucleotides for SBS analysis (see Enclosure 14, page 22, lines 20 to 24).

140

2)  A multiply negatively charged grouping is introduced with the triphosphate, i.e. a "salt" is formed. In order to keep this in solution, aqueous conditions are necessary, and these are detrimental to the chemical reactions during multi-stage nucleotide synthesis that are usually carried out in organic solvents.

141

3)  The purification of intermediates with multiply negatively charged phosphate groups is more difficult since ion exchange chromatography is required therefor. This is accompanied by higher yield losses. Moreover, ion exchange chromatography takes place in an aqueous environment (see Enclosure 14, page 36, lines 13 to 17) while most synthesis steps take place in organic solvents. This requires switching between organic solvents and aqueous buffer solutions with dissolved salts, which is cumbersome and also leads to higher yield losses.

142

It is therefore obvious to provide for the introduction of the 5'-phosphate groups at as late a stage of the synthesis pathway as possible, at least for nucleotide production

143

beyond the laboratory scale. Conversely, this means that the introduction of the 3'-protecting group should take place at an early stage of the overall synthesis. EP 578 does not do anything different. In all of the examples, the 5'-phosphate groups are introduced as the last step and thus after the 3'-protecting group (in this case azidomethyl) (see Enclosure 14, paragraph [0123], reaction (5); paragraph [0143], reaction (23); paragraph [0151], reaction (31)).

For the chemical synthesis of the 3'-protected nucleotides, *Tsien et al.*, in combination with common general knowledge, thus teaches to introduce the 3'-protecting group at an early stage, in any case before the 5'-phosphate groups. This further restricts the possible selection of protecting groups to those with deprotection conditions that are as selective as possible, which do not conflict with subsequent chemical synthesis steps.

144

As explained above, the term "nucleoside" refers to precursors of nucleotides that do not yet have 5'-phosphate groups. The early introduction of the protecting group before the 5'-phosphate groups proposed by *Tsien et al.* therefore means that the respective precursor is present as a nucleoside and is not yet a nucleotide.

145

It can be concluded herefrom that when searching for alternative protecting groups, the skilled person will primarily concentrate on the corresponding literature regarding the chemical synthesis of nucleosides and not so much on nucleotides.

146

b)    *Ju et al. as closest prior art*

*Ju et al.* – WO 02/29003 (Enclosure 8) – discloses an SBS method for DNA sequencing which uses the same biochemical principles as *Tsien et al.* – WO 91/06678 (Enclosure 14) – and also EP 578. *Ju et al.* was published shortly before the priority date of EP 578 and therefore takes into account further developments made in the SBS since *Tsien et al.* This publication was also acknowledged in EP 578 itself (see paragraphs [0008] to [0012]) and is therefore particularly suitable as a starting point for the assessment of inventive step.

147

37

*c)*    *The skilled person's approach towards a protecting group*

**i)**    **Criteria of use for the protecting group**

The SBS method of *Ju et al.* also makes use, as does *Tsien et al.*, of a protecting group shielding the 3'-position on the ribose moiety in order to first interrupt the chain extension of the oligonucleotide to identify the incorporated base. The OH protecting group is then cleaved off so that the polymerase can incorporate the next nucleotide into the DNA strand (see Enclosure 8, page 5, lines 5 to 19): [148]

> *"The approach disclosed in the present application is to make nucleotide analogues by linking a unique label such as a fluorescent dye or a mass tag through a cleavable linker to the nucleotide base or an analogue of the nucleotide base, such as to the 5-position of the pyrimidines (T and C) and to the 7-position of the purines (G and A), to use a small cleavable chemical moiety to cap the 3'-OH group of the deoxyribose to make it nonreactive, and to incorporate the nucleotide analogues into the growing DNA strand as terminators. Detection of the unique label will yield the sequence identity of the nucleotide. Upon removing the label and the 3'-OH capping group, the polymerase reaction will proceed to incorporatethe next nucleotide analogue and detect the next base."*

*Ju et al.* also mention criteria that must be met by the 3'-protecting group in order to be usable for SBS (see Enclosure 8, page 25, line 28, to page 26, line 2): [149]

> *"Any chemical group could be used as long as the group*
>
> *1)   is stable during the polymerase reaction,*
>
> *2)   does not interfere with the recognition of the nucleotide analogue by polymerase as a substrate, and*
>
> *3)   is cleavable."*

On page 42 of *Ju et al.* the authors summarise the "fundamental requirements" for the success of the SBS once again (see <u>Enclosure 8</u>, page 42, first paragraph; emphasis added):

> *"The fundamental requirements for such a system to work are:*
>
> *(1) the availability of 4 nucleotide analogues (aA, aC, aG, aT) each labelled with a unique label and containing a chemical moiety capping the 3'-OH group;*
>
> *(2) the 4 nucleotide analogues (aA, aC, aG, aT) need to be efficiently and faithfully incorporated by DNA polymerase as terminators in the polymerase reaction;*
>
> *(3) the tag and the group capping the 3'-OH need to be removed with high yield to allow the incorporation and detection of the next nucleotide; and*
>
> *(4) the growing strand of DNA should survive the washing, detection and cleavage processes to remain annealed to the DNA template."*

[151] Unsurprisingly, *Ju et al.*'s criteria largely coincide with those of *Tsien et al.* (see above, N 103). They confirm and supplement *Tsien et al.*'s criteria to the effect that the protecting group should not be cleaved off prematurely during the polymerase reaction and should not interfere with the recognition of the modified nucleotides as a substrate for the polymerase.

[152] On page 4 *et seqq.*, *Ju et al.* explain the requirements to be met by the protecting group for SBS in more detail and highlight two criteria in particular, which we will discuss further below:

a)    the **small dimension** of the protecting group,

b)    the **absence of** an **ester or keto function** adjacent to the 3'-oxygen atom.

ii)     **Small dimension of the protecting group**

At the time of *Ju et al.* it was known that 3'-modified nucleotides of polymerases     153
were incorporated with varying success into an oligonucleotide. The reason was
assumed to be that the 3'-position at the ribose moiety of the nucleotide is close to the
amino acids of the active centre of the polymerase during the incorporation reaction.
This increases the sensitivity of the polymerases to modifications at the 3'-position of
the nucleotide, which can possibly lead to limited incorporation in one polymerase or
potentially even to no incorporation at all in another polymerase (see Enclosure 8,
page 4, lines 10 to 21).

