*Polushin et al.:*

During his research on alternative deprotection conditions for the azidomethyl group, the skilled person would also have inevitably come across *Polushin et al.* This is particularly due to the fact that *Polushin et al.* relates to modified nucleotides.

Evidence:  *Polushin et al.* (1996), Synthesis of Oligonucleotides Containing 2'-Azido- and 2'-Amino-2'-deoxyuridine Using Phosphotriester Chemistry; Tetrahedron Letters, Vol. 37, No. 19, pp. 3227-3230

(Enclosure 25)

*Polushin et al.* discloses that a dinucleotide modified with an azido group can be reduced by a modified Staudinger reaction under extremely mild conditions. The corresponding reduction takes place in an aqueous medium with TCEP as the reducing agent. The skilled person would therefore assume with an expectation of success almost bordering on certainty that the conditions according to *Polushin et al.* would also be suitable for deprotecting an oligonucleotide with a 3'-azidomethyl group to the free OH.

This is also confirmed by the further experiments of *Prof. Carell* (see Enclosure 23, page 9, line 12, to page 10, line 2):

> *"Question 2.1: Do the Polushin conditions lead to a denaturation of the DNA?*
>
> *In the publication of Polushin et al. (THL 1996, 37, 3227), an azide group at a DMT-protected dinucleotide is quantitatively reduced with TCEP•hydrochloride in a pyridine / water / acetonitrile mixture (2/1/4, v/v/v, 0.01 M 2'-azidonucleotide, 4-fold excess of TCEP· HCl) under mild conditions, at 10 °C, for no longer than 10 minutes. The question was therefore raised whether a double-stranded primer-template duplex denatures at these temperatures."*

The above duplex of the primer and the template was first measured by means of a melting point analysis (4 μM DNA duplex, measured at 290 nm) in a

249

250

251

252

pyridine/water/acetonitrile mixture (2:1:4) (see <u>Enclosure 25</u>, page 3230, line 1). The melting point was determined at 17°C (see <u>Enclosure 23</u>, Fig. 2.1A). Accordingly, a duplex is present below 17°C and thus under the deprotection conditions of 10°C specified by *Polushin et al.* The melting point is low, as can be expected in the absence of salt.

As explained above, it is common general knowledge that DNA duplexes are only stable in the presence of salt. Prof. Carell therefore measured the melting point in the presence of 150 mM in a second experiment (Fig. 2.1B), i.e. in a mixture of pyridine/water/acetonitrile (2:1:4) plus 150 mM salt. In this experiment, a melting point of **42°C, i.e. significantly above the room temperature recommended for deprotection by *Polushin et al.*,** was measured:



*Fig. 2.1 Melting the primer-template duplex in a mixture of pyridine / water / acetonitrile (2:1:4) without (A) and with (B) 150 mM salt.*

Finally, *Prof. Carell* investigated the question of whether an azidomethyl group at the 3'-position of a nucleotide can also be cleaved off under the conditions of Polushin (see <u>Enclosure 23</u>, page 10, lines 15 to 18):

"*Question 2.2: Can the azidomethyl group be removed with TCEP under the Polushin et al. conditions?*

253

254

67

*Evaluation of this question was supposed to clarify whether under the Polushin conditions an efficient deprotection of the 3' azidomethyl group is possible.*

To investigate this question, the experiment to answer question 1.3 was repeated with the conditions specified by *Polushin et al.* The results of the analysis show that a fully deprotected nucleotide was obtained:



Exact Mass: 536,00

In summary, *Prof. Carell* concludes (see Enclosure 23, page 13, lines 5 to 14):

*"Regarding the deprotection of the azidomethyl group, on the basis of our experiments, it can be determined that the experimental conditions of Zavgorodny, as well as of Polushin, enable an efficient reduction of the azido group, followed by the subsequent decay = deprotection of the forming hemiaminal. Under the conditions described by Zavgorodny and Polushin, i.e., either with PPh 3 or TCEP even in the presence of pyridine, the primer-template model construct selected by us is double-stranded paired.*

*The influence of the pyridine used for the reduction is detectable, but the reduction in stability of the duplex by only a few degrees barely has any effect."*

The skilled person therefore had no reason to fear that the conditions of *Polushin et al.* would lead to irreversible denaturation when applied to double-stranded DNA. The opposite is the case. In any event, he still had appropriate remedies at his disposal, for example the hairpin technology.

255

256

257

### e) The remaining asserted claims

The subject matter of the further claims of EP 578, in particular the asserted ones, is likewise invalid in view of *Tsien et al.* (Enclosure 14) or *Ju et al.* (Enclosure 8).

258

### i) Claim 4

Claim 4 defines that Z is an azidomethyl group. For the reasons set forth in any detail above, the subject matter of claim 4 is rendered obvious by *Ju et al.* in combination with *Zavgorodny et al.* (1991), at least to the extent that this claim relates to a 3'-O-azidomethyl group.

259

### ii) Claims 6, 7 and 9

Claims 6 and 7 define that the base is linked to a detectable label via a linker (claim 6) or that the base is linked to a detectable label via a cleavable linker (claim 7). Claim 9 defines that the label is a fluorophore.

260

*Ju et al.* discloses the subject matter of claims 6, 7 and 9 since it teaches that the nucleotides to be used can carry a cleavable linker on the base of the nucleotide, to which a label is attached (see Enclosure 8, page 73, lines 20 to 29):

261

> "[...] each different nucleotide analogue comprises (a) a base selected from the group consisting of adenine, guanine, cytosine, thymine, and uracil, and their analogues; (b) a unique label attached through a cleavable linker to the base or to an analogue of the base; (c) a deoxyribose; and (d) a cleavable chemical group to cap an -OH group at a 3' -position of the deoxyribose; [...]"

This label may be a fluorophore as defined in claim 9 (see Enclosure 8, page 77, lines 25 to 28):

262

> "The method of claim 1, wherein the unique label that is attached to the nucleotide analogue is a fluorescent moiety or a fluorescent semiconductor crystal."

69

Likewise, *Tsien et al.* also teaches that nucleotides can carry a label on their base, in particular a fluorophore (see <u>Enclosure 14</u>, page 27, line 33, to page 28, line 6):

263

> *"While the above-described approaches to labelling focus on incorporating the label into the 3' hydroxyl blocking group, there are a number of alternatives - particularly the formation of a 3'-blocked dNTP analogue containing a label such as a fluorescent group coupled to a remote position such as the base. This dNTP can be incorporated and the fluorescence measured and removed according to the methods described below. One method involves the use of a fluorescent tag attached to the base moiety."*

*Tsien et al.* also teaches that the label can be attached by means of a linker, referred to herein as a "spacer" or "tether" (<u>Enclosure 14</u>, page 28, lines 19 to 23):

264

> *"In another type of remote labeling the fluorescent moiety or other innocuous label can be attached to the dNTP through a spacer or tether. The tether can be cleavable if desired to release the fluorophore or other label on demand."*

Claims 6, 7 and 9 are thus not inventive either.

265

iii)   **Claim 12**

Method claim 12 is not based on an inventive step, either. For example, see the method according to claim 1 on pages 73 to 75 of *Ju et al.*, which – if it is carried out in an obvious manner with the nucleotides according to claims 6 to 11 of EP 578 – also results in a method according to claim 12. This is because, in the method of *Ju et al.*, a nucleotide that is complementary to a target polynucleotide (herein referred to as "next nucleotide on the template") is incorporated during an (SBS) synthesis reaction – in agreement with claim 12. This is obvious to the skilled person, for example, from the following passage, in which the method of *Ju et al.* is further explained (see <u>Enclosure 8</u>, page 43, lines 2 to 7):

266

> *"Upon adding the four nucleotide analogues and DNA polymerase, only one nucleotide analogue that is complementary to the next nucleotide on the template is incorporated by the polymerase on each spot of the surface [...]"*

The method of *Ju et al.* relates to a "method for controlling incorporation", in which, according to the claim, the incorporation of the nucleotide prevents introduction of subsequent nucleoside or nucleotide molecules into said growing complementary polynucleotide. This is already apparent from the fact that the nucleotides used carry a 3'-protecting group which prevents the subsequent incorporation reactions. The above-mentioned method of claim 1 on pages 73 to 75 of *Ju et al.* further describes this by citing a termination of the polymerase reaction, which is caused by the incorporation of the nucleotide (see <u>Enclosure 8</u>, page 73, lines 15 to 20; emphasis added):

> *"(iii) adding a polymerase and one or more different nucleotide analogues to the nucleic acid to thereby incorporate a nucleotide analogue into the growing strand of DNA, **wherein the incorporated nucleotide analogue terminates the polymerase reaction** [...]"*

The same applies to *Tsien et al.*; see the following method in claim 1 (see <u>Enclosure 14</u>, page 41, lines 3 to 11):

> *"1. A method for determining the sequence of deoxyribonucleotides in a subject single stranded deoxyribonucleic acid (DNA) molecule comprising: synthesizing, in the presence of the subject DNA molecule, the complementary DNA molecule, the synthesizing being carried out in a stepwise serial manner in which the identity of each deoxynucleotide triphosphate incorporated into the complementary DNA molecule is determined subsequent to its incorporation."*

The skilled person would have carried out the sequencing method specified in *Tsien et al.* in an obvious manner with the nucleotides according to claims 6 to 11 of EP 578. The skilled person would have thereby arrived at a method according to claim

267

268

269

12. This is because, in the method of *Tsien et al.*, a nucleotide that is complementary to a target polynucleotide (herein referred to as "subject DNA molecule") is incorporated during an (SBS) synthesis reaction – in agreement with claim 12. Because the incorporation is carried out in a stepwise and thus controlled manner, the method of *Tsien et al.* falls under the "Method of controlling incorporation" according to the claim. The incorporation of the nucleotide hereby prevents the introduction of subsequent nucleoside or nucleotide molecules into said growing complementary polynucleotide, also according to the claim, since the nucleotides used carry a 3'-protecting group which prevents the subsequent incorporation reactions.

Claim 12 is thus not inventive either. 270

iv) **Claim 17**

Claim 17 differs from the preceding method claims in that (i) the identity of the 271 incorporated nucleotide is determined by detection of the label linked to the base and (ii) the blocking group and the label are removed prior to the introduction of the next complementary nucleotide. These method steps are merely typical steps of an SBS method and cannot establish an inventive step. The subject matter of this claim therefore emerges from the prior art in an obvious manner.

For example, *Ju et al.* teaches the following method steps (see Enclosure 8, claim 1 272 on page 74, lines 2 to 24; emphasis added):

> *"(v) detecting the unique label attached to the nucleotide analogue that has been incorporated into the growing strand of DNA, so as to thereby identify the incorporated nucleotide analogue;*
>
> *(vi) adding one or more chemical compounds to permanently cap any unreacted -OH group on the primer attached to the nucleic acid or on a primer extension strand formed by adding one or more nucleotides or nucleotide analogues to the primer;*

72

> *(vii) cleaving the cleavable linker between the nucleotide*
> *analogue that was incorporated into the growing strand of*
> *DNA and the unique label;*
>
> *(viii) cleaving the cleavable chemical group capping the -*
> *OH group at the 3'-position of the deoxyribose to uncap*
> *the -OH group, and washing the solid surface to remove*
> *cleaved compounds [...]"*

Even *Ju et al.* therefore teaches that the identity of the incorporated nucleotide is 273
determined by detecting the label linked to the base, and the blocking group and said
label are removed prior to the introduction of the next complementary nucleotide.

Claim 17 is thus not inventive over *Ju et al.* 274

The same applies to *Tsien et al.* which proposes to simultaneously remove the label 275
("tag") and the blocking group, i.e. in a single step, and to measure the label (see
Enclosure 14, page 28, lines 5 to 10):

> *"One method involves the use of a fluorescent tag attached*
> *to the base moiety. The tag may be chemically cleaved*
> *(either separately from or simultaneously with the*
> *deblocking step) and measured either in the reaction zone*
> *before deblocking or in the reaction eluant after*
> *cleavage."*

Moreover, *Tsien et al.* states that the removal of the label may be carried out prior to 276
the incorporation of a further nucleotide (see Enclosure 14, page 28, lines 23 to 25):

> *"There are several cleavable tethers that permit removing*
> *the fluorescent group before the next successive nucleotide*
> *is added [...]"*

Thus, *Tsien et al.* also renders the subject matter of claim 17 obvious. 277

**v)    Claim 25**

Kits according to claim 25 are rendered obvious by *Ju et al.*, which discloses inter 278
alia the following (see Enclosure 8, page 6, lines 17 to 27; emphasis added):

> *"The approach disclosed in the present application is to incorporate nucleotide analogues, which are labeled with cleavable, unique labels such as fluorescent dyes or mass tags and where the 3'-OH is capped with a cleavable chemical moiety such as either a MOM group (-CH2OCH3) or an allyl group (-CH2CH=CH2), into the growing strand DNA as terminators. **The optimized nucleotide set (3'-RO-A-LABEL1, 3'-RO-C-LABEL2, 3'-RO-G-LABEL3, 3'-RO-T-LABEL4, where R denotes the chemical group used tocap the 3'-OH) can then be used for DNA sequencing by the synthesis approach."***

In light of this disclosure, the skilled person would have used said "set" of nucleotides as a kit, wherein he would have used nucleotides according to the claims of EP 578. That such a set or kit is packaged with suitable packaging materials is self-evident and would have been read in by the skilled person in the above-mentioned passage of *Ju et al.* Thus, the subject matter of claim 25 is not inventive over *Ju et al.*

279

The same applies to *Tsien et al.* since it already renders the use of different nucleotides with different labels obvious in claim 12. The production of a corresponding kit with these nucleotides is thus also not inventive when starting from *Tsien et al.*

280

## 5. The decision of the Opposition Division is flawed for yet further reasons

### a) *The objective technical problem is not plausibly solved*

The examples according to EP 578 deal in detail with the production of various nucleotides protected by a 3'-azidomethyl group. These are also provided with base-specific labels which are connected to the nucleotide base via a cleavable linker. Detailed synthesis instructions and analytical data of the correspondingly modified nucleotides can be found in paragraphs [0118] to [0153].

281

On the other hand, the examples of the polymerase-catalysed incorporation of the 3'-modified nucleotides into a double-stranded oligonucleotide (see paragraphs [0154] and [0156]) as well as of the deprotection reaction (see [0157]) remain extremely vague with regard to the specific reaction conditions. Furthermore, unlike in the detailed manufacturing examples, the examples are worded in the present tense, which implies that the examples are merely "prophetic" in nature, even if reference is made to figures with electrophoresis diagrams (see Figs. 5 and 6).

