# EXHIBIT C

May 11, 2020
330186|11213918v1

**O2019_007 | Statement of Reply**

Dear Mr. President
Ladies and Gentlemen

In the matter of

**Illumina Cambridge Limited**                                                    **Plaintiff**
19 Granta Park, Great Abington, Cambridge, Cambridgeshire, England, CB21 6DF

represented by Dr. Andri Hess, Attorney-at-Law and|or Julian Schwaller, Attorney-at-law and|or Katrina Frame, Attorney-at-Law, Homburger AG, Prime Tower, Hardstrasse 201, 8005 Zurich

assisted by Dr. Claudia Bibus, Swiss and European Patent Attorney, E. Blum & Co. AG, Vorderberg 11, 8044 Zurich

vs.

**Latvia MGI Tech SIA**                                                              **Defendant**
Dzirnavu iela 57A-4, Riga, Latvia, LV1010

represented by Dr. Thierry Calame, Attorney-at-Law, and|or Lara Dorigo, Attorney-at-Law, Lenz & Staehelin, Brandschenkestrasse 24, 8027 Zurich

assisted by Dr. Martin Wilming, Swiss and European Patent Attorney, Hepp Wenger Ryffel AG, Friedtalweg 5, 9500 Wil SG

---

Homburger AG
Prime Tower
Hardstrasse 201
CH-8005 Zürich

T   +41 43 222 10 00
F   +41 43 222 15 00
www.homburger.ch
lawyers@homburger.ch

re

**Patent Infringement**

we herewith respectfully submit Plaintiff's

**Statement of Reply,**

maintaining the prayers for relief as filed with the statement of claim, with the following additional auxiliary prayers for relief:

Prayer for relief 4a, subsidiarily (*eventualiter*) to prayer for relief 4:

> Defendant shall be prohibited,
>
> under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,
>
> from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland
>
> kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s),
>
> said kits comprising a buffer that comprises ascorbic acid or a salt thereof;

Prayer for relief 4b, subsidiarily (*eventualiter*) to prayer for relief 4a:

> Defendant shall be prohibited,
>
> under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,
>
> from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland
>
> kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating

the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s) by illumination,

said kits comprising a buffer that comprises ascorbic acid or a salt thereof;

Prayer for relief 4c, subsidiarily (*eventualiter*) to prayer for relief 4b:

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing by successive cycles of sequencing-by-synthesis at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s) by illumination with laser light,

said kits comprising a buffer that comprises ascorbic acid or a salt thereof;

Prayer for relief 5a, subsidiarily (*eventualiter*) to prayer for relief 5:

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing by successive cycles of sequencing-by-synthesis at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucle-

otides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s),

wherein the substrate for incorporation of fluorescently labelled nucleotide is a nucleoside triphosphate,

said kits comprising a buffer that comprises ascorbic acid or a salt thereof;

Prayer for relief 5b, subsidiarily (*eventualiter*) to prayer for relief 5a:

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s) <u>by illumination</u>

wherein the substrate for incorporation of fluorescently labelled nucleotide is a nucleoside triphosphate,

said kits comprising a buffer that comprises ascorbic acid or a salt thereof;

Prayer for relief 5c, subsidiarily (*eventualiter*) to prayer for relief 5b:

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s) <u>by illumination with laser light</u>,

wherein the substrate for incorporation of fluorescently labelled nucleotide is a nucleoside triphosphate,

said kits comprising a buffer that comprises ascorbic acid or a salt thereof;

**Prayer for relief 6a, subsidiarily (*eventualiter*) to prayer for relief 6:**

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s),

wherein the substrate for incorporation of fluorescently labelled nucleotide is a nucleoside triphosphate,

said kits comprising a buffer that comprises ascorbic acid or a salt thereof

wherein the ascorbic acid or salt thereof is present in the buffer at a concentration of at least 20 mM;

**Prayer for relief 6b, subsidiarily (*eventualiter*) to prayer for relief 6a:**

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s) <u>by illumination,</u>

wherein the substrate for incorporation of fluorescently labelled nucleotide is a nucleoside triphosphate,

said kits comprising a buffer that comprises ascorbic acid or a salt thereof

wherein the ascorbic acid or salt thereof is present in the buffer at a concentration of at least 20 mM;

Prayer for relief 6c, subsidiarily (*eventualiter*) to prayer for relief 6b:

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s) <u>by illumination with laser light,</u>

wherein the substrate for incorporation of fluorescently labelled nucleotide is a nucleoside triphosphate,

said kits comprising a buffer that comprises ascorbic acid or a salt thereof

wherein the ascorbic acid or salt thereof is present in the buffer at a concentration of at least 20 mM;

Prayer for relief 7a, subsidiarily (*eventualiter*) to prayer for relief 7:

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s),

comprising

one or more fluorescently labelled nucleotides, wherein the fluorescent label is linked to the <u>base of the</u> nucleotides via a cleavable linker,

DNA polymerase

and a buffer comprising ascorbic acid or a salt thereof, or a supply of ascorbic acid or a salt thereof;

Prayer for relief 7b, subsidiarily (*eventualiter*) to prayer for relief 7a:

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucle-

otides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s) <u>by illumination</u>,

comprising

one or more fluorescently labelled nucleotides, wherein the fluorescent label is linked to the <u>base of the</u> nucleotides via a cleavable linker,

DNA polymerase

and a buffer comprising ascorbic acid or a salt thereof, or a supply of ascorbic acid or a salt thereof;

**Prayer for relief 7c, subsidiarily (*eventualiter*) to prayer for relief 7b:**

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s) <u>by illumination with laser light</u>,

comprising

one or more fluorescently labelled nucleotides, wherein the fluorescent label is linked to the <u>base of the</u> nucleotides via a cleavable linker,

DNA polymerase

and a buffer comprising ascorbic acid or a salt thereof, or a supply of ascorbic acid or a salt thereof;

**Prayer for relief 7d, subsidiarily (*eventualiter*) to prayer for relief 7c:**

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s),

comprising

one or more fluorescently labelled nucleotides, wherein the fluorescent label is linked to the <u>base of the</u> nucleotides via an <u>azido moiety-containing</u> cleavable linker,

DNA polymerase

and a buffer comprising ascorbic acid or a salt thereof, or a supply of ascorbic acid or a salt thereof;

Prayer for relief 7e, subsidiarily (*eventualiter*) to prayer for relief 7d:

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s) <u>by illumination,</u>

comprising

one or more fluorescently labelled nucleotides, wherein the fluorescent label is linked to the <u>base of the</u> nucleotides via an <u>azido moiety-containing</u> cleavable linker,

DNA polymerase

and a buffer comprising ascorbic acid or a salt thereof, or a supply of ascorbic acid or a salt thereof;

Prayer for relief 7f, subsidiarily (*eventualiter*) to prayer for relief 7e:

Defendant shall be prohibited,

under threat of an administrative fine of CHF 1,000 per day of non-compliance pursuant to Article 343(1)(c) CCP, but of at least CHF 5,000 pursuant to Article 343(1)(b) CCP, as well as punishment of its organs pursuant to Article 292 CC in the event of non-compliance,

from manufacturing, importing into Switzerland, exporting from Switzerland, offering in Switzerland, selling in Switzerland, putting in circulation otherwise in Switzerland, storing in Switzerland

kits for sequencing <u>by successive cycles of sequencing-by-synthesis</u> at least two nucleotides of a template nucleic acid comprising repeating the steps of (a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid and (b) determining the identity of one or more of the incorporated nucleotide(s) <u>by illumination with laser light</u>,

comprising

one or more fluorescently labelled nucleotides, wherein the fluorescent label is linked to the <u>base of the</u> nucleotides via an <u>azido moiety-containing</u> cleavable linker,

DNA polymerase

and a buffer comprising ascorbic acid or a salt thereof, or a supply of ascorbic acid or a salt thereof.

## Table of Contents:

I.    **Formal Matters** ............................................................................................. 13

    A.    In General ................................................................................................ 13

    B.    Plaintiff's Address .................................................................................... 13

II.   **On the Merits** ................................................................................................. 13

    A.    Defendant's Infringing Activities in Switzerland ....................................... 13

        1.    Change of Product Names ............................................................. 13

        2.    Further MGI Sequencing Chemistry for Use on MGI Sequencers ... 15

        3.    The Defendant's Infringing Acts in Switzerland ............................. 16

        4.    Technical background .................................................................... 22

    B.    Infringement of EP'578 ........................................................................... 22

        1.    Preliminary remarks ...................................................................... 22

        2.    MGI sequencing nucleotides, reagent kits and methods infringe EP'578 ............................................................................................. 23

            a)    Testing material .................................................................. 23

            b)    New test results with the MGI Kit confirm the presence of infringing modified nucleotides in MGI's sequencing chemistry ........ 23

            c)    Direct Literal Infringement of Independent Claim 1 and Dependent Claim 4 by MGI's unlabelled dNTPs ............................. 24

                (1)    Realization of Feature 1 "A modified nucleotide molecule" ..... 24

                (2)    Realization of Feature 1.1 "comprising a purine or pyrimidine base" .................................................................... 24

                (3)    Realization of Feature 1.2 "and a ribose or deoxyribose sugar moiety" .................................................................... 24

                (4)    Realization of Feature 1.3 "having a removable 3'-OH blocking group covalently attached thereto" and of entire Feature Group 1.3 in the alternative corresponding to Feature 4 .................................................................... 24

            d)    Direct literal infringement of independent claim 1 and dependent claims 4, 6, 7, 9 by MGI's labelled dNTPs ......................... 30

            e)    Direct infringement of claim 25 by nucleotides and kits ................... 35

            f)    Contributory infringement of method claims 12 and 17 and product claim 29 ................................................................. 35

            g)    Conclusion .......................................................................... 36

    C.    Validity of EP'578 .................................................................................. 36

        1.    Preliminary Remarks ..................................................................... 36

        2.    *Ju et al.*, the closest prior art .......................................................... 37

            a)    The criterion "*Small Dimension of the Protecting Group*" is not defined in *Ju et al.* ............................................................... 38

            b)    Regarding the criterion "*Selective cleavability under mild conditions in an aqueous environment*" by *Ju et al.* ......................... 39

            c)    Regarding the criterion "*Deprotection must not lead to irreversible denaturation of the DNA*" ............................................... 40

            d)    "*The avoidance of protecting groups with ester or ketone units*" is the only clear predictive selection criterion taught by *Ju et al.* –

yet it teaches away from using the electrophilic azidomethyl group ...................................................................................... 41

e) *Ju et al.* does not disclose or suggest a *"preference for unbranched protecting groups with no more than 4 atoms"* ............ 42

f) *"The skilled person's appreciation that the preferred protecting group in Ju et al., i.e. the MOM group, was a protected hemiacetal"* is a mere allegation ..................................................... 43

g) Summary .......................................................................................... 44

3. *Greene and Wuts* – a standard textbook that belongs to the general technical knowledge of the skilled person ........................................ 45

4. *Zavogorodny et al.* as secondary document ............................................. 48

5. *Gololobov and Polushin et al.* as an additional documents regarding deprotection conditions............................................................................. 49

6. The Claims are inventive of *Ju et al.* and the other cited documents........ 51

7. Critical Review of Statements and Results presented in the Carell Declaration ...................................................................................... 52

8. The decision by the Opposition Division is correct..................................... 54

9. Remaining claims ........................................................................................ 55

D. Infringement of EP'412 ............................................................................................... 55
   1. Preliminary remarks...................................................................................... 55
   2. MGI's sequencing reagent kits and methods infringe EP'412.................... 57
      a) Sufficient proof of infringing acts of Defendant............................... 57
      b) Infringement of EP'412 ...................................................................... 57

E. Validity of EP'412........................................................................................................ 61
   1. Preliminary Remarks .................................................................................... 61
   2. Amendments to claims were admissible ..................................................... 61
      a) Preliminary Remarks .......................................................................... 61
      b) Amendments in claim 1 ...................................................................... 62
      c) Amendments in claim 2 ...................................................................... 65
      d) Amendments in claim 15 .................................................................... 66
      e) Conclusion .......................................................................................... 67
   3. Novelty of EP'412 ......................................................................................... 67
      a) Novelty of claim 1 over US 420 ......................................................... 67
   4. Inventive Step of EP'412.............................................................................. 69
      a) Preliminary remarks............................................................................ 69
      b) Prior art in opposition proceedings ................................................... 69
      c) Distinguishing feature over WO'073 and the objective technical problem ................................................................................................ 70
      d) WO'957 in combination with *Dittrich et al.* or *Van Dijk et al.* .............. 72
      e) Braslavsky et al. in combination with *Dittrich et al.* or *Van Dijk et al.* ..................................................................................................... 74
      f) Any of WO'073, WO'957 or Braslavsky et al. in combination with WO'165, WO 2004|085546 and|or Parhad et al. .............................. 74
      g) The remaining claims .......................................................................... 76

F. Auxiliary Requests regarding Infringement of Claim 1 of EP'412 ...................... 76
      a) Remarks regarding the validity of amended Claim 1 according to Auxiliary Requests 1 to 4: ................................................................. 78
      b) Remarks regarding the infringement of amended Claim 1 according to Auxiliary Requests 1 to 4: ........................................... 79

G.    Auxiliary Requests Regarding Infringement of Claim 15 of EP'412 ....................79
      a)   Remarks regarding the disclosure of the amended features in
            Auxiliary Requests 5 and 6: ...........................................................80
      b)   Remarks regarding the validity of amended Claim 15 according
            to Auxiliary Requests 5 and 6: ......................................................80
      c)   Remarks regarding the infringement of amended Claim 15
            according to Auxiliary Requests 5 to 6............................................81
H.    Prayers for relief ...............................................................................81

# I.   Formal Matters

## A.   In General

<u>Ad paras. 18-23:</u>

1     No comments. The Plaintiff takes note that the Court dismissed the Defendant's proce-
dural motion to limit the proceedings to the question of the Defendant's capacity to be
sued (act. 16 para. 23; see act. 29 and 30).

## B.   Plaintiff's Address

2     It should be noted that in January 2019, the Plaintiff's registered address under the Com-
panies Act 2004 became 19 Granta Park, Great Abington, Cambridge, Cambridgeshire,
England, CB21 6DF.

Evidence:
— Excerpt of Companies House re Plaintiff               Exhibit 22

3     Consequently, the caption is to be amended accordingly.

# II.   On the Merits

## A.   Defendant's Infringing Activities in Switzerland

## 1.   Change of Product Names

4     In the statement of claim, we referred to BGI and MGI genetic sequencers that were
known as the MGISEQ-T7, the MGISEQ-2000, the MGISEQ-200 and the BGISEQ-500,
and the sequencing reagent kits bearing the respective denominations (e.g., act. 1
para. 87 et seq.).

5      Due to a trademark dispute between the Plaintiff's group of companies (holder of the
       "MISEQ" trademark and selling the MiSeq System) and the Defendant's group of com-
       panies, the latter had to rebrand their product range. Outside of China, the MGISEQ-T7
       became the DNBSEQ-T7, the MGISEQ-2000 became the DNBSEQ-G400, and the
       MGISEQ-200 became the DNBSEQ-G50. Regardless of the name changes, the prod-
       ucts and their technology remain identical. This can be seen from the MGI-website,
       where for example with respect to the DNBSEQ-G400, formerly MGISEQ-2000, the fol-
       lowing is stated (Exhibit 23):

       Product Model*

       DNBSEQ-G400
       DNBSEQ-G400RS (for research only)
       DNBSEQ-G400CX (clinical purpose, overseas IVD)

       *Remark: DNBSEQ-G400 remain their original product names as MGISEQ-2000 respectively in
       China and some other overseas countries.

       Evidence:
       — Excerpt from https://en.mgitech.cn/products/instruments_info/2/ re DNB-
         SEQ-G400                                                                          Exhibit 23
       — Excerpt from https://en.mgitech.cn/products/instruments_info/6/ re DNB-
         SEQ-G50                                                                           Exhibit 24
       — Excerpt       from         https://www.illumina.com/systems/sequencing-plat-
         forms/miseq.html                                                                  Exhibit 25

6      The rebranding also affected the sequencing reagent kits, where the reference to the
       respective sequencer has simply been adapted to the new denomination. For example,
       the MGISEQ-2000 High-throughput Sequencing Set was rebranded as the DNBSEQ-
       G400 High-throughput Sequencing Set. This is evidenced by the current DNBSEQ-
       G400RS High-throughput Sequencing Set User Manual. Under "1.1 Applications" it says
       "**DNBSEQ-G400RS High-throughput Sequencing Set** is specifically designed for DNA
       or RNA sequencing on **MGISEQ-2000RS or DNBSEQ-G400RS**".

       Evidence:
       — DNBSEQ-G400RS High-throughput Sequencing Set User Manual              Exhibit 26

7      Because the products were unaffected by the name changes, references in the state-
       ment of claim to the old names must be read as references also to the products under
       the new names.

## 2. Further MGI Sequencing Chemistry for Use on MGI Sequencers

8   Since submitting the statement of claim in June 2019, Defendant's group of companies announced that they will supplement their portfolio of sequencing reagent kits for their DNBSEQ sequencers with kits based on a chemistry called CoolMPS. In a recent article co-authored by Radoje Drmanac – MGI's CSO (see act. 16 para. 89) – released on the BioRxiv preprint server on February 19, 2020, MGI reported that its "*CoolMPS™: massive parallel sequencing chemistry is implemented on MGI's PCR-free DNBSEQ MPS platform*" (cf. Abstract).

Evidence:
— BioRxiv preprint 2020                                                    Exhibit 27

9   According to the BioRxiv preprint, one "feature of the CoolMPS chemistry is that no fluorescently labeled RTs [reversibly terminated nucleotides] are required". As explained in the extract below, detection of the modified nucleotides used in the CoolMPS method is achieved using fluorescently labeled antibodies. Furthermore, MGI's CoolMPS chemistry still uses 3'-blocked nucleotides, i.e. modified nucleotides, for successive cycles of nucleotide incorporation in SBS. The BioRxiv preprint states:

> "Incorporation of unlabeled reversibly terminated nucleotides, and base determination, is performed in each cycle of sequencing using base-specific 3' block-dependent fluorescently labeled antibodies. **Removal of the bound antibodies and 3' blocking moiety on the sugar group of the nucleotide** regenerates natural nucleotides with no scar on the base. This feature of reversion to a natural nucleotide allows further extension of the strand in a new cycle of sequencing without any interference from the prior cycle" (cf. p. 2, para. 2, emphasis added).

Evidence:
— BioRxiv preprint 2020                                                    Exhibit 27

10  Thus, apparently MGI plans to offer as an alternative to its "current sequencing chemistry" (cf. act. 16, para. 89 and act. 16_15) a sequencing chemistry termed "CoolMPS™" that still uses nucleotides modified with a 3' blocking group.

11  The 3' blocking group attached to the nucleotides of both MGI's current and the CoolMPS sequencing chemistry is an azidomethyl blocking group, as demonstrated in section II.B. below. The difference between MGI's "current" and MGI's "CoolMPS" nucleotides is only related to how the fluorescent label is attached to the 3'-azidomethyl blocked nucleotides during the imaging phase.

12  Thus, the infringement analysis below and in act. 1, para. 93 et seqq., at least regarding MGI's unlabelled modified nucleotides, applies to both the "current sequencing chemistry" and the "CoolMPS sequencing chemistry" of MGI (regarding the CoolMPS, cf. also paras. 59 et seqq.).

**3.    The Defendant's Infringing Acts in Switzerland**

Ad paras. 26-41

13    As set out in the statement of claim (act. 1, para. 87-92), Defendant offers and distributes
a range of MGI sequencing platforms and the corresponding sequencing reagent kits in
Europe, including Switzerland. Among the platforms and kits offered and distributed in
Switzerland are the MGISEQ-2000 sequencer (today: DNBSEQ-G400) and the appro-
priate sequencing reagent kits such as the MGISEQ-2000 High-throughput Sequencing
Set, today called the DNBSEQ-G400 High-throughput Sequencing Set.

14    Defendant contests infringing acts in Switzerland. Defendant's primary defense is that
Plaintiff has not provided appropriate evidence for the alleged infringing activities (act. 16
para. 27 et seq.). In particular, Defendant states that act. 1_5 does not mention that
Defendant is a distributor in Europe, or Switzerland in particular. Further, Defendant crit-
icizes that act. 1_1 and act. 1_13 do not state that Defendant is a distributor in Switzer-
land or that it cooperates with Swiss entities in this respect (act. 16, para. 28-29).