On the other hand, no impairment of the incorporation of nucleotides also having     154
sterically extensive groups was observed when using specially "modified" DNA
polymerases, for example Thermo Sequenase and Taq FS Polymerase (see Enclosure
8, page 4, line 21, to page 5, line 3):

> *"On the other hand, it is known that modified DNA
> polymerases (Thermo Sequenase and Taq FS polymerase)
> are able to recognize nucleotides with extensive
> modifications with bulky groups such as energy transfer
> dyes at the 5-position of the pyrimidines (T and C) and at
> the 7-position of purines (G and A) (Rosenblum et al.
> 1997, Zhu et al.1994). The ternary complexes of rat DNA
> polymerase, a DNA template-primer, and dideoxycytidine
> triphosphate (ddCTP) have been determined (Pelletier et
> al. 1994) which supports this fact. As shown in Figure 1,
> the 3-D structure indicates that the surrounding area of
> the 3'- position of the deoxyribose ring in ddCTP is very
> crowded, while there is ample space for modification on
> the 5-position the cytidine base."*

*Ju et al.* see this as a problem, since with larger protecting groups the general     155
applicability of common polymerases for SBS is severely restricted. If necessary,
these must first be genetically modified in a complex process in order to still accept a
nucleotide with a large 3'-protecting group as substrate. This applies all the more if
the 3'-protecting group also contains an extensive label for identifying the

incorporated base, for example in the form of a light-sensitive molecule unit (see Enclosure 8, page 5, lines 23 to 26):

> "[....] a photocleavable group is generally bulky and thus the DNA polymerase will have difficulty to incorporate the nucleotide analogues containing a photocleavable moiety capping the 3'-OH group."

To circumvent this problem, *Ju et al.* uses a two-stage approach:                                      156

*On the one hand,* the base-specific label, e.g. a fluorescent dye, is to be linked to the      157
5- or 7-position of the nucleotide base via a cleavable linker, since no steric
interference with the polymerase is to be expected here (see Enclosure 8, page 5,
lines 5 to 11).

*On the other hand, Ju et al.* proposes to use protecting groups for the 3'-OH function      158
of the nucleotide with low spatial expansion as terminators (see Enclosure 8, page 5,
lines 11 to 13) and states in more detail (see Enclosure 8, page 5, line 26, to page 6,
line 2; emphasis added:

> "If small chemical moieties that can be easily cleaved chemically with high yield can be used to cap the 3'-OH group, such nucleotide analogues should also be recognized as substrates for DNA polymerase. It has been reported that 3'-O-methoxy-deoxynucleotides are good substrates for several polymerases (Axelrod et al. 1978). 3'-O-allyl-dATP was also shown to be incorporated by Ventr(exo-) DNA polymerase in the growing strand of DNA (Metzker et al. 1994)".

Evidence:     *Metzker et al.* (1994), Termination of DNA synthesis by novel 3'-modified
deoxyribonucleoside 5'-triphosphates; Nucleic Acids Research, Vol. 22, No.
20, pp. 4259-4267
[*D23* in EPO opposition proceedings]

(Enclosure 17)

To confirm their theory, the authors of *Ju et al.* point out that nucleotides with      159
particularly small protecting groups, such as the methyl or unbranched allyl group

with one or three carbon atoms, respectively, are accepted by various polymerases as substrates.

*Ju et al.* explicitly mention polymerases that are commercially available, e.g. "*Thermo Sequenase, Taq FS DNA polymerase, T7 DNA polymerase, and Vent (exo-) DNA polymerase*", as suitable polymerases according to the invention (see Enclosure 8, page 44, lines 15 to 17). The advantage of a small protecting group is that correspondingly modified nucleotides of many different polymerases are accepted as substrate. [160]

A suitable polymerase can therefore easily be selected from the multitude of known and possibly commercially available polymerases, for which only a few simple preliminary tests are required. Thus, the more complex genetic modification of a polymerase in such a way that nucleotides with an extensive protecting group can be incorporated at all, can be avoided.[3] [161]

iii)     **Selective cleavability under mild conditions in an aqueous environment is necessary**

However, the small dimension of the protecting group is only one factor. An efficient incorporation of the protected nucleotides by the polymerase is, for example, useless for the SBS if the protecting group is not reversibly cleavable. The same applies if the protecting group can only be removed again under conditions that are detrimental to the formed DNA or even compromise further reaction cycles. [162]

The 3'-methoxy group (-O-CH$_3$), which is actually well accepted by most polymerases owing to its small dimension, must thus be removed from the list of useable protecting group candidates. According to *Ju et al.*, it can only be cleaved under harsh conditions (see Enclosure 8, page 6, lines 2 to 6): [163]

---

[3] *Ju et al.* clearly do not exclude the possibility of further optimising a basically functional polymerase by mutation, if desired.