282

The instructions for cyclically repeating nucleotide incorporation and subsequent deprotection are set out in paragraphs [0157] and [0158]:

283

> *"Incorporation of the fully functional nucleoside triphosphate (FFN)*
>
> *[0157] To a solution of Tris-HCl pH 8.8 50 mM, Tween-20 0.01%, MgSO$_4$ 4 mM, MnCl 2 0.4 mM (except cycle 1, 0.2 mM), add 2 mM FFN and 100 nM polymerase. This solution is then added to the beads and mixed thoroughly and incubated at 65°C for 10-15 minutes. The reaction mixture is removed and the beads washed 3 times with TE buffer.*
>
> *Deblocking step*
>
> *[0158] Tris-(2-carboxyethyl)phosphines trisodium salt (TCEP) (0.1M) is added to the beads and mixed thoroughly. The mixture was then incubated at 65°C for 15 minutes. The deblocking solution is removed and the beads washed 3 times with TE buffer."*

Prior to deprotection, the reaction mixture for the polymerase reaction is first of all removed. The microbeads with the DNA immobilised thereon are then washed three times with TE buffer. According to paragraph [0156], this TE buffer has the composition: 10 mM Tris-HCl, pH 8, 1 mM EDTA. Information regarding other components is not provided, and thus it can be assumed that the TE buffer does not contain any other components either.

284

As regards the actual deprotection, it is merely stated that TCEP trisodium salt in a concentration of 0.1 M should be incubated with the oligonucleotides immobilised on microbeads at 65°C for 15 minutes. Whether this should be done in water, in the TE buffer or in another medium is left open. It is merely stated that after completion of the reaction, the deprotection solution is removed and the microbeads are to be washed again three times with TE buffer.

285

However, even assuming that the examples had actually been carried out, it is immediately clear to the skilled person – contrary to the opinion of the Opposition Division – that the reaction conditions exemplified in EP 578 are by no means so "mild" per se as to prevent the DNA from being denatured with certainty. This applies to the polymerase reaction, and in particular also to deprotection, as will be explained in more detail below.

286

Defendant asked *Prof. Carell* to rework deprotection conditions known from the prior art; see Enclosure 23.

287

In the context of his experiments on DNA denaturation under deprotection conditions, *Prof. Carell* also investigated the melting behaviour of typical primer/target DNA duplexes. It should be noted that EP 578 does not provide any information regarding the sequence and length of the primer used. The length of the double-stranded overlap area of primer and target DNA is not specified. However, the sequence and length of the primer essentially determines the melting temperature of the double-stranded DNA region, i.e. the strength of the bond between the primer and the target DNA. EP 578 therefore obviously assumes that primers already known for SBS can also be used for the teaching according to EP 578.

288

Such primers commonly used for SBS are disclosed, for example, in *Tsien et al.* Accordingly, for reasons of efficiency, primers should be as short as possible and typically have a minimum length of 10 bases (see Enclosure 14, page 18, lines 15 to 27):

289

> *"The length of the primer must be adequate to unambiguously and strongly hybridize with a single region of the subject DNA. As is known in the hybridization art, this can depend upon factors such as the sequence, environmental conditions, and the length of the subject DNA. For efficiency of operation, the primer should ideally be as short as possible. Primer lengths typically range from about 10 bases to about 30 bases, although shorter primers would certainly be attractive if they met the above criteria, and longer primers could be used albeit with an increase in cost and time. Good results generally are achieved with primers from 12 to 20 bases long."*

Even though *Prof. Carrell's* experiments mainly relate to known deprotection methods, he has, for comparison purposes, determined inter alia the melting points of a 10 base-pair-long primer / DNA duplex with the sequence

     5' AGC GAT ACT A 3'

     3' TCG CTA TGA T 5'

at various salt concentrations (NaCl) (see <u>Enclosure 23</u>, Fig. 1.1.1a) and Fig. 1.1.1e)). The melting points were at 43.5°C (150 mM $Na^+$) and 47.9°C (550 mM $Na^+$):



*Fig. 1.1.1a)*



*Fig. 1.1.1e)*

290

291

In the deprotection experiment of EP 578, TCEP trisodium salt in a concentration of 0.1M is used as reducing agent for the cleavage of the azidomethyl group. Further information on the composition of the deprotection solution, e.g. pH or type and concentration of any buffers, is not provided.

292

However, due to the good water solubility of TCEP trisodium salt, it can be assumed that the concentration of $Na^+$ ions is 300 mM. It is thus approximately in the middle of the salt concentrations used by *Prof. Carell*. It is therefore to be expected that the melting temperature of the primer/target DNA duplex will lie between the two measured values and will not exceed 47.9°C in any case.

293

According to the provision in EP 578, the deprotection solution should act for 15 minutes at 65°C on the DNA immobilised on the microbeads before it is separated and the microbeads are washed with TE buffer. At this temperature – approx. 20°C (!) above its melting point – the primer/DNA duplex is completely melted, however. If only one of the strands is immobilised on the microbeads, the other strand would also be separated when removing the deprotection solution. The cycle would thus be interrupted since a subsequent extension of the primer by the next nucleotide using polymerase is no longer possible.

294

Even the use of longer primers cannot solve this problem. In another experiment, *Prof. Carell* shows that the melting temperature of a 17-mer primer can be increased to 64°C (see Enclosure 23, Fig. 1.1.2A) and roughly corresponds to the reaction temperature of 65°C in the example of EP 578. Accordingly, half of the DNA is present as an unpaired single strand, which would be washed away during removal of the reaction solution and the washing processes. The expected yield losses of up to 50% after each cycle would rapidly reduce the total amount of available DNA to such an extent that SBS is no longer practicable.

295

Thus, the deprotection method according to EP 578 would also lead to the denaturation of the DNA unless appropriate countermeasures are taken.

296

Nothing else occurs in EP 578 since it makes use of the hairpin technology described in *Ju et al.* or *Canard and Sarfati* to prevent irreversible denaturation. Paragraph [0156] of EP 578 describes the immobilisation of DNA on microbeads used for the subsequent SBS pursuant to paragraphs [0157] to [0161]. The primer was linked to the target sequence using hairpin DNA in order to avoid irreversible denaturation and the resulting loss of DNA (see [0156]; emphasis added):

> *"Preparation of the streptavidin beads [0156] Remove the storage buffer and wash the beads 3 times with TE buffer (Tris-HCl pH 8, 10 mM and EDTA, 1 mM). Resuspend in B & W buffer (10 mM Tris-HCl pH 7.5, 1 mM EDTA and 2.0 M NaCl), add biotinylated 32P labelled hairpin DNA with appropriate overhanging template sequence. Allow to stand at room temperature for 15 minutes. Remove buffer and wash beads 3 times TE buffer."*

The alleged technical effect that deprotection of the azidomethyl protecting group should only be possible with a water-soluble phosphine, such as TCEP, was not demonstrated in EP 578 and thus -- in contrast to the opinion of the Opposition Division -- was not made plausible.

The object formulated by the Opposition Division, i.e. to provide 3'-modified nucleotides which can be deprotected under mild conditions in an aqueous medium without denaturing the DNA, was therefore not solved. This has two legal consequences:

1) Also according to European practice, the objective technical problem is to be worded less ambitiously, i.e. to find only one 3' protecting group alternative to *Ju et al.* (or *Tsien et al.*).

2) The alleged technical effect of being able to avoid DNA denaturation without the usual countermeasures must not be taken into consideration for the assessment of the inventive step.

297

298

299

300

301

As regards the question of the motivation of the skilled person to turn to a specific publication to solve his technical problem, it is therefore not decisive in the present case whether this document also offered indications as to how denaturation could be avoided during deprotection without further auxiliary measures. For the teaching of EP 578 to be obvious, it is rather sufficient if the skilled person with a reasonable assessment of the publication and his common general knowledge, could assume with a sufficient expectation of success that deprotection is, in principle, possible – irrespective of whether denaturation of the DNA could occur or not.

302

This is not precluded by the fact that irreversible denaturation may not occur for the SBS. The skilled person had known methods at his disposal to prevent this, for example by means of "hairpin" technology. In fact, a primer/target DNA duplex connected via a hairpin is also used in EP 578 to prevent permanent denaturation.

303

b)    *Ju et al. well discloses deprotection in an aqueous medium*

In the opinion of the Opposition Division, *Ju et al.* would only consider the removal of protecting groups in a medium containing organic solvents (see Enclosure 5, page 17, third paragraph).

304

The "complex and multi-stage method" required therefor is disclosed in *Kamal et al.* (1999).

305

Evidence:    *Kamal et al.* (1999), A mild and Rapid Regeneration of Alcohols from their Allylic Ethers by Chlorotrimethylsilane/Sodium Iodide; Tetrahedron Letters, Vol. 40, pp. 371-372

(Enclosure 26)

*Ju et al.* actually makes several references to *Kamal et al.* (see Enclosure 8, page 6, line 17; page 49, line 24; page 54, lines 19 and 24; page 59, line 3; page 60). However, even a cursory glance at *Kamal et al.* immediately shows that this document primarily relates to the cleavage of the 3'-allylether protecting group (see

306

Enclosure 26, Title; Abstract). The deprotection method is described on page 371, final paragraph, to page 372:

> "This led us to utilise this reagent system for the cleavage of allyl ethers following this procedure: To a solution of allyl ether (1 mmol) in acetonitrile (10 ml). NaI (1.5 mmol) was added and the mixture stirred for 2 min. To this stirred suspension, a solution of chlorotrimethylsilane (1.5 mmol) was added and the stirring continued for another 2 min (for entry 7, 4.5 equivalent of the reagents were used). On completion of the reaction, as indicated by TLC, the reaction mixture was quenched using sodium thiosulphate and extracted with ethyl acetate. The organic layer was dried over anhydrous Na 2 SO 4 and concentrated under reduced pressure to give the product which was purified by column chromatography (EtOAc-hexane, 2:3) to give the final product."

It is apparent from the instructions provided above that (with the exception of quenching with sodium thiosulphate) the deprotection method for allyl ethers according to *Kamal et al.* is carried out in organic solvents under anhydrous conditions. However, a certain amount of water in the medium would be necessary to keep the DNA in solution during deprotection. This was obvious for the skilled person since he knew that DNA can be precipitated in organic solvents. [307]

*Kamal et al.* is also discussed in EP 578 (see paragraph [0012]). The inventors are of the opinion that the *Kamal* method cannot be carried out in an aqueous medium in any case since trimethylsilane chloride (TMS chloride) hydrolyses in an aqueous medium. This would make the in-situ production of the actual deprotection reagent trimethylsilane iodide – and thus also deprotection – impossible from the outset (see paragraph [0012]): [308]

> "The Kamal methodology is inappropriate to conduct in aqueous media since the TMS chloride will hydrolyse preventing the in situ generation of TMS iodide. Attempts to carry out the Kamal deprotection (in acetonitrile) in sequencing have proven unsuccessful in our hands."

The Opposition Division obviously also took this technical understanding as a basis for its assessment that *Ju et al.* only describe deprotection methods in non-aqueous media. However, the Opposition Division thereby overlooked the fact that *Ju et al.* in any case also describes another protecting group which is cleaved in a water-containing medium. This is the MOM protecting group, which has been discussed in detail above.

309

As regards deprotection of the MOM group, *Ju et al.* (see Enclosure 8, page 6, line 17; page 49, line 23; page 54, line 19, line 26; page 59, line 2) refers to *Ireland and Varney*.

310

Evidence: *Ireland and Varney* (1986), Approach to the Total Synthesis of Chlorothricolide: Synthesis of (±)-19,20-Dihydro-24-*O*-methylchlorothricolide, Methyl Ester, Ethyl Carbonate; J. Org. Chem. Vol. 51, pp. 635-648

(Enclosure 27)

The deprotection method described in *Ireland and Varney* (see also Fig. 14 of *Ju et al.*, as far as the MOM group is concerned) uses $LiBF_4$ in an acetonitrile/water mixture and achieves a quantitative yield (see Enclosure 27, page 640, middle of the final paragraph; emphasis added):

311

> *"Both the SEM and the MOM group could, however, be removed in one step ($LiBF_4$, $CH_3CN$, $H_2O$, 70 °C) to give the diol 31 (Scheme VI) in quantitative yield."*

It therefore does not need to be discussed whether the deprotection method according to *Kamal et al.* can be adapted in such a manner that the DNA remains dissolved. With the MOM function, the *Ju et al.* in any case provides a protecting group and a corresponding deprotection method, as regards which the person skilled in the art could expect that it also works with DNA and is therefore also suitable for SBS.

312

It is furthermore also of no importance whether the DNA denatures or not when the MOM group is deprotected as according to Ireland and Varney. With the "hairpin" method also disclosed in *Ju et al.*, a remedy was available which in any case allowed

313

a successful implementation of SBS. As shown above, EP 578 also has to resort to this measure.

The opinion of the Opposition Division that *Ju et al.* only discloses deprotection methods in an anhydrous medium – and thus methods that are unsuitable, in principle, for SBS – is based on an obvious misinterpretation of the technical teaching of this document. Moreover, it is in direct contradiction to other statements in *Ju et al.* itself, according to which anhydrous deprotection conditions are not practicable for SBS (see above, N 163 *et seq.*).

314

c) *No reservations based on Ju et al. against the use of 3'-protecting groups with azidomethyl function*

Also the third theory of the OD, according to which *Ju et al.* teaches away from the use of the azidomethyl protecting group according to EP 578, is based on a misconception of the technical teaching of this document, as will be explained in more detail below.

315

It is true that *Ju et al.*, with reference to *Canard et al.*, advises against the use of protecting groups with ester or keto functions, i.e. groups with a carbonyl unit adjacent to the 3'-oxygen atom (see the detailed discussion above, N 175 *et seqq.*).

316

However, the further assumption by the OD that an azidomethyl group is equivalent to the ester or keto groups – as far as its vulnerability to nucleophilic groupings in the polymerase is concerned – and therefore cannot be used for SBS either, is incorrect.