15    Plaintiff has obtained two versions of the user manuals of the MGI sequencer MGISEQ-
2000, today DNBSEQ-G400. This is the type of sequencer that is installed at the
Health 2030 Genome Center at Campus Biotech in Geneva. The last page of both these
manuals states that the Defendant is the European MGI representative (see Exhibit 28,
p. 61):

## European representative information

| Item | Description |
|---|---|
| Name | Latvia MGI Tech. SIA |
| Address | Dzirnavu street 57a-4, Riga, Latvia, LV-1010 |

Evidence:
— User Manual MGISEQ-2000 dated August 28, 2018                      Exhibit 28
— User Manual MGISEQ-2000 dated September 5, 2018                    Exhibit 29

16    It is clearly established that Defendant indeed is acting as the MGI group representative
and distributor in Europe. It is established that Defendant on several occasions sold
MGISEQ-2000 High-throughput Sequencing Sets to a customer in Sweden (Exhibit 30),
has supplied an MGISEQ-2000 (today: DNBSEQ-G400) sequencing platform to a cus-
tomer in the UK (Exhibit 31), and has supplied a DNBSEQ-G400 sequencer together
with DNBSEQ-G400 High-throughput Sequencing Set to a customer in Finland (Ex-
hibit 32).

Evidence:
— Commercial Invoice dated July 22, 2019                   Exhibit 30
— Response to Freedom of Information request dated November 13, 2019    Exhibit 31
— E-mail exchange with Finnish customer                Exhibit 32

17    The statement in the user manuals of the MGI sequencer that Defendant is the European
      group representative does not positively name Sweden, the UK or Finland, and it does
      not exclude Switzerland. "European representative" therefore clearly means, and in good
      faith, must be understood as including all European countries, including Switzerland.
      Europe without carving out Switzerland means Europe including Switzerland.

18    This is further supported by the following information in the product brochures for the
      DNBSEQ sequencers:



Evidence:
— Brochure of DNBSEQ-G400 Gene Sequencer           Exhibit 33
— Brochure of DNBSEQ-G50 Gene Sequencer            Exhibit 34
— Brochure of DNBSEQ-T7 Gene Sequencer             Exhibit 35

19    According to this information, Defendant is the MGI group's European **"Logistics Cen-
      ter"** and **"After-sales Service Center"**. The map of Europe includes Switzerland, and

**logistics is tantamount to distribution**. Clearly, Defendant is, and is promoted as, the MGI group's distributing company for Europe including Switzerland.

20 Under the heading "After-Sales Services" it says "Please be advised to communicate in advance for all international **regional orders** prior to the proposal". In the above-copied information, Defendant is illustrated as **regional representative** for the **region of Europe**, which is fully in line with the reference on the last page of the MGI sequencers' user manual ("European representative information"; *supra*, para. 15).

21 After-sales services for sequencing platforms includes supply of sequencing reagent kits. This directly follows from the MGI sequencers' user manuals. These user manuals include the explicit instruction that MGI sequencers must only be used together with MGI sequencing kits. The following is a warning copied from the user manual of a MGI sequencer MGISEQ-2000 (today: DNBSEQ-G400, cf. *supra* para. 5 et seq.):

## Reagent kit and sequencing flow cell

Use only the reagent kit and flow cell of the manufacturer for the sequencing process. You can purchase them as needed from the authorized sales representatives.

Evidence:
— User Manual MGISEQ-2000 dated August 28, 2018      Exhibit 28
— User Manual MGISEQ-2000 dated September 5, 2018      Exhibit 29

22 As mentioned before, the "authorized sales representative" for Europe is, according to the last page of the user manual, Defendant. Defendant is therefore clearly offering to sell and deliver sequencing reagent kits into Switzerland, a part of Europe.

23 Furthermore, the above information copied from DNBSEQ product brochures states that Defendant, as part of its after-sales services, is also offering "free installation and installation validation services, **including all the reagents** required for delivering such services". Installation and installation validation requires performing sequencing runs for which sequencing reagent kits are needed. This is confirmed by the email exchange between Defendant and a Finnish customer. An employee of Defendant's service department wrote:

> 10. For validation need the following:
>      1. MGISEQ-2000 High-throughput Sequencing Kit (PE100), min 3pcs.

Evidence:
— E-mail exchange with Finnish customer      Exhibit 32

24 This further confirms that Defendant is offering to provide sequencing reagent kits for use on MGI sequencers to Switzerland as part of Europe.

25     That Defendant is offering such services into Switzerland and that there at least is a manifest risk that Defendant will become active in Switzerland is finally confirmed by a press release issued in late 2019 on the occasion of the expansion of Defendant's business activities. With respect to Defendant's established business activities, the press release states:

> "At present, the Latvia center fulfills four functions: R&D cooperation, testing experiments, **regional sales** and regional maintenance."

As regards the Defendant's role within the MGI group for the development of the European market, the president of MGI said that

> "the base in Latvia is a key investment for the development of European business and an important step for MGI's globalization"

and that

> "this will help high-end life science research equipment in China go global, building a complete technical service support system and product supply chain to efficiently meet the needs of customers and build deep experience in the European market".

Evidence:
— MGI press release of November 26, 2019            Exhibit 36

26     The press release thus confirms that it clearly is Defendant's raison d'être to develop and therefore serve the European market – not some European countries, but the European market as a whole. It would make no sense to establish a European base that does not also serve MGI's Swiss customers, be it Swiss distributors or Swiss end customers. It is unreasonable to assume that Defendant as MGI's regional representative that is, among others, responsible for regional sales, would deny servicing Swiss customers and would refer Swiss customers to other MGI centers, all of which are located much further away and in different time zones. It seems far fetched, for example, to assume that of the two MGI hotline numbers that are available, one in Europe and the other in China, Swiss customers would be required to use the Chinese number with Beijing service hours. The European number is a Latvian number:



Evidence:
— Excerpt from MGI website regarding Service

Exhibit 37

27    For all these reasons, it is established that Defendant is at least offering to distribute and sell MGI sequencing reagent kits for use with MGI sequencers in Switzerland.

28    Regarding the MGISEQ-2000 sequencer installed in Geneva, Defendant states that such a sequencing platform being present in Geneva does not constitute an infringing act and that Defendant was not involved in the supply of such product to the Health 2030 Genome Center at Campus Biotech (act. 16, para. 31). Defendant then goes on to allege that the MGISEQ-2000 at the Health 2030 Genome Center at Campus Biotech may well have been used with kits of Plaintiff or of a third party (act. 16 para. 33). This line of defense is evidently wrong, for several reasons.

29    *Firstly*, it is disputed that it is possible to use third party reagent kits and, in particular, Illumina's reagent kits on MGI sequencing platforms.

30    One apparent reason for this is that operating MGI sequencers involves scanning the reagent kit ID as described in the brochures of the MGI sequencers (see step 4 of the description on gene sequencing):

## Graphical User Guide,
### simple and easy to operate



Evidence:
— Brochure of DNBSEQ-G400 Gene Sequencer           Exhibit 33
— Brochure of DNBSEQ-G50 Gene Sequencer            Exhibit 34
— Brochure of DNBSEQ-T7 Gene Sequencer            Exhibit 35

31     This alone shows that the MGI sequencers cannot be used with reagent kits of other manufacturers. Such kits, e.g. kits of Illumina, cannot be scanned on an MGI sequencer.

32     In addition, the quantity of individual reagents used is different in different machines – in different machines of MGI, and even more so in different machines from other manufacturers (see act. 1 para 87). It is also for this reason not possible to use sequencing reagent kits of other manufacturers with MGI sequencers or vice versa.

33     *Secondly*, the MGI sequencers are sold with the explicit instruction that they must only be used together with MGI reagent kits (*supra*, para. 21). This disproves Defendant's suggestion in act. 16 para. 33 that the MGISEQ-2000 at the Health 2030 Genome Center in Geneva could be running with non-MGI sequencing reagent kits.

34   Lastly, Defendant states that Plaintiff did not reveal where or from whom it obtained the
     MGI sequencing reagent kit that it used for test purposes (act. 16 para 34). However,
     Defendant does not elaborate why it would be relevant whether the kit was obtained in
     Switzerland or not. MGI is offering the same range of MGI sequencers (DNBSEQ-T7,
     formerly MGISEQ-T7; DNBSEQ-G400, formerly MGISEQ-2000; DNBSEQ-G50, for-
     merly MGISEQ-200) and the same MGI sequencing reagent kits based on the same
     sequencing chemistries worldwide. Thus, the MGISEQ-2000 High-throughput Sequenc-
     ing Kit is the same, regardless where it is bought.

     Evidence:
     — Brochure of DNBSEQ-G400 Gene Sequencer                          Exhibit 33
     — Brochure of DNBSEQ-G50 Gene Sequencer                           Exhibit 34
     — Brochure of DNBSEQ-T7 Gene Sequencer                            Exhibit 35
     — DNBSEQ-G400RS High-throughput Sequencing Set User Manual        Exhibit 26

## 4.   Technical background

## B.   Infringement of EP'578

## 1.   Preliminary remarks

### Ad paras. 45-49

35   Plaintiff agrees with some aspects of the Defendant's definition of the skilled person.
     Plaintiff's position is that the skilled person would have been a member of a team of
     scientists working on SBS product development. Such a skilled person would have held
     a doctoral degree in chemistry, molecular biology, or a closely related discipline, and
     would have had at least five years of practical academic or industrial laboratory experi-
     ence directed toward the research and development of DNA sequencing technologies.
     The Defendant asserts that the skilled person would have specialist knowledge in par-
     ticular areas, which is clearly motivated by having the invention of EP'578 firmly in mind.
     This is addressed further below.

36   Nonetheless, regardless of which precise definition of the skilled person is ultimately
     used, Plaintiff's position is that EP'578 is valid and infringed.

**2.    MGI sequencing nucleotides, reagent kits and methods infringe EP'578**

**a)    Testing material**

<u>Ad paras. 50-52</u>

37    Defendant's allegations that the testing material used by Plaitniff was suitable is contested:

38    The results demonstrating the presence of infringing modified nucleotides in samples from the previously tested BGI kit ("BGISEQ-500RS High-throughput Sequencing Kit Model: PE100") have now been confirmed by highly conclusive tests results from further analyses of samples from another MGI kit.

39    Plaintiff has obtained a MGI sequencing reagent kit labelled "MGISEQ-2000RS High-throughput Sequencing Kit Model: PE150". This **MGI Kit** contains the reagents needed for performing SBS on an MGISEQ-2000RS sequencer (today: DNBSEQ-G400; see *supra* para. 5)

40    An analysis of this MGI Kit was performed by the independent test laboratory Eurofins EAG Materials Sciences (**Eurofins**). The results of Eurofins' testing are reported in the declaration of Mary M. Dothage dated January 8, 2020 (**578 Eurofins Report**). As explained in the 578 Eurofins Report at para. 7, the MGI Kit contained fluorescently labelled dNTPs and unlabeled dNTPs. The 578 Eurofins Report confirms that MGI's sequencing chemistry applies Illumina's proprietary SBS technology.

Evidence:
— Declaration of Mary of Dothage Eurofins EAG Material Sciences of January 8, 2020                                                                         Exhibit 38

41    In the following, we will also prove that this MGI Kit (i.e. the MGISEQ-2000RS High-throughput Sequencing Kit) infringes EP'578. This confirms the previous findings relating to the BGISEQ-500RS High-throughput Sequencing Kit.

42    Further, we also show that MGI's CoolMPS chemistry infringes EP'578.

**b)    New test results with the MGI Kit confirm the presence of infringing modified nucleotides in MGI's sequencing chemistry**

<u>Ad paras. 53-59</u>

43    The 578 Eurofins Report presents results of the following experiments:

(a)    Liquid chromatography|mass spectrometry analysis undertaken to establish whether the masses of **unlabelled** dNTPs in the MGI Kit correspond to the masses of 3'-azidomethyl-dNTPs (cf. Section D of the 578 Eurofins Report, <u>Exhibit 38</u>).

(b)   Liquid chromatography|mass spectrometry|mass spectrometry undertaken to establish whether the molecular structure of a **labelled** dNTP in the MGI Kit corresponds to the molecular structure of a published Illumina labelled 3'-azidomethyldNTP (cf. Section E of the 578 Eurofins Report, Exhibit 38).

**c)   Direct Literal Infringement of Independent Claim 1 and Dependent Claim 4 by MGI's unlabelled dNTPs**

**(1)   Realization of Feature 1 "A modified nucleotide molecule"**

44   According to the GenomeWeb Article (act. 1_15), MGI's CSO Radoje (Rade) Drmanac stated that their "sequencing chemistry relies on stepwise sequencing-by-synthesis (SBS) where 3'-blocked nucleotides are labeled with cleavable fluorescent dyes..." and that "MGI has now developed a chemistry that involves unlabeled 3'-blocked nucleotides and uses four types of fluorescently labelled monoclonal antibodies for detection that are each specific for one base" (cf. page 3, last paragraph bidging to p.4). The newly developed chemistry is a reference to CoolMPS sequencing chemistry.

Evidence:
— "MGI Prepares to Sell Sequencers in North America, Europe; annonces     act. 1_15
   Proprietary Sequencing Chemistry", GenomeWeb, March 4, 2019
— BioRxiv preprint 2020                                                    Exhibit 27

**(2)   Realization of Feature 1.1 "comprising a purine or pyrimidine base"**

45   The MGI Kit comprises two vials with labelled dNTPs and unlabelled dNTPs (cf. para. 40 above). dNTPs are deoxynucleotide triphosphates, i.e. the building blocks of DNA which by definition comprise a purine or a pyrimidine base.

**(3)   Realization of Feature 1.2 "and a ribose or deoxyribose sugar moiety"**

46   Nucleotide triphosphates (NTPs) by definition also comprise a ribose or deoxyribose sugar moiety. dNTPs comprise a deoxyribose sugar moiety.

**(4)   Realization of Feature 1.3 "having a removable 3'-OH blocking group covalently attached thereto" and of entire Feature Group 1.3 in the alternative corresponding to Feature 4**

47   According to the GenomeWeb 2019 article (act. 1_15) and the BioRivx preprint (Exhibit 27), both MGI's current and its CoolMPS sequencing chemistry are used for the stepwise SBS method, also termed cycle sequencing method. Such a stepwise or cycle sequencing method requires that the incorporated dNTPs are modified with a removable 3'-OH blocking group to stop the synthesis reaction after every single nucleotide that is added to a growing DNA strand (cf. act.1 para. 30). Only after the newly incorporated nucleotide is identified, can the 3'-OH blocking group be removed and the sequencing

by synthesis can proceed to the next step, i.e. to the next cycle of incorporation|imaging|detection|deprotection.

48    Thus, both the nucleotides according to MGI's current and the nucleotides according to MGI's CoolMPS sequencing chemistry comprise a removable 3' blocking group.

49    For the unlabelled nucleotides in the MGI Kit, the presence of the preferred azidomethyl blocking group is confirmed by experiment (a) of Eurofins as explained below in para. 52 et seqq.

50    The azidomethyl blocking group is the subject matter of dependent claim 4, i.e., it realizes feature 4 and correspondingly also the following selection of alternative features according to claim 1:

    Feature 1.3.1:    "such that the 3' carbon atom has attached a group of the structure -O-Z"

    Feature 1.3.2:    in the third alternative: "wherein Z is $-C(R')_2-N_3$"

    Feature 1.3.4    in alternative a: "each R' is independently a hydrogen atom"

51    Evidently, features 1.3.2 and 1.3.4 must only be fulfilled in one of the possible alternatives. Furthermore, features 1.3.3 and 1.3.5 of claim 1 refer to R" and are therefore not required for the third alternative of feature 1.3.2 (cf. act. 1, para. 46).

52    In experiment (a) liquid chromatography|mass spectroscopy (LC|MS) analysis, Eurofins compared the masses of standard 3'-azidomethyl-dNTPs obtained from Jena Bioscience GmbH (Jena, Germany; Jena 3-AZM-dNTPs Mix) with the masses of the dNTPs present in the translucent white vial labelled "dNTPs Mix II" of the MGI Kit. This vial contained a colorless solution, the appearance of which was consistent with the characteristics of unlabelled dNTPs (MGI Unlabelled dNTPs) (cf. 578 Eurofins Report, Exhibit 38, para. 9 et seqq.).

53    Based on the known atomic composition of each free anion of each of the Jena 3'-AZM-dNTPs, the expected masses for the free dNTP anion and the masses observed in the LC|MS analysis for both the MGI Unlabelled dNTPs and the Jena 3'-AZM-dNTPs Mix are summarized in the table below (cf. 578 Eurofins Report, Exhibit 38, para. 18):

LC/MS Mass Observations

| dNTP | Source | Observed Ion (mass/charge) |
|---|---|---|
| 3-AZM-dTTP | Expected | 536.2 |
| | Jena | 536.1 |
| | MGI | 536.1 |
| 3-AZM-dATP | Expected | 545.2 |
| | Jena | 545.1 |
| | MGI | 545.2 |
| 3-AZM-dCTP | Expected | 521.2 |
| | Jena | 521.1 |
| | MGI | 521.1 |
| 3-AZM-dGTP | Expected | 561.2 |
| | Jena | 561.1 |
| | MGI | 561.1 |

54    The 578 Eurofins Report therefore concludes in para. 19 that, for each of the four dNTPs, the expected mass, the Jena observed mass, and the MGI observed mass are within experimental error (±0.2 atomic mass units) of each other, and that:

> "These results confirm that the dNTPs in both the MGI Unlabelled dNTPs Mix and the Jena 3-AZM-dNTPs Mix have the expected mass of the four 3'-O-azidomethyl-dNTPs. These results confirm that each of the dNTPs in the MGI Unlabelled dNTPs Mix has the same structural composition as the dNTPs in the Jena 3-AZM-dNTPs Mix."

Evidence:
— Declaration of Mary of Dothage Eurofins EAG Material Sciences of January 8, 2020                                                                      Exhibit 38

55    The above findings of identical structural compositions are supported by Dr. Floyd Romesberg whom Illumina has retained as an independent expert to opine on whether, based on the available evidence, the MGI Kit obtained and analysed by Eurofins according to the 578 Eurofins Report includes nucleotides comprising a 3'-azidomethyl blocking group and therefore falls within the scope of EP'578.

Evidence:
— Declaration of Dr. Floyd Romesberg of May 7, 2020 including annexes A-D                                                                              Exhibit 39

56    In para. 44 of his declaration, Dr. Romesberg concludes:

> "LC|MS is an extremely powerful technique which permits the resolution and identification of molecules in a highly discriminatory manner. In my opinion, these results confirm that each of the dNTPs in the MGI Unlabelled dNTPs Mix has the same structural composition as the dNTPs in the Jena 3-AZM-dNTPs Mix. This strongly

suggests that the MGI Unlabelled dNTPs and the corresponding Jena-AZM-dNTPs have the exact same number and type of atoms. Given the limited number of ways that atoms can be connected, and the statement in the GenomeWeb article that MGI's SBS uses 3'-O-modified dNTPs [...] this fortifies my opinion that the MGI Unlabelled dNTPs are 3'-azidomethyl dNTPs."

Evidence:
— Declaration of Dr. Floyd Romesberg of May 7, 2020 including annexes A-D                                                                                          Exhibit 39

57   The results of the LC|MS analysis therefore show that the MGI unlabelled dNTPs of the MGI Kit, which are used to perform SBS on the MGISEQ-2000 (today: DNBSEQ-G400), directly and literally infringe claims 1 and 4 of EP'578.

58   It is Illumina's understanding and position that MGI uses the same sequencing chemistry for all MGI sequencers, and therefore the testing performed on the MGI Kit for the MGISEQ-2000 (today DNBSEQ G400) demonstrates that all sequencing reagent kits based on MGI's current sequencing chemistry include the same modified nucleotides.

59   MGI's new CoolMPS sequencing chemistry also infringes at least claims 1 and 4 of EP'578. In CoolMPS chemistry unlabeled 3'-blocked dNTPs are incorporated into the growing polynucleotide chain, following which four different base-specific monoclonal antibodies (each labelled with a fluorescent dye) are introduced for the imaging/ detection step. Figure 2 in the BioRxiv preprint by Drmanac et al. (Exhibit 27) shows the "*unlabeled adenosine, cytosine, guanosine and thymidine, monophosphate nucleotides with a 3'-O-azidomethyl blocking group*" that were used for generation of monoclonal antibodies.