> *"However, the procedure to chemically cleave the methoxy group is stringent and requires anhydrous conditions. Thus, it is not practical to use a methoxy group to cap the 3'-OH group for sequencing DNA by synthesis."*

Moreover, deprotection of the methoxy group occurs under anhydrous conditions, which, according to *Ju et al.*, also makes the use of this protecting group **impracticable** for SBS. This – as already explained above for *Tsien et al.* – is immediately apparent to the skilled person since oligonucleotides having a phosphate backbone with negatively charged phosphate groups are only poorly soluble or are not soluble at all therein. [164]

**iv) Deprotection must not lead to an irreversible denaturation of the DNA**

Like *Tsien et al.* earlier, *Ju et al.* also emphasise that an irreversible denaturation of the primer/target DNA duplex must not occur during SBS – especially during deprotection – since this would destroy the success of SBS (see Enclosure 8, page 42, lines 17 to 19): [165]

> *"(4) the growing strand of DNA should survive the washing, detection and cleavage processes to remain annealed to the DNA template."*

*Ju et al.* on the one hand solve this problem by means of special protecting groups which can be cleaved under mild, aqueous and non-denaturing conditions (see below). [166]

In an alternative embodiment, *Ju et al.* on the other hand propose to avoid the risk of denaturation from the outset, even under somewhat harsher conditions (see claim 9). This is achieved by immobilising on the solid surface a DNA strand which is capable of "self-priming" instead of a separate primer or single-stranded target DNA – as is still the case with *Tsien et al.* (see Enclosure 8, pages 26 to 29). The production of such "self-priming" DNA is described on pages 47 to 49 of *Ju et al.* in the section *"2. Construction of a Self-primed DNA Moiety"*. [167]

The primer to be extended is covalently bonded via a nucleotide "loop" (also referred      168
to as a "hairpin") to the target DNA immobilised on a chip so that it can associate
with a complementary sequence located immediately prior to the target DNA to be
sequenced (see Enclosure 8, page 49, lines 17 to 24):

> *"The looped primer (B) is designed to contain a very*
> *stable loop (Antao et al. 1991) and a stem containing the*
> *sequence of M13 reverse DNA sequencing primer for*
> *efficient priming in the polymerase reaction once the*
> *primer is ligated to the immobilized DNA on the*
> *sequencing chip and the 3'-OH cap group is chemically*
> *cleaved off (Ireland et al. 1986; Kamal et al. 1999)."*

The primer is "attached" to the target DNA, which enormously strengthens the      169
binding of the paired region, i.e. significantly increases the melting point. Should a
separation nevertheless occur, the two partial strands can easily be reunited. Since
the DNA is immobilised on a solid surface at the other end, the primer also cannot be
washed away during the exchange of the deprotection solution and the various
washing processes.

The functioning of SBS with a primer connected via a hairpin is explained in Fig.      170
2A:

**FIGURE 2A**



The label for identifying the base incorporated after each cycle in step (2) is in this case a fluorescent dye connected to the base via a UV-cleavable linker. The dye is cleaved off together with the 3′-protecting group in reaction (4). After separation of the deprotection solution, washing and buffer exchange, the chain is extended in step (5) by one base with a further 3-protected and labelled nucleotide.

171

The problem of a possible denaturing of the DNA during deprotection had been known for a long time before the date of priority of EP 578 and had also been described elsewhere -- as was its solution! Reference is made by way of example to *Canard and Sarfati* (1994).

172

Evidence:     *Canard and Sarfati* (1994), DNA polymerase fluorescent substrates with reversible 3′-tags; Gene, Vol. 148, pp. 1-6

(Enclosure 18)

*Canard and Sarfati* hold that ester and ether functions are possible protecting groups for the 3′-position of the nucleotide. However, they do not fail to recognise that the

173

conditions required for the cleavage of these groups may not be compatible with the stability of the DNA (see Enclosure 18, page 4, right-hand column, final paragraph):

> *"Of particular importance was the nature of the chemical bond between the ribosyl moiety and the anthranyloyl substituents. Ethers or esters are both expected restore a hydroxyl group upon deprotection. We reasoned that ether bonds would be hard to cleave under mild conditions compatible with DNA chemical stability, whereas chemical deprotection using alkali has the present disadvantage of melting the primer-template duplex."*

However, *Canard and Sarfati* do not deem this to be an actual obstacle to the use of such protecting groups in SBS. Suitable remedies are available, including the "hairpin" technology described in *Ju et al.* (see Enclosure 18, page 5, left-hand column, first paragraph): [174]

> *"However, we foresee several ways of remediating to this problem, such as 'locking' the primer covalently by means of a cross-linking agent, or by ligating a 5'-phosphorylated 'hairpin-like' primer to the 3'-end of the ss template. In both cases, alkali denaturation followed by neutralization would lead to immediate intra-molecular reannealing compatible with cycling of the process."*

v)     **No protecting groups with ester or ketone units**

Whereas *Tsien et al.* still propose ester or ketone units as 3'-protecting groups, *Ju et al.* report concerns about their usability in SBS (see Enclosure 8, page 6, lines 6 to 14): [175]

> *"An ester group was also explored to cap the 3'-OH group of the nucleotide, but it was shown to be cleaved by the nucleophiles in the active site in DNA polymerase (Canard et al. 1995). Chemical groups with electrophiles such as ketone groups are not suitable for protecting the 3'-OH of the nucleotide in enzymatic reactions due to the existence of strong nucleophiles in the polymerase."*

Canard et al. report on the catalytic "editing" properties of DNA polymerases (see [176] title). The authors found that at least some polymerases are able to "edit" 3'-ester-modified nucleotides, i.e. to cleave off the protecting group, as a result of which termination of the chain extension does not occur (see Enclosure 13, Abstract):

> "Enzymatic incorporation of 2', 3' dideoxynucleotides into DNA results in chain termination. We report that 3'-esterified 2'-deoxynucleoside 5'-triphosphates (dNTPs) are false chain-terminator substrates since DNA polymerases, including human immunodeficiency virus reverse transcriptase, can incorporate them into DNA and, subsequently, use this new 3' end to insert the next correctly paired dNTP. Likewise, a DNA substrate with a primer chemically esterified at the 3' position can be extended efficiently upon incubation with dNTPs and T7 DNA polymerase lacking 3'-to-5' exonuclease activity."

Based on their results, Canard et al. expect that the polymerase-bound end of DNA [177] is located in the vicinity of a powerful nucleophilic group in the active centre of the enzyme (see Enclosure 13, page 10863, left-hand column, middle of the second paragraph; emphasis added):

> "The results reported here may indicate that the polymerase-bound 3' end of DNA lies in the vicinity of a powerful nucleophilic group in the active site involved either in polymerization or in 3'-substituent removal, a finding in accordance with crystallographic data for several DNA polymerases (8-12)."