317

The Opposition Division derives its theory from the observation that the 3'-azido group of azidothymidine (AZT) carries a partial positive charge in a similar position to 3'-esterified nucleotides. It refers in this regard to the end of the left-hand column on page 10836 of *Canard et al.* (Enclosure 13, emphasis added):

318

> *"Strikingly, the central nitrogen of the 3'-azido group of AZT bears a partial positive charge (29) in a position*

*similar to the carbonyl group of 3'-esterified nucleotides, and the 3'-azido group of AZT is metabolized into a 3'-amino group in vivo (30)."*

Such a positive partial charge for the middle nitrogen atom can in fact be derived from the mesomeric boundary structures of the azido group since this carries a positive charge in two of the three boundary structures, i.e. is electrophilic. In the illustration besides, the central nitrogen atom in each case is surrounded by a common frame, R is an organic residue, e.g. the 3'-residue of the nucleotide.



319

Evidence: - Excerpt of Wikipedia, Azide (https://de.wikipedia.org/wiki/Azide)
(Enclosure 28)

However, the OD did not take into consideration the sentence preceding the above passage in *Canard et al.*, according to which the position and distance of the electrophilic atom from the ribose sugar moiety is important in order to be susceptible to a nucleophilic attack by groups in the catalytic centre of the polymerase (see Enclosure 13, page 10863, left-hand column, lines 7 to 5 from the bottom; emphasis added):

320

*"Other substituents at the 3' end of DNA **at such a position and distance of the sugar ring** may also receive a nucleophilic attack."*

This statement is understandable for the skilled person since the interactions relevant for a nucleophilic attack are only effective over short distances in the range of an atomic distance. In a 3'-ester, the electrophilic carbonyl carbon atom is adjacent to the 3'-oxygen atom, i.e. is in a position two atoms away from the 3'-carbon atom of the sugar moiety.

321

In AZT, on the other hand, the azido group is located directly at the 3'-carbon atom of ribose. Thus, the middle atom of the azido group has about the same distance from the ribose moiety as the carbonyl carbon in a 3'-ester. Both atoms are electrophilic,

322

i.e. they carry a partial positive charge and could therefore be susceptible to a nucleophilic attack from the polymerase **at this position**.

If the corresponding atomic positions of a 3'-O-CH₂-N=N=N group are compared herewith, it becomes apparent at first glance that the "logic" of the Opposition Division is flawed: At the position of the carbonyl carbon atom of an ester or the middle nitrogen atom of an azido group lies the methylene carbon atom of the -CH₂-O-N=N=N group which is not susceptible to a nucleophilic attack (marked with a frame): 323

3'-Ester:            3'C – O –│C│O – R
3'-Azido:            3'C – N =│N│= N
3'-O-azidomethyl:    3'C – O –│C│H₂ – N =(N)= N

The electrophilic nitrogen atom in the middle of the azidomethyl group (marked with a circle) is, in contrast, two bond distances away from the position of the carbonyl carbon in the ester. There is nothing to indicate that possible nucleophilic groups within the catalytic centre of the polymerase could also attack this site which is two atomic distances away. 324

The argumentation of the OD becomes entirely incomprehensible if the three-dimensional arrangements of the respective groupings are also taken into consideration. The following figure[5] simulates a possible position and orientation of a 3'-O-azidomethyl group compared to a 3'-azido group in the active centre of a polymerase: 325

---

[5] The computer graphics were created by Prof. Carell with the aid of the program "PyMOL". The simulated DNA polymerase is a KOD polymerase with a known 3D structure. The diagram only serves for illustration purposes and does not show the exact positions and distances of the atoms. See Enclosure 23.



3'-N=N=N                    3'-O-CH₂-N=N=N

Owing to the freely rotatable "joints" of its ether (-O-) and methylene (-CH₂-) bonds, the 3'-O-azidomethy group is much more flexible than the short and relatively rigid 3'-azido group. The above computer graphic clearly shows that both groups orient themselves differently in the active centre of the polymerase (see circles). The middle nitrogen atom of the azido function therefore spatially comes to lie at a different position to the corresponding nitrogen atom of the -O-azidomethyl group (see arrows). Special attention should be paid to the different position of the central nitrogen atom in relation to the magnesium ion in the polymerase. 326

Therefore there is no need to discuss that the carbonyl carbon atom of a 3'-ester group comes to lie close to the position of the middle nitrogen atom of a 3'-azido group and the latter is susceptible to a nulceophilic attack at this site. The middle nitrogen atom of a 3'-azidomethyl group is in any case in a different position. An identical reactivity, as presumed by the Opposition Division, therefore cannot be assumed. 327

It is furthermore worth noting that *Canard et al.* did not themselves make the observation that the 3'-azido group of AZT is reduced *in vivo* to 3'-amine. They merely refer to reference (30), a publication by *Cretton et al.* (1991).

328

Evidence:    *Cretton et al.* (1991), Catabolism of 3'-Azido-3'-deoxythymidine in Hepatocytes and Liver Microsomes, with Evidence of Formation of 3'-Amino-3'-deoxythymidine, a Highly Toxic Catabolite for Human Bone Marrow Cells; Molecular Pharmacology, Vol. 39, pp. 258-266

(Enclosure 29)

According to its title, this publication relates to the catabolism of AZT (3'-azido-3'deoxythymidine) in hepatocytes and liver microsomes (see Enclosure 29, page 258, right-hand column, end of the Abstract; emphasis added):

329

> *"This study provides the first detailed catabolic profile of AZT at the hepatic site and emphasizes the critical role that the liver plays in drug clearance. Formation of AMT, a highly toxic catabolite of AZT, raises a question regarding the role of AMT in the cytotoxic effects of AZT observed in patients."*

The authors found that inter alia within intact liver cells, AZT is reduced to 3'-amino thymidine (AMT) by an NADPH-dependent enzyme system (see Enclosure 29, page 263, right-hand column, second-to-last-line, to page 264, left-hand column, first line). The AMT is then released into the extracellular medium (see Enclosure 29, page 265, right-hand column, final paragraph):

330

> *"Of particular interest was the unexpected finding of two catabolites, AMT and GAMT, that were formed within hepatocytes. These metabolites were resolved from GAZT and did not coelute with any known AZT anabolites. A number of characteristics of the formation, disposition, and biological significance of these two metabolites were established. (i) AMT formation is NADPH dependent. (ii) Once formed within the hepatic intracellular milieu, AMT is slowly released into the extracellular medium."*

The reduction of the azido group to the amino function in AZT as described by *Cretton et al.* is therefore irrelevant for the polymerase reaction: On the one hand, it

331

was only observed as a catabolic degradation reaction in intact liver cells. On the other hand, it requires a specific enzyme system with NADPH as the cofactor.

In contrast, nucleotide incorporation during SBS takes place in a cell-free system. The polymerase used here is not a reductase, nor is it NADPH-dependent. There is, of course, also no NADPH in the reaction medium.

332

The skilled person also did not presume that the azido group was generally unstable and was for this reason alone at risk of being degraded in the polymerase reaction as "collateral damage", so to speak. In fact, the azido group is known to be one of the most stable chemical groups and is only reactive under specific conditions. It does not occur in natural biomolecules and is virtually inert in biological/ physiological systems. This property is therefore also referred to as "bioorthogonal".

333

This fact also makes the azido group so interesting for use in experiments in biological systems since an unspecific side reaction is not to be expected. *Ju et al.* also use a highly specific coupling reaction based on an azido function to immobilise the DNA molecules on a solid surface such as a chip (see <u>Enclosure 8</u>, page 7, line 24, to page 8, line 1):

334

> *"Saxon and Bertozzi (2000) developed an elegant and highly specific coupling chemistry linking a specific group that contains a phosphine moiety to an azido group on the surface of a biological cell. In the present application, this coupling chemistry is adopted to create a solid surface which is coated with a covalently linked phosphine moiety, and to generate polymerase chain reaction (PCR) products that contain an azido group at the 5' end for specific coupling of the DNA template with the solid surface."*

The document *Saxon and Bertozzi* (2000) as referred to in *Ju et al.* is entitled "Cell Surface Engineering by a Modified Staudinger Reaction".

335

Evidence:   *Saxon and Bertozzi* (2000), Cell Surface Engineering by a Modified
Staudinger Reaction; Science, Vol. 287, pp. 2007-2010
(Enclosure 30)

Interestingly, the coupling reaction according to *Saxon and Bertozzi* also makes use      336
of a "Staudinger reaction", which was specifically modified here to couple the azido
group to the cell surface. This is hardly surprising since the Staudinger reaction was
one of the few reaction types with which azido groups could be reacted.[6]

Moreover, *Saxon and Bertozzi* shows that a Staudinger reaction can, in principle, also     337
be carried out in a completely aqueous medium, which is an indispensable
prerequisite for the manipulation of living cells.

What is above all also significant is the clear finding by the authors that the azido       338
group is "abiotic" and "chemically orthogonal" to "native cell components", which
also include polymerases (see Enclosure 30, Abstract; emphasis added):

> *"Selective chemical reactions enacted within a cellular
> environment can be powerful tools for elucidating
> biological processes or engineering novel interactions. A
> chemical transformation that permits the selective
> formation of covalent adducts among richly
> functionalized biopolymers within a cellular context is
> presented. A ligation modeled after the Staudinger
> reaction forms an amide bond by coupling of an azide and
> a specifically engineered triarylphosphine. Both reactive
> partners are abiotic and chemically orthogonal to native
> cellular components. Azides installed within cell surface
> glycoconjugates by metabolism of a synthetic azidosugar
> were reacted with a biotinylated tri- arylphosphine to
> produce stable cell-surface adducts. The tremendous
> selectivity of the transformation should permit its
> execution within a cell's interior, offering new
> possibilities for probing intracellular interactions."*

---

[6] The so-called "click" chemistry, with which azido groups can be selectively coupled to an – also
bioorthogonal – alkyne (-C≡C-) group, had just been introduced in 2001 by Sharpless, Kolb and Finn,
and was developed further by Prof. Carell (see Enclosure 23, A). It only found widespread use after the date
of priority of EP 578.

Last but not least, it is emphasised how important the provision of a bio-orthogonal protecting group was for SBS, similar to scientists close to the patent proprietor Illumina, such as Prof. *Balasubramanian* in <u>Enclosure 19</u> (see <u>Enclosure 30</u>, page 7284, left-hand column, second paragraph; emphasis added):

> *"The 3'-oxygen of the DNA being extended is the **essential nucleophile for the nucleotidyl transfer reaction**. Therefore for practical implementation of the sequencing chemistry, the most straightforward way to control stepwise incorporation was **to design a <u>bioorthogonal</u> protecting group to mask the 3'oxygen of the modified dNTP."***

And, yet further (see <u>Enclosure 30</u>, page 7284, left-hand column, middle of the final paragraph; emphasis added):

> *"Besides **bioorthogonality**, this chemistry also allowed a relatively compact protecting group at the 3'OH of the incoming nucleotide, which was important for being tolerated by the DNA polymerase."*

It is thus clear that the conclusion of the Opposition Division that *Ju et al.* teaches away from the teaching according to EP 578 since the azido group is not sufficiently stable in the context of the polymerase reaction is based on a fundamental misjudgement.

**The opposite is the case: The person skilled in the art was rather motivated to use the azidomethyl group to block the 3'-position of the nucleotide since it was not only sufficiently small but also bioorthogonal, i.e. inert in the biological system and did not interfere with the polymerase. He could therefore assume with a reasonable expectation of success that the azidomethyl group would not be unspecifically deprotected during the polymerase reaction.**

339

340

341

342

## G. Non-Infringement of EP 412

### 1. Preliminary remarks

#### a) *Specific technical background of EP 412*

The technical background described by the Plaintiff as to the effects of ascorbic acid or a salt thereof in a DNA sequencing method is very brief (act. 1 N 10-33; N 64-69). A more detailed overview on the matter is deemed appropriate and helpful.    343

The core concept of EP 412 boils down to the use of ascorbic acid as an antioxidant when performing a method of sequencing of a template strand of nucleotides by means of incorporating and identifying fluorescently labelled nucleotides into a strand complementary to a template strand (claim 1).    344

Fluorescence is the emission of light by a substance that has previously absorbed light. The emitted light typically has a longer wavelength, and therefore lower energy, than the absorbed radiation. The concept of fluorescence is often illustrated by means of a so-called *Jablonsky* diagram.    345



Illustration from Wikipedia

After an electron absorbs a high-energy photon the system is excited electronically    346
and vibrationally. The system relaxes vibrationally, and eventually fluoresces at a
longer wavelength.

Evidence:    Excerpt of Wikipedia, Fluorescence
             (https://en.wikipedia.org/wiki/Fluorescence)

                                                          (Enclosure 31)

Strong fluorescence is almost entirely confined to conjugated systems, which possess    347
highly mobile electrons and non-crossing potential curves of the ground state and the
excited state. Typical examples of fluorophores therefore include:



TMR

Cy3

In the case of sequencing by synthesis as performed by Plaintiff, fluorophores are      348
typically attached via a linker bound to the base of the nucleotide (page 20 Fig. 1 of
WO 2004/018493).



Cytidine C5-linker

Guanosine N2-linker

Evidence:    WO 2004/018493, *Solexa*

                                                          (Enclosure 32)

A fluorophore as shown above (TMR, Cy3) can repeatedly undergo a fluorescence          349
process – in theory, indefinitely. This is useful because it means that one fluorophore

molecule can generate a signal multiple times. In reality, however, the fluorophore's structural instability during the excited lifetime makes it susceptible to degradation. High-intensity illumination can cause the fluorophore to change its structure so that it can no longer fluoresce – this effect is called photobleaching.

One of the main factors in the degradation of fluorophores is the presence of oxygen.    350
Molecular oxygen is prone to damage other structures by producing highly reactive oxygen species such as peroxides, hydroxyl radicals or singlet oxygen. As a consequence, antioxidants are often used to diminish the detrimental effects of reactive oxygen species by either preventing these reactive species from being formed or by removing them before they can damage other sensitive compounds.

Ascorbic acid (also called vitamin C) is a mild reducing agent and one of the most    351
widely used naturally occurring antioxidants in biological systems. It is oxidized with loss of one electron to form a radical cation and then with loss of a second electron to form dehydroascorbic acid. It typically reacts with oxidants of the reactive oxygen species, such as the hydroxyl radical.

Evidence:   Excerpt of Wikipedia, Chemistry of ascorbic acid
(https://en.wikipedia.org/wiki/Chemistry_of_ascorbic_acid)
(Enclosure 33)

b)   *Subject matter of EP 412 (ad act. 1 N 62-69)*

EP 412 relates to the use of ascorbic acid as an additive which can be added to    352
buffers used in nucleotide detection processes to improve the efficiency of fluorescence-based nucleic acid sequencing reactions.