(cf. BioRxiv preprint 2020, bottom of p. 2 and Fig. 2).

Evidence:
— BioRxiv preprint 2020                                                                                                      Exhibit 27

60   The article confirms that the monoclonal antibodies generated were "*specific for the base associated with the 3' reversible terminated ribose*" and "*in addition to the base this [i.e. 3'-O-azidomethyl] chemical moiety is important for strong antibody binding*". Thus, the antibodies recognize both the specific type of the base and the specific type of 3' blocking group, and so CoolMPS **requires** the use of 3'- azidomethyl blocked dNTPs, which fall within the scope of product claims 1 and 4 of EP'578.

61    This view is supported by the following concise summary of the relevant parts of the BioRxiv preprint regarding the CoolMPS chemistry in paras. 66 to 70 of Dr. Romesberg's declaration (Exhibit 39):

62    Para. 66 of the Romesberg Declaration states:

>     "In the section on page 2 titled "CoolMPS: A new MPS Chemistry using unlabeled RTs", Drmanac et al. explains that in the CoolMPS method "[i]ncorporation of unlabeled reversibly terminated nucleotides, and base determination, is performed in each sequencing cycle using base-specific 3' block-dependent fluorescently labeled antibodies". The CoolMPS process is depicted in Figure 1 of Drmanac et al., which is reproduced below. Following the incorporation of "cold" nucleotides with an "extension block", Figure 1 shows the introduction of "labeled base-specific-block-depend[e]nt" antibodies, where each base-specific antibody is labelled with a different fluorescent dye."



*Figure 1: CoolMPS™ process overview. Bars ( ▬ ) on the unlabeled ("cold") nucleotides depict removable 3' chemical blocks. Antibodies specific for RTs with natural nucleobase are depicted with three dye molecules to increase fluorescent signal.*

Evidence:
—  Declaration of Dr. Floyd Romesberg of May 7, 2020 including annexes A-D                                                        Exhibit 39

63    Para. 67 of the Romesberg Declaration states:

>     "The section of Drmanac et al. titled "Obtaining and labeling monoclonal CoolMPS™ antibodies" on pages 2-3, explains that to demonstrate CoolMPS "natural unlabelled adenosine, cytosine, guanosine and thymidine, monophosphate nucleotides with a 3'-O-azidomethyl blocking group" were used as immunogens to generate rabbit monoclonal antibodies. In simplified terms, this means that rabbits were injected with 3'-O-azidomethyl blocked nucleotides in order to induce an immune response and generate nucleobase specific antibodies. Drmanac et al. explains that antibodies were screened against each of the 4 nucleotide variants (A, C, G and T) to identify

those that were highly reactive against (i.e., specifically bound to) a specific nucleo-base antigen, and had low or non-detectable reactivity to (i.e., binding of) the three non-targeted bases."

Evidence:
— Declaration of Dr. Floyd Romesberg of May 7, 2020 including annexes A-
  D                                                                              Exhibit 39

64      Para. 68 of the Romesberg Declaration states:

"The section of Drmanac et al. titled "Binding requires the 3' blocking group" on page 5 explains that after confirming base specificity, it was next determined if the blocking group is required for strong binding. The paper reports that all four antibod-ies produced a strong signal when the blocking group was present during antibody binding and that "[n]o signal detection was evident after removal of the 3' blocking group suggesting that in addition to the base this chemical moiety is important for strong antibody binding potentially preventing antibody to bind to other target bases in DNA".

Evidence:
— Declaration of Dr. Floyd Romesberg of May 7, 2020 including annexes A-
  D                                                                              Exhibit 39

65      Para. 69 of the Romesberg Declaration states:

"Drmanac et al. reports paired-end sequencing (PE150) and single-end 400 base read sequencing (SE400) using CoolMPS. The discussion section on page 13 states that the paper demonstrates for the first time "the sequencing of DNA utilizing the specificity of natural nucleobase recognition by fluorescently labeled antibodies in-cluding accurate SE400 and PE150". On page 14, the paper goes on to state that "[o]ur results demonstrate that all four 3' sugar-modified nucleotides (four 3'–O-az-idomethyl RTs [reversibly terminated nucleotides] with natural base) can be effi-ciently discriminated in the context of dsDNA after incorporation of RTs by polymer-ase at the end of an extending strand hybridized to a longer overhanging template."

Evidence:
— Declaration of Dr. Floyd Romesberg of May 7, 2020 including annexes A-
  D                                                                              Exhibit 39

66      Accordingly, Dr. Romesberg concludes in para. 70:

"The teaching of Drmanac et al. therefore confirms that MGI's CoolMPS chemistry involves the use of nucleotide triphosphate molecules comprising a purine or pyrim-idine base and a deoxyribose sugar moiety having an azidomethyl group attached in the 3' position (i.e. a –OCH2N3 group), thereby possessing the features of claims 1 and 4 of EP'578."

Evidence:
— Declaration of Dr. Floyd Romesberg of May 7, 2020 including annexes A-
  D                                                                              Exhibit 39

d) **Direct literal infringement of independent claim 1 and dependent claims 4, 6, 7, 9 by MGI's** <u>labelled</u> **dNTPs**

67   MGI's labelled dNTPs were tested in experiment (b) by Eurofins. The results are presented in section E of the 578 Eurofins Report. As reported in para. 26 and 27, "[t]*he MGI Labelled dNTPs Mix showed four LC [liquid chromatography] peaks consistent with the expected presence of four different labelled dNTPs*".

Evidence:
— Declaration of Mary of Dothage Eurofins EAG Material Sciences of January 8, 2020                                                                Exhibit 38

68   "*The third peak eluted from the liquid chromatography column ("MGI Peak 3 dNTP") had the same retention time as that observed for the Illumina Labelled dNTP in the Illumina dNTP Solution*". The results of the Eurofins experiment (b) establish structural identity between the molecular structure of a reference Illumina Labelled dNTP and one of MGI's labelled dNTPs obtained from the MGI kit.

Evidence:
— Declaration of Mary of Dothage Eurofins EAG Material Sciences of January 8, 2020                                                                Exhibit 38

69   The reference Illumina labelled dNTP has the following structural formula (Fig. copied from para. 50 of the Romesberg declaration):

Evidence:
— Declaration of Dr. Floyd Romesberg of May 7, 2020 including annexes A-
  D                                                                    Exhibit 39

70    The reference Illumina labelled dNTP exhibits all the features of claim 4 and the corre-
      sponding alternatives of claim 1 and of claims 6, 7 and 9, namely:

| No. | Feature | Structural part and its color in the formula above |
|---|---|---|
| 1 | A modified nucleotide molecule | entire structure |
| 1.1 | comprising a purine or pyrimidine base and | Pyrimidine base: green |
| 1.2 | a ribose or deoxyribose sugar moiety | Deoxyribose ribose sugar moiety: blue <br><br> (also in blue: a 5'triphosphate) |
| 1.3 | having a removable 3'-OH blocking group covalently attached thereto | 3' carbon and O atoms of base: blue |
| 1.3.1 | such that the 3' carbon atom has attached a group of the structure -O-Z | |
| 1.3.2 | wherein Z is -C(R')$_2$ -N$_3$ , | |
| 1.3.4.a | each R' is a hydrogen atom, | 3' Azidomethyl group: red |
| 4 | wherein Z is an azidomethyl group | |
| 6a | wherein said base is linked to a detectable label via a cleavable linker | Detectable label: purple <br> Azido moiety-containing cleavable linker: brown |
| 7 = 6a | wherein said linker is cleavable | |
| 9 | wherein said detectable label is a fluorophore | The purple structure represents a rhodamine-type dye which is a fluorescent dye |

71    The results of Eurofins experiment (b), Liquid Chromatography|Mass Spectrometry|Mass
      Spectrometry, prove that the molecular structure of one of the four labelled dNTPs of the
      MGI Kit, namely the one eluting in the third peak when subjected to liquid chromatog-
      raphy, has the identical molecular structure as the reference Illumina labelled 3'-az-
      idomethyl-dNTP shown in para. 69 above. This conclusion is based upon the following
      experimental evidence (as copied from section E of the 578 Eurofins Report, Exhibit 38):

<u>LC behavior and UV|Vis spectra</u> (cf. 578 Eurofins Report, <u>Exhibit 38</u>, para. 30, 31)

72    "The Illumina Labelled dNTP eluted from the liquid chromatography column at the same
       elution time as the MGI Peak 3 dNTP, which indicated that the two samples have the
       same LC elution behavior".

73    "The UV|Vis spectra of both the Illumina Labelled dNTP and the MGI Peak 3 dNTP were
       recorded and shown to be identical within experimental error, as shown in Figure 1 below
       (upper spectrum is Illumina Labelled dNTP and lower spectrum is MGI Peak 3 dNTP)."



Figure 1

<u>Mass|charge (m|z) values and isotopic envelopes</u> (cf. 578 Eurofins Report, <u>Exhibit 38</u>,
para. 32 to 34)

74    "Mass spectrometric measurements of each unfragmented MS molecule (Illumina La-
       belled dNTP and MGI Peak 3 dNTP) yielded a set of multiple mass|charge (m|z) values,
       as shown in Figure 2 below. Each member of the set of the m|z values differed from the
       other by 0.5 atomic mass units per charge (to within experimental error), which reflects
       a net difference of 1 atomic mass unit per molecule. Such peaks that differ from each
       other by 1 atomic mass unit are expected and known to reflect isotopic variants."

75    "A set of MS peaks for isotopic variants of a given molecule is termed an isotopic enve-
       lope. The peaks within isotopic envelopes for a given molecule vary as a function of its
       atoms because the relative abundance of isotopes varies between different atoms. Thus,

two molecules having the same mass but different atomic compositions will have differ-
ent isotopic envelopes. As a result, analysis of isotopic envelopes provides a means to
determine the exact number of each atom type present in the molecule of interest."

76    "As shown in Figure 2 below, the isotopic envelope of the Illumina Labelled dNTP is
      identical (within experimental error) to the isotopic envelope of the MGI Peak 3 dNTP. In
      addition, the isotopic envelopes of both the Illumina Labelled dNTP and MGI Peak 3
      dNTP were identical to the theoretical isotopic envelope for a molecule having the atomic
      (charged state) composition of $C_{65}H_{81}N14O_{28}P_3S_2^{+2}$. This isotopic analysis establishes
      that the atomic composition of the MGI Peak 3 dNTP (+2 charged state) is
      $C_{65}H_{81}N_{14}O_{28}P_3S_2^{+2}$."



Figure 2

Fragmentation patterns (cf. 578 Eurofins Report, Exhibit 38, para. 35)

77    "The second MS step, i.e. the fragmentation MS step, was then examined. During this
      fragmentation, the molecule breaks into smaller fragments according to the bonds that
      connect the atoms. As shown in Figure 3 below, the fragmentation pattern of the Illumina
      Labelled dNTP is identical (within experimental error) to the fragmentation pattern of the
      MGI Peak 3 dNTP".



Figure 3

78    Thus, experiment (b) of the 578 Eurofins Report concludes in para. 36:

"The identity between both the isotopic envelopes and the fragmentation patterns of the Illumina Labelled dNTP and the MGI Peak 3 dNTP establish that the MGI Peak 3 dNTP is identical to the Illumina Labelled dNTP (i.e. it has the same number and types of atoms connected in the same way). Thus, these LC|MS|MS data establish that the MGI Peak 3 dNTP present in the MGI Labelled dNTPs Mix from the MGI Kit possesses the structural formula of the Illumina Labelled dNTP",

which realizes the features of claims 1, 4, 6, 7 and 9.

Evidence:
— Declaration of Mary of Dothage Eurofins EAG Material Sciences of Janu-
ary 8, 2020                                                                    Exhibit 38

79    Dr. Romesberg in his declaration supports this conclusion, based, among others, on the following explanatory remarks:

—    "LC|MS|MS is an analytical technique that combines liquid chromatography with two steps of mass spectrometry. [...] In LC|MS|MS [...] after the intact molecule of a certain mass-to-charge (m|z) ratio is selected in a first MS step, the molecule is then subjected to conditions that cause it to fragment into smaller sub-portions. The masses of these sub-portion fragments can then be measured via a second magnetic field (i.e. the second MS step of MS|MS [...]). The set of specific sub-portions into which a molecule fragments is highly reproducible and is commonly

used to uniquely and unambiguously identify the parent molecule." (Romesberg declaration, Exhibit 39, para. 52)

— "Since the natural abundance of different isotopes is well known, the isotopic envelopes may be used to determine the atomic composition of the molecule. Importantly, when two molecules have the same mass but different atomic compositions, their isotopic envelopes will differ. If two molecules (e.g., the MGI Peak 3 dNTP and the Illumina Labelled dNTP) show the same isotopic envelopes, this demonstrates that the two samples possess the same atomic composition." (Romesberg declaration, Exhibit 39, para. 56, 2nd half)

— "LC|MS|MS is not an esoteric technique, but rather one employed every day in thousands of laboratories across the world to identify beyond doubt the atomic composition of a molecule of interest." (Romesberg declaration, Exhibit 39, para. 56, last sentence).

— "[T]he MS fragmentation step breaks the molecule into smaller fragments according to the bonds that connect the atoms. Thus, a pattern of masses of the smaller fragments ("fragmentation pattern") is a unique indicator of how the atoms within a given molecule are connected. When two samples (e.g., the MGI Peak 3 dNTP and the Illumina Labelled dNTP) show the same fragmentation pattern, as well as identical masses, it is clear that the two samples possess molecules having the same number and type of atoms, and also the same connectivity between the atoms." (Romesberg declaration, Exhibit 39, para. 58)

Evidence:
— Declaration of Dr. Floyd Romesberg of May 7, 2020 including annexes A-D                    Exhibit 39

80  Thus, the modified nucleotides in the MGI sequencing kits required for operating MGI sequencers directly and literally infringe independent claim 1 and claims 4, 6, 7 and 9 which are dependent on claim 1.

e)  **Direct infringement of claim 25 by nucleotides and kits**

Ad paras. 60-66:

81  The nucleotides of the tested MGI Kit are proven to infringe EP'578 claim 1 and claims 4, 6, 7 and 9 by results presented above in para. 43 et seqq. Therefore, claim 25 directed to the kit is infringed, too.

f)  **Contributory infringement of method claims 12 and 17 and product claim 29**

Ad paras. 67-71

82  The previous and the additional evidence presented above in paras. 37 et seqq. render Defendant's allegations regarding non-infringement of method claims 12 and 17 moot.

83    Furthermore, product claim 29 is also contributorily infringed. Independent product claim 29 of EP'578 is directed at an oligonucleotide and comprises the following features:

| 29 | An oligonucleotide comprising |
|------|-------------------------------|
| 29.1 | a modified nucleotide of claims 1-11. |

84    Features 29 and 29.1 are infringed directly by Defendant's customers and indirectly by Defendant who is offering and selling MGI sequencers and sequencing reagent kits because each incorporation step of stepwise SBS as performed on MGI sequencers inevitably generates an oligonucleotide comprising a 3' blocked modified nucleotide comprising the features defined by claims 1, 4, 6, 7 and 9.

g)    Conclusion

Ad para. 72

85    Thus, the modified nucleotides in the MGI sequencing reagent kits required for operating MGI sequencers directly and literally infringe independent claims 1 and 15 as well as claims 4, 6, 7 and 9 which are dependent on claim 1.

86    Furthermore, by advertising or distributing such kits as described above in Switzerland, Defendant commits contributory literal infringement of method claims 12 and 17 and product claim 29.

C.    Validity of EP'578

1.    Preliminary Remarks

Ad paras. 91-342

87    Defendant alleges EP'578 to be invalid based on the sole ground of lack of inventive step.

88    Defendant relies on Ju et al. (act. 16_8) as closest prior art, on alleged knowledge from the textbook Greene and Wuts (act. 16_15) and on Zavgorodny 1991 (act. 16_12) as a secondary document for the inventive step analysis under the problem solution approach (cf. act. 16, para. 147, para. 196 et seqq.).

89    However, before discussing Ju et al. (act. 16_8) as starting point for assessing inventive step, Defendant enters into a lengthy discussion of other specific documents from the patent and scientific literature, in particular Tsien et al. (act. 16_14) and Kraevskii et al.

(act. 16_16), to explain what is characterized as "basic principles" of SBS and protecting groups.

90      Yet, the 15 pages covered by act. 16, paras. 91-146 do not summarize the general back-ground regarding SBS technology and protecting groups, but they rather represent expert knowledge that the skilled person would only look for or have if they already had the invention of EP'578 in mind. This is one of several arguments that demonstrate that the Defendant is engaging in a speculative and impermissible hingsight analysis in order to arrive at the invention.

91      Neither *Tsien et al.* nor *Kraevskii et al.* belong to the common general knowledge of the skilled person. *Kraevskii et al.* is not even concerned with SBS, but rather with the older Sanger sequencing method based on compounds that irreversibly terminate DNA synthesis. Both documents are specific pieces of prior art that would need to be introduced and considered within the framework of the inventive step analysis under the problem solution approach, i.e., as closest prior art documents or as documents that need to be combined with the respective closest prior art.

92      Similarly, the documents introduced by Defendant in the preceding act. 16, paras. 73-91 in the context of addressing the allegation that EP'578 was wrongfully upheld as valid in the Opposition Proceedings, would also not have formed or reflected the common general knowledge of the skilled person. Rather they are specific prior art references that should not be considered unless they are legitimately introduced by established criteria according to the problem-solution approach – i.e. as closest prior art or as combination documents.

93      Cited document *Greene and Wuts* (act.16_15) is a textbook that indeed is part of the common general knowledge. It discloses *inter alia* an azidomethyl (–$CH_2$-$N_3$) protecting group for a phenolic compound on p. 260. However, this disclosure nevertheless is not relevant for inventive step of EP'578 as demonstrated below in para. 134 et seqq.

94      Defendant alleges in act. 16, paras. 6 and 148 et seqq. that the person skilled in the art already had clearly defined criteria available for an appropriate choice of the protecting group for use in SBS. Yet, this amounts to a vast exaggeration as the following analysis demonstrates based on the documents related to the problem solution approach starting out with the teaching derivable from *Ju et al.* as closest prior art.

**2.    *Ju et al.*, the closest prior art**

Ad paras. 147-152

95      *Ju et al.* (act. 16_8) neither discloses nor suggests clear criteria based on which a person skilled in the art could predict which protecting group is useful in SBS. *Ju et al.* mainly recites functional requirements. Apart from the specific teaching regarding two preferred protecting groups, *Ju et al.* offers no guidance how to fulfill the multiple stringent requirements that are needed for a protecting group to be suitable for SBS.

96    First, Defendant refers in act. 16, para. 148 to *Ju et al.'s* teaching on p. 25, li. 28 to p. 26, li. 2:

   "Any chemical group could be used [as protecting group in SBS] as long as the group

   1) is stable during the polymerase reaction,

   2) does not interfere with the recognition of the nucleotide analogue by polymerase as a substrate, and

   3) is cleavable."

   Evidence:
   — *Ju et al.*, WO 02|29003                                                    act. 16_8

97    Notably, these criteria merely represent necessary functional properties of any useful protecting group for stepwise SBS. Absent these properties — i.e. if a protecting group is not stable during the polymerase reaction, or if a nucleotide analogue with this protecting group is not recognized by the polymerase and incorporated into the growing strand or if the protecting group is not cleavable after nucleotide incorporation — it is not suitable for SBS.

98    Evidently, these three criteria are not useful as selection criteria to predict whether a protecting group will be functional in SBS. They teach nothing beyond the functional criteria for which each potential blocking group has to be individually tested.[1] Critically, these criteria provide no guidance on how to attain the "fundamental requirements" of sequencing by synthesis taught by *Ju et al.* at page 42, lines 17-19.