Based thereon, they conclude that other substituents at the 3'-end of the DNA could [178] also be exposed to a nucleophilic attack if this is at the same position and distance to the ribose ring (see Enclosure 13, page 10863, left-hand column, lines 7 to 5 from the bottom):

> "Other substituents at the 3'-end of DNA at such a position and distance of the sugar ring may also receive a nucleophilic attack."

Specifically, this concerns the atom immediately adjacent to the 3'-oxygen atom in the protecting group, for example the carbonyl-carbon atom (*) of an ester group:

$$\text{Nuc-3'-O-}\overset{\displaystyle *}{\underset{\displaystyle \underset{\displaystyle O}{\|}}{C}}\text{-R}$$

Due to the electronegativity of the adjacent oxygen, this has a partially positive charge and, as an electrophile, can therefore interact with a nucleophile in the polymerase thereby eliminating the protecting group. *Ju et al.* therefore propose not to use protecting groups with an electrophilic centre at this position.

A number of protecting groups that are actually suitable for hydroxyl groups, such as esters or ketones, are thus ruled out. However, this restriction does not apply to hydroxyl ethers, acetals, hemiacetals or hemiaminals, for example of the MOM or allyl ether group (see also below, N 182 *et seqq.* and N 189 *et seqq.*).

vi) **Preferred protecting groups are unbranched and have no more than 4 atoms in the chain**

In addition to the allyl group "-CH$_2$CH=CH2", *Ju et al.* cites the group "-CH$_2$OCH$_3$", also referred to as "MOM" (short for "methoxymethyl"), as the preferred reversible protecting group for the 3'-position. The latter forms a geminal diether together with the 3'-oxygen. A characteristic feature of both groups is that they form an unbranched chain and, together with a terminal hydrogen atom, only have four atoms in the chain (i.e. "-C-C=C-H" for allyl; "-C-O-C-H" for MOM).

Thus, the preferred protecting groups of *Ju et al.* are small enough that the corresponding 3'-protected nucleotides are accepted by common polymerases as a substrate and incorporated into the oligonucleotide strand (see Enclosure 8, page 25, line 26, to page 26, line 2):

179

180

181

182

183

48

> *"In one embodiment, the cleavable chemical group that caps the -OH group at the 3'-position of the deoxyribose in the nucleotide analogue is $-CH_2OCH_3$ or $-CH_2CH=CH_2$. Any chemical group could be used as long as the group 1) is stable during the polymerase reaction, 2) does not interfere with the recognition of the nucleotide analogue by polymerase as a substrate, and 3) is cleavable."*

This suggests to the skilled person to use nucleotides with small, i.e. unbranched, 3'-protecting groups with few atoms in the chain (i.e. not more than four atoms) in order to ensure a broad substrate recognition by common polymerases. Unbranched chains rotate more easily around their axes than branched and sterically hindered groups and can therefore assume a variety of configurations. The increased flexibility of the group thus facilitates its fitting into the active centre of the polymerase.    [184]

Post-published *Balasubramanian* (2011) specifically addresses the dimension of the 3'-protecting group.    [185]

Evidence:    *Balasubramanian* (2011), Sequencing nucleic acids: from chemistry to medicine; ChemComm, Vol. 47, pp. 7281-7286
(Enclosure 19)

*Balasubramanian* (2011) confirms that the small dimension of the 3'-protecting group in the above sense is a decisive factor for good acceptance by the polymerase and thus for the SBS method according to EP 578 (see Enclosure 19, page 7284, left-hand column, second paragraph):    [186]

> *"The 3'-oxygen of the DNA being extended is the essential nucleophile for the nucleotidyl transfer reaction. Therefore for practical implementation of the sequencing chemistry, the most straightforward way to control stepwise incorporation was to design a bioorthogonal protecting group to mask the 3'oxygen of the modified dNTP. We elected to keep this small in order to minimize steric interference in the polymerase active site."*

And, further (see Enclosure 19, page 7284, left-hand column, middle of the second paragraph):    [187]

> *"Besides bioorthogonality, this chemistry also allowed a relatively compact protecting group at the 3'OH of the incoming nucleotide, which was important for being tolerated by the DNA polymerase. Improved compatibility of the sequencing deoxynucleoside triphosphates with the active site of a DNA polymerase was ultimately achieved by re-engineering the polymerase active site by mutagenesis."*

Even though the tolerance of the polymerase could be further improved by genetic modifications, post-published *Balasubramanian* (2014) also emphasises the importance of the small dimension of the azidomethyl group for the method according to EP 578 (see <u>Enclosure 20</u>, page 4, right-hand column, middle of the second paragraph): [188]

> *"The polymerase required some protein engineering of the active site to accommodate the 3'-blocking group, which was helped by the relatively small size of the azido-methyl moiety."*

<u>Evidence:</u>   *Balasubramanian* (2014), Chemical biology on the genome; Bioorganic & Medical Chemistry, http://dx.doi.org/10.1016/j.bmc.2014.05.016

(Enclosure 20)

**vii)   The preferred MOM group is a protected hemiacetal**

The preference for the the methoxymethyl group (MOM), together with the allyl group, is emphasised repeatedly in *Ju et al.*, for example on page 33, lines 16 to 19, Fig. 7 for "R = CH₂OCH₃", as well as claims 12 and 38. [189]

The skilled person readily appreciates that the MOM group is a special case among -OH protecting groups since it can also be regarded as a masked hemiacetal. Reference is made to *Nishinio and Ishido* (1986) in this respect. [190]

<u>Evidence:</u>   *Nishinio and Ishido* (1986), Partial Protection of Carbohydrate Derivatives. Part 22. Further Improvement in Introduction of Methoymethyl Group to Hydroxyl Groups of Carbohydrate Derivatives; Journal of Carbohydrate Chemistry, https://doi.org/10.1080/07328308608062969

(Enclosure 21)

*Nishinio and Ishido* investigated the methoxymethylation of various carbohydrate derivatives, including nucleotides (see Enclosure 21, page 314, lines 5 to 10):

> *"Our interest in carbohydrate hydroxy protection methods prompted us to investigate methoxymethylation procedures suitable for nucleoside and saccharide derivatives. A methoxymethyl ether is a hemiacetal-type protecting (R-O-CH-O-) group which unlike THP and THF groups does not afford any diastereoisomers."*

191

Thus, the concept of the "protected hemiacetal or hemiaminal" according to EP 578 is by no means new, but was already realised in previously known protecting groups.