EP 412 suggests that efficiency of fluorescence-based multiple cycle nucleic acid    353
sequencing be improved when the step of determining the identity of an incorporated, fluorescently labelled nucleotide is carried out in a buffer comprising ascorbic acid (see paragraph [0005]).

The Plaintiff asserts that this method and a related kit are new and inventive, even though (see paragraph [0006]):

354

> *"it was known in the art to add chemical antioxidants such as ascorbic acid to fluorescent imaging buffers."*.

As will be shown in detail below, EP 412 as granted is invalid because the claimed subject matter goes beyond the disclosure as originally filed (N 381 *et seqq.*), and does not involve an inventive step (N 415 *et seqq.*).

355

c)      *Feature analysis of the claims of EP 412 (ad act. 1 N 70-86)*

The feature analysis of the claims of EP 412 as suggested by Plaintiff is accepted herein.

356

d)      *The skilled person*

The skilled person in the case at hand is a biochemist (or chemist specialised in biochemistry), with a university degree and several years of practical experience in the biochemical industry. During his studies, he regularly acquired his own practical experience with classical sequencing methods, such as the Sanger method. He is also aware of the more recent methods and may already have used these during his studies or in his further professional career. The person skilled in the art also has solid chemical knowledge regarding the provision of the corresponding basic building blocks, such as nucleotides and nucleosides.

357

The person skilled in the art is also, as part of his background knowledge, aware of means and methods for preserving the performance of sequencing reactions. As such, he understands the chemistry associated with sequencing, for example dye and radical chemistry, in particular the phenomenon of photobleaching, and measures for its prevention.

358

2. **EP 412 is not infringed by Defendant and by the contested embodiments (ad act. 1 N 151-197)**

a) *Plaintiff did not provide proof of infringing acts of Defendant (ad act. 1 N 87-92, N 151)*

As pointed out above (see N 27 *et seqq.*) Plaintiff has not provided any evidence of infringing activities of Defendant. Alone for this reason, a finding of infringement is excluded.
<span style="float:right">359</span>

b) *The contested sequencing reagent kits and methods do not infringe EP 412 (ad act. 1 N 152-197)*

As already explained with respect to non-infringement of EP 578, Plaintiff's infringement arguments cannot be followed because Plaintiff used unsuitable testing material (see N 50 *et seqq.*), wrongly assumed that all reagent kits provided by the MGI group rely on the same chemistry (see N 53 *et seqq.*) and the test methods used are not suitable to unambiguously prove infringement of the patents (see N 55 *et seqq.*). All these disqualifying elements likewise apply to the infringement analysis of EP 412 and reference can therefore be made to the above arguments.
<span style="float:right">360</span>

In addition, with respect to the analysis of EP 412 Plaintiff used a Quantofix® Test Strip analysis (see act. 1_16 and act. 1_17), which is also not suitable to provide proof of infringement.
<span style="float:right">361</span>

The Quantofix® Test Strip analysis is a fast and simple test for quickly screening analyte solutions for the presence of ascorbic acid, similar to conventional pH-strips.
<span style="float:right">362</span>

Evidence: Excerpt of the website
https://www.sigmaaldrich.com/catalog/product/aldrich/z166340?lang=en&region=GB; visited 17.11.2019

(Enclosure 34)

The exact mode of action of Quantofix® appears to be the trade secret of the supplier. As a consequence, it is not possible to know whether or not this test is specific. In particular, it is generally acknowledged that such quick tests are very sensitive towards interfering factors ("Störfaktoren"). Pursuant to the cited website, such interferences must be eliminated by precipitation or masking. There is no section in the expert delarations on file (act. 1_16, act. 1_17), that such necessary measures were taken. The reliability of the Quantofix® test is therefore very limited.

**3.    EP 412 is invalid**

It will be shown below that the claims of the subject-matter of EP 412 exceed the content of the application as filed in the version decisive for the filing date, and that EP 412 lacks novelty and does not involve an inventive step, respectively.

With regard to inventive step, it will specifically be shown that there are several prior art documents which incentivise the skilled person to use effective antioxidants when performing a method of sequencing nucleotides involving fluorescence detection steps, and that there are in fact at least two documents which present ascorbic acid as the preferred antioxidant when performing fluorescence based single-molecule analysis.

*a)    EP 412 was erroneously upheld in opposition proceedings*

The mention of grant of EP 412 was published on 28 November 2012. Opposition was filed on 20 August 2013.

During prosecution proceedings, documents D3 (*WO 00/70073*, referred to as *WO 073* below) and D4 (*WO 02/086165*, referred to as *WO 165* below) were suggested as closest prior art.

Evidence:    WO 00/70073, Cornell Research Foundation

(Enclosure 35)

WO 02/086165, 3M Innovative Properties

(Enclosure 36)

The differentiating feature between *WO 073* and EP 412 was considered to be the use of a different antioxidant, i.e. ascorbate instead of DTT (see Enclosure 35, p. 17, last paragraph). The applicant argued that the skilled person would not have expected that ascorbic acid is more efficient than DTT as an antioxidant in experimental setups for determining fluorescently labelled nucleotides. The applicant filed a series of data to support the effect of ascorbic acid on fluorescence intensity.

368

Evidence:     Submission in EPO prosecution, dated 13 April 2011

(Enclosure 37)

The source of such data had been filed earlier in US proceedings (the *Klausing declaration*), and was introduced during EPO opposition proceedings as D10 by the opponent.

369

Evidence:     *Klausing declaration*
              [D10 in EPO opposition proceedings]

(Enclosure 38)

Based on such data, it appeared that fluorescence intensity in cycle 20 was higher and that the error rate in cycle 35 was lower when using ascorbic acid, compared to the same experimental setup using DTT as an antioxidant.

370

Later, in opposition proceedings, the OD was of the opinion that D1, *WO 770*, should be considered the closest prior art.

371

Evidence:     WO 00/06770, Solexa
              [D1 in EPO opposition proceedings]

(Enclosure 39)

*WO 770* teaches a device with an array of molecules capable of interrogation, wherein the array has a surface density which allows the DNA molecules to be individually resolved and wherein the molecules are immobilized on a solid surface by specific interaction.

372

Opponent suggested that D1 be combined with *Olson et al.*    373

Evidence:    *Olson et al.* (2001), Electrophoresis of DNA Adsobed to a Cationic
Supported Bilayer; Langmuir, 17, 7396-7401
[D2 in EPO opposition proceedings]

(Enclosure 40)

*Olson et al.* teaches the addition of ascorbic acid to a DNA electrophoresis    374
experiment as a scavenger for molecular oxygen. Oxygen would otherwise increase
the photosensitization of the DNA-dye complex (see Enclosure 40, p. 7397, col. 1,
penultimate paragraph).

Further lines of argument were presented by the opponent in a submission dated 7    375
October 2015: Opponent argued in particular that the subject matter of the
independent claims is also obvious over D9 (WO 00/18957) in combination with
*Olson et al.*

Evidence:    WO 00/18957, Applied Research Systems
[D9 in EPO opposition proceedings]

(Enclosure 41)

*WO 957* pertains to methods for amplification and sequencing of nucleic acid    376
comprising the steps of: (1) forming a nucleic acid template comprising the nucleic
acid(s) to be sequenced; (2) mixing said nucleic acid template(s) with one or more
colony primers in the presence of a solid support so that the 5' ends of both the
nucleic acid template and the colony primers bind to the solid support; (3)
performing one or more nucleic acid amplification reactions on the bound
template(s), so that nucleic acid colonies are generated and performing a step of
sequence determination of one or more of the nucleic acid colonies generated. The
sequencing method is suggested to be performed in an antifade solution.

After the oral hearing, EP 412 was maintained in amended form. The amendments    377
were confined to the addition of the term "successively" in claims 13 and 14 in order
to remedy a lack of enabling disclosure (Art. 83 EPC) found by the OD. According

to the reasons of the decision, *WO 770* (D1) was considered to be the closest prior art. The differentiating feature was the use of ascorbic acid in the buffer solution during determination of the identity of the incorporated nucleotide. The OD was of the opinion that the skilled person – despite having knowledge of ascorbic acid as an oxygen scavenger – would not have readily chosen ascorbic acid over other antioxidants.

A technical effect was acknowledged by the OD based on the data of the *Klausing declaration*.

The OD held that none of the documents of the prior art had described the use of ascorbic acid as more efficient than other oxygen scavengers, and that none of the documents concerning sequencing had provided an incentive to improve sequencing by reducing photobleaching.

Evidence:    Interlocutory decision of the OD re EP 412, dated 30 November 2015
                    (Enclosure 42)

Opponent filed an appeal against such decision on 25 January 2016. However, the appeal was withdrawn on 26 February 2016 following a settlement. The flawed decision could therefore not be corrected by the Boards of Appeal.

Evidence:    Notification of termination of appeal proceedings, dated 7 March 2016
                    (Enclosure 43)

**b)    *EP 412 is invalid for added matter***

**i)    Preliminary Remarks**

EP 412 is invalid for added matter because its subject-matter exceeds the content of the application as filed.

378

379

380

381

It will be explained below that claims 1, 2 and 15 of EP 412 were unduly amended over the application as originally filed, i.e. WO 2006/064199, and are, therefore, invalid for added matter.

382

Evidence:     WO 2006/064199, Solexa

(Enclosure 44)

**ii)     Amendments in claim 1**

With regard to claim 1, the subject matter had undergone quite substantial modifications during EPO prosecution. The claim had effectively been reformulated entirely. Claim 1 of EP 412 is presented below in mark-up mode, highlighting the amendments over claim 1 of *WO 199*:

383

> A method of ~~detecting a fluorescent moiety incorporated in or attached to a polynucleotide molecule,~~ <u>sequencing at least two nucleotides of template nucleic acid comprising repeating the steps of:</u>
>
> <u>(a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid; and</u>
>
> <u>(b)</u> ~~wherein the method includes a detection step which requires repeated or prolonged exposure to intense illumination,~~ <u>determining the identity of one or more of the incorporated nucleotide(s),</u>
>
> ~~and wherein detection of the fluorescent moiety~~ <u>the steps of determining the identity of the incorporated nucleotide(s) is carried out in a buffer which comprises</u> ~~one or more antioxidants~~ <u>ascorbic acid, or a salt thereof.</u>

The deletion of the features of "*fluorescent moiety incorporated in or attached to a polynucleotide molecule*" and of the "*detection step which required repeated or prolonged exposure to intense illumination*" in the text as granted was inadmissible. These features are essential elements of the subject matter of the independent claim based on the application as filed, *WO 199*.

384

100

Furthermore, there was no basis for adding the phrase *"repeating the steps of* [...]" in claim 1 EP 412.

385

The decision of the OD on added matter cannot be followed because it is flawed. The OD mistakenly stated that claim 1 could be directly derived from a combination of claims 1 and 4 as originally filed, with the specification of the antioxidant being ascorbic acid or a salt thereof taken from original claim 16. Also, the OD held that there was a disclosure for the feature "repetition" on page 1, paragraph [0002], page 4, paragraph [0002], the paragraph bridging pages 8 and 9 as well as in Example 1 (see page 37 line 27 to page 38, line 8 and page 38 lines 10-11, line 27) and Example 2 (see page 47) of the application as filed, *WO 199.*

386

However, the elements of *"incorporated or attached fluorescent moieties"* and *"repeated or prolonged exposure to intense illumination"* were part of the essential subject matter of EP 412 both in the claims and description. Despite the presentation of the combined features in original claim 1 and the corresponding sections of the specification (see page 3, third paragraph; page 4, second and fifth paragraph), the two elements were selectively omitted during prosecution.

387

The reasons indicated by the OD for allowing the said amendment, i.e. that the subject matter of claim 1 is directly derivable from claims 1, 4 and 16, lacks any basis. First of all, it is *per se* not persuasive, how a combination of subject matter from dependent claims could justify the omission of features. Furthermore, the omission of very essential features such as a *"detection step which required repeated or prolonged exposure to intense illumination"* cannot be justified as it essentially changes the subject matter of the claimed invention.

388

According to the case law of this Court (O2013_013 cons. 22, in consideration of FSC 4A_111/2011; O2016_017 cons. 19), the EPO's *"gold standard"* is applicable for the assessment of added matter. According to such *"gold standard"*, any amendment to the application can, irrespective of the context of the amendment

389

made, only be made within the limits of what a skilled person would derive *directly and unambiguously*, using common general knowledge, and seen objectively and relative to the date of filing, from the whole of the application as filed.

In the present case, the *gold standard* was clearly not complied with: Plaintiff states in the introductory part of EP 412 that it wants to prevent loss of signal due to diminished brightness of the incorporated fluorophores in cycles of nucleic acid sequencing. Plaintiff, as a consequence, had stated in claim 1 as originally filed that the subject matter of the invention comprises a *"detection step which required repeated or prolonged exposure to intense illumination."* Since this feature had been included in claim 1 as filed, it must be assumed that it had been considered essential to the applicant at the time of filing; there is no indication to the contrary. Rather, only a detection step involving prolonged exposure to intense illumination can benefit from the anti-oxidative properties of ascorbic acid – which is the core teaching of EP 412. In contrast, nowhere in the application as filed is there any statement indicating that the detection step which required repeated or prolonged exposure to intense illumination could be considered a dispensable option.

390

Claim 1 in its current overly broad version includes also other ways of determining the identity of one or more of the incorporated nucleotide(s). The claim encompasses a plurality of methods to determine incorporated nucleotides, such as for example pyrosequencing or additional radioactive labelling and in such a case repeated or prolonged exposure to intense illumination would not be necessary. Hence, claim 1 inadmissibly extends beyond the content of the application as filed.

391

A similar reasoning applies to the feature of *"a fluorescent moiety incorporated in a polynucleotide molecule"*. This feature was replaced by the result of the step: *"incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid"*, while no disclosure of such exchangeability can be derived from the application documents.

392

With regard to the addition of the fragment *"comprising repeating the steps of"* it shall be noted that in none of the sections of the application as filed, the repetition of the two steps (incorporating/determining) is ever mentioned. Claim 1 of EP 412 as it stands, i.e. reading on any method *"comprising repeating the steps of [...]"*, an indefinite number of combinations of

393

-   incorporation steps (as claimed or else),
-   determination steps (as claimed or else),
-   yet further, different steps prior, after or in between the incorporation / determination steps

is encompassed. The two steps to be repeated need not even to be arranged in a specific sequential order. However, the disclosure of EP 412 is clearly limited to either *"incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid"* (original claim 4) or to the subject matter of dependent claims such as *"successively incorporat[ing] at least 10 nucleotides"* (original claim 13). Also for this reason, claim 1 inadmissibly extends beyond the content of the application as filed.