99    Defendant relies upon six allegedly "*clearly defined criteria*" for the protecting group (cf. act. 16, para. 6) not all of which are clearly derivable from Ju *et al.* in view of the skilled persons' knowledge. These are addressed below:

a)    **The criterion "*Small Dimension of the Protecting Group*" is not defined in *Ju et al.***

   Ad para. 153-161

100   The allegedly clear selection criterion "*small dimension of the protecting group*" is by no means clearly defined in *Ju et al.* (act. 16_8). In fact, none of the citations of *Ju et al.* define the term "*small*" or "*small size*" in chemical terms, e.g., with respect to molecular

---

[1] As in the previous two sentences – the terms "protecting group" and "blocking group" are generally used interchangeably in the art. Additionally, the term 3' capping group or 3' cap are sometimes used instead of 3' blocking group. There is an exception in one specific context of claim 1 of EP'578: where the term "blocking group" refers to the entire formula Z and the term protecting group refers to R" present in the first two alternatives of formula Z only. Since R" is not present in the the third alternative of Z according to claim1 regarding the azidomethyl group (cf.act.1, para. 46), such distinction is not relevant in the context of the azidomethyl group.

weight, number of atoms or molecular diameter (cf. e.g. *Ju et al.*, act. 16_8, p. 5, li. 11-14 and li. 26-28; p. 6, li. 21-24; p. 20, li. 22-24; p. 43, li. 27-28).

101    *Ju et al.* discloses two specific preferred protecting groups $CH_2OCH_3$ and $CH_2-CH=CH_2$, the MOM and allyl group, respectively (cf. e.g. *Ju et al.*, act. 16_8, p. 6, li. 21-24). Yet, based on just these two preferred examples, a generalized teaching regarding size, number of atoms or molecular weight of potential further protecting groups is neither suggested by *Ju et al.* nor derivable based on the skilled person's knowledge. *Ju et al.* just emphasizes that nucleotide analogues suitable for SBS need to be structurally and functionally similar enough to natural nucleotides in order to be recognized by the polymerase as a substrate e.g. with respect to the 3' capping groups (*Ju et al.*, act. 16_8, p. 20, li. 1-4, and li. 22-24). However, *Ju et al.* nowhere discloses what *"structurally and functionally similar enough"* means in terms of chemical structure.

102    In summary, *Ju et al.* does not teach how to identify or structurally delimit suitable *"small"* protecting groups by defining a selection criterion distinguishing functional from non-functional protecting groups depending on size.

**b)**    **Regarding the criterion *"Selective cleavability under mild conditions in an aqueous environment"* by *Ju et al.***

<u>Ad paras. 162-164</u>

103    Defendant proposes *"selective cleavability under mild conditions in an aqueous environment"* as a second clear criterion for an appropriate choice of the protecting group for use in SBS (cf. act .16, para. 6 and paras. 162-164).

104    *Ju et al.* does teach very clearly that *"fundamental requirements"* of the method described include that *"the group capping the 3'-OH need[s] to be removed with high yield to allow the incorporation and detection of the next nucleotide"* and *"the growing strand of DNA should survive the washing, detection and cleavage processes to remain annealed to the DNA template"* (*Ju et al.*, act. 16_8, p. 42, li. 7 and 14-19). Thus, the skilled person would understand from *Ju et al.* that the protecting group must be selected very carefully, not only with respect to toleration by polymerase during incorporation into the growing polynucleotide chain, but also with respect to the deprotection yield and conditions required.

105    However, despite the deprotection conditions being of *"fundamental"* importance, *Ju et al.*'s specific teaching on the subject is very limited, focusing almost entirely on the MOM and allyl blocking groups which it discloses, in respect of which it teaches *"[t]he chemical cleavage of the MOM and allyl groups is fairly mild and specific, so as not to degrade the DNA template moiety"* (*Ju et al.*, act. 16_8, p. 54, li. 18-22, Fig. 14 and p. 59, li. 2-4). *Ju et al.* provides no common chemical reagents or reaction conditions shared for MOM and allyl deprotection and provides no general guidance for the chemical reagents or reaction conditions that must be used for other undisclosed blocking groups. Therefore,

*Ju et al.* provides almost no guidance to the skilled person as to how to identify deprotection conditions which satisfy the *"fundamental requirements"*. Additionally, from this disclosure it is apparent that, contrary to Defendant's suggestion, *Ju et al.* does not teach that the deprotection conditions must be aqueous – for example, Fig. 14 indicates that the deprotection conditions for the allyl protecting group utilised sodium iodide in chloro-trimethylsilane (an organic solvent).

**c)  Regarding the criterion *"Deprotection must not lead to irreversible denaturation of the DNA"***

Ad para. 165-174

106   Defendant mentions at act. 16, para. 6 and paras. 165-174 the criterion that irreversible denaturation of the DNA must not be caused by the cleavage of the protecting group.

107   As mentioned above, in this regard *Ju et al.*'s description of the SBS approach includes as a "fundamental requirement" that *"(4) the growing strand of DNA should survive the washing, detection and cleavage processes to remain annealed to the DNA template"* (cf. *Ju et al.*, act. 16_8, p. 42, li. 17-19). Defendant's insertion of avoiding "irreversible" denaturation is absent from this fundamental requirement. Defendant provides no explanation of how the fundamental requirement to "remain annealed" should be interpreted as permitting the strands to not remain annealed, so long as such denaturation is irreversible.

108   The skilled person would appreciate that deprotection must not lead to any denaturation of the DNA. *Ju et al.* provides no useful teaching as to which protecting groups and their respective deprotection conditions might fulfil this requirement.

109   The technical effect of the difference between the closest prior art (i.e. *Ju et al.*) and the granted claims of EP'578 is a 3'OH blocking group that can be deprotected without denaturing the template and growing DNA strands, i.e. in an aqueous environment under conditions compatible with DNA and DNA sequencing by synthesis.

110   The objective technical problem formulated based on this technical effect is "the provision of compounds with improved properties which can be incorporated, and which comprise a blocking group that can be removed without denaturation of DNA". This amounts to a combination of the technical features that are the subject of criteria (b) and (c).

111   This problem is indeed plausibly solved: EP'578 in paras. [0157] and [0158] discloses the methods for the incorporation and detection steps:

   i.   The incorporation step is performed by a polymerase enzyme according to conditions usual in the art such as the indicated buffer, temperature (65°C) and time (10 to 15 minutes).

ii. The deblocking step is performed with water-soluble TCEP (Tris-(2-carboxy-ethyl) phosphine trisodium salt) at a concentration of 0.1M and at the same temperature (65°C) as in the previous step for 15 minutes.

112 There is no reason to question the suitability of the indicated conditions for the incorporation step. Taq polymerase, an exemplary polymerase that is routinely used in PCR, is typically incubated for 15 minutes at 68° to 72°C. Evidently, conditions for DNA synthesis must allow for base pairing.

113 Accordingly, there is no reason to doubt that a deprotection step using an aqueous solution at the same temperature as the preceeding step (the temperature probably being maintained for convenience), for 15 minutes, can be performed without denaturing the DNA. Therefore, it is clearly plausible that the disclosure of EP'578 solves the objective technical problem set out above.

d) **"The avoidance of protecting groups with ester or ketone units" is the only clear predictive selection criterion taught by *Ju et al.* – yet it teaches away from using the electrophilic azidomethyl group**

Ad para. 175-181

114 The only teaching in *Ju et al.* regarding chemical properties of blocking groups is to avoid esters and ketones comprising protecting groups. As electrophilic groups, esters and ketones are susceptible to a nucleophilic attack in the active center of the polymerase and are therefore not stable in the polymerase (cf. *Ju et al.*, act. 16_8, p. 6, li. 6-14).

115 Albeit a clear criterion to avoid, this negative criterion does not help the person skilled in the art to positively identify among potential candidates which ones will be useful as protecting groups in SBS. It is only useful to diminish the number of candidates by negative selection.

116 Notably, *Ju et al.* teaches away not only from using esters and ketones but more generally teaches away from using chemical groups with electrophiles due to strong nucleophiles in polymerase (*Ju et al.*, act. 16_8, p. 6, li. 6-14):

"Chemical groups with electrophiles such as ketone groups are not suitable for protecting the 3'-OH of the nucleotide in enzymatic reactions due to the existence of strong nucleophiles in the polymerase."

Evidence:
— *Ju et al.*, WO 02|29003                                                   act. 16_8

117 Therefore, with this clear criterion, *Ju et al.* in fact teaches also away from the azidomethyl group of claims 1 and 4 of EP'578, because the center N-atom of the azide has a partial positive charge and qualifies as an electrophile:



Evidence:
— Excerpt from Wikipedia re Azide                                                     Exhibit 40

118   This view is also supported by *Canard et al.* (act. 16_13) cited in *Ju et al.* (cf. act. 16_8, p. 6, li. 10). *Canard et al.* specifically warn that azido moieties might pose a similar risk to that of carbonyl groups (cf. p. 10863, col. 1 last full sentence):

*"Strikingly, other substituents at the 3' end of DNA at such a position and distance of the sugar ring may also receive a nucleophilic attack. Strikingly, the central nitrogen of the 3' -azido group of AZT bears a partial positive charge (29) in a position similar to the car- bonyl group of 3'-esterified nucleotides, and the 3'-azido group of AZT is metabolized into a 3'-amino group in vivo (30)".*

Evidence:
— *Canard et al.*, 1995, Proc. Natl. Acad. Sci. USA, 92: 10859-108636                 act. 16_13

119   In summary, this is a clear criterion taught by *Ju et al.* predicting protection groups that are non-functional in SBS, i.e. to avoid protecting groups with electrophiles such as ke- tone groups. It clearly, teaches away from the azidomethyl group of claims 1 and 4.

e)    ***Ju et al.* does not disclose or suggest a "*preference for unbranched protecting groups with no more than 4 atoms*"**

Ad para. 182-188

120   Defendant's suggested criteria such as a preference for "unbranched protecting groups with no more than four atoms" or "an unbranched chain and, together with a terminal hydrogen atom, only have four atoms in the chain" or "unbranched allyls with few, i.e. not more than four atoms" find no support in the disclosure of *Ju et al.* (cf. act. 16_8, para. 6 and paras. 182 et seq.). Defendant's allegation that these criteria are based on "characteristic features" of the two preferred protecting groups MOM and allyl represents hindsight. They are neither disclosed nor suggested by *Ju et al.*

121   In fact *Ju et al.* on the one hand discloses the three very general functional criteria (cf. act. 16_8, p. 25, li. 28 to p. 26, li. 2) repeatedly cited by Defendant and recited above in para. 96. In addition, *Ju et al.* teaches the vaguely defined criterion "small" (act. 16_8, e.g. p. 5, li. 11-15) discussed above in para. 53 et seqq.

122   On the other hand, *Ju et al.* discloses the specific criterion to avoid ester and ketone groups discussed above in para. 107 et seqq. and finally the two very specific preferred MOM and allyl protecting groups.

123 Thus, *Ju et al.* simply offers only very limited teachings for the selection of further pro-
tecting groups. A "preference for unbranched protecting groups with no more than four
atoms" is not based on the teaching of *Ju et al.*

124 Moreover, Defendant's allegation in act. 16, para. 182 "[a] characteristic feature of both
groups is that they form an unbranched chain and, together with a terminal hydrogen
atom, have four atoms in the chain (i.e. "-C-C=C-H" for allyl; "-C-O-C-H" for MOM)" is
actually misleading: In counting atoms the convention is to count all atoms in a chain
except for hydrogen, e.g. allyl would usually be referred to as a "three carbon chain".The
Defendant's alleged characteristic of the protecting group having a four atom chain dis-
regards that hydrogen atoms are not equally sized (measured by Van der Waals radii) in
comparison to carbon and oxygen atoms.

125 Furthermore, it is arbitrary to count only hydrogen atoms in linear spatial arrangement
with the carbon and oxygen atoms, whereas not to count hydrogen atoms at an angle to
the chain. If Defendant wants to count hydrogen atoms regarding the length of the chain,
it must also count all of the other hydrogen atoms. This would result in branched chains
for all of the above-mentioned protecting groups. No chemist would look at it in this way.

126 In fact, neither the size, number of atoms in the chain, nor nature of the bonds of *Ju et
al.*'s preferred allyl or MOM group point towards the azidomethyl group of claims 1 and 4.
Not only is the claimed azidomethyl group larger than both of *Ju et al.*'s preferred groups,
but it also has, unlike *Ju et al.*'s allyl and MOM groups, two double bonds and therefore
a rigid rod-like 3D structure that is not flexible and therefore its incorporation by a poly-
merase would not be considered to be readily predicted from *Ju et al.*'s teaching of the
smaller and less rigid MOM and allyl groups. The conclusion remains: *Ju et al.* lacks any
teaching, suggestions or hints towards the chemical structure of the azidomethyl protect-
ing group.

Evidence:
— Court-appointed expert

f)     **"The skilled person's appreciation that the preferred protecting group in Ju et al.,
i.e. the MOM group, was a protected hemiacetal" is a mere allegation**

Ad para. 189-195

127 Defendant's allegation that the skilled person readily appreciates that the MOM group is
a special case among OH protecting groups since it can be regarded as a masked hem-
iacetal is unfounded.

128 In fact, *Ju et al.* recommends MOM and allyl with equal weight and systematically refers
to both of them at the same time throughout the disclosure. There is neither a basis in
*Ju et al.* to suggest to the skilled person a preference for the MOM group over the allyl
group nor that the MOM group is favored because it contains a masked hemiacetal.

129 Defendant again resorts to a specific piece of scientific literature that does not form part of the skilled person's common general knowledge, *Nishinio and Ishido* (1986) (act. 16_21), to support this allegation (cf. act. 16, paras. 193-195). This is not permissible because act. 16_21 is not part of skilled person's general knowledge and there is no substantiated motivation of the skilled person to search for this document and combine its disclosure with the teaching of *Ju et al. Ju et al.* does not cite *Nishinio and Ishido*, and *Ju et al.* does not teach the generalized desirability of using a "masked hemiacetal." Defendant generalizes a single selected example from *Ju et al.* allegedly suggestive of azidomethyl with no support outside of the unrelated teachings of *Nishinio and Ishido*. This is a further demonstration that the Defendant is engaging in an impermissible hindsight analysis.

g) **Summary**

130 Overall, of the six general criteria that Defendant alleges are based upon *Ju et al.'s* teachings only criterion (d), the avoidance of protecting groups comprising esters or ketones, is well-founded -- and that is because *Ju et al.* teaches against the use of protecting groups that contain an electrophile (of which azidomethyl is one).

131 In contrast, Defendant's criterion (a) relating to the "*small dimension*" of the protecting group is not clearly taught, and the alleged preference for unbranched chains of no more than four atoms in criterion (e) has no basis in the teaching of *Ju et al.* and is transparently self-serving. Defendant's suggestion that the skilled person would appreciate that the MOM group is a protected hemiacetal is also no more than a mere assertion based upon hindsight.

132 Whilst Defendant is correct that *Ju et al.* clearly teaches that protecting groups must be cleavable in mild conditions (criterion (b)) and in a manner which does not denature DNA (criterion (c)), Defendant over-states the teaching in *Ju et al.* in respect of these criteria both by suggesting that the cleavage conditions must be <u>aqueous</u> and in qualifying that DNA denaturation should not be <u>irreversible</u> (incorrectly implying that reversible denaturation would be tolerated by *Ju et al.*).

133 In conclusion, nothing actually supported by *Ju et al.'s* teachings would direct persons skilled in the art to azidomethyl. Moreover, the fact that Defendant attempts to selectively generalize the teaching of *Ju et al.* to six allegedly established criteria for protecting groups in SBS, based upon selected articles and patent literature, demonstrates that there is no general technical teaching regarding how to identity a protecting group (and deprotection conditions) that meet the stringent requirements to be suitable for a step-wise SBS process. Indeed, there was a longstanding need to find such protecting groups until finally EP'578 met this need in particular with the azidomethyl group.

**3.** ***Greene and Wuts* – a standard textbook that belongs to the general technical knowledge of the skilled person**

<u>Ad paras. 199-210</u>

134 Under the title "could-would approach", Defendant mentions *Greene and Wuts* (act. 16_15), a 750 page compendium on protective groups in organic synthesis, which indeed represents the common general knowledge.

135 Defendant alleges that the skilled person based on *Ju et al.* in combination with common general knowledge would be capable of significantly reducing the list of possible protecting groups disclosed in *Greene and Wuts* and would thereby arrive at a selection of only five valid potential candidates with the azidomethyl group among them. However, Defendant's approach is a biased, hindsight-driven "*whittling down*" of the more than 200 potential OH protecting groups disclosed in *Greene and Wuts*.

136 The first bluntly wrongful step in this hindsight exercise is the allegation that the skilled person would consider protecting groups listed in chapter 3 for protecting phenolic OH residues as equally suitable as the groups listed in chapter 2 for protecting alcoholic OH groups (cf. act. 16, paras. 202-205). The skilled person would appreciate that the 3'OH of a nucleotide sugar is an alcoholic and not a phenolic OH group.

137 Why would *Greene and Wuts*, a compendium representing general technical knowledge, split the groups suitable to protect alcoholic OH groups from phenolic OH groups into two chapters if there was no difference between the protection and deprotection of alcoholic and phenolic OH groups?

138 Moreover, why would *Greene and Wuts* add a note that many of the protecting groups that were originally developed for alcohols also work for phenol protection (c.f. act. 16_15, p. 287) but not add a comparable note vice versa, i.e. regarding a general applicability for alcohols also of groups developed for phenols?

139 Defendant's motivation for alleging that the skilled person would nevertheless have considered protecting groups listed for phenolic compounds is evident: The azidomethyl group is only disclosed as a protecting group for phenols in chapter 3 (act. 16_15, p. 260) but not for alcohols in chapter 2.

140 However, the skilled person would not have considered the phenolic protecting groups. *Firstly*, he or she had no reason to assume that the division between protection of alcoholic and phenolic OH groups was arbitrary. *Secondly*, the skilled person based on his or her chemical knowledge would understand that phenols as aromatically stabilized compounds are better leaving groups during deprotection than alcoholic compounds. Accordingly, while protecting groups for alcoholic compounds are generally also useful for phenolic compounds, the opposite is not generally true. This explains why the chapter in Greene & Wuts on phenol protection refers to the chaper on protection of alcohols, but not the other way around.

141 Defendant's second mistake resulting in a biased analysis is the wrongful application of some of the six allegedly established criteria. Defendant arbitrarily excludes from the combined number of over two hundred phenolic and alcoholic protecting groups any group identified as not being "*small, in the sense of no more than four carbon atoms in an unbranched chain*" and any group comprising a carbonyl ester or keto function but not other electrophile comprising protecting groups. Thereby, Defendant arbitrarily "*whittled down*" the number of potential protecting groups to twelve and finally five candidates.

142 In the first step to reduce to only twelve candidates, Defendant strictly applied the alleged four atom rule, i.e. excluded all groups comprising more than four atoms (cf. act.16, para. 206). In the subsequent step to arrive at five candidates, Defendant no longer applied the four atom rule but looked at the size of the atoms to exclude further groups. This is inconsistent.

143 Moreover, as shown above, a number, including the above, of the applied allegedly clear criteria neither form part of the skilled person's common general knowledge, nor are they disclosed or suggested by *Ju et al.*

144 Defendant, however, chose not to consistently apply the one criterion actually taught by *Ju et al.*, which teaches away from the use of protecting group comprising an electrophile, which may react with strong nucleophiles in the polymerase active site. Instead, Defendant limited its elimination to groups comprising esters and ketones, which are **specifically** identified in *Ju et al.*, in order to whittle down the list of protecting groups in *Greene and Wuts* to arrive at 12 viable candidates. But Defendant then argues there is no basis to exclude other protecting groups with electrophilic atoms (act. 16 paras 323-324). If Defendant had applied *Ju et al.*'s criterion regarding the avoidance of electrophiles in an impartial manner, the azidomethyl group that comprises an electrophilic N atom would have been eliminated, too. Thus, Defendant's approach again appears inconsistent and hindsight-driven.

145 Another requirement of *Ju et al.* that Defendant chose to ignore is the requirement that the growning strand of DNA survive the deprotection. On p. 260, *Greene and Wuts* teaches to use catalytic hydrogenation or reduction with $LiAlH_4$ for deprotection of the azidomethyl group and refers to *Loubinoux et al.* (1988). These are not mild conditions and they would deter the skilled person from considering the azidomethyl group for capping the 3'OH during SBS since they would undermine one of *Ju et al.*'s fundamental requirements.