192

*Nishinio and Ishido* further shows that the MOM group can be efficiently used for the derivatisation of -OH functions in carbohydrates and nucleosides, and the following conclusion is drawn (see Enclosure 21, page 319, lines 10 to 13):

193

> *"Based on the present results, it can be concluded that the methoxymethyl function can be essentially used as a hemi-acetal-type protecting group of carbohydrate alcoholic function, [...]"*

The MOM protecting group, like the allyl group, can be cleaved off under mild and specific conditions without damaging the DNA (see Enclosure 8, page 54, lines 20 to 26; see also page 59, lines 1 to 4):

194

> *"The chemical cleavage of the MOM and allyl groups is fairly mild and specific, so as not to degrade the DNA template moiety. For example, the cleavage of the allyl group takes 3 minutes with more than 93% yield (Kamal et al. 1999), while the MOM group is reported to be cleaved with close to 100% yield (Ireland et al. 1986)."*

Cleavage occurs with LiBF$_4$ in an acetonitrile/water mixture (see Enclosure 8, Fig. 14), i.e. also in an aqueous medium. The MOM protecting group accordingly also meets the usability criteria established by *Tsien et al.* It in particular meets the requirement that the correspondingly protected nucleotide should be accurately and

195

efficiently incorporated by the polymerase into the oligonucleotide strand and that it can be efficiently cleaved off again under mild conditions.

### d) *Problem-and-solution approach*

In the following, the lack of an inventive step will be outlined in detail in accordance with the problem-solution approach to which the FPC has repeatedly committed; the series of steps in the problem-solution approach is foreseen in the EPO Guidelines (Nov. 2019), G-VII, 5.    196

### i) The distinguishing feature(s) over *Ju et al.*

The distinguishing feature(s) over *Ju et al.* is the precise nature of the protective group, i.e. features 1.3.1 – 1.3.5.    197

### ii) The objective technical problem

In the absence of any advantageous effect of the distinguishing feature(s) (see N 281 *et seqq.* in detail), the objective technical problem can only be formulated as to provide an alternative nucleotide molecule.    198

### iii) Could-would approach

The could-would approach is an essential element of the problem-solution approach; EPO Guidelines, G-VII, 5.3. Basically, it is all about whether the skilled person would (not only could) have arrived at the invention by adapting or modifying the closest prior art, either in the expectation of some improvement or advantage, or, at least, in the expectation of a viable alternative.    199

### (a) *Ju et al. in combination with the common general knowledge significantly restricts the lists of possible protecting groups*

The over 750-page compendium by *Greene and Wuts* (Enclosure 15) provides a comprehensive overview of protecting groups for all possible reactive groups in    200

organic chemistry. A total of more than 1000 different reversible protecting groups are presented.

*Greene and Wuts* reflects the common general knowledge on reversible protecting groups; it is mentioned in EP 578 in connection with cleavable linkers, but also in connection with the cleaving of the 3'-protecting group (see [0090]). The skilled person would have consulted *Greene and Wuts* in any case when searching for alternative protecting groups in order to gain an overview of the various possibilities.

201

In the present context, what is at issue is the protection of the OH group located at the 3'-position of the ribose moiety. Therefore, protecting groups for the hydroxyl function as listed in Chapter 2 ("Protection for the Hydroxyl Group, Including 1,2- and 1,3-Diols"), are, of course, of interest.

202

However, the person skilled in the art would also have taken into consideration protecting groups for the phenolic -OH function from Chapter 3 ("Protection for Phenols and Catechols") since often the same protecting groups can be used for both the aliphatic and the aromatic hydroxyl group. In fact, more than two thirds of the protecting groups mentioned for phenols are identical to those for aliphatic alcohols.

203

*Greene and Wuts* therefore expressly recommend consulting both chapters, even if (only) protecting groups for the phenolic hydroxyl function are at issue (see para. Enclosure 15, page 248, middle of the first paragraph; emphasis added):

204

> *"Many of the protective groups developed for alcohol protection are also applicable to phenol protection: thus, the chapter on alcohol protection should also be consulted."*

The same conversely applies. The person skilled in the art would therefore also have taken into consideration the chapter on the phenolic protecting group, even if he had only – as in the present case – searched for a protecting group for aliphatic alcohols. However, this still leaves over 230 possible candidates. However, this number is

205

whittled down to just a few if the criteria developed by *Tsien et al.* and *Ju et al.* are used as "filters" for the selection.

As explained above, the "small dimension" of the protecting group (in the sense of no more than four atoms in an unbranched chain) is essential for its usability for SBS. If the protecting groups with carbonyl ester or keto functions, which are not recommended by *Ju et al.*, are also omitted, **this selection criterion alone reduces the list of possibilities to just 12 (!) candidates. This list also includes the azidomethyl group[4] according to EP 578:**

- Methyl ether (page 23, page 249);
- MOM ether (page 27, page 257);
- Methylthiomethyl (MTM) ether (page 33, page 259);
- 2,2,2-trichloroethyl ether (page 63);
- Allyl ether (page 67, page 262);
- Propargylether (page 74, page 264);
- **Azidomethyl ether** (page 260);
- Cyanomethyl ether (page 260);
- 2,2-dichloro-1,1-difluoroethylether (page 260);
- 2-chlorethylether (page 261);
- 2-bromoethylether (S. 261);
- Methane sulfonate (page 285).