394

### iii) Amendments in claim 2

With regard to claim 2, the only basis for the use of a *"fluorescently labelled nucleoside triphosphate"* can be found in the introductory section of the application as filed, where a nucleoside triphosphate of US 5,302,509 is referenced. However, a mere reference in the **prior art** section of the application as filed is no sufficient basis for such an amendment. The patent specification must be self-contained with respect to the essential features of the **invention**. The OD was obviously mistaken.

395

### iv) Amendments in claim 15

A similar reasoning applies to claim 15. Claim 15 pertains to a kit comprising – among other things – a fluorescently labelled nucleotide, wherein the fluorescent

396

label is linked to the nucleotide via a cleavable linker. However, there simply is no basis in the application as filed for a generic *"cleavable linker"*.

In EPO opposition proceedings, the OD was of the opinion that the disclosure could be found on page 7, second paragraph, by way of the reference to WO 03/048387 (see (Enclosure 44, second paragraph; emphasis added)):

> *"Detectable labels such as fluorophores can be linked to nucleotides via the base using a suitable linker. The linker may be acid labile, photolabile or contain a disulfide linkage. Preferred labels and linkages include those disclosed in WO03/048387. Other linkages, in particular phosphine-cleavable azide-containing linkers, may be employed in the invention as described in greater detail in WO2004/018493."* (Enclosure 36 para. 2; emphasis added).

However, such a reference which is clearly confined to specific examples of linkers cannot be considered a direct and unambiguous disclosure for a generic cleavable linker.

**v)** **Conclusion**

EP 412 is invalid for added matter according to Art. 123(2) EPC / Art. 26 para. 1 lit c PatA, because at least claims 1, 2 and 15 extend beyond the content of the application as filed.

Dependent claims 3 to 14 are likewise invalid for added matter, because they share the unduly amended subject matter of claims 1 and 2.

397

398

399

400

c) *EP 412 is invalid for lack of novelty*

i) **The subject matter of claim 1 is anticipated by US 420**

The subject matter of claim 1 and of several of the dependent claims is anticipated by the disclosure *US 420*:                    401

Evidence:     US 6,355,420 B1, US Genomics

(Enclosure 45)

*US 420* teaches methods and products useful for determining the sequence of polymers, in particular of DNA. The suggested methods are said to enable the entire human genome to be sequenced several orders of magnitude faster than by using conventional technology (col. 6 lines 28-38). The technique is based on the ability to examine each unit of the DNA and its position on the polymeric backbone individually. This is accomplished by moving a unit of the DNA past a "station" and examining a change (e.g. a change of electromagnetic signal), which occurs when the unit is proximate to the said station, e.g. as a result of an interaction that occurs between the unit and the station (col. 6 lines 46-63).                    402



*Fig. 8A*

For visualization purposes, one example of the method displayed in Fig. 8A is briefly explained: The figure shows a DNA strand being conveyed through a nanochannel                    403

(98). The arrow indicates the direction of the DNA strand moving from the bottom to the top. The DNA strand is labelled by an acceptor fluorophore (100) which consecutively moves through positions A, B and C. The circles (96) symbolize donor fluorophores. The donor fluorophores (96) interact in a measurable way (through Fluorescence Resonance Energy Transfer, FRET) with the acceptor fluorophore (100) when the acceptor fluorophore (100) is exactly located in position "B" (col. 73 lines 52-67).

The disclosure of *US 420* is, however, not limited to this example.                    404

The disclosure of *US 420* anticipates the features of claim 1 of EP 412 as shown in    405
the following claim chart:

|     | Claim features of EP 412 | Anticipation by *US 420* |
| --- | --- | --- |
| 1 | A method of sequencing at least two nucleotides of a template nucleic acid comprising repeating the steps of: | The document deals with sequencing of a template nucleic acid, this is for example shown in the section "Summary of the Invention" which has already been cited before (col. 6 lines 28-38). |
| 1.1 | (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid; and | Fluorescence labelling of the nucleic acid strand of interest can be achieved, e.g., by means of direct PCR labelling. Such a method is disclosed in col. 93 lines 22-38. |
| 1.2 | (b) determining the identity of one or more of the incorporated nucleotide(s), | Detection is carried out by moving the single, fluorescently labelled DNA molecule past a "detection |

| | | station" where the labelled nucleotide will interact, for example, with a fluorescence donor (FRET). The general concept of a detection station is disclosed in col. 34 lines 43-62. |
|---|---|---|
| 1.2.1 | wherein the steps of determining the identity of the incorporated nucleotide(s) is carried out in a buffer which comprises ascorbic acid, or a salt thereof. | The problem of fluorophore fading is dealt with in col. 33 and 34, bridging paragraph: A range of chemical methods for increasing a number of fluorophore excitation cycles are listed, among others ascorbic acid. |

As a result, the subject matter of claim 1 of EP 412 is anticipated by *US 420 and EP 412* is therefore invalid for lack of novelty.   406

**ii)   Anticipation of the remaining asserted claims by *US 420***

Likewise, various features of the dependent claims are anticipated by the disclosure of *US 420.*   407

*(a)   Dependent claim 2*

The incorporation of fluorescently labelled nucleoside triphosphates is shown in col. 93 lines 22-38:   408

> *"Wiemann et al., 1995 describe the method of internally labeling PCR products with fluorescein-15-dATP, a protocol that can be applied to other fluorophores."*

The fluorescently labelled dATP is a nucleoside triphosphate.   409

(b)     *Dependent claim 8*

It is an aspect of *US 420* that the DNA molecule is moved past the detection station    410
by an electric current (col. 23 lines 6-10). Such mechanism is well known in the art
as electrophoresis, which is likewise mentioned as an exemplary method in *US 420*
(col. 87 lines 43-61). In the said experiment of fluorescence microscopy in
combination with electrophoresis (line 43), a TBE buffer (0.5x) was used. TBE
(Tris/Borate/EDTA) buffer is generally adjusted to pH 8.3, hence anticipating the
subject matter of claim 8.

(c)     *Dependent claims 13 and 14*

Dependent claims 13 and 14 add the features that at least 10 nucleotides (or 16    411
nucleotides respectively) were successively incorporated and that the identity of the
base present in each of the incorporated nucleotides is determined.

The method disclosed in *US 420* is suitable for labelling DNA fragments of up to    412
3 kb (col. 93, lines 28-29). The "successive" incorporation is inherently encompassed
in a PCR processes.

The document also discloses the identity of the base present in each of the    413
incorporated nucleotides being determined. This is for example shown in the
summary section, already cited (col. 6 lines 35-37), but also in col. 48 l. 4-12:

> *"A four nucleotide labeling scheme can be created where
> the A's, C's, G's, and T's of a target DNA is labeled with
> different labels. Such a molecule, upon traversing an
> interaction station, will generate a linear order of signals
> which correspond to the linear sequence of nucleotides on
> the target DNA. The advantage of using a four nucleotide
> strategy is its ease of data interpretation and the fact that
> the entire sequence of units can be determined from a
> single labeled polymer."*

As a result, also the subject matter of claims 13 and 14 lacks novelty over *US 420*.    414

108

### d) EP 412 is invalid for lack of inventive step

### i) Preliminary remarks

Undisputedly, at the time of filing EP 412 it was known in the art to add chemical antioxidants such as ascorbic acid (vitamin C) to fluorescent imaging buffers. This is correctly stated in the introductory section of EP 412 itself, paragraph [0006].

415

More precisely, it was very common at the time to use chemical antioxidants such as ascorbic acid in fluorescent imaging buffers when analytical imaging experiments were performed with fluorescently labelled nucleic acid strands. This can be seen, for example, in US 2002/0006622.

416

Evidence:    US 2002/0006622, Bradley

(Enclosure 46)

*Bradley* relates to a method of genomic DNA microarray based comparative genomic hybridization CGH (see para. [0003]), which may be performed in ascorbic acid (see para. [0102] and claim 46). Comparative genomic hybridization is a molecular method for analysing variations in the DNA of a test sample compared to a reference sample. The aim of this technique is to quickly and efficiently compare two genomic DNA samples arising from two sources, which are most often closely related, because it is suspected that they contain differences in terms of either gains (e.g. duplications) or losses (e.g. deletions). Comparison (e.g. of tumour *vs.* normal tissue) is achieved through the use of competitive *in situ* hybridization of fluorescently labelled DNA fragments.

417

Such an analysis according to general theory is performed in *Bradley* in Example 1 in the presence of DTT. Ascorbic acid is suggested as an equally valid antioxidant (see paragraph [0102]) and a clear enhancer of fluorescence intensity. It is worth noting, that *Bradley* **lists no more than just five (!) suitable antioxidants, namely: DTT, n-propyl gallate, ascorbic acid, vitamin E (tocopherol), as well as mercapto-containing compounds for antioxidative purposes.**

418

The performance of fluorescence imaging techniques with antioxidants, such as ascorbic acid, was therefore widespread, also and especially in the context of sequencing techniques performed on nucleic acids.

419

## ii) Inaccurate and incomplete assessment of the prior art in opposition proceedings

The decision of the OD is flawed in several respects. One of the most prominent amongst them is the choice of the closest prior art document.

420

The OD held that *WO 770* (Enclosure 39) was the closest prior art because *"it relates to the same field as the patent and has the most features in common with the solution proposed"* (see Enclosure 42, section 9.2). The opposition then went on to state that *"none of the documents cited concerning sequencing provides any incentive to improve sequencing by reducing photobleaching"* (see Enclosure 42, section 9.10).

421

These findings are incorrect and prompted an inappropriate selection of *WO 770* (Enclosure 39) as closest prior art in the assessment of inventive step. In fact, there are documents other than *WO 770* which

422

- have more features in common with claim 1 of EP 412;

- pertain to a more relevant technical problem, similar to the one of EP 412; and

- provide an incentive to improve sequencing by reducing photobleaching.

Defendant suggests the following documents as more suitable closest prior art documents, instead of *WO 770*:

423

- *WO 073* (Enclosure 35; D3 in EPO opposition proceedings), which teaches the use of a buffer containing DTT in single molecule arrays for sequencing by repetitive incorporation of fluorescently labelled nucleotides; and

- *WO 957* (<u>Enclosure 41</u>; D9 in EPO opposition proceedings), which teaches the use of anti-bleaching reagents in single molecule arrays for sequencing by repetitive incorporation of fluorescently labelled nucleotides.

Defendant further considers that *Braslavsky et al.* has to be considered as a closest prior art document.

424

Evidence: *Braslavsky et al.* (2003), Sequence information can be obtained from single DNA molecules; PNAS, Vol. 100, No. 7, pp. 3960-3964

(<u>Enclosure 47</u>)

*Braslavsky et al.* teaches the use of an oxygen scavanging system during illumination periods with fluorescent dyes.

425

The decision of the OD is flawed also for other reasons. The OD did not take into account other relevant documents to be combined with the above mentioned closest prior art documents.

426

Specifically, the OD had rejected obviousness of the subject-matter of EP 412 with the following line of arguments (see <u>Enclosure 42</u>, section 9.10):

427

- allegedly, none of the documents of the prior art documents describes the use of ascorbic acid in fluorescence based sequencing; and

- allegedly, none of the documents describes the use of ascorbic acid as more efficient than any other oxygen scavenger.

However, these statements are not convincing in view of the prior art submitted herewith , which the OD had not been aware of:

428

- *Bradley* (<u>Enclosure 46</u>) shows the use of ascorbic acid in fluorescence based sequencing (i.e. sequencing by comparative hybridisation);

- *Van Dijk et al.* discloses that ascorbic acid is more efficient than DTT; and

- *Dittrich et al.* discloses that ascorbic acid is more efficient than any other oxygen scavenger.

Evidence:   *Van Dijk et al.* (2004), Combining Optical Trapping and Single-Molecule Fluorescence Spectroscopy: Enhanced Photobleaching of Fluorophores; J. Phys. Chem. B, Vol. 108, pp. 6479-6484

(Enclosure 48)

*Dittrich et al.*, (2001), Photobleaching and stabilization of fluorophores used for single-molecule analysis with one- and two-photon excitation; Appl. Phys. B, Vol. 73, pp. 829-837

(Enclosure 49)

The subject-matter of claim 1 of EP 412 is obvious in view of various combinations of documents, as discussed below in detail.

429

### iii) The distinguishing feature over *WO 073* and the objective technical problem

*WO 073* (Enclosure 35) can be considered as closest prior art for assessing inventive step of the subject matter of claim 1. *WO 073* shows the following features of EP 412 claim 1:

430

| 1 | A method of sequencing at least two nucleotides of a template nucleic acid comprising repeating the steps of: | The document is directed to a method of sequencing a target nucleic acid molecule having a plurality of bases. [...] The sequence is deduced by identifying which base is being incorporated into the growing complementary strand of the target nucleic acid by the catalytic activity of the nucleic acid polymerizing enzyme at each step in the sequence of base additions. (Abstract) |
|---|---|---|

| 1.1 | (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid; and | The general concept is disclosed on page 5, lines 11-24; page 10, lines 3-6 and 18-20; page 12, lines 27-28.<br><br>The fluorescent label is disclosed on page 18, entire page; page 21, lines 15-19; claim 15. |
|---|---|---|
| 1.2 | (b) determining the identity of one or more of the incorporated nucleotide(s), | Ways of determining the identity of the incorporated nucleotide are disclosed on page 18. |
| 1.2.1 | wherein the steps of determining the identity of the incorporated nucleotide(s) is carried out in a buffer which comprises ascorbic acid, or a salt thereof. | The steps of determining the identity are carried out in a buffer comprising DTT with a pH of 8; see page 17, lines 27-32.<br><br>DTT (dithiotreitol) is an antioxidant. |

The distinguishing feature between *WO 073* and EP 412 is therefore the use of ascorbic acid or a salt thereof during the step of determining the identity of the incorporated nucleotide(s), rather than DTT, as an antioxidant.

431

Plaintiff stated in prosecution proceedings that the technical effect of the subject matter of EP 412 over *WO 073* allegedly was the superior signal intensity of ascorbic acid in fluorescence measurements when using a buffer containing ascorbic acid, rather than DTT. Plaintiff tried to demonstrate an effect by filing comparative data (see Enclosures 37 and 38).