146 Moreover, *Loubinoux et al.* taught the use of azidomethyl protection groups in the context of synthesis of unstable phenol derivatives investigated "the methods of protection of phenolic hydroxyls which allow the return to phenol under the gentlest conditions possible" (cf. *Loubinoux* [Exhibit 41], Introduction). *Loubinoux* used various deprotection conditions including triphenyl phosphine and then water in tetrahydrofuran, treatment with hydrogen in the presence of palladium on carbon, stannous chloride, and $LiAlH_4$. These conditions cannot be considered to be mild conditions in **the context of SBS**.

Exhibit:
— Loubinoux B. et al. "Protection of phenols by the azidomethylene group,
   application to the synthesis of unstable phenols", Tetrahedron Vol. 44, No.
   19, pp. 6055-6064, 1988.                                          Exhibit 41

147    Furthermore, Defendant also ignores *Ju et al.*'s fundamental requirement of a "high yield"
       for deprotection in its hindsight-driven selection of azidomethyl. *Loubinoux* reported that
       "Regardless of the reduction method used, they are obtained as pure products at a yield
       between 60 and 80%. In general, the method that uses hydrogen yields better results
       than the one that uses triphenylphosphine." Thus, Loubinoux's "yield between 60 and
       80%" would be considered to fall well short of *Ju et al.*'s "high yield" requirement, partic-
       ularly when using the inferior triphenylphosphine deprotection method. Failure in depro-
       tection of e.g. 30% of the terminal 3'OH would leave only 70% of the signal in the sub-
       sequent cycle and decrease stepwise to about 50%, 34%, 24%, 17%, 12%, 8%, 6% and
       so on in the subsequent cycles. Accordingly, the skilled person readily appreciates that
       a deprotection efficiency well over 98% is necessary in order to keep the signal strong
       enough over multiple, e.g. over one hundred or more cycles of SBS.

148    Finally, Plaintiff notes that although *Greene and Wuts*, a compendium of over 1,000 pro-
       tecting groups, may be considered as a standard reference forming part of the common
       general knowledge of the skilled person, this does not mean that the skilled person re-
       gards each and every individual protecting group disclosed therein to be obviously ap-
       plicable in all circumstances.

149    *Greene and Wuts* is a reference listing blocking groups that are generally applicable in
       organic synthesis (cf. act. 16_15, Title). There is no indication at all in *Greene and Wuts*
       that any of these protecting groups would be useful under the stringent requirements
       applicable to a 3'OH protecting group in a nucleotide analogue used in SBS as referred
       to in EP'578 [0005] and also appreciated by *Ju et al.*'s three purely functional criteria
       referenced in para. 96 above. Compared to organic synthesis, in vitro DNA synthesis is
       a very complex and sensitive biochemical system involving functional macromolecular
       interaction of various components (template and primer DNA, polymerase). The skilled
       person finds no guidance in *Greene and Wuts* regarding which of the listed protecting
       group could be functional in an SBS setting.

150    According to the German BGH judgment of March 27, 2018 – X ZR 59|16 ("Kinderbett"),
       standard solutions have to be considered as common general knowledge if they are ob-
       jectively recognizable as appropriate in the specific circumstances. *Greene and Wuts*
       does not provide such basis and therefore it is not appropriate to consider it common
       general knowledge that the azidomethyl group is suitable as 3'OH protecting group in
       SBS.

151    Alternatively, if *Greene and Wuts* were considered to provide standard solutions that
       formed part of the common general knowledge, these standard solutions show that the
       skilled person would not have considered using azidomethyl because *Greene and Wuts*

teaches it as only useful for phenol protection and only provides DNA-incompatible deprotection conditions for azidomethyl.

152   In conclusion, the azidomethyl group is not rendered obvious to the skilled person as a protecting group for the 3'OH group in nucleotide analogues, starting out from *Ju et al.* as closest prior art in combination with the common general knowledge provided by the compendium *Greene and Wuts.*

## 4.   *Zavogorodny et al.* as secondary document

Ad paras. 211-244

153   In order to qualify as relevant disclosure derived from a secondary document, according to the problem-solution approach the skilled person has to be motivated to consider *Zavgorodny et al.* starting out from *Ju et al.* as the closest prior art. Defendant has not identified a pointer to *Zavgorodny et al.* or any other reason for considering that piece of prior art. Plaintiff contests that the skilled person looking for a 3'OH nucleotide protection group for use in SBS without hindsight and knowledge of the invention of EP'578 would have turned to literature on nucleoside synthesis and out of the vast literature available before the priority date on nucleoside synthesis would have arrived at *Zavgorodny et al.*

154   Even if the skilled person had come across *Zavgorodny et al.*, why would he or she pick the azidomethyl group and not any of the other twenty alternatives disclosed as protecting groups in nucleoside synthesis by *Zavgorodny et al.* in the figure on p. 7594?

155   Following *Ju et al.* and looking to *Zavgorodny et al.*, the skilled person would have found MOM to be disclosed by *Zavgorodny et al.*, reinforcing MOM and not azidomethyl as the natural choice since MOM is the consistent teaching between the references.

156   Furthermore, as discussed above, Defendant's argument that the two preferred protecting groups of *Ju et al.* also comprised four atoms in a chain does not convince (cf. para. 120 et seqq. above)

157   Moreover, *Zavgorodny et al.* taught five other capping groups as small or smaller than azidomethyl.

158   Certainly and contrary to what Defendant is alleging in act. 16, para. 231, the skilled person would not have done so due to the described deprotection conditions: Whereas triphenylphosphine in aqueous pyridine may be mild for organic synthesis, the skilled person would not have considered *Zavgorodny et al.*'s deprotection conditions as mild in the context of SBS in which functional macromolecular interaction of various components (template and primer DNA, polymerase) must not be disturbed. The skilled person knows that pyridine is a strong denaturant for duplex DNA, particularly at the concentrations which would be required to deprotect an azidomethyl using triphenylphosphine which is insoluble in water. In fact, pyridine not only in aqueous solution raises the pH, e.g. the pH of 0.1M pyridine is 9.1, which is far off a physiological pH value. In addition, pyridine's

chaotropic effects of dehydration and its intercalation into the DNA render it entirely unsuitable for use in SBS.

159   Defendant alleges that *Tsien et al.* encourages the skilled person to use pyridine (0.1 M pyridine|pyridinum chloride buffer). Defendant refers to an exemplary deprotection reaction relating to a different protecting group (2,4 dinitrobenzene sulfenyl fluorescent blocking groups, cf. act. 16, para. 230). However, *Tsien et al.* neither forms part of the common general knowledge (cf. above, para. 89), nor was it legitimately introduced as a third document, based upon a motivation for the person skilled in the art to consider it. Moreover, the conditions in *Tsien et al* are not comparable to the conditions that would be required to perform the deprotection of an azidomethyl protecting group as described in *Zavgorodny et al.* Triphenylphosphine is insoluble in water, and 0.1 M pyridine would not be anywhere near sufficient to achieve a solution. In contrast an excess of pyridine would likely be required.

160   The results obtained from experiments recently conducted by Defendant's commissioned expert, Prof. Carrel (act. 16_23), are not prior art and, therefore, should not be taken into account for inventive step analysis. Nevertheless, Plaintiff has analyzed these results and will discuss serious concerns regarding the validity and relevance of the presented experimental results below in para. 177 et seqq.

161   Finally, independent of the unsuitable deprotection conditions, starting out from *Ju et al.*, the skilled person would not have picked the azidomethyl group out of the twenty alternatives due to *Ju et al.*'s clear and strong teaching away from protecting groups comprising electrophiles. As explained in para. 117 above, the center N-atom of the azide has a partial positive charge and qualifies as an electrophile and would therefore be considered by the skilled person to be susceptible to a nucleophilic attack at the active center of the polymerase.

5.   *Gololobov and Polushin et al.* as an additional documents regarding deprotection conditions

Ad paras. 245-257

162   Defendant presented no convincing argument why *Gololobov* (act. 16_24) constitutes common general knowledge and why the skilled person would recognize how standard knowledge about the Staudinger reaction in *Gololobov* is applicable in the specific circumstances to the problem of deprotecting the azidomethyl group during SBS.

163   Firstly, the Tetrahedron journal is a weekly scientific publication concerning the field of organic chemistry in general. The reports published are therefore enormously varied in nature, and cannot be said to qualify as common general knowledge to the skilled person to whom EP'578 is directed.

164   Secondly, the alleged disclosure in *Gololobov* (act. 16_24, p. 1376, li. 2-9) is related to the synthesis of nitrogen-containing compounds (p. 1400), not deprotection of alcohols.

The skilled person therefore had no reason to consult these publications when considering appropriate protecting groups based on *Ju et al.*'s requirements for SBS.

165    Thirdly, even if the skilled person considered *Golobolov* he would not have arrived at the SBS compatible deprotection conditions. *Ju et al.*'s fundamental requirements include a high yielding deprotection step where the growing strand remains hybridized to the DNA template. *Gololobov* is silent regarding anything involving DNA, even less regarding DNA hybridization conditions. There is no teachings in *Gololobov* leading the skilled person to arrive at suitable deprotection conditions for SBS.

166    The Defendant alleges *Ju et al.* has a requirement for aqueous conditions (which is wrong), but the Defendant does not identify a single phosphine reagent of *Gololobov* that would work under aqueous conditions, even less a phosphine reagent of *Gololobov* that would meet *Ju et al.*'s requirements for SBS. MGI appears to be arguing that it would have been obvious to use any phosphine, whether or not disclosed by *Gololobov*, to achieve *Ju et al.*'s requirements.

167    For the reasons above, *Gololobov* neither represents applicable common general knowledge nor would the skilled person be motivated to consider *Gololobov* in the first place nor would *Gololobov* lead to the claimed invention even if considered.

168    Confusingly, the Defendant also refers to DTT, which is not the subject of *Gololobov* or any other reference relied upon by MGI. And nothing in the record even suggests that DTT could be used for azidomethyl deprotection. This is emblematic of MGI's hindsight – the only evidence MGI cites for using DTT is EP'578 itself.

169    Defendant also presented no convincing argument for the skilled person's motivation to additionally consider *Polushin et al.* as a third document in the problem-solution-approach analysis.

170    *Polushin et al.* is not a DNA sequencing reference. *Polushin et al.* does not even relate to protecting groups and their removal. *Polushin et al.* performs synthesis only on nucleosides, not nucleotides or DNA. *Polushin et al.* does not disclose the azidomethyl group (-CH$_2$-N$_3$). In contrast, *Polushin et al.* discloses an azide group (-N$_3$) attached to the 2' carbon of a nucleoside (act. 16_25, formula 3a, top of p. 3228), and conversion of the azide group to an amine.

171    Even if assuming that the skilled person was motivated to consider *Polushin et al.* and would have recognized the conversion of an azide to an amine as similar to the conversion of an azidomethyl to a hydroxide, it is highly unlikely that he or she considered *Polushin's* reaction conditions suitable for deprotection in the context of SBS. They require the presence of pyridine and another organic solvent, acetonitrile (cf. act. 16_25, p. 3229 bridging p. 3230: tris(2-carboxyethyl)-phosphine hydrochloride (TCEP HCl) in Py/H$_2$0/CH$_3$CN (2/1/4, v/v/v, 0.01 M, [formula]3a [p.3228], 4 fold excess of TCEP HCl) for less than 10 min at room temperature).

172    Again, Defendant presented experimental results by Prof. Carell allegedly confirming that the skilled person would have considered *Polushin's* deprotection conditions as suitable (cf. act. 16, para. 251 et seq.). Yet, their relevance is questionable as discussed below in para. 173 et seqq. And such experimental data were certainly not prior art available to the skilled person at the time of the invention.

173    It is Plaintiff's impression that *Polushin et al.* emerged from a hindsight search with the key words TCEP and azide, which is not a permissible basis to introduce *Polushin et al.* for inventive step assessment. There is no basis for why a person in the art striving to implement the teachings of Ju *et al.* would have looked to *Polushin et al.* for developing SBS methods.

## 6.    The Claims are inventive of *Ju et al.* and the other cited documents

174    The inventiveness of the claims is readily apparent by the following recapitulation of the steps the skilled person starting from *Ju et al.* would have to take in order to arrive at azidomethyl 3'OH protecting group for nucleotide analogues used in SBS and use of TCEP for deprotection:

—    Start with Ju et al. (act. 16_8). Ignore preferred MOM and allyl groups because you look for an improved blocking group that can be deprotected without denaturing DNA. And even though Ju does not require it, you also apply the additional requirement that the blocking group must be deprotected under aqueous conditions.

—    Turn to *Greene and Wuts* (act. 16_15), which is a standard textbook but does not include azidomethyl in the relevant section.

—    If you look in the wrong section, you might find azidomethyl among the numerous options, but the reaction conditions cited in *Loubinoux* (Exhibit 41) are not suitable for SBS. *Loubinoux* also reports that the reaction has a low yield, and triphenylphosphine deprotection is particularly unsuitable. There are also reasons to think that azidomethyl is not "small" according to *Ju et al.*'s teachings and that its electrophilic nitrogen might react with the polymerase. There is no data showing that it can be incorporated into a nucleic acid strand by a polymerase.

—    You have to ignore the teaching away of *Ju et al.* and these other issues and search for alternative deblocking chemistries for azidomethyl. Assuming you find *Zavgorodny* (act. 16_11|12), its triphenylphosphine reaction conditions (which Loubinoux teaches is unsuitable) using pyridine denature DNA (despite Prof. Carell's declaration to the contrary [act. 16_23]). The reaction is also expected to have a low efficiency.

—    You would then have to choose to abandon *Zavgorodny's* deprotection conditions despite the fact that *Zavgorodny* taught that those conditions were the reason why azidomethyl might be selected.

—    Next, you would have to search for new deprotection conditions and assuming you came across *Polushin* (act. 16_25) and *Gololobov* (act. 16_24), you would then

have to consider their chemical teachings notwithstanding that they do not address deprotecting chemistries and do not teach DNA or SBS compatibility.

175    This series of steps starting from *Ju et al.* to arrive at the azidomethyl group as alleged by Defendant is based on an unmotivated combination of documents and ignores relevant teaching of *Ju et al.*, *Greene and Wuts*, and *Loubinoux* along the way. This does not fulfill the could|would requirement of the problem solution approach. The skilled person would not have combined all these teachings without hindsight.

176    Indeed, it took inventive activity to arrive at the azidomethyl group. Claim 1, in particular in the variant of claim 4, is inventive and EP'578 is valid.

## 7.    Critical Review of Statements and Results presented in the Carell Declaration

### Ad paras. 232-257

177    Regarding Prof. Carell's observations with respect to the deprotection conditions of *Zavogordny* et al.:

—    Firstly, the mere fact that Prof. Carell had to do these experiments illustrates that there would be doubt in the skilled person's mind regarding the suitability of the prior art deprotecting conditions for SBS.

—    The experiments reported by Prof. Carell are not realistic models for the *Zavgorodny* conditions.

—    The melting point measurements (cf. act. 16_23, Fig. 1.1.1) were performed at pyridine concentrations of 200 mM (1.6% v/v) and 400 mM (3.2 % v/v) that are much lower than the concentrations that must have been used by *Zavgorodny*. A much higher percentage of pyridine is required for solubility of triphenylphosphine (TPP), because TPP is insoluble in water.

—    A larger fraction of DNA remains denatured even at temperatures below the melting point.

     —    Fig. 1.1.1 shows that with increasing pyridine concentration notably not only the melting point was lowered but also the slope of the melting curve decreases (cf.: act. 16_23, comparison of e.g. figure 1.1.1 a) vs c): at e.g. 20°C a larger percent fraction of DNA remains denatured in the presence of 400 mM vs no pyrimidine.

     —    This is relevant because even a small fraction of denatured DNA in each cycle of SBS results in a large cumulated loss of signal during multiple rounds of SBS, cf. para. 147 above.

—    *Zavgorodny*'s conditions of aqueous pyridine without salt clearly denature DNA.

     —    As Prof. Carell (act. 16_23) states and Fig. 1.1.2 shows: Pyridine alone does not allow formation of a duplex in the absence of salt. Thus, the deprotection

conditions of *Zavgorodny* (which does not include salt) would not have allowed any duplex formation. These conditions are incompatible with SBS.

— The HPLC and MS measurements are questionable and a sound proof for a successful deprotection reaction is lacking.

— The starting materials in the HPLC (act. 16_23, Fig. 1.3.1) appear to have impurities because of the additional peaks. The declaration acknowledges the sample may not be "clean". The impurity could be an unblocked nucleotide without the azidomethyl (i.e., the product of the final reaction) as the impurities were not tested.

— The end materials in the HPLC (act. 16_23, Fig. 1.3.3) had two peaks before the large pyridine peak, which again suggests impurities. It is possible that one of these peaks is the blocked nucleotide, while the other is the unblocked nucleotide. This would suggest the reaction was not very efficient – albeit a fundamental requirement for *Ju et al.*'s SBS. Even worse, if the unblocked nucleotide is the impurity in the starting material, the reaction may not have proceeded at all. Neither the starting nor the end materials were analyzed to exclude this possibility.

— The deprotection reaction was performed at room temperature with 50% pyridine and no salt. Fig. 1.1.2 shows that even if only a small amount of pyridine were used, these deprotection conditions would have denatured DNA. Similarly, Fig. 1.2 shows that even if 150 mM salt were added to a 50% pyridine solution, a significant percentage (>30%) of the DNA would have been denatured at this reaction temperature.

— Prof. Carell cites *Portella et al.*, which supports the Plaintiff's position. The article confirms in the abstract and other points throughout that pyridine has "very strong denaturant properties". The abstract also states "[a]ddition of pyridine is known to unfold DNA…" and ["o]ur study reveals that one of the most powerful denaturants of DNA [pyridine] can become structure-protective when combined with another strong denaturant: acidic pH."

— Plaintiff has serious concerns that the LC-MS data (act. 16_23, Tables 1 and 2) has not been presented in a forthright way:

— The blocked nucleotide peak is about 536 M|Z and the unblocked nucleotide peak is about 481 M|Z. The x-axis in Table 1 is 480-1020 M|Z, so the unblocked nucleotide peak (481) just barely fits in the graph. But the scale is quite large such that this peak may not be distinguishable from the y-axis in the graph.

— The x-axis in Table 2 is from 80-520 M|Z, which means any remaining blocked nucleotide (at 536 M|Z) is definitely cut off. (Compare this data with act. 16_23, Figures 2.2.2 and 2.2.4, where the full range of measured M|Z values are shown.)

— Thus, the spectra appear intentionally scaled to hide the existence of the unblocked nucleotide in the starting material and the existence of blocked nucleotide in the final material.

— Furthermore, Tables 1 & 2 are scaled differently for unexplained reasons.

— In summary, based on the above analysis, it cannot be excluded that the starting material already contained unblocked nucleotide impurities and that the reaction product contained unreacted blocked nucleotides. This would suggest that the reaction was inefficient, or even worse, did not proceed at all.

Evidence:
— Court-appointed expert

178 Regarding Prof. Carell's observations with respect to the deprotection conditions of *Polushin et al.*:

— The tested duplex DNA denatures at 25°C according to the reaction conditions disclosed in Polushin.

— Prof. Carell's declaration on p. 9, last line, misstates the reaction conditions cited in *Polushin* as to be 10°C instead of the correct value of room temperature (cf. act. 16_25, p. 3229, last line).

— Prof. Carell's measurement of a melting point at 17°C thus implies – in contrast to his own conclusion – that the tested duplex DNA would be mostly denatured at the room temperature reaction temperature disclosed in *Polushin*.

— Prof. Carell modifies *Polushin*'s cleavage conditions by adding 150 mM NaCl without explaining that this is different from *Polushin*'s teachings or explaining how *Polushin*'s teachings would lead to this modification.

— *Polushin* does not disclose that the reaction was quantitative, in contrast to Professor Carell's statement.

— Even if the reaction is described as rapid by *Polushin*, p. 3229, last line: reaction completed "in less than 10 min.", that does not establish that it was quantitative.

## 8. The decision by the Opposition Division is correct

179 Plaintiff contests Defendants allegations that the decision by the Opposition Division is incorrect. In any event, since these allegations do not form part of Defendant's own attack on the patent's validity, the Defendant's respective arguments do not seem to be relevant for the present proceedings.