Among the candidates in the above list, the 2,2,2-trichloroethyl ethers, the 2,2-dichloro-1,1-difluoroethyl ethers, and the 2-chloro and 2-bromomethyl ethers are particularly extensive due to the van der Waals radii of the chlorine and bromine atoms, which are comparable to the methyl group, and therefore the skilled person would not have primarily considered them.

---

[4] The azido methyl group forms an azidomethyl ether together with the 3'-oxygen atom

The known groups "methyl ether", "MOM ether" and "allyl ether" are also ruled out, which means that there are only 5 candidates left that satisfy *Ju et al's.* criterion of the "small dimension" for the protecting group. Thanks to this significant reduction in possibilities based solely on their size, the skilled person was able to check the few remaining members of this list for the remaining selection criteria easily and without effort.

208

As can be seen from its title, *Greene and Wuts* essentially relates to protecting groups for use in the chemical synthesis of organic compounds. Even though several methods for introducing and deprotecting a certain protecting group are usually described, these focus primarily on compatibility with organic synthesis reactions in organic solvents.

209

The skilled person would therefore by no means have assumed that the list of deprotection possibilities mentioned in *Greene and Wuts* for a certain protecting group was already complete. In order to check SBS-compliant deprotection conditions, he would therefore not have restricted himself to the information in *Greene and Wuts* alone. Rather, he would have generally considered literature relating to the mentioned protecting groups in the context of nucleotides and nucleosides.

210

*(b)*   *The azidomethyl protecting group is obvious in further view of Zavogorodny et al. (1991)*

When searching for alternatives to the allyl or MOM group of *Ju et al.*, the skilled person would have come across *Zavgorodny et al.* (1991) alone by carrying out a simple literature search among the known protecting groups for nucleosides.

211

- **The OD's opinion regarding *Zavgorodny et al.* (1991) is incorrect:**

The OD was of the opinion that there were no indications to use the nucleosides described therein for the development of alternative 3'-protected nucleotides for SBS

212

inter alia because they relate to "nucleosides" whereas EP 578 relates to nucleotides for SBS (see assumption (4), N 90).

However, as explained above, the 3'-protecting group is preferably introduced before the 5'-phosphate groups during the chemical synthesis of the modified nucleotide, i.e. already at the stage of the nucleoside and not at the stage of the nucleotide. Therefore -- contrary to the Opposition Division's opinion -- the skilled person would, a fortiori, have consulted the literature regarding 3'-protected nucleosides.

213

- **_Zavgorodny et al._ (1991) discloses a 3'-Azidomethyl Protecting Group:**

_Zavgorodny et al._ (1991) describes a series of 3'-protecting groups for nucleosides as well as the synthesis thereof by means of "nucleoside chemistry" (see title). The figure on page 7594 shows the following structure (5) of the protected nucleosides:

214



wherein X may be one of the residues shown in the figure:

215



Incidentally, the publication would have aroused the skilled person's interest for the reason alone that it also contains _inter alia_ improved methods for introducing the allyl and MOM protecting groups known from _Ju et al._ into nucleoside precursors, which, in turn, are transferred into the correspondingly protected nucleotides (see Enclosure 12, page 7595, final paragraph, emphasis added):

216

*"The compounds as discussed above are **useful specifically blocked synthons.**"*

According to the concept developed by E.J. Corey, a "synthon" is a conceptual component of the retro-synthesis planning. For the organic chemist, it represents a structural unit within a molecule to which a synthesis step can be assigned

217

Evidence:-    Excerpt of Wikipedia, Synthon (https://de.wikipedia.org/wiki/Synthon)

(Enclosure 22)

With regard to the synthesis of 3'-protected nucleotides for SBS, the modified nucleosides of *Zavgorodny et al.* (1991) therefore correspond exactly to such nucleoside precursors in the sense of "specifically blocked synthons". Only the 5'-triphosphate group still needs to be introduced in order to arrive at the corresponding nucleotides. The residue X may be an azido group ("$N_3$"; see the legend of the figure on page 7594). The nucleosides according to *Zavgorodny et al.* thus include the 3'-O-azidomethyl group according to EP 578.

218

Consequently, this protecting group would well have been considered as an obvious alternative for the MOM and allyl groups mentioned in *Ju et al.*, without requiring any inventive ingenuity. All the skilled person had to do was check whether it meets the criteria developed in *Tsien et al.* and *Ju et al.* -- which it does.

219

- **The azidomethyl group in *Zavgorodny et al.* (1991) corresponds to the criteria developed in *Ju et al.*:**

The 3'-O-azidomethyl group is part of the preselection determined from *Ju et al.* solely on the basis of its small dimension. Selection criterion (1) (see N 152) is thus fulfilled. The small size of the 3'-O-azidomethyl group is clear inter alia from the fact that *Zavgorodny et al.* (1991) cites the 3'-O-azidomethyl group at the same time as the MOM group, referred to herein as "$X=OCH_3$" (see Enclosure 12, legend of the figure on page 7594; emphasis added):

220

LENZ & STAEHELIN

X = H, SOCH$_3$, SO$_2$CH$_3$, F, N$_3$, CN, SBn, SPh, OCH$_3$, OC(CH$_3$)$_3$

It was therefore immediately apparent to the skilled person that both the 3'-O-azidomethyl group and the MOM group each contain four consecutive atoms (C-N=N=N or C-O-CH2-H, respectively), and are thus of a comparable size.

The MOM group had already been described by *Ju et al.* as suitable for SBS. The skilled person in the art had thus readily expected it to be efficiently and accurately incorporated into the new oligonucleotide strand by a polymerase.

Selection criterion (4) (see N 175 *et seqq.*) is also met since the 3'-O-azidomethyl group is not an ester group and the azido group is known to be bioorthogonal, as explained above, N 185 *et seqq.*

Finally, the azidomethyl group is emphasised among the alternatives mentioned in *Zavgorodny et al.* (1991) as being of "special interest" precisely owing to its deprotection conditions. *Zavgorodny et al.* (1991) considers the 3'-O-azidomethyl group to be particularly advantageous since the conditions for its removal are "very specific and mild" (see Enclosure 12, page 7595, final sentence; emphasis added):

> *"Azidomethyl group is of special interest since it can be removed under very specific and mild conditions, viz.* with triphenylphosphine in aqueous pyridine at 20 °C."