432

The *Klausing declaration* (Enclosure 38) shows that ascorbic acid (used in Lanes 1-4 in the picture below) reduces fluorescence decay due to photobleaching more

433

efficiently when compared to DTT (used in Lanes 5-8 in the picture below) after a series of cycles:

**APPENDIX A**



However, there are at least two issues with the *Klausing declaration*: First, the data show that the subject matter of claim 1 of EP 412 has no technical effect at all over the first two repetitions of the method. Secondly, also for later cycles the data appear only slightly better than the effect described in *WO 770*, also for later cycles. This *de minimis* – if any – effect must be appropriately reflected in the objective technical problem to be solved.

434

According to *WO 073* (Enclosure 35), at least 14 bases can successfully be incorporated by means of a conventional set-up using DTT. Disclosure for this can be found in claim 1 (*"repeating said providing [...] / polymerizing [...] / identifying [...] so that the sequence of the target nucleic acid is determined"*) in combination with Fig. 1A/C; Fig. 2; page 16, lines 22-23; page 17, lines 21-23). Thus, at least 13 repetitions of the method could be performed by using DTT.

435

Note that this disclosure of *WO 073* is in no contradiction with the data presented in   436
EP 412 which only offers a comparison between ascorbic acid and a buffer having
**no antioxidant at all**. According to EP 412 (page 18, paragraph [0165]):

> *"[...]a clear difference between the number of clusters
> detected at each cycle could be seen. The non-ascorbate
> buffer resulted in a loss of signal for each cluster, and a
> loss of the number of detectable clusters, such that after
> seven cycles the sequencing process was no longer
> working. Using the ascorbate buffer, at least 18 cycles of
> sequencing could be achieved."*

The *Klausing declaration*, on the other hand, only offers a comparison between   437
ascorbic acid and DTT as an antioxidant. Therefore, even when studying the
*Klausing declaration*, one still cannot tell how buffers without any antioxidants,
buffers in the presence of DTT and buffers in presence of ascorbic acid would
perform in an overall relative comparison. Based on the chart in the *Klausing
declaration*, the skilled person cannot tell which fluorescence level would be
required for reliably determining the identity of the base, and there is no indication
whatsoever available that DTT would not be perfectly suitable not only for two
repetitions of the cycle, but also for 8, 10 or 14 cycles.

Since a series of multiple cycles in the presence of antioxidants was thus perfectly   438
known and enabled in the prior art, the technical problem cannot be considered to
enable multiple cycles. Such a wording was incorrectly suggested by the OD (see
Enclosure 42, section 9.8, emphasis added):

> *"provision of an improved method of sequencing [...] in
> which light-induced chemical artefacts are prevented or
> reduced, **thereby allowing accurate determination** of the
> identity of the incorporated nucleotides **over successive
> cycles of nucleotide incorporation** and illumination of
> fluorescent labels".*

The objective technical problem must rather be worded less ambitiously. The   439
technical problem can merely be to provide an alternative method of sequencing

nucleotides of a template nucleic acid in which light-induced chemical artefacts and detrimental effects of photobleaching are reduced.

iv)    **WO 073 in combination with *Van Dijk et al.***

The subject matter of claim 1 is not inventive over *WO 073* (Enclosure 35) in combination with *Van Dijk et al.* (Enclosure 48).    440

In an attempt to provide an alternative to, or to improve, the method of sequencing nucleotides of a template nucleic acid, by reducing light-induced chemical artefacts and detrimental effects of photobleaching the skilled person would inevitably consider the use of suitable antioxidant(s). The use of antioxidants was uncontestably known as a standard measure for extending the fluorescent properties of fluorophores. For the solution to this problem, the skilled person, being well aware of the chemistry associated with sequencing, such as fluorescence spectroscopy, would readily come across *Van Dijk et al.* (Enclosure 48).    441

*Van Dijk et al.* discusses single molecule fluorescence spectroscopy study. In particular, *Van Dijk et al.* tested the behaviour of dyes typically used for fluorescent labelling (such as TMR or Cy3) when subject to optical trapping in fluorescence spectroscopy. The research group found that photobleaching rates increased linearly with the intensity of the fluorescence excitation light. Photobleaching rates were unaffected by the presence or absence of oxygen, but were significantly diminished in the presence of antioxidants (see Enclosure 48, Abstract). *Van Dijk et al.* promotes the usefulness of this study also for applications in Biology (see Enclosure 48, Introduction, line 4).    442

Further, the researchers compared the effect of antioxidants and oxygen depletion on the photobleaching rates. **Table 1 shows that oxygen scavenger DTT (dithiothreitol) decreases the bleaching rate more than 2-fold, while the presence of ascorbic acid as an antioxidant decreased the bleaching rate even 4-fold** (see Enclosure 48, paragraph bridging the first and second column).    443

The person skilled in the art would therefore have had a clear incentive to replace the buffer composition in *WO 073* comprising DTT with a composition as suggested by *Van Dijk et al.*, i.e. comprising ascorbic acid. The skilled person would, in any case, have had a reasonable expectation that photobleaching would be reduced by half when using ascorbic acid instead of DTT.

444

In conclusion, the subject matter of claim 1 of EP 412 is not inventive over *WO 073* in combination with *Van Dijk et al.* The skilled person was aware of the impact of antioxidants on photobleaching and had any reason to expect that ascorbic acid would perform twice as effective than DTT when used in fluorescence measurements.

445

It bears emphasis that the OD had not been aware of *Van Dijk et al.* Hence, **one of the key considerations in the decision of the OD, namely that none of the prior art documents on file described the use of ascorbic acid as more efficient than other oxygen scavengers, is proven wrong and thus no longer applies.**

446

v)   *WO 957* **in combination with** *Dittrich et al.*

The subject matter of claim 1 of EP 412 also lacks an inventive step over *WO 957* (Enclosure 41) in view of *Dittrich et al.* (Enclosure 49).

447

*WO 957* discloses:

448

| 1 | A method of sequencing at least two nucleotides of a template nucleic acid comprising repeating the steps of: | A method of determining the sequence of "colonies" on a "clustered array" formed by solid sequence amplification (Abstract). |
| --- | --- | --- |
| 1.1 | (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid | This can be done by using a sequencing primer complementary to the target and extending this |

| | complementary to said template nucleic acid; and | sequencing primer with fluorescently labelled nucleotides (pages 30-31). The step can be repeated. |
|---|---|---|
| 1.2 | (b) determining the identity of one or more of the incorporated nucleotide(s), | Any device allowing detection and preferably quantitation of the appropriate label, for example fluorescence or radioactivity, may be used for sequence determination (page 31-32, bridging paragraph). |
| 1.2.1 | wherein the steps of determining the identity of the incorporated nucleotide(s) is carried out in a buffer which comprises ascorbic acid, or a salt thereof. | *WO 957* makes use of 5xSSC buffer, which is known to have a pH value of 7 (e.g. page 58, line 24). *WO 957* further uses anti-bleaching reagents (by Prolong, Molecular Probes, Portland OR) when using fluorescence detection, e.g. with Cy5-, Cy3- or fluorescein-labelled fluorophores (page 66, lines 19-23). |

The differentiating feature between *WO 957* and EP 412 is the use of ascorbic acid or 449 a salt thereof during the step of determining the identity of the incorporated nucleotide(s), instead of certain antibleaching reagents (by Prolong, Molecular Probes, Portland OR). Some background information on these antibleaching reagents was on file in proceedings before the OD.

Evidence:  *Molecular Probes* (2005), Prolong Antifade Kit, Product Information
[D12 in EPO opposition proceedings]
(Enclosure 50)

However, no structural information on the compounds used is revealed in this product information sheet.   450

When starting from WO 957 the objective technical problem remains the same as described above at N 439.   451

In search for a solution to this problem, the skilled person – not knowing, based on *WO 957* which compound should be used as an antifade agent – would be even more incentivized to look for further information in the prior art.   452

*Dittrich et al.* (Enclosure 49) compares a series of suitable antioxidants in fluorescence spectroscopy in view of their effect on fluorescence intensity. It is again noteworthy, that *Dittrich et al.* had not been discussed in the EPO opposition proceedings.   453

*Dittrich et al.* deals with the problem of choosing an ideal antioxidant in fluorescence spectroscopic measurements. The document discusses photobleaching and stabilization of fluorophores used for single molecule analysis with one or two photon excitation. *Dittrich et al.* studies the effect of different stabilizing reagents on photobleaching rates and photon-emission yields when used in combination with TMR as a typical dye (see Enclosure 49, page 830, second column, lines 8-10). The stabilizing agents put to the test where L-ascorbic acid, γ-L-glutamyl-L-cysteinyl-glycine (Glutathiol); 1,4-diazabicyclo[2,2,2]-octane (DABCO); 2-mercaptoethylamine (MEA).   454

The efficiency of ascorbic acid as an antioxidant has most impressively been demonstrated in Two-Photon-Excitation (TPE) experiments (Fig. 6). It was shown that photobleaching can be diminished by all three of ascorbic acid, DABCO and MEA. **However, the intensity η is clearly the highest for ascorbic acid** (see Enclosure 49, Fig. 6).   455



**FIGURE 6** AC curves after TPE at $3.5 \times 10^6$ W/cm$^2$. Photobleaching can be diminished by addition of ascorbic acid (*gray solid line*), DABCO (*black dotted line*), and MEA (*gray dotted line*), not by glutathione (*light-gray dotted line*). The strongly shifted curve of TMR in pure water (*black line*) is included for comparison. The inset shows the intensity dependence of $\eta$ for the different stabilizers (*squares*: pure water, *rhombs*: ascorbic acid, *crosses*: glutathione, *asterisks*: DABCO, *triangles*: MEA)

Hence the skilled person confronted with the objective technical problem to provide an alternative, or improved, method of polynucleotide sequencing, in which the detrimental effects of photobleaching are mitigated by a very promising antioxidant, would have considered ascorbic acid, which is promoted as the stabilizing agent of choice in fluorescence measurements by *Dittrich et al.* 456

As mentioned above, like *Van Dijk et al.*, *Dittrich et al.* had not been known to the OD. Yet again, *Dittrich et al.* clearly rebuts the OD's erroneous assumption that none of the prior art documents on file would describe *"the use of ascorbic acid as more efficient than any other oxygen scavenger"*. 457

In conclusion, the subject matter of claim 1 is also not inventive based on *WO 957* in combination with *Dittrich et al.* **The skilled person had any reason to believe that** 458

ascorbic acid would serve as an outstanding antibleaching agent when used in fluorescence measurements.

It goes without saying that *WO 957* could and would have been combined also with *Van Dijk et al.* because *Van Dijk et al.* performs comparative studies on the suitability of alternative antibleaching agents (see above, N 442). EP 412 is thus also invalid for lack of inventive step in view of a combination of *WO 957* with *Van Dijk et al.*   459

vi)    ***Braslavsky et al.* in combination with *Dittrich et al.* or *Van Dijk et al.***

Also *Braslavsky et al.* (Enclosure 47) can be considered as closest prior art, and can be combined with *Dittrich et al.* or *Van Dijk et al. Braslavsky et al.* is yet another document dealing with successive incorporation of fluorescently labelled nucleotide triphosphates into a growing DNA strand complementing a template strand.   460

In brief, *Braslavsky et al.* discloses the subject-matter of claim 1 as follows:   461

| 1 | A method of sequencing at least two nucleotides of a template nucleic acid comprising repeating the steps of: | Disclosed is a method of determining the sequence of single DNA molecules anchored on fused silica surface (page 3961, section *"sample preparation"*). |
|---|---|---|
| 1.1 | (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid; and | Successive incorporation of nucleotides by DNA polymerase is performed (page 3960, right column, first paragraph).<br><br>The fluorescent labels are, for example, listed on page 3961, right column, first paragraph. |

| 1.2 | (b) determining the identity of one or more of the incorporated nucleotide(s), | After each incorporation event, a fluorescent signal is measured (page 3960, right column, first paragraph; section "reagent exchange sequence for Single-Pair FRET sequencing"). |
|---|---|---|
| 1.2.1 | wherein the steps of determining the identity of the incorporated nucleotide(s) is carried out in a buffer which comprises ascorbic acid, or a salt thereof. | *Braslavisky et al.* suggests the use of an oxygen scavanging system to reduce bleaching of the fluorescent dyes (page 3961, right column, last lines of the first paragraph). |

In an attempt to find an alternative to, or an improved, oxygen scavenging system for use in fluorescence based nucleotide detection, the skilled person would readily have consulted *Dittrich et al.* (Enclosure 49) and/or *Van Dijk et al.* (Enclosure 48) for guidance on how to reduce photobleaching. The combination of such documents would inevitably have led to the subject-matter of claim 1 of EP 412.   462

**vii)    Any of *WO 073, WO 957* or *Braslavsky et al.* in combination with *WO 165, WO 2004/085546* and/or *Parshad et al.***

Yet further documents that explicitly deal with fluorescently labelled biomolecules such as proteins and nucleic acids would also have been readily combined with the teachings of *WO 073, WO 957* or *Braslavsky et al.* by the skilled person in an attempt to solve the objective technical problem (see above, N 439) and the skilled person would thereby have arrived at the subject-matter of claim 1.   463

For instance, *WO 165* (Enclosure 36) discloses the use of ascorbic acid for the detection of fluorescent labels in sequencing and other reaction involving cycles of addition of nucleotides. Specifically, *WO 165* discloses a method of detecting a fluorescent moiety which is attached to a nucleic acid by incorporation into a   464

polynucleotide during PCR (Example 9, also p. 12 last paragraph), wherein the addition of ascorbic acid reduces photobleaching of fluorescent dyes during prolonged exposition to a laser beam.

Similarly, *Olson et al.* (Enclosure 40), had already been discussed in opposition proceedings for using ascorbic acid in electrophoresis experiments. Two more prior art documents are submitted herewith.      465

Evidence:    WO 2004/085546 A1, Fluorotechnics Pty

(Enclosure 51)

*Parshad et al.* (1978), Fluorescence light-induced chromosome damage and its prevention in mouse cells in culture; PNAS, Vol. 75, No. 4, pp. 1830-33

(Enclosure 52)

*WO 2004/085546 A1 (WO 546)* deals with improving fluorescent properties of      466
labelled biomolecules, for example in order to facilitate electrophoresis (see Enclosure 51, page 1, *"technical field"*; page 2, line 27). *WO 546* states on page 9:

> *"Treatment with an acid, surprisingly, stabilises the fluorescent complex, further increases the fluorescent intensity, prevents or minimises the loss of fluorescence and/or further increases the signal to background ratio of the fluorescent complex. The acid may be selected from a mineral acid, an organic acid, or combinations thereof. [...] Suitable organic acids are alkanoic acids (e. g. a C1-20 alkanoic acid), halogenoalkanoic acids [...], ascorbic acid or triflic acid. Preferably, the acid is sulfuric acid, acetic acid, propionic acid, ascorbic acid, hydrochloric acid, orthophosphoric acid, trifluoroacetic acid, trichloroacetic acid or chloroacetic acid."*

Ascorbic acid is explicitly recited in claim 35 of *WO 546*.      467

*Parshad et al.* suggests a combination of glutathione and ascorbic acid to reduce the      468
number of light-induced chromatid breaks in cultured cells (see Enclosure 52, page 1832, paragraph bridging the first and second column).