9. **Remaining claims**

Ad paras. 258-280

180 As claim 1 is novel and inventive, this is true for all the dependent claims, too.

D. **Infringement of EP'412**

1. **Preliminary remarks**

Ad paras. 343-358

181 Defendant's presentation in act. 16, paras. 343 to 352 of the technical background and of the subject matter of EP'412's invention focuses on the protection of the fluorescent activity of fluorophores by antioxidants such as ascorbic acid. This is misleading.

182 Defendant's presentation suggests a fundamental misunderstanding of EP'412's invention, namely that the antioxidants that are present in the detection buffer over multiple cycles of SBS preserve the fluorescent activity of the fluorescent labels attached to the incorporated nucleotides and thereby preserve the signal intensity in SBS over multiple cycles.

183 However, the preserved signal intensity when ascorbic acid is present in the detection buffer of the SBS method according to EP'412's invention is not due to increased stability of the fluorophores.

184 In contrast, the core of the claimed invention of EP'412 is based on the following surprising finding of the inventors: The effect of the antioxidants in the detection buffer during successive cycles of SBS must be attributed to protection of the nucleic acid template strand against light-induced damage during repeated illumination for detection of the incorporated fluorophore in each cycle of SBS (cf. EP'412, [0005], last sentence).

185 Indeed, a stabilization of fluorophores during sequencing cycles of SBS does not make any difference to signal intensity and would not be expected to do so:

186 During each cycle of sequencing in a step a), fresh fluorescently labelled nucleotides that have never been illuminated before are added and incorporated into the growing nucleic acid strand. Next, the fluorescent label is detected in a subsequent step b). Thus, a stabilization of the fluorophore in SBS is neither needed nor could it have a relevant effect on the strength of the signal that is detected in step b).

187 As the inventors explain in para. [0005] of the description of EP'412, antioxidants in the sequencing buffer surprisingly nevertheless do prevent or reduce loss of fluorescent signal over multiple cycles of incorporation and detection.

188     This surprising effect of antioxidants preventing loss of fluorescent signal over successive cycles of SBS must be attributed to the increased stability conferred to the nucleic acid template strand. This is supported by the inventors' observation that the decrease and loss of signal detection occurs only in areas of clusters of nucleic acid templates on the array that have been previously exposed to repeated illumination over multiple cycles of SBS. In contrast, "[m]oving to a new area of the array that has not been previously scanned, [...] clearly shows, that the correct base can be accurately read. This is indicative of light-induced damage to the nucleic acid templates upon repeated exposures to the intense illumination used to read the incorporated fluorophores" (cf. para. [0005], last four lines).

189     This new finding of the EP'412 inventors in para. [0005] is then distinguished in para. [0006] from the known protective effect of antioxidants on fluorophores by addition of antioxidants to fluorescent imaging buffers.

190     Defendant's extensive emphasis that this protective effect of antioxidants on fluorophores was well known in the prior art is beside the point of the invention of EP'412. It was neither known nor expected that antioxidants would be useful in SBS where fresh fluorescent nucleotides are detected in each cycle.

191     Only after finding template protection in SBS, the inventors further observed that the presence of antioxidants is useful for a wide range of molecular biology techniques beyond SBS, as described in para. [0007]. Therefore, in originally filed claim 1, the inventors aimed at a broad protection encompassing also molecular biology methods other than sequencing.

192     However, granted claim Claim 1 of EP'412 is directed to a cycle sequencing method, where the surprising stabilization effect of nucleic acid templates by antioxidants was observed initially. This is the very core of the invention. Indeed, an improvement of sequencing methods, in particular of sequencing-by-synthesis (SBS) methods, is also what the description is focused on (cf. e.g. para. [0011], [0012], [0013] and [0029]):

> [0013] "Use of a buffer which comprises one or more antioxidants in such methods substantially improves performance, **increasing the number of nucleotide additions which can be accurately determined** in each sequencing experiment. **The inclusion of an antioxidant** as an additive in the buffer prevents the loss of signal that otherwise occurs over successive cycles of nucleotide incorporation and **allows more cycles of sequencing to be achieved using the same sequencing templates.** (emphasis added)

Evidence:
— EP 1 828 412 B2                                                  act. 1_11

## 2. MGI's sequencing reagent kits and methods infringe EP'412

### a) Sufficient proof of infringing acts of Defendant

Ad para. 359

193 As shown above, all available evidence points towards the Defendant being responsible for infringing activities in Switzerland (see *supra*, para. 8 et seqq.).

### b) Infringement of EP'412

Ad paras. 360-363

194 Defendant's allegation of unsuitable testing material in act. 16, para. 360 is contested.

195 The results demonstrating ascorbic acid in a sample of the previously tested BGI kit that was labelled "BGISEQ-500RS High-throughput Sequencing Kit Model: PE100" were confirmed by further tests with an MGISEQ-2000RS High-throughput Sequencing Kit Model: PE150 (the **MGI Kit**):

196 As explained above in para. 39, Plaintiff has obtained an MGI sequencing reagent kit labelled "MGISEQ-2000RS High-throughput Sequencing Kit Model: PE150". This MGI Kit contains the reagents needed for performing SBS on a MGISEQ-2000RS sequencing machine (today: DNBSEQ-G400; see above para. 5)

197 An analysis of the MGI Kit was performed by Eurofins also regarding the presence of ascorbic acid in the imaging buffer. The results of this Eurofins testing are reported in a second declaration of Mary M. Dothage dated April 5, 2020 (**412 Eurofins Report**).

198 As explained in the 412 Eurofins Report at para. 7, the MGI Kit contained a cartridge with multiple compartments. One compartment, Well No. 10, was labelled with Chinese letters that translate into "Scanning Reagent". An aliquot of this scanning reagent was removed for testing and is referred to as MGI Sample below.

199 Eurofins conducted the following experiments:

(a) "Test strip analysis" as a semi-quantitative assay for the presence of ascorbic acid in the MGI Sample,

(b) Liquid chromatography|mass spectrometry analysis undertaken to establish the presence of ascorbate in the MGI Sample, and

(c) pH determination of the MGI Sample.

Evidence:
— Declaration of Mary of Dothage Eurofins EAG Material Sciences of April 5, 2020 including annex A      Exhibit 42
— Declaration of Dr. Floyd Romesberg of May 7, 2020 including annexes A-D      Exhibit 39

200    According to the 412 Eurofins Report, para. 7, the pH of the MGI Sample was 7.3, i.e. within a pH range of about 5.5 to 8.6.

201    Ascorbic acid, when in solution, is present as both the uncharged form, ascorbic acid, and the charged form, the ascorbate anion. Therefore, the term "ascorbic acid" refers here to both the uncharged ascorbic acid form and the charged ascorbate anion.

202    Quantofix® Ascorbic Acid Test Strips according to the manufacturer can detect and semi-quantitatively determine the concentrations of ascorbic acid as low as 50 mg|L (50 ppm). Eurofins' test strip analysis compared the MGI Sample to two standard solutions with 0 ppm ascorbic acid ("Tris Buffer ") and with 100 ppm ascorbic acid ("100 ppm Ascorbic Acid Standard") (cf. 412 Eurofins Report, Exhibit 42, para. 8, 9)

203    For each sample, in accordance with the instructions for use in the Instruction Leaflet, a test strip was dipped into the solution to completely wet the color indicating portion of the strip. The wet test strip was then visually inspected and compared to the color scale provided by the manufacturer (cf. 412 Eurofins Report, Exhibit 42, para. 10 and Instruction Leaflet attached there as Annex A).

204    Below, the test strip results are presented next to the color scale provided by the manufacturer of the test strip. The extent of color reaction from yellow to green-blue corresponds to the approximate concentration of ascorbic acid present in the solution tested.



**Figure 1**: Photograph of Test Strip semi-quantitative assays for the presence of ascorbic acid in the Tris Buffer Blank ("TRIS BUFFER"), the 100ppm Ascorbic Acid Standard ("ASCORBIC ACID STANDARD 2198-9-2 ~100 ppm"), and the MGI Sample (S2 Well 10 2198-9-3+). Also shown is the color scale provided by manufacturer[2].

Evidence:
— Declaration of Mary of Dothage Eurofins EAG Material Sciences of April 5, 2020 including annex A                     Exhibit 42

205   These results show that Tris Buffer Blank and the 100 ppm Ascorbic Acid Standard showed the expected color by reference to the color scale provided by the manufacturer. Furthermore, the MGI Sample contained ascorbic acid at a concentration greater than that of the 100ppm Ascorbic Acid Standard. Based on the color comparison with scale of the Quantofix, the concentration of ascorbic acid in the MGI sample is in the order of 200 ppm or greater.

206   The Tris Buffer Blank, the 100ppm Ascorbic Acid Standard and the MGI Sample of the MGI kit were also tested for the presence of ascorbic acid using LC|MS.

207   The expected mass for the free ascorbate anion and the masses observed in the LC|MS for the 100ppm Ascorbic Acid Standard and the MGI Sample are summarized in the table below (Table 2 of the 412 Eurofins Report). Since the Tris Buffer Blank did not contain ascorbic acid, no ascorbic acid mass peak was observed. This confirms unambiguously

that the color reaction in the Quantofix test is due to the presence of ascorbic acid in the MGI Sample.

**LC/MS Mass Observations**

| Source | Observed Ion (mass/charge) |
|---|---|
| Expected | 175.1 |
| Tris Buffer Blank | N/A |
| 100ppm Ascorbic Acid Standard | 175.0 |
| MGI Sample | 175.0 |

Table 2

208 The 412 Eurofins Report at para. 16 accordingly concludes "that the mass observed for both the 100ppm Ascorbic Acid Standard and the                reported in Table 2 are within experimental error (±0.2 atomic mass units) of each other and the expected mass for the ascorbate free anion."

Evidence:
— Declaration of Mary of Dothage Eurofins EAG Material Sciences of April 5, 2020 including annex A          Exhibit 42

209 These results confirm that also the MGI Sample of the tested MGI Kit labelled "MGISEQ-2000RS High-throughput Sequencing Kit Model: PE150" contains ascorbic acid or a salt thereof in the scanning reagent, i.e. detection buffer. This conclusion is supported by Dr. Romesberg in para. 90 of his Declaration dated May 7, 2020.

Evidence:
— Declaration of Dr. Floyd Romesberg of May 7, 2020 including annexes A-D          Exhibit 39

210 In addition, these results are in line with Plaintiffs view that at least all MGI sequencing reagent kits for MGI's "current sequencing chemistry" comprise the same infringing ingredients.

211 Furthermore, Defendant's allegations in act. 16, para. 361 to 363 are contested. The Quantofix test is suitable to test infringement and yielded the correct result for the following reasons:

(a)    The Quantofix test is an established quick screening test that is routinely used.

(b) The test was performed exactly according to the original manufacturers instruction leaflet (Machery-Nagel instruction leaflet cf. Appendix A of 412 Eurofins Report). There is not even any mention in these instructions of a potential need to use precipitation or masking in order to prevent cross-reactions.

(c) The Sigma Aldrich website act (cf.16_34), does not prescribe a mandatory precipitation or masking of interferences either in contrast to Defendant's allegation in act.16, para. 362 to para. 363. Rather, the Sigma Aldrich website indicates that the product is highly specific and that interferences can (not "must") be eliminated by precipitation or masking (cf. "Description", second paragraph, third bullet point). Thus, only for cases when interferences do occur, methods of remedy are recommended.

(d) The results of Quantofix test indicating the presence of ascorbic acid in the MGI scan mix are proven by LC/MS experiment, see para. 206 et seqq. The LC/MS results conclusively prove the presence of ascorbic acid in the tested MGI sample.

212 Consequently, there is no ambiguity: feature 1.2 of claim 1 is realized by use of the MGI Kit with the MGISEQ-2000RS sequencer. Thus, independent method claim 1 of EP'412 is infringed indirectly and literally.

213 Based on the results from the tested MGI Kit and for the same reasons as previously presented in act.1. dependent claim 2 (cf. act. 1, paras. 172, 173) and dependent claims 8 to 12 (cf. act. 1, paras. 176 et seqq. are infringed, too.

## E. Validity of EP'412

### 1. Preliminary Remarks

Ad paras. 364-380

214 EP'412 is valid. EP'412 was upheld in amended form by the European Patent Office. An appeal was lodged but withdrawn.

215 Defendant alleges invalidity of EP'412 based on the grounds of added matter, lack of novelty and lack of inventive step. Plaintiff will demonstrate below that none of Defendant's challenges are justified.

### 2. Amendments to claims were admissible

### a) Preliminary Remarks

Ad paras. 381-382

216 Plaintiff contests added matter. According to the standard established by the European Patent Office, a European patent application and a European patent may be amended within the limits of what a skilled person would derive directly and unambiguously, using

common general knowledge, and seen objectively and relative to the date of filing, from the whole of the original application. A literal disclosure of the claimed subject matter in the original application documents is not required.

b)   **Amendments in claim 1**

Ad paras. 383-394

217   The allegation of added matter in act. 16, paras. 384 and 392 based on the omission of the feature "detecting a fluorescent moiety incorporated in or attached to a polynucleo-tide molecule" because the granted claim 1 still incudes the allegedly omitted feature:

218   Indeed, feature 1.1 of granted claim 1 requires in step "(a) incorporating one or more fluorescently labeled nucleotides into a strand of nucleic acid complementary to said template nucleic acid", i.e., into a polynucleotide. Feature 1.2 requires in step "(b) deter-mining the identity of the one or more fluorescently labeled nucleotide(s)". This is based on EP'412, [0011].

219   Thus, the more general term "fluorescent moiety" of original claim 1 has been replaced by the more specific term of "fluorescently labeled nucleotide". Likewise, the more gen-eral feature "incorporated in or attached to a polynucleotide molecule" has been replaced by the more specific feature "incorporated into a strand of nucleic acid [...]". Both features are disclosed in EP'412, e.g. in para. [0011] corresponding to p. 4, li. 8 to 12 in the original application WO'199 (act. 16_44) as filed.

220   Accordingly, the original feature "detecting a fluorescent moiety incorporated in or at-tached to a polynucleotide molecule" has not been omitted. Rather, the original feature has been replaced by the more specific features 1.1 and 1.2 of granted claim 1. Nothing has been omitted or added compared to the original application documents by this re-placement.

221   The allegation in act. 16, paras. 385 and 393-394 that subject matter was inadmissibly added by the addition of the fragment "comprising repeating the steps of" is also con-tested.

222   Put into context of claim 1, Plaintiff asserts that EP'412 and the original application WO'199 unambiguously and directly disclose "a method of sequencing [...] a template nucleic acid comprising repeating the steps (a) of incorporating fluorescently labelled nucleotides into a strand [...] complementary to said template [...] and (b) of determining the identity [...] of the incorporated nucleotide(s) [...]".

223   The skilled person undoubtedly recognizes the claimed sequencing method comprising repeating the steps (a) and (b) as a SBS method, also referred to as cycle sequencing method. SBS is characterized by "successive cycles of incorporation and detection", i.e.

"nucleotides [that] are successively incorporated, and identified in the sequencing reac-
tion" as disclosed and highlighted below in [0002] and [0029] of EP'412 corresponding
to p.1, li. 14–19 and p. 8, li. 27–p.9, li.3, respectively in the application WO'199 as filed:

> [0002] There are known in the art methods of nucleic acid sequencing based on
> successive cycles of incorporation of fluorescently labelled nucleic acid ana-
> logues. In such "sequencing by synthesis" or "cycle sequencing" methods the
> identity of the added base is determined after each nucleotide addition by de-
> tecting the fluorescent label. (emphasis added)

> [0029] [...] The inclusion of antioxidants prevents|reduces light-induced chemical re-
> actions from damaging the integrity of the nucleic acid template and allows accurate
> determination of the identity of the incorporated base over at least 2 [...] cycles
> of nucleotide incorporation. Preferably from 10 to 30 and more preferably from 16 to
> 30 nucleotides are successively incorporated, and identified, in the sequenc-
> ing reaction. (emphasis added)

Evidence:
— Application WO'199                                                           act. 16_44

224    The skilled person as defined by Defendant in act. 16, para. 357 with experience in clas-
       sical sequencing methods and awareness of more recent sequencing methods undoubt-
       edly understands that a sequencing method "comprising repeating the steps (a) and (b)"
       as defined by granted claim 1 refers to the successive cycles – i.e. the repetition of –
       incorporation and detection of fluorescently labelled nucleotides in a SBS method as
       described in the above cited paragraphs. The gold standard as established by the Euro-
       pean Patent Office does not require literal word-by-word disclosure of the fragment "com-
       prising repeating the steps (a) and (b)".

225    Thus, the disclosure of EP'412 is by no means limited to the subject matter of dependent
       claims such as "incorporating one or more fluorescently labelled nucleotides into a strand
       of nucleic acid" (original claim 4) or to "successively incorporating at least 10 nucleotides"
       (original claim 13) as alleged by Defendant in act. 16, para. 394.

226    Defendant's further allegation of added matter due to the omission of the feature "includ-
       ing a detection step which requires repeated or prolonged exposure to intense illumina-
       tion" in act. 16, paras. 386 – 391 is also not justified.

227    As outlined above in paras. 181-192, the goal of the invention is directed at an improve-
       ment of sequencing methods, in particular of SBS methods. The subject matter of
       granted claim 1 fully corresponds to the core of the invention as originally disclosed,
       namely to an SBS method with an antioxidant in the detection buffer thereby allowing
       more cycles of sequencing to be achieved using the same sequencing templates
       (cf. EP'412 para. [0013]).

228    The skilled person as defined by Defendant in act. 16, para. 357 and 358 – to which
       Plaintiff agrees – is a biochemist with a university degree and several years of experience

in the biochemical industry and is not only aware of classical and more recent sequencing methods, but "as part of his background knowledge, [he also] understands the chemistry associated with sequencing, for example dye and radical chemistry, in particular the phenomenon of photobleaching, and measures for its prevention".

229    Accordingly, this skilled person when reading the words of granted claim 1 certainly understands that the determination in step (b) of the identity of the fluorescently labelled nucleotides incorporated in step (a) must be based on the fluorescent label of the incorporated nucleotide. Unquestionably, he also understands that detection of the fluorescent label requires exposure to illumination as is commonly used in sequencing.

230    Because evidently fluorescent labels attached to nucleotides used in sequencing exactly for the purpose of their detection by illumination, Defendant's suggestion in act. 16, para. 391 that the skilled person would consider other methods to determine the identity of incorporated fluorescently labelled nucleotides is entirely out of place.

231    Moreover, the skilled person equipped with the above-mentioned technical background must also be familiar with the type of intense illumination required for exciting the fluorescent dyes that are commonly used in the detection step of sequencing methods such as SBS. Otherwise he or she could not be familiar with the effect of photobleaching.

232    In summary, it emerges from the above considerations: Granted claim 1 defines by the combination of features 1, 1.1 and 1.2 a method of SBS sequencing comprising repeating steps (a) and (b) wherein in step (b) the identity of the fluorescently labelled nucleotide incorporated in step (a) is determined. Undoubtedly, the skilled person when reading the words of claim 1:

(a)    understands that the detection of the fluorescently labelled incorporated nucleotide must be based on exposure to illumination, since without illumination a fluorescent label does not fluoresce and cannot be detected;

(b)    understands the type of intensity of the illumination that is required for such detection due to his technical background – otherwise he could not understand photobleaching;

(c)    understands that a method of cycle sequencing, i.e. SBS, comprises **repeated** illumination as detailed above regarding the disclosure of the fragment "comprising repeating the steps (a) and (b)".

233    Accordingly, the feature "including a detection step which requires repeated (or alternatively prolonged) exposure to intense illumination" from original claim 1 is implicit in granted claim 1 as understood by the skilled person. An explicit literal inclusion of this original feature is not required.

234    Furthermore, during prosecution a shift or even a broadening of the definition of the claimed invention is allowed, let alone a narrower definition of the invention as in the instant case. The claimed subject matter of granted claim 1 is limited to the preferred

embodiment, i.e. SBS method according to the focus of the description as explained above.

235    In conclusion, granted claim 1 comprises no added subject matter and fulfills the requirements of Art. 123(2) EPC.

c)    **Amendments in claim 2**

Ad para. 395

236    The allegation of added matter in act. 16, para. 395 due to the specification of the fluorescently labelled nucleotide as a "nucleoside triphosphate" in granted claim 2 is contested for the following reasons:

237    EP'412 in para. [0003] and WO'199 (act. 16_44)on p.1, li. 29 to p.2, li. 2 disclose that in SBS the "substrate nucleoside triphosphates used in the sequencing reaction are labelled [...] permitting determination of the incorporated nucleotide as successive nucleotides are added".