The skilled person therefore had every reason to assume that selection criteria (2) (mild conditions for cleavage of the protecting group) and (3) (selective conditions for cleavage the protecting group) (see N 162, above) were also fulfilled. It was therefore immediately obvious to use the 3'-O-azidomethyl group recommended in *Zavgorodny et al.* (1991) also in nucleotides in order to carry out sequencing procedures such as SBS.

In addition, reference is also made to *Zavgorodny et al.* (2000), referred to as D11 in the European opposition proceedings and which continues the teachings of

*Zavgorodny et al.* (1991) (see reference 5 in *Zavgorodny et al.* (2000)). It describes the synthesis of 3'-acidomethyl nucleosides (and also the corresponding 3'-derivatives) on the basis of detailed experimental specifications. To this end, methylthiomethyl (MTM)-modified precursors are reacted with lithium azide.

*Zavgorodny et al.* (2000) also emphasises the specific cleavability of the azidomethyl protecting group under mild conditions:

> *"On the other hand, this group can be removed under specific and mild conditions (triphenylphosphine in aqueous pyridine at ~20°C[5]) or used to obtain other derivatives or analogues of nucleosides.[20,21]"*

*Zavgorodny et al.* (2000) also points out that the azidomethyl-modified nucleosides may also be used, *inter alia*, for the production of nucleoside-derivatives. Based on *Tsien et al.* or *Ju et al.*, the skilled person would have easily understood this hint as indications of their suitability as precursors / synthons for the corresponding nucleotides. Nucleotides are nothing other than "nucleoside" derivatives that are modified with phosphate groups at the 5'-position. Accordingly, nucleotides are also referred to as phosphates of nucleosides; see, for example, the term "3'-modified deoxyriobnucleoside 5'-triphosphate" in *Ju et al.* (Enclosure 8, page 68, line 27).

- **No reservations concerning the use of pyridine:**

The reaction conditions used in *Zavgorodny et al.* (1991) for the cleavage of the 3'-O-azidomethyl protecting group are described therein as being very specific and mild. The skilled person also would not have had any reservations against using the solvent used by *Zavgorodny et al.* (1991) (aqueous pyridine) also for the deprotection of 3'-O-azidomethyl nucleotides in the context of SBS methods. In particular, he would not have had any concerns that the DNA would be irreversibly denatured during deprotection.

For instance, in Example 5, *Tsien et al.* specify possible conditions for the chemical cleavage of protecting groups. Aqueous pyridine is thereby used (see <u>Enclosure 14</u>, page 38, lines 31 to 34; emphasis added): 230

> *"The 2,4-dinitrobenzene sulfenyl fluorescent blocking groups are removed with a deblocking reagent which consists of 0.1 M pyridine/pyridinium chloride buffer (pH 7.8) containing thiourea 0.05 M."*

The skilled person would have concluded based on e.g. these statements in *Zavgorodny et al.* (1991) that aqueous pyridine is suitable for the cleavage of protecting groups in SBS methods. The skilled person would in particular have assumed, in view of the teaching in *Zavgorodny et al.* (1991), that aqueous pyridine enables sufficiently mild reaction conditions, and that no damage thus occurs to the newly formed double-stranded DNA oligonucleotide. There was therefore no prejudice against the use of aqueous pyridine. 231

The suitability of aqueous pyridine is also confirmed in a technical opinion of *Prof. Carell* who is a Professor of Organic Chemistry at the Ludwig Maximilian University in Munich. According to his CV (<u>Enclosure 23</u>, A) and the literature list (<u>Enclosure 23</u>, B), *Prof. Carell* is an expert in the field of nucleotide synthesis and nucleic acid sequencing methods, including SBS methods. Moreover, he was significantly involved in the development of the "click chemistry" and is thus very familiar with the chemical reactivity of the azido group. His scientific expertise in the field of EP 578 is therefore beyond question. 232

<u>Evidence:</u>  Technical Opinion of *Prof. Carell* (incl. Annexes A, B, C)

(<u>Enclosure 23</u>)

In order to test the effects of pyridine under extreme conditions, *Prof. Carell* first of all used pyridine concentrations that are already many times greater than the pyridine concentration of 0.1 M cited in *Tsien et al.*, i.e. 200 mM pyridine and 400 mM pyridine. 233

In these experiments, he also used salt concentrations of 150 mM NaCl and 550 mM NaCl. A physiological salt concentration of 150 mM is a reasonable starting concentration for the skilled person since he knew that such a concentration is compatible with DNA polymerase reactions and is therefore also compatible with DNA double strands. This is apparent, for example, from *Tsien et al.*, which uses a total salt concentration of 150 mM (= 0.05 M Tris chloride + 0.05 M magnesium chloride + 0.05 M NaCl) for the Klenow fragment of DNA polymerase I (see page 20, lines 5 to 10, of *Tsien et al.*).

234

Melting curves for the DNA duplex were recorded using the above conditions (see Enclosure 23, Figs. 1.1.1 a) – e)). *Prof. Carell* summarises the results as follows (see Enclosure 23, page 2, line 32, to page 3, line 2; emphasis added):

235

> *"In summary, we measured in the presence of 400 mM pyridine at a normal ionic strength (150 mM NaCl) a decrease of the Tm-value of just 4°C to about 40 °C compared to the same mixture without pyridine. This small reduction is in full agreement with literature data (Angew. Chem. Int. Ed. 2015, 54, 1 5, see Enclosure C). A very strong denaturing effect of pyridine can be ruled out. In light of the longer duplex strands that are generated during sequencing, based on our data we can exclude that the sole presence of pyridine leads to a melting of the duplex. We found further that the ionic strength has a much more dramatic effect on the stability of duplexes than the absence or presence of pyridine."*

This is also confirmed by a further experiment performed by *Prof. Carell*. Since no primer is mentioned in EP 578, Prof. Carell used the "M13" primer described as an example in *Tsien et al.* This primer is a 17-mer with the sequence dGTAAAACGACGGCCAGT and was recommended by *Tsien et al.* as particularly suitable for SBS (see Enclosure 14, page 37, line 31).