The skilled person would have combined any of the closest prior art documents (*WO 073*, *WO 957* or *Braslavsky et al.*) with *WO 546* without further ado, because all such documents relate to the same technical field, *i.e.* detecting fluorescently labelled biomolecules, and because *WO 546* promises specific guidance on how fluorescence can be enhanced. 469

Likewise, the skilled person would combine any of the closest prior art documents (*WO 073*, *WO 957* or *Braslavsky et al.*) with *Parshad et al.* without further ado, because *Parshad et al* deals with the same problem as the closest prior art, *i.e.* to prevent fluorescent light-induced chromosome, *i.e.* DNA, damage. 470

In conclusion, the subject matter of claim 1 is also not inventive over any of *WO 073*, *WO 957* or *Braslavsky et al.*, in combination with either of *WO 546* or *Parshad et al.* 471

**viii)** **WO 770 in combination with *Van Dijk et al.* and/or *Dittrich et al.***

*WO 770* was selected by the OD as the closest prior art. It has been shown above that this choice was not the most appropriate one. However, even if the skilled person had started from WO 770, the subject-matter of claim 1 would be obvious over such prior art document *WO 770* in combination with *Van Dijk et al.* or *Dittrich et al.* 472

The OD considered that *WO 770* (see <u>Enclosure 42</u>, section 9.2) did 473

> *"[...] not mention photobleaching as a problem for sequencing, on the contrary it describes the use of photobleaching profiles to differentiate between signals obtained from single molecule and pixel regions."*

While this is correct, it must not be forgotten that, in accordance with the established problem-solution approach, the problem to be solved needs not be indicated in the closest prior art document. The problem is to be defined by the technical contribution of the distinguishing feature between the closest prior art and the claimed subject-matter. In the present case, the technical contribution, when starting from *WO 770*, 474

124

would be – at best – to reduce a loss of signal due to photobleaching when performing a sequencing method, or to provide an alternative sequencing method.

The skilled person would have found immediate and highly relevant advice in *Van Dijk et al.* (Enclosure 48) and/or *Dittrich et al.* (Enclosure 49) on how to reduce photobleaching when performing a single molecule fluorescence analysis.   475

Both *Van Dijk et al.* and *Dittrich et al.* specifically deal with this problem, as can be inferred already from their respective titles and abstracts. *Van Dijk et al.* found that *"[p]hotobleaching rates were significantly diminished in the presence of antioxidants"* in single-molecule fluorescence spectroscopy (see Enclosure 48, Abstract). *Dittrich et al.* is even entitled *"photobleaching and stabilization of fluorophores used for single-molecule analysis with one- and two-photon excitation."*   476

The skilled person when looking for stabilizing agents for fluorophores – be it antioxidants, oxigen scavengers or anti-bleaching agents – would thus have solved the objective technical problem (see above, N 439) without any inventive effort, merely by following explicit pointers in the prior art.   477

ix)     **The remaining asserted claims**

The subject-matter of the remaining claims asserted by Plaintiff is likewise invalid. The lack of inventive step will be discussed hereinafter for dependent claims 2, 3, 4, 8, 9, 10, 12, 13, 14 as well as kit claim 15.   478

(a)     *Dependent claim 2*

Dependent claim 2 requires that the substrate for incorporation of fluorescently labelled nucleotides is a nucleoside triphosphate.   479

The use of nucleoside triphosphates in sequencing by synthesis methods is trivial. When using nucleoside triphosphates, a pyrophosphate residue is cleaved from the monomeric nucleoside triphosphates in the polymerase reaction so that the   480

125

monosaccharides of the nucleotides are coupled to each other via one phosphate group. The reaction occurs naturally and is particularly beneficial from an energy point of view.

Often, the abbreviation "dNTP" for "<u>d</u>eoxyribo<u>n</u>ucleotide <u>t</u>riphosphate" is used. 481

The use of nucleoside triphosphates is abundantly disclosed in the prior art, for 482 example in *WO 073* (see <u>Enclosure 35</u>, page 10, second paragraph, *"dNTP"*), in *WO 957* (<u>Enclosure 41</u>, pages 51, 53, 55, 64 under the title *"colony generation"*), and in *Braslavsky et al.* (<u>Enclosure 47</u>, page 3961, second column, *"dATP, dGTP, dTTP, dCTP"*). There is thus nothing inventive in dependent claim 2.

*(b)     Dependent claims 3 and 4*

Dependent claims 3 and 4 add the feature of the concentration of ascorbic acid being 483 at least 10 mM and 20 mM, respectively. There is nothing inventive about a relative amount of at least 10 mM of ascorbic acid and Defendant is not able to see a technical effect of such concentration.

In any event, such an amount of at least 10 mM of ascorbic acid is for example 484 shown in *Van Dijk et al.* (<u>Enclosure 48</u>, page 6481, first column, fourth paragraph):

> *"In another experiment ascorbic acid (100mM, dissolved in water, pH set to 7) was added."*

The amount of 100 mM would therefore have been readily considered by the skilled 485 person. Furthermore, WO 165 (<u>Enclosure 36</u>) suggests the use of ascorbic acid in a concentration of 28 mM (5mg/mL, Example 9). Dependent claims 3 and 4 therefore also lack an inventive contribution in this respect.

(c)     *Dependent claims 8 and 9*

Dependent claims 8 and 9 add the feature of the buffer having a pH of about 5.5-8.6,    486
preferably 7. Such a pH value is very common for sequencing reactions in general.
For example, a pH of 8 is disclosed in *WO 073* (Enclosure 35, p. 17 line 30). *WO 957*
(Enclosure 41) teaches that the fluorescence measurements be performed in 5xSSC
buffer (page 59 lines 25-33), a buffer typically adjusted to a pH of 7.0. *WO 770*
(Enclosure 39) suggests to perform fluorescence measurements in 100µl PBS (p. 16
lines 26-28), a buffer having a pH of 7.4.

(d)     *Dependent claims 10 and 12*

Dependent claim 10 adds the feature of the template nucleic acid being present in an    487
array. According to EP 412, an array provides the possibility to sequence several
template strands in parallel. The templates are "arrayed" on a solid support, wherein
the method includes both single-molecule arrays and clustered arrays (see [0035] of
the B2-publication). It is preferred that the array is a single molecule array (claim
12).

Templates being "arrayed" on a solid support and being sequenced in parallel were    488
well known in the prior art, in particular single molecule arrays. For example,
*WO 073* teaches the possibility of array sequencing by individual molecules
(Enclosure 35, p. 7 line 20, p. 12 line 25, Fig 1 A-B). Also, *WO 957* discloses the
arraying of DNA samples (Enclosure 41, p. 6 line 31 to p. 7 line 13. Likewise,
*Braslavsky* teaches that DNA templates were bound to a surface with a surface
density low enough to resolve single molecules (Enclosure 47, p. 3960, right column,
second paragraph). Also *WO 770*, a patent by Solexa Ltd., also shows the same
technique (Enclosure 39,. p. 18, fourth last line).

(e)  *Dependent claims 13 and 14*

Dependent claims 13 and 14 add the features that at least 10 nucleotides (or 16    489
nucleotides respectively) were successively incorporated and that the identity of the
base present in each of the incorporated nucleotides is determined.

The feature of at least 14 nucleotides being successively incorporated is shown in    490
*WO 073* (Enclosure 35: claim 1: *"repeating said providing [...] / polymerizing [...] /*
*identifying [...] so that the sequence of the target nucleic acid is determined"*) in
combination with Fig. 1A/C, Fig. 2, page 16, lines 22-23, page 17, lines 21-23). It is
notable that the publication states in the referenced section that *"the entire sequence*
*of the target nucleic acid can be determined"*.

Also, *Braslavsky* teaches the sequencing of target DNA templates having more than    491
16       bases.      For       example,       a       template:       3'-
atcttggaggcacaATCATCGTCATCGTCGTCATCG-(TCATCG)$_7$-5'biotin              was
successfully sequenced (the lower case letters indicating the primer hybridization
region). This includes clearly more than 16 bases.

The subject matter of claims 13 and 14 is thus not inventive either.    492

(f)  *Independent kit claim 15*

Independent kit claim 15 defines a kit for use in a method according to claim 1,    493
comprising some already discussed features (fluorescently labelled nucleotides, a
buffer comprising ascorbic acid or a salt thereof), and furthermore comprising

- a fluorescent label being linked to the nucleotide via a cleavable linker; and

- an enzyme capable of catalysing incorporation of said nucleotides into a
  nucleic acid strand complementary to a nucleic acid template to be
  sequenced; in short: a DNA polymerase.

Both these additional features were well known in the art at the priority date of EP 412. *WO 073* notes that photochemical cleavage of the fluorophore and the nucleotide, e.g. cleavage of a chemical bond in the linker, may be a step following the fluorophore detection (see <u>Enclosure 35</u>, paragraph bridging pages 21/22):

> *"For this scheme, the objective of the present invention is to detect all of the photons from each label and then photobleach or photochemically cleave before or soon after the next few nucleotide is incorporated in order to maintain adequate signal to noise values for subsequent identification steps."*

Other examples of cleavable linkers are found on page 24 of *WO 073* (<u>Enclosure 35</u>), or in the references acknowledged in EP 412 itself: *WO 03/048387* and *WO 2004/018493* (see act. 1_11, paragraph [0025]).

The use of a polymerase enzyme is inherently part of any SBS method and is mentioned for instance in *WO 073* (<u>Enclosure 35</u>, Fig. 1), in *WO 957* (<u>Enclosure 41</u>, page 20 line 11) and in *Braslavsky et al.* (<u>Enclosure 47</u>, Abstract).

As a result, kit claim 15 is likewise invalid for lack of inventive step.

**H.    Plaintiff's prayers for Relief (ad act. 1 N 198-203)**

**1.    Plaintiff's Prayers for Relief No. 1-7 (injunctive relief, ad act. 1 N 198-200)**

Plaintiff's prayers for relief no. 1 to 7 must be dismissed for lack of infringement as explained herein.

In addition, such prayers for relief lack the required definiteness. Plaintiff's prayers for injunctive relief are unspecific and overly broad and do not comply with the principles set out by the Federal Supreme Court in BGE 131 III 70 cons. 3.3.:

> *"Wird insbesondere das Verbot patentverletzender Handlungen beantragt, so kann die sinngemässe*

494

495

496

497

498

499

129

*Aufnahme der Patentansprüche in das Unterlassungsbegehren zwar zur Klärung des Verletzungsgegenstands erforderlich sein, sie ist aber zur Identifizierung der zu verbietenden Handlungen ebenso wenig ausreichend wie etwa die Angabe der Typennummer eines Erzeugnisses (...). Die behauptete Verletzungs- oder Ausführungsform ist vielmehr so zu beschreiben, dass durch blosse tatsächliche Kontrolle ohne weiteres festgestellt werden kann, ob die verbotene Ausführung vorliegt. Denn der Patentverletzungsprozess bezweckt die rechtskräftige Bestimmung des Schutzbereiches des Patents in der Konfrontation zwischen dem Patent und der behaupteten Verletzungs- oder Ausführungsform (...). Dieser Zweck lässt sich nicht erreichen, wenn im Vollstreckungsverfahren wiederum geprüft werden muss, ob die dem Patentinhaber vorbehaltene technische Lehre benützt wird. Vielmehr ist die Verletzungsform als reale technische Handlung durch bestimmte Merkmale so zu umschreiben, dass es keiner Auslegung rechtlicher oder mehrdeutiger technischer Begriffe bedarf."*

Plaintiff's prayers for injunctive relief do nothing more than repeating the patent claims. It is impossible to identify specific products of Defendant based on these prayers for relief. Such prayers for relief are thus inadmissible and the Complaint must therefore also be dismissed, to the extent it can be examined at all, because of the indefiniteness of Plaintiff's prayers for relief. 500

## 2. Plaintiff's Prayers for relief no. 8 and 9 (accounting and monetary claims, ad act. 1 N 201)

Plaintiff's prayers for relief no. 8 and 9 must be dismissed for lack of infringement by Defendant. Defendant can neither be made responsible for alleged damages of Plaintiff, nor is there any basis to claim a compensation based on surrender of profits or unjust enrichment. 501

3. **Plaintiff's Procedural motion (ad act. 1 N 202)**

Defendant does not object to Plaintiff's procedural motion as a matter of principle. 502

However, Defendant points to its own procedural motion regarding an even further 503
limitation of the proceedings to the question of Defendant's capacity to be sued
("Passivlegitimation") in the present proceedings, which restriction is demanded by
procedural efficiency and fairness considerations (see above at N 23).

4. **Costs and Indemnification (ad act. 1 N 203)**

It is clear from the foregoing that it is Plaintiff who must be ordered to pay the costs 504
of the proceedings and compensate Defendant for its legal and patent attorney
representation. In this context it bears particular emphasis that Plaintiff decided to
bring these proceedings against Defendant without any evidence of infringing
activities of Defendant and without even giving Defendant a chance to declare itself
outside of costly proceedings.