238    This feature "substrate for incorporation of fluorescently labelled nucleotide is a nucleoside triphosphate" on p. 1, li. 29 is disclosed in the context of the technical background regarding SBS, i.e. the sequencing method that is not only at the focus of the description but also at the core of the claimed invention. SBS in line with its name is based on the synthesis of a growing nucleic acid strand based on repeated incorporation by a polymerase of nucleotides that are fluorescently labelled.

239    Every college student of molecular biology knows that the nucleotides that are the substrates for incorporation into a growing nucleic acid strand by a polymerase enzyme are nucleoside triphosphates (abbreviated as NTPs or dNTPs) both in vivo and in vitro.

240    Defendant supports this view in act. 16, paras. 480 to 482:

> "The use of nucleoside triphosphate in SBS methods is trivial. When using nucleoside triphosphates, a pyrophosphate residue is cleaved from the monomeric nucleoside triphosphates in the polymerase reaction so that the monosaccharides of the nucleotides are coupled to each other via one phosphate group. The reaction occurs naturally and is particularly beneficial from an energy point of view. Often, the abbreviation "dNTP" for "deoxyribonucleotide [correct: deoxyribonucleoside] triphosphate" is used. The use of nucleoside triphosphates is abundantly disclosed in the prior art, for example in WO 073 (see Enclosure 35, page 10, second paragraph, "dNTP"), in WO 957 (Enclosure 41, pages 51, 53, 55, 64 under the title "colony generation"), and in Braslaysky et al. (Enclosure 47, page 3961, second column, "dATP, dGTP, dTTP, dCTP")."

241    In conclusion, the subject matter of claim 2 is unambiguously and directly disclosed both explicitly in the above cited paragraph of the originally filed application and implicitly due to the understanding of dNTPs as substrate for SBS by the skilled person.

242   Claim 2 does not comprise added matter.

d)   **Amendments in claim 15**

Ad paras. 396-398

243   There is no added matter due to the feature "cleavable linker" in "one or more fluores-
cently labelled nucleotides, wherein the fluorescent label is linked to the nucleotides via
a cleavable linker" for the following reasons:

244   The feature of nucleotides comprising a "cleavable linker" for attachment of the fluores-
cent label is disclosed by EP'412 in combination with WO 2004|018493 (act. 16_32),
because EP'412 teaches in para. [0025], corresponding to WO'199 (act. 16_44) p.7, li. 3
to li. 12:

> "Detectable labels such as fluorophores can be linked to nucleotides via the base
> using a suitable linker. The linker may be acid labile, photolabile or contain a disulfide
> linkage. Preferred labels and linkages include those disclosed in WO03|048387.
> **Other linkages, in particular phosphine-cleavable azide-containing linkers, may be
> employed in the invention as described in greater detail in W02004|018493.** The
> contents of WO 03|048387 and WO 2004|018493 are incorporated herein in their
> entirety by reference." (Emphasis added)

Evidence:
— Application WO'199                                                                     act. 16_44

245   Thereby, EP'412 in the section describing the method for solving the problem of the in-
vention teaches the skilled person unambiguously and directly how to arrive at linkers
for fluorescently labelling nucleotides that are suitable for the claimed method, namely:

(a)   to select a suitable linker for the attachment of a detectable label to the base from
a group of linkers that consists of cleavable linkers such as e.g. the explicitly listed
exemplary cleavable linkers that are acid labile, photo-labile, contain an easily
cleavable disulfide linkage or a phosphine-cleavable azide;

(b)   to refer to WO'493 for further suitable linkers for attachment of a detectable label
such as a fluorophore to the base of a nucleotide. WO'493 unambiguously and
directly teaches the use of "cleavable linkers" for this purpose, as already the Ab-
stract of WO'493 states:

> "The invention provides a nucleotide or nucleoside having a base **attached to a
> detectable label via a cleavable linker"** (Emphasis added).

Evidence:
— WO 2004|018493, Solexa                                                               act. 16_32

246   Thus, also the more general definition of a suitable linker as "cleavable" linker is directly
disclosed in the same EP'412 para. [0025] by direct reference to WO'493.

247 Accordingly, also the subject matter of claim 15 was unambiguously disclosed already in the original application documents and claim 15 does not comprise inadmissible added matter.

e) **Conclusion**

Ad paras. 399-400

248 In conclusion, granted claims 1, 2 and claims dependent on them as well as claim 15 of EP'412 do not comprise inadmissible added matter. The requirements of Art. 123(2) EPC are met and the Swiss Part of EP'412 is not invalid according to Art. 26(1)(c) PatA.

249 Should the Court come to a different conclusion, infringement of EP'412 is asserted based on amended claims 1 and 15 according to auxiliary requests in sections F and G below.

3. **Novelty of EP'412**

a) **Novelty of claim 1 over US 420**

Ad paras. 401-414

250 US'420 (act. 16_45) is an extensively detailed patent with multiple avenues and options in the methods and processes it discloses. However, at its core US'420 teaches single molecule sequencing of a previously synthesized and labelled polynucleotide and does not disclose a method of sequencing comprising cycles of repeating incorporation step (a) followed by detection step (b) according to claim 1 as demonstrated below:

251 In the method of US'420, a labelled polynucleotide is moved through a nanochannel (e.g. col. 8, li. 11 et seq., Figs. 4-9). The labelled polynucleotide was previously synthesized e.g. by PCR with Taq polymerase that has the capability to incorporate labelled nucleotides into growing DNA copies (cf. col. 7, li. 54-65; col. 93, li. 21 et seq.). Only subsequent to the synthesis of the entire polynucleotide strand comprising already all of the labelled nucleotides, it is moved through the nanochannel for detection of each labelled nucleotide (one after the other) by interaction with an acceptor fluorophore (cf. e.g. col. 34, li. 17-26 or li.56-62). Each fluorophore in the polynucleotide chain is only able to fluoresce in extremely close proximity to the acceptor fluorophore. In this manner, the process described can selectively excite the fluorophore on each nucleotide in the polynucleotide chain in turn as it passes the acceptor fluorophore in the nanochannel (thus avoiding obtaining multiple signals from multiple fluorophores, which would make identifying the sequences of bases impossible)

252 US'420 teaches to use antioxidants including ascorbic acid in the specific context of optimizing the conditions for detection by reduction of fluorophore fading (cf. col. 33, li. 53 to col. 34, li. 8).

253    Unsurprisingly, Defendant does not prove how the skilled person would combine ascorbic acid picked out from the list of substances for optimizing detection by acceptor fluorescence with the method of US'420 and how that would lead to the claimed method.

254    In fact, the teaching of US'420 has no relevance to SBS and to the claimed method where new labels are incorporated before each detection step and accordingly protection of the label by ascorbic acid is neither necessary nor is expected to have a beneficial effect. In the method of US'420 the acceptor flurophore in the nanochannel is excited repeatedly each time the polynucleotide chain is moved through the nanochannel and detection of the proximate nucleotide takes place. In contrast, in SBS, each flurophore in the labelled polynucleotide chain is only subjected to a single detection step. The suggestion in US'420 to include an antioxidant is therefore in entirely in accordance with known practice, as an antioxdient would mitigate photobleaching/fading of the acceptor fluorophore over multiple detection steps. However, this issue does not arise in an SBS system.

255    US'420 neither teaches nor hints towards the surprising technical effect of protection of the nucleic acid template by antioxidants|ascorbic acid. Evidently, such protection of the nucleic acid template is not required for the method of US'420, where there is no exposure to illumination during synthesis of the strand complementary to the template strand during PCR. The integrity of the original template is no longer of importance during illumination according the method of US'420.

256    Defendant's overly broad interpretation of features 1, 1.1 and 1.2 in para. 393 to read on any method "comprising repeating an indefinite number of combinations of incorporation steps (as claimed or else), determination steps (as claimed or else) without a specific sequential order" is not appropriate:

257    As explained in detail above, the skilled person understands the claimed method with combination of features 1, 1.1 and 1.2 as a cycle sequencing method alias SBS method of sequencing at least two nucleotides of a template nucleic acid comprising a repetition of steps (a) incorporation and (b) detection.

258    Steps (a) and (b), as is explained in act. 1, paras. 30 and 31, correspond to phase (i) of incorporation of a modified nucleotide in the SBS method and phase (ii) of imaging in the SBS.

259    US'420 does not disclose a repetition of steps (a) incorporation and (b) detection as required in claim 1 by feature 1 in combination with features 1.1 and 1.2. Moreover, US'420 does not disclose feature 1.2.1. in the context of SBS, i.e., it does not disclose the presence of ascorbic acid in the detection buffer during step (b) of SBS.

260    In conclusion, EP'412 is novel over US'420.

261    As claim 1 is not anticipated by US'420, none of the dependent claims 2, 8, 13 and 14 are anticipated by US'420 either.

## 4. Inventive Step of EP'412

### a) Preliminary remarks

Ad paras. 415-419

262 Defendant's repeated allegation also in the context of inventive step (e.g. act. 16 para. 12, paras. 416 to 419 and para. 428) that ascorbic acid was a known component in imaging buffers to protect fluorophores from degradation is beside the point as explained above (cf. paras. 181 et seqq.).

263 This applies as well to Defendant's presentation of US'622 (Bradley; act. 16_46). US'622 is directed to a nucleic acid hybridization assay and discloses antioxidants preventing oxidation of fluorescent dyes (cf. [0042]) and five antioxidants, among them ascorbic acid for addition to nucleic acid hybridization buffers (cf. [0102]).

264 Nucleic acid hybridization assays are a technique of molecular biology that is entirely different from nucleic acid sequencing. The alleged "sequencing by comparative hybridization" in act. 16 para. 428 is irrelevant because it refers to a rare application of hybridization assays that is not even disclosed in US'622 and has no similarity to the claimed invention.

265 Addition of antioxidants in the detection buffer of SBS for protection of nucleic acid templates against light-induced damage during exposure to illumination was neither known nor suggested by US'622 or any other cited prior art as will be demonstrated below.

266 It should also be borne in mind that US'622 has no relevance for the inventive step discussion of EP'412; Defendant is not further relying on US'622 in its entire 18 page long attack on inventiveness.

### b) Prior art in opposition proceedings

Ad paras. 420-429

267 Plaintiff contests that the decision of the Opposition Division was wrong and further contests that any of the alleged combinations of prior art documents in Defendant's response render the claimed invention obvious.

268 Moreover, regarding act.16 para. 422, it is again emphasized that any incentive found in the prior art to improve sequencing by reducing photobleaching does not lead to the claimed invention (cf. paras. 181 et seqq. above).

269 A selection of further prior art documents beyond those documents previously assessed in opposition proceedings based on this criterion cannot be expected to be relevant prior art.

### c) Distinguishing feature over WO'073 and the objective technical problem

<u>Ad paras. 430-439</u>

270   WO'073 (act. 16_35) is directed at real time SBS.

271   Defendant alleges that claim 1 of EP'412 differs from WO'073 by the use of ascorbic acid or a salt thereof, rather than DTT, as an antioxidant during the step of determining the identity of the incorporated nucleotide(s), (act.16 para. 431). However, the alleged difference is understated:

272   The method of WO'073 uses the antioxidant DTT in an "extension medium" during "carrying out the diffusion, incorporation and removal steps". The reason for the presence of DTT in the "extension medium" during the incorporation step is to comply with the manufacturer's recommendation for the composition of the reaction buffer to be used with the enzyme "Sequenase", a DNA polymerase (cf. WO'073, p. 17, li. 27-32).

273   The technical effect of ascorbic acid in the detection buffer of SBS as distinguishing feature is a higher signal intensity over multiple cycles of SBS by protection of the template strand (as taught by EP'412, cf. para. [0013], [0029]).

274   Accordingly, the objective problem is to provide a detection buffer that provides for a higher signal intensity over multiple cycles of SBS.

275   This objective problem is indeed solved as supported by comparative data in a document referred to as the Klausing declaration. The Klausing Declaration was filed by Plaintiff during prosecution proceedings (cf. act.16_37) and submitted by Defendant in these proceedings as act. 16_38.

276   Defendant's allegation in act. 16, para. 434 that the data in the Klausing declaration fail to prove that the objective problem is solved is contested. The contrary is true even if there is no big difference between DTT and ascorbic acid in the first two cycles. Indeed, not very much damage to the nucleic acid template would be expected to have accumulated already in the first couple of cycles of SBS. This explains the low initial effect. However, the difference between the effect of DTT and ascorbic acid in the following cycles becomes substantial: as Table 1 of the Klausing declaration reveals, the signal intensity remaining after 20 cycles in the presence of ascorbic acid in the scan mix (i.e. in the detection buffer) is still 90%, whereas it dropped to only 65% in the presence of DTT.

277   Moreover, Defendant's allegation in act. 16 para. 435 is contested. The alleged disclosure in WO'073 of an incorporation of at least 13 or 14 nucleotides in the presence of the antioxidant DTT is not convincing:

278   An identification of at least 13 or 14 incorporated nucleotides in the presence of DTT according to the method of WO'073 based on claim 1 in combination with Fig. 1A|C; Fig. 2; page 16, lines 22-23; page 17, lines 21-23 is not traceable. The purely schematic

drawings in Figs. 1 and 2 showing approximately 13 nucleotides in the growing strand beyond the primer without any supporting experimental data certainly fail to plausibly support the alleged detection of at least 13 or 14 incorporated bases by the method of WO'073.

279  Accordingly, Defendant neither has a basis to claim that the objective problem has already been solved by WO'073, nor does it have a basis to disclaim the superior effect of ascorbic acid over DTT in the buffer during the detection steps of SBS.

280  In contrast to Defendant's further allegations, the Opposition Division correctly based the formulation of the objective problem based on the technical effect provided by ascorbic acid as "the provision of an improved method of sequencing [...] in which light induced chemical artefacts are prevented or reduced, thereby allowing accurate determination of the incorporated nucleotides over successive cycles of nucleotide incorporation and illumination of fluorescent labels". This is true independent of whether the starting document is WO'770 (act. 16_39) or WO'073 (act. 16_35).

281  With the same objective problem applying regardless of whether WO'770 or WO'073 is used as a starting document, if combined with identical secondary documents, the outcome of the inventive step analysis by the problem solution approach will be the same unless the teaching of one of the two provides better guidance towards the invention.

282  As alleged by Defendant, WO'770 is less suitable as a starting document (c.f. act. 16 para. 420 et seqq. and para. 472 et seqq.). In other words, WO'770 would even less lead towards the invention than WO'073.

283  Accordingly, Defendant's allegation that claim 1 is lacking inventive step over WO'770 in combination with either *Van Dijk et al.* or *Dittrich et al.* is contested for the same reasons as explained below in paras. 264 et seqq. for WO'073.

Ad paras. 440-446

284  For the assessment of an inventive step by the problem solution approach with WO'073 (act. 16_35) as closest prior art in combination with *Van Dijk et al.* (act. 16_48), the question must be answered whether the skilled person starting with WO'073 and presented with the objective problem as stated above in para. 280 could have and would have considered *Van Dijk et al.* and thereby arrive at the invention without inventive step. In fact, he or she could not and would not as demonstrated below:

285  First, because WO'073 as starting document induces no motivation to look for an antioxidant as additive to the detection buffer for improvement of any sequencing method, let alone SBS, for two reasons:

(a)  In the method of WO'073, the antioxidant DTT is not present in the detection buffer as alleged by Defendant in act. 16 para. 431 but instead in an extension medium present during the incorporation phase (cf. above para. 271, 272).

(b)  WO'073 even teaches away from using antioxidants for stabilizing fluorophores. Because, according to the teaching of WO'073, p. 21, li. 25 to li. 32, photobleaching of incorporated and detected fluorescent nucleotides is recommended prior to incorporation of the next fluorescent nucleotide for improvement of the signal to noise ratio in the subsequent detection step.

286  Second, the skilled person in view of the objective problem of improving an SBS method is working with a highly complex and sensitive biochemical in vitro reaction system. *Van Dijk et al.*, in contrast, has nothing to do with a biochemical reaction, but rather concerns physical chemistry related to optical trapping and fluorescence spectroscopy.

287  Defendant has not shown why the skilled person would be motivated to look at and consider the *Van Dijk et al.* document which is concerned with physical aspects of single molecule fluorescence spectroscopy.

288  Third, an anti-bleaching effect by antioxidants is mentioned in *Van Dijk et al.*'s Abstract. Furthermore, the anti-bleaching effect of DTT and ascorbic acid in a two photon bleaching process is compared (*Van Dijk et al.*, act. 16_48, p. 6482 col 1, last para. bridging into col. 2 and table 1). Yet, this fails to attract the skilled person's interest in applying *Van Dijk et al.*'s teaching to solve the objective problem for two reasons:

(a)  There is no teaching or hint that *Van Dijk et al.*'s findings would be transferable to a biochemical reaction system such as SBS. The skilled person has no basis for a reasonable expectation of success, and explanations by Defendant how the two teachings would be combined to lead to the claimed invention are lacking.

(b)  Notably, the skilled person would not be interested in antibleaching effects of antioxidants on fluorophores in view of the technical problem. As explained above e.g. in para. 262 to para. 266, the skilled person would not expect any beneficial effects of antibleaching reagents in the detection step because in SBS in each incorporation step fresh fluorophores that have not previously been illuminated are added to the reaction system.

289  Accordingly the skilled person would not have considered *Van Dijk et al.* Moreover, even if he or she did, it would be highly doubtful that any beneficial effect towards the claimed invention could be achieved by combination of the two teachings.

290  In conclusion, the method of granted claim 1 is inventive over the combination of WO'073 with *Van Dijk et al.*

d)  **WO'957 in combination with *Dittrich et al.* or *Van Dijk et al.***

Ad paras. 447-459

291  WO'957 (act. 16_41) is directed at a nucleic acid synthesis (amplification) method and its use for sequencing.

292   The feature distinguishing the claimed method from WO'957 as starting document is ascorbic acid in the detection step of an SBS method. The technical effect of this distinguishing feature is a higher signal intensity over multiple cycles of SBS by protection of the template strand (cf. para. 273).

293   Thus, the same objective problem is applicable as previously formulated by the opposition division with WO'770 as starting document and as applied above with WO'073 as starting document (cf. above para. 274).

294   WO'957 comprises no teaching towards the solution of this objective problem. The alleged disclosure regarding the use of Prolong as an antioxidant is not even in the context of a sequencing reaction.

295   Moreover WO'957 relates to stabilization of fluorophores, only, and not to template protection (WO'957, p. 66, li. 19 to li. 23) and is therefore not leading to the claimed invention for the previously discussed reasons cf. above para. 181 to para. 192 and also e.g. para. 262).

296   The same is true for the secondary document *Dittrich et al.*, a scientific article from a physics journal. As its title reveals, *Dittrich et al.*, too, is concerned with stabilization of fluorophores against photobleaching. Thus, the skilled person would not consider *Dittrich et al.* for the same previously discussed reasons (cf. above e.g. para. 181 et seqq.)

297   Even if the skilled person considered *Dittrich et al.* and found the four antioxidants including ascorbic acid that are listed in Table 1 on p. 836 in the context of one and two photon excitation experiments, there is no clue as to how these effects of antioxidants in *Dittrich et al.*'s experimental set-up would be transferable to the complex reaction system of SBS.

298   Defendant did not explain why the skilled person would have considered *Dittrich et al.* and upon what to base a reasonable expectation of success to arrive at the claimed invention by the combination of WO'957 with *Dittrich et al.*

299   In summary, the skilled person would not have considered *Dittrich et al.* Moreover, even if he or she did, there is no basis to expect arrival at the claimed invention based on the combined teachings of WO'957 with *Dittrich et al.* without inventive activity.

300   The same is applicable to the allegedly equally relevant combination of WO'957 with *Van Dijk et al.* (cf. act. 16, para. 459).