236

As a model for a typical intermediate of an SBS sequencing method, *Prof. Carell* [237] associated the M13 primer with a corresponding "template" strand (see <u>Enclosure 23</u>, page 4, lines 17 to 19):

> *"Sequence:*
>
> *Primer:*     *5' GTAAAACGACGGCCAGT 3'*
>
> *Template:* *3' CATTTTGCTGCCGGTCATATCGGA 5'"*

In this experiment, *Prof. Carell* tested pyridine concentrations up to 50% (see [238] <u>Enclosure 23</u>, page 5, lines 2 to 4):

> *"Question 1.2: Do primer-template complexes denature in the presence of 50% pyridine?*
>
> *This question was raised because 50% pyridine is required in the aqueous medium (see below question 1.3) to achieve proper deprotection of the azidomethyl group with triphenylphosphine."*

Even at this pyridine concentration of 50% and at the already mentioned salt [239] concentration of 150 mM NaCl, it was revealed that the DNA double strand consisting of a primer and DNA "template" is stable at room temperature (melting point of 25°C; see Figure 1.2):



*Fig. 1.2: Melting of the primer-template duplex*

*at 150 mM salt in the presence of 50% pyridine*

The melting point of 25°C determined in this experiment is higher than the temperature used in *Zavgorodny et al.* (1991) for cleavage (20°C), i.e. the double strand is still largely stable at the temperature of *Zavgorodny et al.* (1991) (see Enclosure 23): [240]

> *"For the experiment we took the primer-template complex from above and performed melting point studies with 150 mM NaCl and with 50% pyridine. The obtained melting point of Tm = 25°C with 50% pyridine is depicted in Fig. 1.2. The result of the study is that a primer-template complex is even at 50% pyridine stable at room temperature."*

*Prof. Carell* finally investigated whether the azidomethyl group can be cleaved from a 3'-O-azidomethyl nucleotide at this pyridine concentration and by means of triphenylphosphine in accordance with *Zavgorodny et al.* (1991) (see Enclosure 23, page 5, lines 14 to 16): [241]

> *"Question 1.3: Can the azidomethyl group be removed under the Zavgorodny (THL 1991, 32, 7593) conditions with 50% pyridine and PPh3?*
>
> *Investigation of this question was supposed to clarify if the solubility of nucleotides and PPh3 would be sufficient to achieve efficient deprotection under the Zavgorodny conditions.*

A 3'-O-azidomethyl thymidine triphosphate was used as the model compound for this purpose with the following result (see Enclosure 23, page 9, lines 6 to 9; emphasis added): [242]

Exact Mass: 480,98

> "This result shows that with 50% pyridine in the presence
> of PPh₃ cleavage of the azidomethyl group occurs rapidly
> at 20°C. Since the deprotection was performed at 20°C we
> conclude that under these conditions the template-primer
> complex with its melting point of Tm = 25°C stays
> substantially base paired."

These conditions are thus suitable for ensuring rapid cleavage of the azidomethyl group during an SBS method without denaturing the DNA double strand. In addition, it should be pointed out once again that DNA denaturation also occurs under the deprotection conditions of EP 578. There too, irreversible denaturation can only be prevented by stabilising the double strand via the hairpin. [243]

Thus, the skilled person would have arrived at the subject matter of EP 578 in an obvious manner when starting from the cited prior art. [244]

- **Yet further alternative aqueous reaction conditions had been obvious:**

Even if the skilled person had been of the opinion that pyridine could not be used in an SBS method (which is not the case), he would have in any case found suitable alternative reaction conditions for the cleavage of the azidomethyl group without requiring any inventive effort. [245]

*Gololobov et al.:*

The reason for this is that it was clear to the skilled person on the basis of his common general knowledge that under the aqueous conditions of *Zavgorodny et al.* (1991), triphenylphosphine serves the purpose of reducing the azido group of the azidomethyl group to an amino group (so-called Staudinger reaction). *Gololobov et* [246]

*al.* describes this common general knowledge as follows (see Enclosure 24, page 1376, lines 2 to 9):

> "*Synthesis of amines. Hydrolysis of the Staudinger iminophosphorane products is a convenient method for the synthesis of amines (see reviews 183, 220).*

$$R-N_3 \xrightarrow{\quad >P\quad} RN=P< \xrightarrow{\quad H_2O/H^+\quad} RNH_2 + O=P< \qquad (53)$$

> *Triphenylphosphine is routinely employed as the phosphorus reagent, and the resultant phosphinimine is hydrolyzed with water, sometimes with diluted acids or ammonia. This method is characterized by high chemo- and stereo-selectivity. The reduction of $N_3$ group in an azide does not affect other functional groups. It is widely used in the synthesis of biologically active amines [...]."*

Evidence:    *Gololobov et al.* (1992), Recent Advances in the Staudinger Reaction; Tetrahedron, Vol. 48, No. 8, pp. 1353-1406

(Enclosure 24)

Although *Gololobov et al.* cites triphenylphosphine as a routinely employed reagent, [247] it also uses a general representation for the side chains of the phosphine in the reaction formula. It is therefore obvious that the reaction only requires a phosphine of any sort and that the side chain (for example phenyl or another side chain) of the phosphine can be selected as required. It would therefore have been readily apparent to the skilled person that one may well use a water-soluble side chain to carry out the reduction of the azido group in water and without organic solvents such as pyridine, or to at least carry it out with less pyridine.

In addition to water-soluble phosphines, the skilled person was also familiar with [248] alternative water-soluble reducing agents such as thiols, e.g. DTT. These are also cited in EP 578 (see paragraph [0060]).