Respectfully submitted,

Thierry Calame                                    Lara Dorigo

**Twofold**

**Enclosures** as listed on the separate List of Evidence

# TABLE OF CONTENT

OVERVIEW     3

I.     PROCEDURAL ISSUES     6
A.     Power of Attorney     6
B.     Timeliness     6
C.     Language (ad act. 1 N 3)     6
D.     Value in Dispute (ad act. 1 N 4)     6
E.     Procedural Motion     6

II.     ARGUMENT     7
A.     Defendant (ad act. 1 N 8-9)     7
B.     Plaintiff did not provide any proof of infringing activities of Defendant (ad act. 1 N 87-92)     8
C.     The Complaint must be dismissed for Lack of Capacity to be sued of Defendant     10
D.     Plaintiff's Action is an Attempt to Discredit Defendant and intimidate the Market     11
E.     Technical Background (ad act. 1 N 10-33)     11
F.     Non-Infringement of EP 578     12
    1.     Preliminary remarks     12
       a)     Subject matter of EP 578 (ad act. 1 N 36-43)     12
       b)     Feature analysis of the claims of EP 578 (ad act. 1 N 44-61)     12
       c)     The skilled person     12
    2.     The contested sequencing nucleotides, reagent kits and methods do not infringe EP 578 (ad act. 1 N 93-150)     13
       a)     Plaintiff used unsuitable testing material     13
       b)     Plaintiff wrongly assumes that BGI/MGI kits for all BGI/MGI sequencers rely on the same chemistry (ad act. 1 N 110)     14
       c)     Plaintiff used unsuitable test methods     14
       d)     No direct infringement of claims 1 and 25 by nucleotides and kits     15
       e)     No contributory infringement of method claims 12 and 17 (ad act. 1 N 132-150)     17
       f)     Conclusions     17
    3.     EP 578 was erroneously upheld in opposition proceedings     18
    4.     EP 578 is invalid for lack of inventive step     22
       a)     Tsien et al. discloses the basic principles of SBS     23
          i)     SBS method according to *Tsien et al.*     24

|       |    | ii)   | Selection criteria for the protecting group | 26 |
|       |    | iii)  | Deprotection reaction must not interfere with the DNA polymerase reaction | 28 |
|       |    | iv)   | Introduction of the 3'-protecting group occurs at the nucleoside stage | 34 |
|       | b) | Ju et al. as closest prior art | | 37 |
|       | c) | The skilled person's approach towards a protecting group | | 38 |
|       |    | i)    | Criteria of use for the protecting group | 38 |
|       |    | ii)   | Small dimension of the protecting group | 40 |
|       |    | iii)  | Selective cleavability under mild conditions in an aqueous environment is necessary | 42 |
|       |    | iv)   | Deprotection must not lead to an irreversible denaturation of the DNA | 43 |
|       |    | v)    | No protecting groups with ester or ketone units | 46 |
|       |    | vi)   | Preferred protecting groups are unbranched and have no more than 4 atoms in the chain | 48 |
|       |    | vii)  | The preferred MOM group is a protected hemiacetal | 50 |
|       | d) | Problem-and-solution approach | | 52 |
|       |    | i)    | The distinguishing feature(s) over *Ju et al.* | 52 |
|       |    | ii)   | The objective technical problem | 52 |
|       |    | iii)  | Could-would approach | 52 |
|       | e) | The remaining asserted claims | | 69 |
|       |    | i)    | Claim 4 | 69 |
|       |    | ii)   | Claims 6, 7 and 9 | 69 |
|       |    | iii)  | Claim 12 | 70 |
|       |    | iv)   | Claim 17 | 72 |
|       |    | v)    | Claim 25 | 73 |
| 5.    | The decision of the Opposition Division is flawed for yet further reasons | | | 74 |
|       | a) | The objective technical problem is not plausibly solved | | 74 |
|       | b) | Ju et al. well discloses deprotection in an aqueous medium | | 80 |
|       | c) | No reservations based on Ju et al. against the use of 3'-protecting groups with azidomethyl function | | 83 |
| G.    | **Non-Infringement of EP 412** | | | **91** |
| 1.    | Preliminary remarks | | | 91 |
|       | a) | Specific technical background of EP 412 | | 91 |
|       | b) | Subject matter of EP 412 (ad act. 1 N 62-69) | | 93 |
|       | c) | Feature analysis of the claims of EP 412 (ad act. 1 N 70-86) | | 94 |
|       | d) | The skilled person | | 94 |
| 2.    | EP 412 is not infringed by Defendant and by the contested embodiments (ad act. 1 N 151-197) | | | 95 |

|  |  | a) | Plaintiff did not provide proof of infringing acts of Defendant (ad act. 1 N 87-92, N 151) | 95 |
|  |  | b) | The contested sequencing reagent kits and methods do not infringe EP 412 (ad act. 1 N 152-197) | 95 |
|  | 3. |  | EP 412 is invalid | 96 |
|  |  | a) | EP 412 was erroneously upheld in opposition proceedings | 96 |
|  |  | b) | EP 412 is invalid for added matter | 99 |
|  |  |  | i) Preliminary Remarks | 99 |
|  |  |  | ii) Amendments in claim 1 | 100 |
|  |  |  | iii) Amendments in claim 2 | 103 |
|  |  |  | iv) Amendments in claim 15 | 103 |
|  |  |  | v) Conclusion | 104 |
|  |  | c) | EP 412 is invalid for lack of novelty | 105 |
|  |  |  | i) The subject matter of claim 1 is anticipated by US 420 | 105 |
|  |  |  | ii) Anticipation of the remaining asserted claims by US 420 | 107 |
|  |  | d) | EP 412 is invalid for lack of inventive step | 109 |
|  |  |  | i) Preliminary remarks | 109 |
|  |  |  | ii) Inaccurate and incomplete assessment of the prior art in opposition proceedings | 110 |
|  |  |  | iii) The distinguishing feature over WO 073 and the objective technical problem | 112 |
|  |  |  | iv) WO 073 in combination with Van Dijk et al. | 116 |
|  |  |  | v) WO 957 in combination with Dittrich et al. | 117 |
|  |  |  | vi) Braslavsky et al. in combination with Dittrich et al. or Van Dijk et al. | 121 |
|  |  |  | vii) Any of WO 073, WO 957 or Braslavsky et al. in combination with WO 165, WO 2004/085546 and/or Parshad et al. | 122 |
|  |  |  | viii) WO 770 in combination with Van Dijk et al. and/or Dittrich et al. | 124 |
|  |  |  | ix) The remaining asserted claims | 125 |
| H. | Plaintiff's prayers for Relief (ad act. 1 N 198-203) | | | 129 |
|  | 1. |  | Plaintiff's Prayers for Relief No. 1-7 (injunctive relief, ad act. 1 N 198-200) | 129 |
|  | 2. |  | Plaintiff's Prayers for relief no. 8 and 9 (accounting and monetary claims, ad act. 1 N 201) | 130 |
|  | 3. |  | Plaintiff's Procedural motion (ad act. 1 N 202) | 131 |
|  | 4. |  | Costs and Indemnification (ad act. 1 N 203) | 131 |

### LIST OF EVIDENCE

to the **Statement of Defense**

dated 25 November 2019

to the Federal Patent Court

in the matter

**O2019_007**

**Illumina Cambridge Limited** vs. **Latvia MGI Tech SIA**

### ENCLOSURES

Enclosure 1:  Excerpts from the Website of MGI Group http://en.mgitech.cn

Enclosure 2:  Illumina Press Release of 28 June 2019, "Illumina Files Patent Infringement Suits Related to BGI in Switzerland, Turkey and the US" (www.illumina.com)

Enclosure 3:  Business Wire, "Illumina Files Patent Infringement Suits Related to BGI in Switzerland, Turkey and the US", 28 June 2019 (www.businesswire.com)

Enclosure 4:  Bloomberg, "Illumina Files Patent Infringement Suits Related to BGI in Switzerland, Turkey and the US", 28 June 2019 (www.bloomberg.com)

Enclosure 5:  Interlocutory decision of the OD re EP 578, dated 9 December 2015

Enclosure 6:  Opponent's withdrawal of appeal, dated 26 July 2017

Enclosure 7:  Notification of termination of appeal proceedings, dated 2 August 2017

Enclosure 8:  *Ju et al.*, WO 02/29003

Enclosure 9:  *Odedra et al.*, WO 01/92284

Enclosure 10:    *Oksman et al.* (1992), Solution conformations and hydrolytic stability of 2'- and 3'- substituted 2',3'-Dideoxyribonucleosides, including some potential inhibitors of human immunodeficiency virus; J. Phys. Org. Chem. Vol. 5, pp 741-747

Enclosure 11:    *Zavgorodny et al.* (2000), S,X-Acetals in nucleoside chemistry: Synthesis of 2'- and 3'-O-Azidomethyl derivatives of ribonucleosides; Nucleosides, Nucleotides and Nucleic Acids, 19(10-12), pp 1977-1991

Enclosure 12:    *Zavgorodny et al.* (1991), 1-Alkylthioalkylation of Nucleoside Hydroxyl Functions and Its Synthetic Applications: A New Versatile Method in Nucleoside Chemistry; Tetrahedron Letters, Vol. 32, No. 51, pp 7593-7596

Enclosure 13:    *Canard et al.*, 1995, Proc. Natl. Acad. Sci. USA, 92: 10859-108636

Enclosure 14:    *Tsien et al.*, WO 91/06678

Enclosure 15:    Exhibits from *Greene and Wuts*, Protective Groups in Organic Synthesis; Wiley and Sons (1999)

Enclosure 16:    *Kraevskii et al.* (1987), ISSN 0026-8933, pp. 25-29

Enclosure 17:    *Metzker et al.* (1994), Termination of DNA synthesis by novel 3'-modified deoxyribonucleoside 5'-triphosphates; Nucleic Acids Research, Vol. 22, No. 20, pp. 4259-4267

Enclosure 18:    *Canard and Sarfati* (1994), DNA polymerase fluorescent substrates with reversible 3'-tags; Gene, Vol. 148, pp. 1-6

Enclosure 19:    *Balasubramanian* (2011), Sequencing nucleic acids: from chemistry to medicine; ChemComm, Vol. 47, pp. 7281-7286

Enclosure 20:    *Balasubramanian* (2014), Chemical biology on the genome; Bioorganic & Medical Chemistry (http://dx.doi.org/10.1016/j.bmc.2014.05.016)

Enclosure 21:     *Nishinio and Ishido* (1986), Partial Protection of Carbohydrate Derivatives. Part 22. Further Improvement in Introduction of Methoymethyl Group to Hydroxyl Groups of Carbohydrate Derivatives; Journal of Carbohydrate Chemistry (https://doi.org/10.1080/07328308608062969)

Enclosure 22:     Excerpt of Wikipedia, Synthon (https://de.wikipedia.org/wiki/Synthon)

Enclosure 23:     Technical Opinion of *Prof. Carell* (incl. Annexes A, B, C)

Enclosure 24:     *Gololobov et al.* (1992), Recent Advances in the Staudinger Reaction; Tetrahedron, Vol. 48, No. 8, pp. 1353-1406

Enclosure 25:     *Polushin et al.* (1996), Synthesis of Oligonucleotides Containing 2'-Azido- and 2'-Amino-2'-deoxyuridine Using Phosphotriester Chemistry; Tetrahedron Letters, Vol. 37, No. 19, pp. 3227-3230

Enclosure 26:     *Kamal et al.* (1999), A mild and Rapid Regeneration of Alcohols from their Allylic Ethers by Chlorotrimethylsilane/Sodium Iodide; Tetrahedron Letters, Vol. 40, pp. 371-372

Enclosure 27:     *Ireland and Varney* (1986), Approach to the Total Synthesis of Chlorothricolide: Synthesis of (±)-19,20-Dihydro-24-*O*-methylchlorothricolide, Methyl Ester, Ethyl Carbonate; J. Org. Chem. Vol. 51, pp. 635-648

Enclosure 28:     Excerpt of Wikipedia, Azide (https://de.wikipedia.org/wiki/Azide)

Enclosure 29:     *Cretton et al.* (1991), Catabolism of 3'-Azido-3'-deoxythymidine in Hepatocytes and Liver Microsomes, with Evidence of Formation of 3'-Amino-3'-deoxythymidine, a Highly Toxic Catabolite for Human Bone Marrow Cells; Molecular Pharmacology, Vol. 39, pp. 258-266

Enclosure 30:     *Saxon and Bertozzi* (2000), Cell Surface Engineering by a Modified Staudinger Reaction; Science, Vol. 287, pp. 2007-2010

Enclosure 31:     Excerpt of Wikipedia, Fluorescence (https://en.wikipedia.org/wiki/Fluorescence)

| | |
|---|---|
| Enclosure 32: | WO 2004/018493, Solexa |
| Enclosure 33: | Excerpt of Wikipedia, Chemistry of ascorbic acid (https://en.wikipedia.org/wiki/Chemistry_of_ascorbic_acid) |
| Enclosure 34: | Excerpt of the website https://www.sigmaaldrich.com/catalog/product/aldrich/z166340?lang=en&region=GB; visited 17.11.2019 |
| Enclosure 35: | WO 00/70073, Cornell Research Foundation |
| Enclosure 36: | WO 02/086165, 3M Innovative Properties |
| Enclosure 37: | Submission in EPO prosecution, dated 13 April 2011 |
| Enclosure 38: | *Klausing declaration*, D10 |
| Enclosure 39: | WO 00/06770, Solexa |
| Enclosure 40: | *Olson et al.* (2001), Electrophoresis of DNA Adsorbed to a Cationic Supported Bilayer; Langmuir, 17, 7396-7401 |
| Enclosure 41: | WO 00/18957, Applied Research Systems |
| Enclosure 42: | Interlocutory decision of the OD re EP 412, dated 30 November 2015 |
| Enclosure 43: | Notification of termination of appeal proceedings, dated 7 March 2016 |
| Enclosure 44: | WO 2006/064199, Solexa |
| Enclosure 45: | US 6,355,420 B1, US Genomics |
| Enclosure 46: | US 2002/0006622, Bradley |

Enclosure 47:   *Braslavsky et al.*, (2003), Sequence information can be obtained from single DNA molecules; PNAS, Vol. 100, No. 7, pp. 3960-3964

Enclosure 48:   *Van Dijk et al.*, (2004), Combining Optical Trapping and Single-Molecule Fluorescence Spectroscopy: Enhanced Photobleaching of Fluorophores; J. Phys. Chem. B, Vol. 108, pp. 6479-6484

Enclosure 49:   *Dittrich et al.*, (2001), Photobleaching and stabilization of fluorophores used for single-molecule analysis with one- and two-photon excitation; Appl. Phys. B, Vol. 73, pp. 829-837

Enclosure 50:   *Molecular Probes* (2005), Prolong Antifade Kit, Product Information

Enclosure 51:   WO 2004/085546, Fluorotechnics

Enclosure 52:   *Parshad et al.* (1978), Fluorescence light-induced chromosome damage and its prevention in mouse cells in culture; PNAS, Vol. 75, No. 4, pp. 1830-33

**WITNESS**

Andis Slaitis, c/o Latvia MGI Tech SIA, General Manager