301   In conclusion, the method of granted claim 1 is inventive over the combination of WO'957 with *Dittrich et al.* or with *Van Dijk et al.*

**e)** **Braslavsky et al. in combination with *Dittrich et al.* or *Van Dijk et al.***

Ad paras. 460-462

302 *Braslavsky*, act. 16_47, is a scientific paper concerned with sequencing by synthesis of anchored single DNA molecules: "After each successful incorporation event a fluorescent signal is measured and then nulled by photobleaching" (cf. p.3960 col. 2, li. 12, 13).

303 On the other hand, Braslavsky also suggests – as relied upon by Defendant (cf. act. 16, para. 461 last line of the table) – that an oxygen scavenging system may be used to reduce bleaching of fluorescent dyes (cf. Braslavsky, p. 3991, col. 2, last sentence of 1st para.). The used oxygen scavenging system is not specified.

304 This suggestion of an oxygen scavenging system to reduce photobleaching "during all green illumination periods", on the one hand, appears incongruent with the teaching of photobleaching after each incorporation event, on the other hand.

305 Yet, independent of ambivalence in *Braslavsky*'s teaching regarding prevention of or in the opposite intentional application of photobleaching, it only concerns the fluorescent activity of fluorophores. This is of no relevance to the claimed invention anyway as previously discussed (cf. above e.g. para. 182 et seqq.).

306 Thus, Braslavsky is certainly not closer to the claimed invention as starting document than the previously discussed documents, WO'070, WO'073 or WO'957. Braslavsky differs from the claimed invention at least by the same distinguishing feature, leading to the same objective problem.

307 A combination of Braslavsky with the same secondary documents *Van Dijk et al.* and *Dittrich et al.* as above accordingly also leads to the same result of the inventive step analysis by the problem-solution-approach.

308 In conclusion, the claimed invention is also inventive over Braslavsky in combination with *Van Dijk et al.* and *Dittrich et al.*

**f)** **Any of WO'073, WO'957 or Braslavsky et al. in combination with WO'165, WO 2004|085546 and|or Parhad et al.**

Ad paras. 463-471

309 In this section, Defendant combines the above analyzed starting documents WO'073, WO'957 or *Braslavsky* with a group of four further secondary documents, none of which has the slightest potential to guide the skilled person towards the claimed invention as demonstrated below:

310  WO'165 (Parthasarathy) is alleged to disclose (on p. 12 and in Example 9 on p. 27) ascorbic acid to reduce photobleaching of fluorescent dyes during PCR (cf. act 16, para. 464).

311  Thus, also WO'165 teaches nothing beyond the use of ascorbic acid and other oxygen scavengers to prevent photobleaching of the fluorescent dyes. WO'165 comprises not even a hint towards using antioxidants during detection in SBS or towards template protection during exposure to laser light.

312  Accordingly, WO'165 as secondary document in combination with any of the above mentioned starting documents would not lead to the claimed method.

313  In act. 16, para. 465 and before in paras. 373 to 375, Defendant mentions briefly Olson, act. 16_40. Olson is not productive as secondary document either:

314  Olson relates to DNA adsorbed to a cationic supported bilayer and has no relevance to sequencing. Ascorbic acid is added as an antioxidant merely to prevent photosensitization of the DNA-dye complex and because other antioxidants are deleterious to the bilayer (cf. Olson, p. 7397, col 1, para. 3). Olson evidently provides no teaching towards using antioxidants during detection in SBS or towards template protection during exposure to laser light.

315  In para. 466, WO'546 (Mackintosh) is proposed as a further secondary document. WO'546 relates to enhancing fluorescent dyes in nucleic acids used e.g. in electrophoresis and a stabilization by organic acids such as ascorbic acid has been observed. Evidently, WO'546 provides no teaching towards using antioxidants during detection in SBS or towards template protection during illumination.

316  In para. 468, Defendant proposes Parshad, act. 16_52, as a final secondary document -- albeit its teaching is of no relevance to the claimed invention, either.

317  Defendant refers to Parshad, p.1832, para. bridging col 1-2 which discloses reduction of light-induced chromatid breaks in cultured cells by ascorbic acid in combination with glutathione.

318  Chromatids comprise double stranded DNA complexed with various proteins. They are thus structurally very different from single stranded nucleic acid templates. Nothing can be deduced from Parshad that would hint towards protection of single stranded templates during the detection step of SBS.

319  In summary, none of the additional secondary cited documents lead to the claimed method in combination with the above cited starting documents because:

(a)  they do not give any hint towards protecting of the template strand against light-induced damage by ascorbic acid in the buffer during detection phase in SBS, and

(b) even with the benefit of hindsight it appears cryptic how the methods and techniques of any of the cited starting documents could be combined with those of the secondary documents and thereby lead to an SBS method with ascorbic acid present in the detection buffer.

320 In conclusion, the skilled person would not have combined the starting and secondary documents as proposed by Defendant and even if he or she did, they would not have arrived at the subject matter of claim 1. Thus, the method of claim 1 is inventive over all of Defendant's proposed combinations of documents.

**g) The remaining claims**

Ad paras. 478-497

321 As claim 1 is inventive, all of claims 1 to 14 that are dependent on to claim 1 are inventive as well.

322 Regarding kit claim 15: None of the prior art documents alone or in combination teach or suggest to provide a kit for an SBS method including a buffer comprising ascorbic acid. Notably, kits for use in sequencing methods are adapted with great precision exactly to the particular sequencing method of their intended use. Accordingly, a kit for an SBS method comprising ascorbic acid is inventive.

**F. Auxiliary Requests regarding Infringement of Claim 1 of EP'412**

323 In the unexpected event that the Court finds granted claim 1 invalid, Plaintiff in the alternative (*eventualiter*) asserts infringement of the following amended claims 1. "Auxiliary Request 1" applies should claim 1 as granted be found invalid, "Auxiliary Request 2" applies should Auxiliary Request 1 also be found invalid, "Auxiliary Request 3" applies should Auxiliary Request 2 be found invalid, and "Auxiliary Request 4" applies if Auxiliary Request 3 is found to be invalid. Additional features are highlighted.

324 Amended Claim 1 as Auxiliary Request 1

A method of sequencing at least two nucleotides of a template nucleic acid by successive cycles of sequencing-by-synthesis comprising repeating the steps of:

(a) incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid; and

(b) determining the identity of one or more of the incorporated nucleotide(s), wherein the steps of determining the identity of the incorporated nucleotide(s) is carried out in a buffer which comprises ascorbic acid, or a salt thereof.

325 Amended Claim 1 as Auxiliary Request 2

A method of sequencing at least two nucleotides of a template nucleic acid by successive cycles of sequencing-by-synthesis comprising repeating the steps of:

(a)      incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid; and

(b)      determining the identity of one or more of the incorporated nucleotide(s), wherein the steps of determining the identity of the incorporated nucleotide(s) <u>by illumination</u> is carried out in a buffer which comprises ascorbic acid, or a salt thereof.

326    Amended Claim 1 as Auxiliary Request 3

A method of sequencing at least two nucleotides of a template nucleic acid <u>by successive cycles of sequencing-by-synthesis</u> comprising repeating the steps of:

(a)      incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid; and

(b)      determining the identity of one or more of the incorporated nucleotide(s), wherein the steps of determining the identity of the incorporated nucleotide(s) is carried out <u>by illumination with laser light of a wavelength specific for the fluorescent label or other suitable sources of illumination to excite the fluorescent label</u> in a buffer which comprises ascorbic acid, or a salt thereof.

327    Amended Claim 1 as Auxiliary Request 4

A method of sequencing at least two nucleotides of a template nucleic acid <u>by successive cycles of sequencing-by-synthesis</u> comprising repeating the steps of:

(a)      incorporating one or more fluorescently labelled nucleotides into a strand of nucleic acid complementary to said template nucleic acid; and

(b)      determining the identity of one or more of the incorporated nucleotide(s), wherein the steps of determining the identity of the incorporated nucleotide(s) <u>by intense illumination</u> is carried out in a buffer which comprises ascorbic acid, or a salt thereof.

328    Remarks regarding the disclosure of the amended features in Auxiliary Requests 1 to 4:

329    Auxiliary Requests 1 to 4 comprise the additional feature that the claimed method of sequencing at least two nucleotides is conducted "<u>by successive cycles of sequencing-by-synthesis</u>".

330    This feature is implicit in the claimed sequencing method as evidenced throughout EP'412's description as detailed above. In particular, the feature "successive cycles of SBS" is disclosed as the preferred embodiment of the claimed sequencing method in EP'412, para [0011] to [0013] corresponding to the original application WO'199, p. 4, li. 5 to li. 25.

331    Thus, amended claim 1 according to auxiliary request 1 is disclosed in both the granted patent and the original application.

332 Auxiliary request 2 comprises an additional feature in step (b) of claim 1:

> (b)    [...] wherein the steps of determining the identity of the incorporated nucle-
> otide(s) by illumination is carried out in a buffer which comprises ascorbic acid, or a
> salt thereof.

333 This feature is disclosed in EP'412, para [0027, first part of sentence] corresponding to
WO'199, p. 7, li. 26 to li. 30, where it is disclosed: "*Methods for detecting fluorescently
labelled nucleotides generally require incident light [...]*", i.e. they generally require illu-
mination.

334 Auxiliary Request 3 comprises an alternative of an additional feature in step (b) of
claim 1:

> (b)    [...] wherein the steps of determining the identity of the incorporated nucle-
> otide(s) by illumination with laser light of a wavelength specific for the fluorescent
> label or other suitable sources of illumination to excite the fluorescent label is carried
> out in a buffer which comprises ascorbic acid, or a salt thereof.

335 This feature is also disclosed in EP'412, para [0027] corresponding to WO'199, p. 7, li.
26 to li. 30, in the first sentence.

336 Auxiliary Request 4 comprises another alternative of an additional feature in step (b) of
claim 1:

> b)    [...] wherein the steps of determining the identity of the incorporated nucle-
> otide(s) by intense illumination is carried out in a buffer which comprises ascorbic
> acid, or a salt thereof.

337 This feature is disclosed in EP'412, para [0005] corresponding to WO'199, p. 2, li. 8 to li.
24, in the context of the observation underlying EP'412's invention, namely that damage
is caused to the nucleic acid strand upon repeated exposure to intense illumination in
repeated cycles of sequencing (c.f. [0005], last sentence).

a)    **Remarks regarding the validity of amended Claim 1 according to Auxiliary Re-
quests 1 to 4:**

338 The claimed method of sequencing at least two nucleotides as defined by the repetition
of steps (a) and (b) is undoubtedly understood by the skilled person as a method of
sequencing by successive cycles of sequencing-by-synthesis.

339 The explicit definition of the claimed method of sequencing at least two nucleotides of a
template nucleic acid by successive cycles of sequencing-by-synthesis – albeit unnec-
essary in Plaintiff's view – even more renders all of Defendant's allegations regarding
added matter moot.

340 As demonstrated above, the skilled person unambiguously and directly recognizes that the two allegedly omitted features and the allegedly added feature are inherent features of SBS as defined by granted claim 1. Adding this feature to claim 1 explicitly renders any attempt to argue the opposite even more futile.

341 Similarly, the amendments of step (b) in auxiliary requests 2 to 4 – albeit not necessary in Plaintiffs view – even more remove any basis for an allegation that the feature of a detection of the fluorescent nucleotides by the in SBS usually applicable illumination is omitted.

342 Moreover, regarding alleged lack of novelty and inventive step, Defendant's arguments even less prove invalidity of claim 1 as none of the prior art documents discloses or suggests the use of ascorbic acid in SBS.

**b)   Remarks regarding the infringement of amended Claim 1 according to Auxiliary Requests 1 to 4:**

343 As demonstrated above in the section regarding infringement of EP'412 (*supra* para. 181 et seqq.), Defendant's sequencers and kits rely on a method of sequencing by successive cycles of SBS. Defendant's sequencing method comprises a detection step by illumination to excite the fluorescent label and detect the emitted light. MGI sequencers use laser light; see, e.g., p. 9 of the MGISEQ-2000 User Manuals. Therefore, claim 1 according to auxiliary requests 1 to 4 is infringed as well.

Evidence:
––– User User Manual MGISEQ-2000 dated August 28, 2018               Exhibit 28
––– User User Manual MGISEQ-2000 dated September 5, 2018             Exhibit 29

**G.   Auxiliary Requests Regarding Infringement of Claim 15 of EP'412**

344 In the unexpected event that the Court finds granted claim 15 invalid, the infringement of the following amended claims 15 is asserted. Amendment as per Auxiliary Requests 5 is is pleaded should claim 15 as granted be held invalid, and amendment as per Auxiliary Request 6 is pleaded should claim 15 as per Auxiliary Request 5 be found to be invalid.

345 Amended claim 15 as Auxiliary Request 5

A kit for use in a method according to any one of claims 1 to 14 comprising:

one or more fluorescently labelled nucleotides, wherein the fluorescent label is linked to the base of the nucleotides via a cleavable linker;

an enzyme capable of catalysing incorporation of said nucleotides into a nucleic acid strand complementary to a nucleic acid template to be sequenced; and

a buffer comprising ascorbic acid or a salt thereof, or a supply of ascorbic acid or a salt thereof.

346 Amended claim 15 as Auxiliary Request 6

A kit for use in a method according to any one of claims 1 to 14 comprising:

one or more fluorescently labelled nucleotides, wherein the fluorescent label is linked to the base of the nucleotides via a cleavable linker selected from the group comprising an acid labile linker, a photolabile linker, a disulfide linkage containing linker or phosphine-cleavable azide-containing linker;

an enzyme capable of catalysing incorporation of said nucleotides into a nucleic acid strand complementary to a nucleic acid template to be sequenced; and

a buffer comprising ascorbic acid or a salt thereof, or a supply of ascorbic acid or a salt thereof.

**a)   Remarks regarding the disclosure of the amended features in Auxiliary Requests 5 and 6:**

347 The feature fluorescently labelled nucleotides, wherein the fluorescent label is attached to the base of the nucleotides via a cleavable linker, is disclosed in both EP'412 and in the original application WO'199.

348 EP'412 discloses the feature of nucleotides with a "cleavable linker" in [0025] in combination with WO 2004|018493. As cited above in para. 244, the description of EP'412 in para. [0025] corresponding to WO'199 (act. 16_44) on p.7, li. 3 to li. 12 discloses "*[d]etectable labels such as fluorophores can be linked to nucleotides via the base using a suitable linker*" and enumerates a collection of exemplary obviously cleavable linkers.

349 Furthermore, the more general definition of a suitable linker as "cleavable" linker is disclosed by direct reference to WO03|048387 and WO2004|018493 in the same para. [0025], i.e. in the same context. Therefore, the generalization from the enumerated examples of cleavable linkers to the general term cleavable linkers for attachment of the label to the base of the nucleotides is unambiguously and directly disclosed in EP'412.

350 Similarly, the additional feature of auxiliary request 6 has an anambiguous and direct basis in the application and the patent. The feature fluorescently labelled nucleotides, wherein the fluorescent label is attached to the base of the nucleotides via a cleavable linker selected from the group comprising an acid labile linker, a photolabile linker, a disulfide linkage containing linker or phosphine-cleavable azide-containing linker is disclosed in the above listed paragraph of EP'412 and WO'199, wherein also the individually listed cleavable linkers are disclosed.

**b)   Remarks regarding the validity of amended Claim 15 according to Auxiliary Requests 5 and 6:**

351 The further definition of the linkage of the fluorescent label to the nucleotide cleavable linker even more closely adhering to the disclosure in [0025] – albeit unnecessary in

Plaintiff's view – renders all of Defendant's allegations with respect to alleged lack of disclosure of the feature of a cleavable linker moot.

c) **Remarks regarding the infringement of amended Claim 15 according to Auxiliary Requests 5 to 6**

352 As demonstrated above in the section regarding infringement of EP'412 (*supra* para. 181 et seqq.), Defendants sequencers and kits rely on a method of sequencing by successive cycles of SBS and comprising a step of cleaving the attached label prior to incorporation of the next nucleotide.

353 Moreover, the LC/MS/MS analysis of the MGI Peak 3 dNTP tested from the vial comprising labelled nucleotides in the MGI Kit has a fully identical structure as the reference Illumina labelled dNTP and therefore comprises an azido moiety-containing cleavable linker.

354 Thus, the MGI Kit and methods infringe claim 15 according to auxiliary requests 5 and 6, too.

## H. Prayers for relief

Ad paras. 498-504

355 Defendant states that the prayers for relief no 1 to 7 lack the definiteness as required by BGE 131 III 70, consid. 3.3 (act. 16 para. 499). Defendant claims that the prayers for relief do nothing more than repeat the patent claims and that it is impossible to identify specific products of Defendant based on the prayers for relief.

356 This is not true. According to BGE 131 III 70, consid. 3.3, the pertinent test for whether a request for an injunction is definite and clear is phrased as follows: "Requests for injunctive relief must be directed at the prohibition of a precisely defined conduct (...). The obligated party should know what it is no longer allowed to do and the enforcement or penal authorities must know which actions they must prevent or punish. ... The alleged form of infringement shall be described in such a way that it can be readily established by mere factual inspection whether the prohibited form is present."

357 Plaintiff's prayers for relief meet this test. First, Defendant does not dispute that their allegedly infringing products fall within the prayers for relief. Clearly, the prayers for relief are precise enough for Defendant to understand that they cover their products, and they are precise enough for Defendant to know what it would no longer be allowed to do.

358 Contrary to Defendant's suggestion, Plaintiff's prayers for relief are also not indefinite. They comprise a technical description that covers Defendant's infringing products, and they do not go beyond what the respective patent claims protect. There is **no** legal requirement that the technical description must **only** cover the allegedly infringing products or must otherwise be as narrow as possible.

359 Furthermore, Plaintiff's prayers for relief are precise in the sense that they enable verification of infringement by mere factual inspection. None of the terms used for describing the scope of the injunctions are ambiguous – Defendant does not even allege this. The meaning of the terms used in the prayers of injunctive relief, some of which are also used in the patent claims, is not disputed between the parties. Therefore, Plaintiff's prayers for relief can be applied and enforced without any interpretation of a legal or ambiguous technical term (BGE 131 III 70, consid. 3.3).

360 In summary, Plaintiff's prayers for relief contain precise and umambiguous technical descriptions that indisputably cover Defendant's products; they do not go beyond the limits of the patent claims; and they can be enforced on the basis of factual determinations alone. The case law of the Swiss Federal Supreme Court does not require any more.

361 It should also be noted that Plaintiff has a legitimate interest in all prayers for injunctive relief being granted, even if the scope of two or more prayers may be overlapping or one included in the other. All prayers for injunctive relief are based on different claim combinations. Should a certain claim or claim combination be held invalid and therefore the respective prayer for relief not admittable by the next instance, this would not affect the other injunctions and they could remain in place as requested. This result can only be achieved if all prayers for relief that are based on valid claims or claim combinations are granted by the Federal Patent Court. Defendant is not disadvantaged in any way by this procedure.

362 As explained in the statement of claim, paras. 199 et seq., prayer for relief 1 addresses the infringement of claim 1 in the third alternative of EP'578. Prayer for relief 2 addresses the infringement of claim combination 4+1, and prayer for relief 3 the infringement of claim combination 9+7+6+4+1. These prayers for relief which address infringement of product claims also cover the contributory infringement of EP'578's method claims and of claim 29.

363 Prayer for relief 4 addresses the contributory infringement of claim 1 of EP'412, prayer for relief 5 the contributory infringement of claim combination 2+1 of EP'412, prayer for relief 6 the contributory infringement of claim combinations 3+2+1 and 4+2+1. Prayer for relief 7 relates to the infringement of product claim 15 of EP'412.

364 Auxiliary prayers for relief 4a-4c, 5a-5c and 6a-6c reflect the auxiliary amendments to claim 1 of EP'412. The added "by illumination with laser light" describes infringement of both the features "by illumination with laser light of a wavelength specific for the fluorescent label or other suitable sources of illumination to excite the fluorescent label" and "by intense illumination" as per auxiliary requests 3 and 4 for amendment of claim 1. Auxiliary prayers for relief 7a-7f reflect the additional features added by the auxiliary requests for amendment of claim 15.

* * * * *

Sincerely yours

Andri Hess

Qualifiziert signiert durch Andri Hess
Pfäffikon ZH, 11. Mai 2020

i.V.     Andri Hess

Qualifiziert signiert durch Andri Hess
Pfäffikon ZH, 11. Mai 2020

Andri Hess                              Katrina Frame

**Evidence as per separate list**