# EXHIBIT D

Lenz & Staehelin
Brandschenkestrasse 24
CH-8027 Zürich
Tel: +41 58 450 80 00
Fax: +41 58 450 80 01

Route de Chêne 30
CH-1211 Genf 6
Tel: +41 58 450 70 00
Fax: +41 58 450 70 01

Avenue de Rhodanie 58
CH-1007 Lausanne
Tel: +41 58 450 70 00
Fax: +41 58 450 70 01

www.lenzstaehelin.com

**By registered mail**

Federal Patent Court
P.O. Box
9023 St. Gallen

Zurich, 25 June 2020

**Proceedings no. O2019_007**

Dear Mr President,
Ladies and Gentlemen,

In the matter of

**Illumina Cambridge Limited,** 19 Granta Park, Great Abington, Cambridge,
Cambridgeshire, CB21 6DF, United Kingdom

represented by Attorneys-at-law Dr. Andri Hess and/or Julian Schwaller and/or Katrina
Frame, Homburger AG, Prime Tower, Hardstrasse 201, 8005 Zurich

assisted by Dr. Claudia Bibus, Swiss and European Patent Attorney, E. Blum & Co. AG,
Vorderberg 11, 8044 Zurich

**Plaintiff**

vs.

**Latvia MGI Tech SIA**, Dzirnavu iela 57A-4, Riga, Latvia, LV1010

represented by Attorneys-at-law Dr. Thierry Calame and/or Lara Dorigo, Lenz & Staehelin,
Brandschenkestrasse 24, 8027 Zurich

assisted by Dr. Martin Wilming, Swiss and European Patent Attorney, Hepp Wenger Ryffel
AG, Friedtalweg 5, 9500 Wil SG

**Defendant**

regarding

EP 1 530 578 and EP 1 828 412

we herewith submit the

## REJOINDER

with the following, unchanged

## PRAYERS FOR RELIEF

*The Complaint shall be dismissed.*

*All costs and fees, including the expenses for the assisting patent attorneys to be borne by Plaintiff.*

and

## PROCEDURAL MOTIONS

*The proceedings shall first be limited to the question of Defendant's capacity to be sued or Plaintiff's legal interest, respectively, and a preliminary decision (Vorentscheid) shall be rendered in this respect.*

*Until such decision is rendered, the further proceedings shall be suspended as regards all other issues.*

## GROUNDS

### OVERVIEW

Unsurprisingly, also in its Reply, Plaintiff could not provide evidence of infringing activities of Defendant in Switzerland. Notably, at the time of filing the Reply Plaintiff was fully aware from evidence specifically sought for Switzerland through US disclosure proceedings that it had wrongly attributed the claimed infringing acts to Defendant, who had never supplied any reagents or even sequencers to Switzerland, let alone the only sequencer found at Health 2030 Genome Center at Campus Biotech in Geneva. Defendant knows that the Geneva sequencer and reagents were provided by another group company. However, instead of dropping its action, Plaintiff tries to justify its rush job by construing inexistent ties of Defendant to Switzerland. It does so by misrepresenting Defendant's role, misusing information about Defendant's activities abroad and artificially speculating about potential activities in Switzerland. Such speculations obviously cannot result in a finding of infringing activities in Switzerland. As a result, there is no legal interest in seeking injunctions against Defendant. Plaintiff's action therefore needs to be dismissed in its entirety, for this reason alone.

What is more, Plaintiff has still not provided the required evidence that the contested products of MGI would infringe the invoked Patents. The new 578 Eurofins Report relied on by Plaintiff in its Reply fails to show that any of MGI's dNTPs infringe EP 578, as such report can at best conclude on the elemental formula of the samples, but certainly not on the structure thereof, as Plaintiff's own expert, Dr. Romesberg, confirms. It is telling that Plaintiff does not submit NMR spectroscopy evidence, which would be the standard method to characterize a molecule beyond reasonable doubt. This, notably, despite the fact that in its own EP 578 Plaintiff has characterized all molecules by this technique.

1

2

3

Likewise, the 412 Eurofin Report is also of no avail to Plaintiff. This report cannot prove the presence of ascorbic acid as it relies on an assay that is in no way specific to ascorbic acid and thus cannot distinguish between ascorbic acid and other antioxidants, such as for example erythorbic acid. Notably, erythorbic acid cannot be distinguished from ascorbic acid by mass spectrometry since it has the exact same molecular weight. Plaintiff therefore did not provide proof of infringement of EP 412 by the contested reagents.

3

With respect to CoolMPS, a new chemistry of the MGI group, which Plaintiff also attacks in its Reply, Plaintiff's infringement allegations remain unsubstantiated.

4

In any event, Plaintiff's patents EP 578 and EP 412 cannot be invoked against Defendant because both are invalid.

5

In the case of EP 578 invalidity is given for lack of inventive step over *Ju et al.* and *Zavgorodny et al.* The skilled person would readily understand that *Ju et al.*, in particular with the basic concepts of SBS in mind as outlined by *Tsien et al.*, already points to the use of the azidomethyl group as an alternative to the allyl group and the MOM group. Plaintiff tries to escape Defendant's invalidity attack by postmarking the common general knowledge of the skilled person as "expert knowledge", which a skilled person would only consider in hindsight. Plaintiff herewith plainly ignores the fact that *Tsien et al.*, a publication cited 46 times in patent families at the priority date and in 865 patent publications by now, obviously is one of the basic documents on SBS technology. *Tsien et al.* explicitly points to *Kraevskii et al.* and *Greene and Wuts;* there is thus no way the skilled person would have missed these pieces of prior art. It is unrealistic to assume that the skilled person would dive into the sophisticated topic of SBS without being aware of the technological background outlined in the prior art references to which *Tsien et al.* explicitly refer. Plaintiff's arguments are thus based on a wrong benchmark for the common general knowledge.

6

EP 412 is invalid on multiple grounds: First, its claims 1, 2 and 15 were amended beyond the content of the application as filed. Plaintiff tries to fix this by filing auxiliary requests, however, all auxiliary claims still suffer from invalidity grounds and thus cannot help to uphold the patent. Secondly, EP 412 lacks novelty over *US 420*. Thirdly, there is nothing inventive in EP 412. Ascorbic acid was commonly added in buffers to reduce or prevent photobleaching, as even the patent admits. Furthermore, adding antioxidants, and in particular ascorbic acid, to prevent damage to a sample had been well known in the art. Hence, regardless from which angle Plaintiff attempts to argue for non-obviousness, inclusion of ascorbic acid in the detection buffer had been plainly obvious to the skilled person. [7]

Finally, Plaintiff's prayers for relief lack the required specificity. This applies particularly to prayer for relief no. 1, which covers an indefinite number of compounds and various selection possibilities of R', including a large number of non-working embodiments in SBS. Such prayer for relief is unduly excessive. Furthermore, contrary to what Plaintiff alleges, it is not sufficiently clear to allow detection of infringement by mere factual inspection, as neither the nature of the "label" nor the way it shall be "detectable" is specified. Prayers for relief no. 2, 3, 5, 6, 7 and the respective auxiliary prayers for relief must be dismissed, because Plaintiff lacks a legal interest in the accumulation of these prayers for relief, which are all directed to the same subject matter. [8]

As a result, Plaintiff's complaint against Defendant must be rejected in its entirety. [9]

## I. PROCEDURE

This Rejoinder is submitted within the deadline set with order dated 13 May 2020 (act. 33). [10]

Defendant maintains its **procedural motions** regarding the limitation of the proceedings to the question of Defendant's capacity to be sued or Plaintiff's legal interest in this action against Defendant, respectively (N 12 et seqq.). Considering that Plaintiff meanwhile perfectly knows that Defendant never performed infringing activities in Switzerland and it also knows which parties it should have sued instead (*cf.* N 14 *et seqq.*), procedural efficiency even more demands that the Complaint be dismissed without further burdening Defendant with additional submissions and arguments with respect to all other aspects of this case and the associated high costs, which notoriously can never be fully covered by a party compensation awarded by judgment. Defendant therefore requests that a decision be taken regarding Plaintiff's legal interest in this action before proceeding with the technical procedural steps (article 237 CPC). [11]

## II. ARGUMENT

### A. No infringing activities of Defendant in Switzerland (ad act. 32 N 13 *et seqq.*)

Pursuant to the established case law of the Federal Supreme Court, an application for an injunction as provided by Article 72 PatA presupposes a sufficient legal interest in legal protection. Such an interest exists if the unlawful act is imminent, i.e. if there is a serious fear of the alleged infringement. A sufficient interest of the plaintiff is to be affirmed if the defendant is either already accused of patent infringements and repetitions cannot be excluded, or if there are concrete indications that it will commit such infringements in the future (BGE 116 II 357 cons. 2 a) with references). In the present case, these requirements are not met. [12]

Plaintiff continues to fail to provide evidence of past or present infringing activities [13] of Defendant in Switzerland. In fact, there is no such evidence, because Defendant never sold or offered to sell any infringing products to Switzerland, nor did it manufacture, import into Switzerland, export from Switzerland, store in Switzerland or put any such products otherwise in circulation in Switzerland (see also act. 16 N 26 *et seqq.*).

Evidence: - Andis Slaitas, c/o Latvia MGI Tech SIA, General Manager

(as Witness)

Plaintiff's allegation that Defendant offers and distributes a range of MGI sequencing [14] platforms and corresponding reagent kits in Europe, including Switzerland (act. 32 N 13), is a bold misrepresentation of the facts. By now Plaintiff perfectly knows that it sued the wrong party in Switzerland, but tries to construe an infringement case in its continued attempt to discredit Defendant and intimidate the market (*cf.* act. 16 N 42 *et seqq.*). Such behaviour can even amount to unfair competition, especially considering Plaintiff's specific knowledge as further explained below.

In this context it bears emphasis that at the time of filing the Reply Plaintiff was fully [15] aware from evidence produced in US disclosure proceedings that it had wrongly attributed the claimed infringing acts to Defendant who had never supplied any reagents or even sequencers to Switzerland, let alone the only sequencer found at Health 2030 Genome Center at Campus Biotech in Geneva. In fact, as Plaintiff knows, BGI Complete Genomics Hong Kong Co., Limited is the group company that supplied the Health 2030 Genome Center at Campus Biotech in Geneva, which is the only Swiss customer of the MGI group, as Plaintiff also knows from the US disclosure.

Evidence: - Agreement between BGI Complete Genomics Hong Kong Co., Limited and Fondation Campus Biotech Geneva dated 2 January 2019

(Enclosure 53)

Plaintiff is also aware of the fact that after a recent restructuring of the MGI group, MGI International Sales Co., Limited is the group entity newly in charge for Switzerland.

16

It is noteworthy that although Plaintiff sought such information through US disclosure *specifically for the purpose of the Swiss proceedings*, it then chose not to use any of it in its Reply, knowing well that it does not support its position in the present proceedings.

17

However, instead of dropping its action, Plaintiff now tries to construe inexistent ties of Defendant to Switzerland. It does so by misrepresenting Defendant's role, misusing information about Defendant's activities abroad and artificially speculating about *potential* activities in Switzerland, which nobody would ever think of, had Plaintiff not started these proceedings with the wrong hat on. Such speculations obviously cannot result in a finding of infringing activities in Switzerland (*cf.* BGE 116 II 357 cons. 2 a)).

18

In fact, none of the evidence produced by Plaintiff with its Rejoinder can establish any past, actual or threatened infringing activities of Defendant in Switzerland, as will be explained in detail.

19

- Plaintiff files user manuals (act. 32_28-29) for an MGI sequencer of the same type as the one installed in Geneva, but not the manuals found in Geneva. Rather, the user manuals used by Plaintiff were obtained *outside of Switzerland*. The "European representative information" in such manuals is therefore not conclusive for the information in user manuals in Switzerland and cannot establish that Defendant acts as the MGI group distributor for Switzerland – which in fact it does not (*cf.* N 13 *et seqq.* above with witness evidence).

20

- Plaintiff does not explain where it obtained the user manuals. The fact that it separately points to single sales by Defendant in Sweden, Finland and the UK, which relate to exactly this type of sequencer, i.e. the MGISEQ-2000RS (*cf.* act.

21

8

32 N 16, act. 32_29-30), makes it very likely that the user manuals submitted as act. 32_28-29 were delivered with such sales, most likely in Sweden (*cf.* N 24). Hence, – irrespective of the meaning of "European representative" (*cf.* N 22 *et seqq.*) – it would only be natural that Defendant's contact information is listed on the last page of such user manuals.

-   What is more, Defendant acts as a service and training centre for Europe (*cf.* act. 16 N 25). Its listing as "European representative" in the user manuals obtained outside of Switzerland, i.e. in documents that customers obtained *after* they purchased a sequencer, would therefore anyway be limited to *after sales support.*    22

Evidence: -   Andis Slaitas, c/o Latvia MGI Tech SIA, General Manager

(as Witness)

-   Furthermore, the user manuals relate to *sequencers*, not to the allegedly infringing reagents. Also for this reason, they cannot provide evidence for infringing activities.    23

-   Plaintiff can only point to a single sale by Defendant to a Swedish customer (act. 32_30). The further alleged sales evidence does not relate to sales of Defendant. Act. 32_31 only states that a sequencing device was provided "for evaluation purposes" – no sale was made. Reagents are not mentioned at all. The fact that Defendant provided a sequencing device for evaluation purposes does not allow conclusions as to who would be the commercial contact if the device was purchased, let alone as to who would supply reagents.    24

-   Likewise, act. 32_32 is no sales evidence by Defendant, but only relates to installation and training services by Defendant. It appears that the customer previously made a sale from a MGI group company and that Defendant later became involved to provide installation and training services, as evidenced by the subject line, the email content and the fact that the "Service Department" was    25

involved. Nothing else can be derived from this email chain. This applies even more considering that most employees copied in the email chain submitted by Plaintiff are not even employed with Defendant, but belong to other group companies and third party agencies, respectively.

- In any event, evidence regarding a single sale to Sweden and allegedly to Finland and the UK (act. 32_31-32) cannot establish infringing activities in Switzerland. Within the MGI group the Hong Kong entities are responsible for sales to Europe and specifically to Switzerland (*cf.* above at N 15 et seq.). Defendant only exceptionally made sales upon specific requests of certain European customers. Such exceptional sales activity in single European countries upon specific customer requests certainly cannot serve as evidence for infringing activities in Switzerland.

Evidence: - Andis Slaitas, c/o Latvia MGI Tech SIA, General Manager

(as Witness)

- If the alleged supply of goods to single countries were sufficient to establish infringing activities in Switzerland, this would mean to find infringement in Switzerland every time an internationally active party makes a sale to any European country, without the necessity to establish a further link of such party to sales or an offering in Switzerland.

- The product brochures filed as act. 32_33-35 do not help Plaintiff either. First, these product brochures of MGI Tech Co., Ltd. were not obtained in Switzerland (Plaintiff rightly does not assert so). Secondly, the product brochures are for sequencers, not for reagents. Thirdly, the brochures list "Latvia Riga" as a "Qualification Center, After-sales Center, Training Center, Logistics Centre". It is clear from the immediately following information that the focus is on technical support, maintenance and warranty services. It is wrong and contested that logistics is "tantamount to distribution" (act. 32 N 19). Logistics is a very broad term, which mainly refers to material handling, warehousing, information,

26

27

28

packaging, inventory, transportation. To the extent it may include distribution this would mainly mean intra-group distribution. Exports by Defendant to Switzerland have never occurred.

<u>Evidence:</u> - Andis Slaitas, c/o Latvia MGI Tech SIA, General Manager

(as Witness)

- Plaintiff also cannot derive anything in its favour from the fact that Switzerland is shown in the map depicted in the product brochures (act. 32 N 18). Indeed, Switzerland is part of the *world*, which the product brochures depict. However, if anything, one would have to assume that Switzerland is of none or minimal relevance, if at all, as it is almost blank in the map where the level of blue shades indicates the presence/relevance of the markets for the MGI group.

29



- In act. 32 N 20 Plaintiff misrepresents the statement found under the heading "After-Sales Services" by cutting its relevant part. In full the statement reads (underlining added):

30

### After-Sales Services

> Please be advised to communicate in advance for all international regional orders prior to the proposal commitment, which leaves time to set up service capability in Europe, Asia Pacific and North America.

- The statement therefore does not refer to sales orders but to *service orders*, as evident also from the following lines, which refer to installation and warranty services. Thus, other than asserted by Plaintiff, the statement merely illustrates Defendant's role as *after*-sales representative, nothing more. [31]

- Plaintiff's assertion that after-sales services includes the supply with reagent kits (act. 32 N 21 et seq.) is wrong and does not follow from the cited extract of the (foreign) user manual. The user manual states that reagent kits can be purchased from the "authorized *sales* representatives". Defendant is not a "sales representative" as explained above (*cf.* N 22). In any event, the user manuals submitted by Plaintiff cannot serve as evidence for infringing activities of Defendant *in Switzerland*, as they were not obtained in Switzerland (*cf.* above at N 20 *et seqq.*). [32]

- Plaintiff's allegation is also not supported by the product brochures (act. 32 N 23 et seq.). To the extent the product brochures refer to reagent kits this occurs exclusively with respect to installation validation services. In the course of such validation services a service engineer may perform sequencing runs for which some reagents are needed. However, such reagents are not sold or given to the customer; they are *used by the MGI engineer*. Such use does not infringe the patents nor does Plaintiff claim that it should be prohibited. Furthermore, Plaintiff has neither alleged nor proved that Defendant ever provided such validation services in Switzerland. [33]

- In line with what has been said above, the press release used by Plaintiff in act. 32 N 25-26 also describes Defendant's role as an R&D and manufacturing [34]

facility, training center and logistics center. This is already stressed at the very beginning of the press release (act. 32_36 p. 1)

> RIGA, Latvia, November 26, 2019 -- MGI officially opened a new R&D and manufacturing facility in Riga, Latvia today, aiming to build a bridge between China and Europe for health science innovation.
>
> The new MGI Latvia facility includes a product manufacturing center, high-throughput sequencing center, training center and logistics center. MGI will also establish a China-Europe Life Health Innovation Center at the site to strengthen innovative cooperation between China and Europe in the fields of life science research, industrial applications and technical standards, further promoting cooperation in international large-scale genome projects and enhancing exchanges between Chinese and European enterprises.

and is repeated throughout the document. Plaintiff again misrepresents single portions of such document and tries to attribute to them a meaning they were never intended to have. To conclude on infringing offerings for Switzerland from such statements would be too much of a stretch. 35

- What is more, Plaintiff misses the point if it speculates about whether Defendant would service Swiss customers (act. 32 N 26). Servicing activities of the type provided by Defendant would not even infringe the patents at stake. 36

- As a result, also the press release does not give concrete indications that Defendant will commit infringements in Switzerland in the future, as required by case law. 37

Against this background the discussion whether third party reagents can be used with the MGI sequencer installed in Geneva or not appears of secondary importance anyway, because Defendant has sufficiently explained that it did never and does not supply reagents to Switzerland and Plaintiff cannot prove otherwise. In any event, Plaintiff's allegations in act. 32 N 29 *et seqq.* are contested and Defendant maintains its position as set out in the Statement of Defense (act. 16) at N 33. 38

In conclusion, Plaintiff sought specific information regarding Switzerland through US disclosure proceedings and obtained all information it had requested. Nevertheless, it was not able to produce any evidence of infringing activities of Defendant in Switzerland, *because there is none*. Plaintiff sued the wrong party and has to bear the consequences thereof. **As a result, Plaintiff clearly lacks a legal interest in the injunctions sought against Defendant and its complaint must thus be dismissed.**

39

The following considerations are therefore only brought forward for the sake of contesting Plaintiff's specific arguments and cannot change the fact that the present action fails for lack of infringing activities and lacking capacity to be sued of Defendant, respectively.

40

**B.    No infringement of EP 578 (ad act. 32 N 35 *et seqq.*)**

**1.    The skilled person (ad act. 32 N 35-37)**

The skilled person's expert knowledge as outlined in Defendant's definition is not *"motivated by having the invention of EP 578 firmly in mind"*; it is simply due to the technical field the invention EP 578 pertains to.

41

**2.    No infringement by any of MGI's dNTPs (ad act. 32 N 4-12, 35 *et seqq.*)**

In the Reply Plaintiff refers to CoolMPS, a new chemistry developed by the MGI group, and alleges that the same infringement arguments are applicable to this new chemistry (act. 32 N 12). This is contested for the reasons set out below.

42

Plaintiff's discussion of Defendants dNTPs refers to *"MGI's current [...] sequencing chemistry"* (e.g. act. 32 N 47) as well as MGI's CoolMPS chemistry (e.g. act. 32 N 42), but both are confused in the detailed infringement analysis. Contrary to what one might assume from a quick read of Plaintiff's reply, Plaintiff did not present – and

43

*could* not present – any experimental analysis in support of its allegation that MGI's CoolMPS infringes EP 578.

Plaintiff had a *"MGISEQ-2000RS High-throughput Sequencing Kit Model: PE150"* analysed by Eurofins; act. 32 N 39, act. 32_38 N 2. This kit does not make use of MGI's CoolMPS chemistry. [44]

With respect to MGI's CoolMPS chemistry, Plaintiff solely relies on a preprint publication of a scientific paper (Drmanac *et al.*; act. 32_27) and a declaration of a hired expert who discusses this preprint publication (Romesberg Declaration; act. 32_39). [45]

Plaintiff failed to establish infringement of EP 578 by either *"MGI's current sequencing chemistry"* or MGI's CoolMPS chemistry, as is set forth in detail below. [46]

## a) *Testing material (ad act. 32 N 37-42)*

Plaintiff contests that the previous testing material had been unsuitable (for the reasons outlined in the Statement of Defense, act. 6 N 50-52), but apparently does not rely on the previous results submitted as act. 1_16 and act. 1_17 anymore. Rather, Plaintiff presents new test results obtained from analysis of yet another MGI kit; the 578 Eurofins Report, act. 32_38. However, the 578 Eurofins Report still fails to show that any of MGI's dNTPs infringes EP 578, as is set forth in detail below. [47]

## b) *Plaintiff failed to establish infringement by MGI's unlabelled dNTPs (ad act. 32 N 43-58)*

As mentioned before, Plaintiff confuses two separate issues in the discussion concerning unlabelled dNTPs in one and the same chapter, i.e. *"MGI's current [...] sequencing chemistry"* (e.g. act. 32 N 47) and MGI's CoolMPS chemistry (e.g. act. 32 N 44). This is misleading. For instance, when Plaintiff asserts in act. 32 N 45 that [48]

15

*"[t]he MGI Kit comprises two vials with labelled dNTPs and unlabelled dNTPs"*, this does not relate to a kit with MGI's CoolMPS chemistry.

As to *"MGI's current [...] sequencing chemistry"*, Plaintiff relies on the 578 Eurofins Report (act. 32_38) as evidence for the presence of the 3'-azidomethyl group. However, the 578 Eurofins Report is by no means sufficient proof of infringement, as is set forth in detail below (below, N 51 *et seqq.* and N 57 *et seqq.*).

On a sidenote, Plaintiff argues (again) that *"features 1.3.3 and 1.3.5 of claim 1 refer to R''" and are therefore not required for the third alternative of feature 1.3.2 (cf. act. 1, para. 46)."* It must not be forgotten that this argument has already been rebutted in act. 6 N 62 *et seqq.*: An infringement can already be ruled out in particular in view of Plaintiff's own admission that a protecting group in which each R'' can be replaced by H does not exist in the contested dNTPs; act. 6 N 65.

Plaintiff had Eurofins analyse MGI's dNTPs labelled *"dNTPs Mix II"* (NB, not from a CoolMPS kit) and compare it with *"standard 3'-azidomethyl-dNTPs obtained from Jena Bioscience GmbH"*; act. 32_38 N 7-19. Based on LC/MS mass observations, the 578 Eurofins Report concludes that (emphasis added) *"[t]hese results confirm that each of the dNTPs in the MGI Unlabelled dNTPs Mix has the **same structural composition** as the dNTPs in the Jena 3-AZM-dNTPs Mix."* This is obviously wrong. At best, one might conclude from mere LC/MS analysis that an unknown sample has the same molecular weight, i.e. the same *elemental formula*. But there is no way to confirm by way of LC/MS that it has the same *structure*.

In an obvious attempt to close this gap, Plaintiff hired an expert to opine on the 578 Eurofins Report. But this backfired. Dr. Romesberg explicitly holds (act. 32_39 N 60; erroneously referred to by Plaintiff as N 44 in act. 32 N 56[1]); emphasis added:

49

50

51

52

---

[1] It appears that most of the references in act. 32 to the Romesberg Declaration (act. 32_39) are shifted, to varying extent.

> *"This strongly suggests that the MGI Unlabelled dNTPs and the corresponding Jena-AZM-dNTPs have the exact same number and type of atoms. Given the limited number or ways that atoms can be connected, and the statement in the GenomeWeb article that MGI's SBS uses 3'-O-modified dNTPs [...] this fortifies my opinion that the MGI Unlabelled dNTPs are 3'-azidomethyl dNTPs."*

In a nutshell, Plaintiff's own expert admits that there are other alternative ways to connect the same number and type of atoms to a different structure than the one that is claimed in EP 578. It is in no way Defendant's obligation to educate Plaintiff about which one of the alternatives that even their own expert apparently conceived actually work in the context of SBS. The burden of proof lies with the Plaintiff; a shaky opinion ("fortifies my opinion") of a hired expert clearly is insufficient. Accordingly, direct and literal infringement of claim of EP 578 is anything but established, contrary to Plaintiff's finding in act. 32 N 57. [53]

c)  *Plaintiff failed to establish infringement by MGI's CoolMPS chemistry (ad act. 32 N 59-66)*

Plaintiff's compilation of quotations from *Drmanac et al.* (act. 32_27) in act. 32 N 60 is misleading and ultimately amounts to a misinterpretation. The full citations taken from the paragraphs under the headings *"Specificity"* and *"Binding requires the 3' blocking group"*, respectively, on page 2 of *Drmanac et al.* read as follows (mark-up to reflect Plaintiff's changes): [54]

> *Accurate sequence determination requires that the antibodies are specific for the base associated with the 3' reversible terminated ribose.*

> *No signal detection was evident after removal of the 3' blocking group suggesting that in addition to the base this [i.e. the 3'-O-azidomethyl] chemical moiety is important for strong antibody binding potentially preventing antibody to bind to other target bases in DNA.*

Plaintiff's interpretation by way of adding *"[i.e. the 3'-O-azidomethyl]"* is not supported by *Drmanac et al.* The mere fact that according to *Drmanac et al.* monoclonal antibodies had been made against 3'-O-azidomethyl dNTPs in no way allows for the conclusion that those antibodies are specific for the 3'azidomethyl protected dNTPS only. This, again, is an over-interpretation which is not supported by *Drmanac et al.* Note that *Drmanac et al.* held that *"CoolMPS™ technology is at the beginning of its development cycle and many future improvements are expected [...]"*; act. 32_27, page 16, third paragraph.

Accordingly, Plaintiff's citations from the Romesberg Declaration (act. 32_39) cannot support the finding that MGI's CoolMPS chemistry fulfils the features of claims 1 and 4 of EP 578; act. 32 N 66.

**d)** **Plaintiff failed to establish infringement by MGI's labelled dNTPs (ad act. 32 N 67-80)**

Plaintiff had Eurofins analyse one of MGI's dNTPs labelled *"dNTPs Mix"* (*nota bene*, not from a CoolMPS kit) and compare it with *"standard 3'-azidomethyl-dNTPs obtained from Jena Bioscience GmbH"*; act. 32_38 N 7-8 and 20-36. Based on LC/MS/MS mass observations, the 578 Eurofins Report concludes that (emphasis added) *"[t]hese LC/MS/MS data establish that the MGI Peak 3 dNTP present in the MGI Labelled dNTPs Mix from the MGI kit possesses the **structural formula** of the Illumina Labelled dNTP: [structural formula]."* Again, and for essentially the same reasons as set forth in N 51, above, this is obviously wrong. At best, one might conclude from mere LC/MS/MS analysis that an unknown sample has the same molecular weight (i.e. the same *elemental formula*) and some fragments of same weight when the molecules breaks down into fragments. But there is no way to confirm by way of LC/MS/MS that molecules have the same *structure*.

55

56

57

The Illumina Labelled dNTP allegedly possesses the following structural formula (act. 32_38 N 22), wherein the coloured version thereof from the Romesberg Declaration (act. 32_39 N 62) is reproduced below:

Evidently, this is a dNTP (green/blue) carrying a 3'-O-azidomethyl blocking group (red), an extensive linker (brown) and a rhodamine-type fluorescent label (purple). It is contested that this structure reads on claim 1 of EP 578, for the reasons set forth in N 50, above, with further reference.

i)      The comparison of UV/Vis spectra is meaningless (ad act. 32 N 72-73)

In first place, the 578 Eurofins Report shows UV/Vis spectra of *"MGI Peak 3 dNTP"* and *"Illumina Labelled dNTP"*. Without any reasoning whatsoever, it is held that they are *"identical within experimental error"*; act. 32 N 72-73. This is a courageous summary of what the comparison actually shows (reproduced below):

58

59

60



61

Both spectra are dominated by a huge and shouldered peak that stems from a rhodamine type fluorescent label (indicated in purple in Plaintiff's structure reproduced in N 58, above), and the software conveniently attributed the same wavelength for both samples. But that just does not matter: The invention of EP 578 does not concern the fluorescent label at all. More importantly, not a single one of the remaining peaks (if those are reasonably considered as peaks at all) shows up at the same wavelength. Plaintiff asserts that all is *"within experimental error"*, but does not provide any error margin at all. The contrary is much more likely: If the error margin was so big that peaks are *"identical"* when they differ by at least 1nm (in all cases), if not even by 3nm (401nm vs. 398nm), it would not make sense to assign values with a precision of two decimal places. Further, the MGI sample features a peak at 651nm, without the slightest corresponding bump in the MGI sample. Accordingly, it is disputed that the peaks in the UV/Vis spectra are the same within experimental error.

ii)     The m/z values and isotopic envelopes cannot prove a structure (ad act. 32 N 74-76)

With reference to the 578 Eurofins Report, Plaintiff argues that the obtained m/z        62
values and isotopic envelopes *"establish[es] that the atomic composition of the MGI
Peak 3 dNTP (+2 charged state) is $C_{65}H_{81}N_{14}O_{28}P_3S_2^{+2}$."* Noteworthy, Plaintiff not
asserts that this would confirm any structural information. Rightly so, as outlined
above in N 51 *et seqq.* and N 57.

iii)    The fragmentation pattern does not allow for any conclusions with respect to the
        protective group (ad act. 32 N 77-80)

The fragmentation pattern is of no avail since it cannot resolve potential differences    63
e.g. with respect to the azidomethyl blocking group – which is all the invention of EP
578 is about.

The atomic composition identified via LC/MS analysis and isotopic envelopes of          64
$C_{65}H_{81}N_{14}O_{28}P_3S_2^{+2}$ corresponds to a molecular weight of about 1663 g/mol.

The 3'-O-azidomethyl group, O-CH$_2$-N$_3$, has a molecular weight of about 72 g/mol.      65

With this in mind, it is immediately apparent that the fragmentation pattern            66
(reproduced below) – even if those pattern *were* identical – do not allow for any
conclusion whatsoever with respect to the nature of the 3' protective group: There is
just no fragment that comes even fairly close to the molecular mass of a potential 3-
O-azidomethyl group, or a characteristic fragment thereof. On the contrary, even the
smallest fragment of m/z $\approx$ 268 (whatever its composition might be; Plaintiff is just
silent about it) is about four times heavier than the protective group of interest; and
even the heaviest fragment of m/z $\approx$ 955 (again, whatever its composition might be)
corresponds to the Labelled dNTP that has lost about 10 times the mass of the 3'-O-
azidomethyl group.



It is evident that the fragmentation pattern is far too coarse to draw any conclusions therefrom about the structure to the extent that is relevant for the case at hand, i.e. the presence of a 3'-O-azidomethyl group. Accordingly, Plaintiff's expert errs in act. 32_39 N 60 (erroneously referred to as N 58 in act. 32 N 79) where he holds that *"when two samples [...] show the same fragmentation pattern, as well as identical masses, it is clear that the two samples possess molecules having the same number and type of atoms, and also the same connectivity between the atoms."* At least the last half sentence is clearly incorrect.

67

As outlined above in N 52-53, Plaintiff's own expert Romesberg admits elsewhere that there are other alternative ways to connect the same number and type of atoms to a different structure than the one that is claimed in EP 578. It is in no way Defendant's obligation to educate Plaintiff about which one of the alternatives that even their own expert apparently conceived work in the context of SBS. The burden of proof lies with the Plaintiff.

68

No undergraduate student would get away with a *"characterization"* of a molecule merely by LC/MS/MS analysis. This is no more than an educated guess of the actual

69

structure, but in no way sufficient proof of a molecular structure in terms of *"the way the atoms are connected"* (as Plaintiff's hired expert put it; above, N 52). The skilled person is well aware of the right techniques that are suitable to *"determine how all atoms of a particular molecule are interconnected"*, e.g. Nuclear Magnetic Resonance (NMR) spectroscopy. NMR spectroscopy is *the* tool to characterize a molecule beyond reasonable doubt. What is more, Plaintiff perfectly knows how to characterize a molecule beyond reasonable doubt: Actually, *all* molecules in EP 578 *are* characterized by their [1]H NMR spectrum; act. 1_6, paragraphs [0119] *et seqq.* If one could legitimately rely merely on a simple LC/MS/MS analysis in order to determine how the atoms are actually connected, plaintiff would certainly have done so in EP 578. But Plaintiff did not do so, for good reasons. Plaintiff's attempt to now prove infringement by way of a LC/MS/MS analysis clearly falls short of the mark.

It follows from the above that Plaintiff failed to establish infringement of claim 1 and dependent claims 4, 6, 7 and 9, contrary to Plaintiff's finding in act. 32 N 80.  70

Evidence: - NMR Services for Chemical Characterization and Analysis; www.emerypharma.com

(Enclosure 54)

### e) No direct infringement of claim 25 by nucleotides and kits (ad act. 32 N 81)

The nucleotides of the tested MGI kit are by no means proven to infringe any of claims 1, 4, 6, 7 and 9 of EP 578, as discussed above. Accordingly, claim 25 is not infringed, either.  71

*f)* **No contributory infringement of method claims 12 and 17 and product claim 29 (ad act. 32 N 82-84)**

The evidence provided by Plaintiff is not at all suitable to render Defendant's arguments regarding non-infringement of method claims 12 and 17 moot. On the contrary, the alleged evidence submitted by Plaintiff is clearly insufficient, as outlined above. [72]

As to the CoolMPS specifically, claims 12 and 17 are not relevant in any event. Note that claims 12 and 17 depend on any of claims 6-10, i.e. the nucleotide must comprise a "detectable label [that] is linked to the molecule through the blocking group by a cleavable or non-cleavable linker." This is not the case in CoolMPS. Even Plaintiff apparently acknowledges this by stating that the fluorescent antibody is only "attached to the 3'azidomethyl blocked nucleotides during the imaging phase" (act. 32 N 11). Clearly, attachment of an antibody cannot read on a "linker" when EP 579 is properly construed in view of the specification. [73]

Likewise, contributory infringement of product claim 29 is ruled out since it necessarily comprises a modified nucleotide of claims 1-11 in an oligonucleotide. However, Plaintiff failed to even establish infringement of claim 1 alone; above, N 43 *et seqq.* [74]

In any event, claim 29 requires the presence of modified nucleotide *"of claims 1-11"* (not *any* of claims 1-11, or similar wording), i.e. all of claims 1-11. Plaintiff not even addressed the subject-matter of claims 2, 3, 5, 8, 10 and 11 at all. [75]

*g)* **Conclusion (ad act. 32 N 85-86)**

Contrary to Plaintiff's allegation, Defendant's modified nucleotides do not directly and literally infringe independent claims 1 and 15, as well as claims 4, 6, 7 and 9. Accordingly, also contributory literal infringement of method claims 12 and 17 and product claim 19 can be ruled out. [76]

24

## C.    EP 578 is invalid (ad act. 32 N 87 *et seqq.*)

### 1.    Preliminary remarks (ad act. 32 N 87-94)

Plaintiff asserts that the summary of the technical background regarding SBS
technology in act. 6 N 91-146 represents *"expert knowledge that the skilled person
would only look for or have if they already had the invention of EP 578 in mind."*
This is not true, and Plaintiff should know better.

77

#### a)    *Tsien et al. is one of the most important pieces of prior art in the field of SBS at all*

From the year of publication of *Tsien et al.* (1991) until the earliest priority year of
EP 578 (2002), *Tsien et al.* had already been cited 46 times in later patent families,
with tendency on the rise:

78



By now, *Tsien et al.* has even been cited in 865(!) later patent publications. This does
not come as a surprise: Roger Y. Tsien has been one of the brightest biological
chemists the world has ever seen. He had worked at the University of California
(Berkeley) from 1982 to 1989, and since the beginning of 1989 he worked at the
University of California (San Diego). It shall not remain unnoticed that Roger Y.
Tsien received the Nobel Prize in Chemistry in 2008. It is completely unrealistic to

79

assume that the skilled person working in the field of SBS in 2002 was not aware of *Tsien et al.* that had been published in 1991. On the contrary, *Tsien et al.* had likely been one of the primary references for him/her to look at when getting familiar with the technology of SBS. *Tsien et al.* undoubtedly is (at least one of) *the* basic document on this technology.

Noteworthy, applicants within the Illumina group of companies, i.e. Illumina Inc. and Illumina Cambridge Ltd., are the applicants of later patent publications where *Tsien et al.* has been cited most frequently by far: 250 times for Illumina Inc., and 104 times for Illumina Cambridge.    80



If *Tsien et al.* was not part of the background knowledge of the skilled person concerned with SBS, then what was?    81

*b)*   **Tsien et al. explicitly point to Kraevskii et al. and Greene and Wuts as "References of Interest"**

As to *Kraevskii et al.* and *Greene and Wuts*, there is no way the skilled person would have missed these pieces of prior art: *Kraevskii et al.* and *Greene and Wuts* are explicitly referred to in *Tsien et al.* (act. 6_14, page 4, lines 16-17 and 30-31) as *"References of Interest"* (sic!), which *"relate to the general field of DNA sequencing*    82

and are provided as a general summary of the background art" (act. 6_14, page 3, lines 10-13). It is unrealistic to assume that the skilled person would dive into the sophisticated topic of SBS without being aware of the technological background outlined in the prior art references to which *Tsien et al.* explicitly refer. Rather, the skilled person would have been grossly negligent (if not blissfully ignorant) if he/she would not have reviewed at least the pieces of prior art to which he/she is explicitly referred to. This is further underlined by the fact that, e.g., *Metzker et al.* (act. 16_17) explicitly cites *Tsien et al.* (see footnote 15 in *Metzker et al.*).

Evidence:- Citation analysis of *Tsien et al.* (Patbase Citation Explorer), as per 14 June 2020

(Enclosure 55)

2. ***Ju et al.*, the closest prior art (ad act. 32 N 95-133)**

Plaintiff asserts that *"not all of [six clearly defined criteria] are clearly derivable from Ju et al. in view of the skilled person's knowledge."* Essentially, Plaintiff argues that *Ju et al.* shall only be read in isolation. This clearly is not a *"real-life"* approach towards the skilled person's knowledge, but would rather amount to specialist idiocy. It is unrealistic to assume that the skilled person dives into the subject of SBS more than 10 years after it had been first mentioned in the prior art without being familiar with the very basics on this topic as outlined in *Tsien et al.*, with further *"References of Interests"* explicitly referred to therein. This must not be confused with the combination of *Ju et al.* and yet another secondary reference in the context of the problem-solution approach (see below). Rather, *Tsien et al.* and the further references explicitly pointed to as *"References of Interest"* therein merely set the stage for the skilled person's reading and understanding of the closest prior art, *Ju et al.*

83

27

### a) The protecting group shall be small (ad act. 32 N 100-102)

Plaintiff correctly notes that *Ju et al.* disclose two protective groups, i.e. the MOM group ($CH_2$-O-$CH_3$) and the allyl group ($CH_2$-CH=$CH_2$). Still, the general teaching of *Ju et al.* clearly is the use of "a small cleavable chemical moiety"; act. 16_8, page 5, lines 11-12 and 26-28. The teaching of Ju et al. is in no way limited to the MOM group and the allyl group; they are presented as examples only ("such as"; act. 16_8, page 6, line 22; page 20, line 22). Plaintiff argues that there was no definition in *Ju et al.* of what *"small"* shall mean in *"chemical terms, e.g., with respect to molecular weight, number of atoms or molecular diameter."* Plaintiff misses the point here and overcomplicates things. Ju et al. gives two examples of what clearly is to be considered "small", and not even Plaintiff would – and actually does not – argue that the azidomethyl group is not of comparable size. The skilled person readily recognizes that the MOM group, the allyl group as well as the azidomethyl group are comparably small, unbranched, non-bulky groups.

84

### b) Cleavability and deprotection conditions (ad act. 32 N 103-105)

Plaintiff alleges that *Ju et al.*'s teaching with respect to deprotection conditions is *"very limited"*. The skilled person is well aware of the fact that the cleavage mechanisms of the MOM and the allyl groups are different. Accordingly, different conditions are used in *Ju et al.* in both instances. Clearly, blocking groups which are not specifically addressed in *Ju et al.* may require yet other deprotection conditions. There is no magic to this; the skilled person is well aware of suitable deprotection conditions for any given protecting group; this is e.g. illustrated by *Greene and Wuts*, act. 6_15, with further references for each and every protecting group.

85

### c) Denaturation (ad act. 32 N 106-113)

It goes without saying that the growing strand of DNA should survive the washing, detection and cleavage steps, to remain (or get again) annealed to the DNA template. However, it is important to understand that the primer extension and the removal of

86

the protecting group are separate steps. Clearly, no deprotection agents are to be carried over to the next cycle of elongation. Else, this might lead to deprotection in parallel to the elongation of the growing chain.

Separation of the primer from the DNA template, also known as *"denaturation"*, is to be avoided. Towards this end, *Ju et al.* makes use of a primer that contains a stable loop, a so-called *hairpin*, to form an entity that is capable of self-priming in a polymerase reaction even when the base-pairing might have been temporarily lost e.g. during the deprotection step (*cf.*, e.g., act. 6_8, Fig. 6B). The hairpin is ligated to the 3' end of each single stranded DNA template. According to Ju et al., *"[t]his approach will solve the problem of washing off the growing extension products in each cycle"* (act. 6_8, page 7, lines 15-22).

87

It is important to understand that this is *exactly* what EP 578 does, and it is telling that Plaintiff painstakingly avoids any mentioning of the hairpin approach in their pleadings. While both the separate primer approach as well as the hairpin approach are generally discussed in paragraph [0110] of EP 578, the *only* way that is actually embodied in EP 578 is the hairpin approach. What is more, EP 578 even acknowledges that it was *"[b]y attaching a hairpin DNA [...]"* that *"[t]he reaction can be performed over multiple cycles as shown in figures 5 and 6"*; EP 578, paragraph [0155]-[0156]. Accordingly, EP 578 in no way teaches that the deprotection regime has to prevent temporary detachment of the base pairing. On the contrary, the only embodiment relies on the hairpin approach. It is no surprise that a primer which is covalently attached to the template strand can subsequently be annealed again with the template if temporary detachment has occurred during the deprotection step, if any. This is what the hairpin approach is all about, i.e. to prevent irreversible denaturation.

88

Plaintiff's formulation of the objective technical problem to be solved is contested. There is no evidence whatsoever of *"improved properties"*, and the absence of denaturation is no surprise in any hairpin approach. To the extent Plaintiff seemingly

89

implies that not even a temporary detachment of the base pairing occurred in accordance with the teachings of EP 578, it is to be noted that there is no evidence on file to that effect and, what is more, the embodiments teach that it is only due to the hairpin that multiple cycles can be performed. Accordingly, the whole teaching of EP 578 allows for temporary detachment of the base pairing. Accordingly, in view of the actual contribution of EP 578 over the prior art, the objective technical problem may only be formulated as to provide an alternative blocking group.

d)   *No teaching away (ad act. 32 N 114-119)*

Plaintiff artificially construes a teaching away scenario based on the disclosure of Ju et al. At closer scrutiny, Plaintiff missed the point. In fact, *Ju et al.* on page 6, l. 10) explicitly refer to *Canard et al.* (act. 6_13) with respect to the avoidance of *certain* electrophiles. A skilled person would certainly consult *Canard et al.* and learn what has already been outlined in the Statement of Defense (act. 6 N 175-181 and 315-342). Accordingly, Plaintiff's incomplete and out-of-context citation from *Ju et al.* in act. 32 N 116 is misleading. 90

Even though Plaintiff correctly refers to *Canard et al.* later in act. 32 N 118, the wrong conclusions are drawn. *Canard et al.* could not have made it more clear that substituents that might receive a nucleophilic attack are not an issue *per se*. It is only that *"other substituents at the 3' end of DNA **at such a position and distance of the sugar ring** may also receive a nucleophilic attack"* (emphasis added). It is thus not the electrophilic position *per se* that is to be avoided, but an electrophile at the wrong position. Indeed, *Canard et al.* teaches that an azido group at the 3' position of the ribose is to avoided, in which case the central nitrogen would be at the same position as the carbonyl carbon atom of an ester group at the 3' position. However, this must not be confused with an azido<u>methyl</u> group – in which case the central nitrogen atom is two bond distances away from the position of the carbonyl carbon in an ester. See also act. 6 N 315 *et seqq.*, in particular N 323. Plaintiff's Statement of Reply is silent on this. 91

e) **Preference for unbranched protective groups with no more than 4 atoms _in the chain_ (ad act. 32 N 120-126)**

Plaintiffs chose a heading preceding act. 32 N 120 that is misleading, to say the least. Plaintiff correctly cites *"preference for unbranched protecting groups with no more than 4 atoms"*, but failed to acknowledged that the Statement of Defense consistently referred to *"no more than 4 atoms in the chain"*; act. 6, heading preceding N 182 (emphasis added). Undoubtedly, this is a common feature of both the MOM group and the allyl group; and it also holds true for the azidomethyl group.

92

Contrary to Plaintiff's assertion in act. 32 N 124-125, there is no convention about not counting hydrogen atoms *in general*. The skilled person in an attempt to understand the teaching of *Ju et al.* with respect to what is *"small"*, he/she will surely take the terminating hydrogen into account. Evidently, a terminating hydrogen atom cannot just be ignored when estimating a size of a group that must not interfere with the polymerase.

93

The azidomethyl group fits well with what the skilled person deduces from *Ju et al.* as *"small"*, in particular when consulting *Canard et al.* to which *Ju et al.* explicitly refer in this respect. Accordingly, the skilled person would well consider the azidomethyl group as a viable alternative with reasonable expectation of success, in particular upon consideration of the secondary reference *Zavgorodny et al.*; see below, N 104 *et seqq.*

94

f) **The MOM group is a masked hemiacetal (ad act. 32 N 127-129)**

Plaintiff disputes that the skilled person would readily appreciate the MOM group as a masked hemiacetal. In doing so, Plaintiff underestimates the skilled persons capabilities. No skilled person would ever use a protective group without understanding the way it works. The reference to *Nishino and Ishido* (act. 6_21) just proves what is evident anyhow: The MOM group had been widely known as a 3' protecting group, and the skilled person knew perfectly well how it worked.

95

31

### g) Summary (ad act. 32 N 130-133)

None of Plaintiff's objections discussed in act. 32 N 100-129 has merit. The skilled person's understanding of *Ju et al.*, in particular with the basic concepts of SBS as outlined by *Tsien et al.* in mind, already points to the use of the azidomethyl group as an alternative to the allyl group and the MOM group. This is further underlined by the secondary references discussed below.

96

### 3. Greene and Wuts (ad act. 32 N 134-152)

Plaintiff essentially argues that the skilled person would exclusively have consulted the chapter on alcohols but not the one on phenols. This falls short of the mark.

97

The skilled person well understands that the 3'OH group of a nucleotide is an aliphatic OH group (also referred to as an *"alcohol"*), and not an OH group attached to an aromatic ring (phenolic OH). However, the skilled person is also aware that even though some differences in reactivity between alcoholic and phenolic OH groups may exist, both can still undergo the same type of chemical reactions with other reagents leading to the same type of derivatives, e.g. esters, ethers, carbonates, etc. Many protective groups used in organic chemistry belong to these classes. Hence, there is no hindsight necessary to at least consider protective groups recommended for phenols also for alcohols.

98

It is common practice in textbooks on organic chemistry to split between aliphatic and aromatic compounds and discuss them in different chapters. The practical reason is that the chemistry of the aliphatic or aromatic background is different. This *may* have an influence on the reactivity of the respective OH groups, but would not *prima facie* preclude that the same type of chemical reaction could occur.

99

The most likely reason why there is a note from alcohols to phenols, and not the other way around, is that the authors started with drafting the chapter on aliphatic alcohols and then moved on to aromatic ones for practical reasons. The skilled

100

person is well aware of the fact that this is the usual order in textbooks on organic chemistry.

Even if it was true that phenols were better leaving groups than alcoholic compounds, this does not mean that the same protective group could not be used for both classes of compounds. The skilled person well understands that slight adaptations to the reaction conditions might be required, if any. The skilled person looking for alternative protecting groups for aliphatic alcohols would have been careless if he had just ignored the chapter on phenols. This is not how a skilled person would have diligently approached the issue. [101]

As to the alleged inconsistent application of the *"four atom rule"* (as Plaintiff put it), there is no such inconsistency. In both the first and the second step of selection, no groups have been considered that have more than four atoms in a chain. The fact that subsequently some very bulky groups have not been *"primarily considered"* does not amount to an inconsistency. It rather is a pragmatic and sensible approach to restrict the list of potential candidates in order to find blocking groups of small size, as an alternative to MOM and the allyl group. In doing so, the remaining list only comprises 5(!) candidates, one of which is the azidomethyl group. Picking the azidomethyl group out of a list of only five reasonably remaining candidate does not involve any inventive activity but rather amounts to what a skilled person can be expected to do when confronted with the objective technical problem to come up with an alternative protective group; N 89, above. [102]

If the skilled person had any remaining doubt as to the practicability of the azidomethyl group in the context of SBS, he would have conducted a straight-forward literature search for the azidomethyl group in conjunction with nucleotides and/or nucleosides (the latter is due to the fact that the 3' protecting group is typically introduced at the nucleo*side* stage, i.e. before the 5' phosphate groups are introduced and the molecule is thereby converted to a nucleo*tide*). This is where *Zavgorodny et al.* comes into play, at the latest. [103]

4.  **Zavgorodny et al. as secondary document (ad act. 32 N 153-161)**

    As outlined above, a first reason of obviousness is *Ju et al.* in view of *Greene and*      104
    *Wuts*, wherein the skilled person's consideration of the azidomethyl group is
    eventually re-assured in further view of *Zavgorodny et al.*, if necessary at all.

    A second reason of obviousness starts out from *Ju et al.* in further view of      105
    *Zavgorodny et al.*, without *Greene and Wuts* even being involved.

    In both lines of reasoning, the objective technical problem cannot be based on any      106
    surprising effect of the differentiating feature, which is the azidomethyl group
    instead of the MOM group or the allyl group. The objective technical problem is only
    to provide an alternative protective group, and this problem is solved without
    involvement of an inventive step; below, N 109 *et seqq.*

5.  **Gololobov and Polushin et al. (ad act. 32 N 162-173)**

    The skilled person well understands that the deprotection conditions must not      107
    irreversibly denature the DNA. However, when the hairpin approach is used,
    temporary displacement of the base-pairing is irrelevant. This is what the hairpin
    approach is all about, and aqueous pyridine is perfectly fine to be used in the
    deprotection step.

    Still, if the skilled person was minded to consider alternative deprotection conditions      108
    that were even milder than an aqueous pyridine solution, he or she would have come
    across various documents discussing mild conditions that are suitable to reduce an
    azido group, e.g. *Gololobov et al.* (act. 6_24) and/or *Polushin et al.* (act. 6_25). This
    is more than enough of a pointer to consider any of these references when looking for
    mild deprotection conditions.

6. **The subject-matter of EP 578 is obvious over Ju et al. in further view of Zavgorodny et al. (ad act. 32 N 174-176)**

*Zavgorodny et al.* (act. 6_12) undisputedly describe the chemical synthesis of 3'-protected nucleosides, inter alia making use of the azidomethyl protecting group. Even though *Zavgorodny et al.* do not specifically mention SBS or even nucle*otides*, but the skilled person would have certainly considered *Zavgorodny et al.* in an attempt to come up with an alternative protective group for nucleotides in the context of SBS, for various reasons: | 109

First, the skilled person had known from *Metzker et al.* (act. 6_17), cross-referenced in the closest prior art, *Ju et al.* (act. 6_08), that 3'-protected nucleosides are the most convenient intermediates in the synthesis of nucleotides. Only one well-established reaction step is necessary to convert the various 3'-protected nucleosides into their respective 3'-protected nucleotides. This principle is followed in *Ju et al.* for MOM- and allyl-protected nucleotides (*cf.* e.g. Figure 13A for MOM, and Fig. 13B for allyl, respectively). Notably, also the opposed patent essentially uses the same reaction scheme and conditions as *Metzker et al.* and *Ju et al.* | 110

Hence, adding a triphosphate group to a nucleoside is trivial step. For this reason alone, the skilled person would have also considered the prior art related to 3'-protected nucleosides. The fact that *Zavgorodny et al.* (act. 6_12) also discusses the MOM group – as already described in *Ju et al.* – would have re-assured the skilled person to be on the right track, if necessary. Defendant is at a loss to understand how the mentioning of the MOM group in *Zavgorodny et al.* would have made MOM the *"natural choice"* (act. 32 N 155). On the contrary, in view of the objective technical problem to come up with an alternative, MOM is actually ruled out. | 111

Secondly, *Metzker et al.* (act. 6_17) is one of the most relevant pioneer papers for SBS. This is highlighted not only by its mentioning in *Ju et al.*, but also by the fact that it is cited as relevant background in most other later documents in this field of | 112

technology. EP 578 itself is no exception to this rule and also cites *Metzker et al.* in the background section (act. 1_6, [0007]). *Metzker et al.* clearly belongs to the common general knowledge of the skilled person.

*Zavgordodny et al.* (act. 6_12) discloses about twenty 3'-protecting groups, all of which are accessible via the 3'-O-methylthiomethyl derivative (compound 1) as a common precursor. Still, the skilled person would have promptly identified the azidomethyl group as the most promising candidate as an alternative to the MOM group and allyl-group of *Ju et al.*: Many candidates can be ruled out from the outset because they do not meet the "small size" precondition of *Ju et al.* Of those that remain, azidomethyl appears attractive because it can be removed under "very specific and mild conditions" (act. 6_12, page 7595, last sentence). Noteworthy, the attractiveness of the azidomethyl group is confirmed by *Zavgorodny* a few years later (act. 6_11), which focusses on azidomethyl only.                                                                    113

The structural similarity and similar size of azidomethyl and *Ju et al.*'s allyl or MOM group would have left the skilled person with a reasonable expectation of success that a nucleotide carrying a 3' azidomethyl protecting group would have been accepted by the polymerase as a substrate.                                                                    114

The skilled person would also not have had concerns about potential side reactions, because azidomethyl has no ester or carbonyl functionality. Further, the only position that could be prone to a nucleophilic attack from the active center is the methylene group $CH_2$ of the azidomethyl group (neighbouring the 3'-oxygen atom). This moiety is not electrophilic. On the contrary, it is important to note that *Ju et al.'s* MOM group and allyl group have a methylene group at the corresponding position, too.                                                                    115

Finally, the skilled person would not have been deterred by the fact that the deprotecting method of *Zavgorodny et al.* employs an aqueous pyridine solution. Starting out from *Ju et al.* as the closest prior art, he would have anyhow used a self-priming template, i.e. the hairpin approach, which is *Ju et al.*'s s most preferred                                                                    116

embodiment. Even if the DNA *might* denature during the deprotection step, the primer would not be washed off during rinsing because it is covalently attached to the template. Before performing the subsequent step of chain extension with a polymerase, the primer would readily re-anneal again when proper conditions for the polymerase reaction are restored again – which has to be assured in any event.

Hence, the skilled person starting from *Ju et al.* would have arrived at the azidomethyl protective group as an alternative to the MOM group and the allyl group without any inventive activity whatsoever, merely in further view of *Greene and Wuts* and/or *Zavgorodny et al.* [117]

## 7. Plaintiff's criticism of the Carell Declaration is unfounded (ad act. 32 N 177-178)

Plaintiff's assertions in the "critical review" of statements and results presented in the Carell declaration have no merit. [118]

### a) Deprotection conditions of Zavgorodny et al. (ad act. 32 N 177)

First, Plaintiff argues that the fact that Prof. Carell "had to do these experiments" would illustrate the doubts of the skilled person. Plaintiff is mistaken. It is not that Prof. Carell *had* to do experiments to come up with anything unexpected or unforeseeable. He did the experiments merely in order to confirm the expectation that the skilled person had right from the outset. [119]

Evidence: - Prof. Dr. Thomas Carell, Ludwig-Maximilians-Universität München, Department Chemie

(as Witness)

Secondly, Plaintiff refers to Fig. 1.1.1 of act. 16_23 and asserts that Prof. Carell did not choose realistic models for "the Zavgorodny conditions". Plaintiff misses the point of Question 1.1, which reads as follows: Does the presence of pyridine lead to denaturation of DNA primer / template duplex? ("Führt das Vorhandensein von [120]

Pyridin zur Denaturierung von DNA Primer / Template – Duplex"). Prof. Carell clearly holds that the presence of salt is of much higher importance for the duplex formation than the presence or absence of pyridine. Not even Plaintiff disputes that it had been common general knowledge to include salt to adjust the ionic strength in order to allow duplex formation. Rightly so, since this is mentioned in any standard textbook well before the filing date of EP 578; *cf.* e.g. *Saenger (1984)*, emphasis added:

> *The melting temperature of double helical nucleic acids increase not only with their lengths but also with the ionic strength of the medium and with the GC/AT ratio of the polynucleotide ([...]).*

Evidence: - Saenger, Principles of Nucleic Acid Structure, 1984, p. 144-145

(Enclosure 56)

This really does not come as a surprise: The multi-anionic backbone of a polynucleotide is stabilized by counter-ions, provided with a suitable buffer that also stabilizes the pH value, in order to compensate for the presence of basic compounds such as e.g. pyridine. Even EP 578 itself acknowledges in paragraph [0110] that "conditions necessary for carrying out the polymerase reaction, including temperature, pH, buffer composition etc., will be apparent to those skilled in the art." [121]

Evidence: - Prof. Dr. Thomas Carell, Ludwig-Maximilians-Universität München, Department Chemie

(as Witness)

Thirdly, Plaintiff misinterprets the slopes in Fig. 1.1.1. The melting point $T_m$ is a thermodynamic value and well characterizes the duplex formation all by itself. At normal ion strength of 150 mM $Na^+$, the decrease of the melting point in the presence of pyridine was neglectable. It remains obscure what Plaintiff aims to imply with pointing to potentially less denaturation at 20°C in the absence of pyridine – a temperature that is not of relevance in any event. What is more, if one were to [122]

assume that Plaintiff's argument had merit, it would actually point *towards* inclusion of pyridine: Both the incorporation of the nucleotide as well as the deblocking step are carried out at 65°C in the examples in paragraphs [0157] and [0158] of EP 578, respectively. Accordingly, a less steep slope would imply less denaturation at such a temperature.

Evidence: - Prof. Dr. Thomas Carell, Ludwig-Maximilians-Universität München, Department Chemie

(as Witness)

Finally, Plaintiff questions the LC/LS measurements, obviously desirous to misunderstand the results. Indeed, the commercial sample of the protected nucleotide contained impurities. However, the calculated mass of m/z = 536 was present in all fractions of the time-resolved MS spectrum, as a prominent signal (Table 1). On the other hand, the unprotected nucleotide would have resulted in an m/z signal of 481 – which is not present in Table 1. Evidently, there is no unprotected nucleotide in the starting material. To ease understanding, the summed-up mass spectrum is shown below, based on the same raw data as Table 1: 123



On the other hand, the nucleotide after deprotection with m/z = 481 is the prominent signal after deprotection in the summed-up mass spectrum, based on the same raw data as Table 2: 124



Note that no protected nucleotide with m/z = 536 is present anymore. Accordingly, Plaintiff's whole guessing about the efficiency of the deprotection, or whether it had proceeded at all, is irrelevant.

Evidence: - Prof. Dr. Thomas Carell, Ludwig-Maximilians-Universität München, Department Chemie

(as Witness)

**b)** *Deprotection conditions of Polushin et al. (ad act. 32 N 178)*

*Polushin et al.* is mainly concerned with oligonucleotides. Prof. Carell's experiments showed that the deprotection proceeded quantitively under non-denaturing conditions of a duplex (at normal ion strength), well below the $T_m$. It is immediately apparent that this would also be the case above the $T_m$, even more so.

The skilled person's reading of *Polushin et al.*'s "completed in less than 10 min." is that the reaction is quantitative. Anyway, if that was an issue, the skilled person would simply increase the amount of deprotection agent, since this is in no way an issue in the context of SBS.

Evidence: - Prof. Dr. Thomas Carell, Ludwig-Maximilians-Universität München, Department Chemie

(as Witness)

125

126

127

8. **The decision of the Opposition Division is incorrect (ad act. 32 N 179)**

Many of the Opposition Division's wrong assessments have been corrected herein and in the Statement of Defense. [128]

9. **The remaining claims (ad act. 32 N 180)**

Plaintiff's allegation that the dependent claims benefit from patentability of claim 1 is wrong. Claim 1 is invalid. Plaintiff did not respond to any of Defendants substantive arguments regarding the invalidity of the remaining asserted claims. [129]

**D. No infringement of EP 412 (ad act. 32 N 181 *et seqq.*)**

**1. Preliminary remarks (ad act. 32 N 181-192)**

Undisputedly, the use of antioxidants – and in particular the use of ascorbic acid (vitamin C) – has been known in the art to prevent / decrease photobleaching; EP 412, paragraph [0006]. Photobleaching is an effect that occurs upon illumination, i.e. upon determination of the identity (by way of detecting the fluorescent label) of the nucleotide(s) in step b) of claim 1.    130

Plaintiff's arguments are detached from the subject-matter of claim 1. Plaintiff asserts that *"during each cycle of sequencing in step y), fresh fluorescently labelled nucleotides that have never been illuminated before are added and incorporated into the growing nucleic acid strand"*; act. 32 N 186 and 190. Note that this is *not* a feature of claim 1.    131

Further, Plaintiff asserts that *"stabilization of the fluorophore in SBS in neither needed nor could it have a relevant effect on the strength of the signal that is detected in step b)"*; act. 32 N 186. This is plainly wrong. The effect of photobleaching and how to mitigate is not only common general knowledge of a skilled person dealing with fluorophores of any kind, but it rather is also a well known issue in the context of SBS; *cf.* e.g. *Fuller et al.*, page 1019, right column, penultimate paragraph (*"This can be done by [...] increasing the laser power in a given sequencing instrument, which will increase the rate of photobleaching. Rapid photobleaching can be mitigated by [...]"*).    132

A skilled person working with fluorophores is well aware of the fact that photobleaching is an effect that starts immediately upon illumination of fluorophores (be it pulsed or continuous); it *"can occur in as short as a few microseconds"* (*Song et al.*, page 2590, left column, lines 9-10 and Fig. 2 (reproduced below).    133



It goes without saying that whenever a signal is to be measured, the skilled person has any motivation to keep that signal stable if there is an easy way to do so – which is the case here: Plaintiff correctly admitted in EP 412, paragraph [0006] that it had been well known to use ascorbic acid (vitamin C) in buffers that were used to detect fluorescence. However, this is exactly what is being done in step b) of claim 1. There can be no doubt that the skilled person was well aware that photobleaching will occur immediately, and he would have taken the most evident measure to counter that, i.e. adding an antioxidant such as ascorbic acid.

134

Accordingly, even if ascorbic acid had some *"stabilizing effect"* on the nucleic acid template, this was no more than a bonus effect that had occurred when doing the obvious: Reducing / preventing photobleaching by way of adding ascorbic acid to the detection buffer.

135

In any event, adding antioxidants (in particular ascorbic acid / ascorbate) to prevent damage to a sample had been well known in the art, e.g. from *Buechler et al.* ("[…] significantly delays or inhibits oxidation of the substrate"; column 5, lines 16-18) and *Tsien* and *Waggoner* ("*As mentioned above, light-induced damage both to the fluorophore and the biological specimen is often dependent on the presence of molecular oxygen, [...]. [...] it has become common to add antioxidants [...]*"; page 272, right column, first paragraph under the heading Protective Agents. Ascorbate is

136

43

explicitly mentioned on page 273, left column, first complete paragraph, lines 26-27).

Accordingly, neither the reduction / prevention of photobleaching of the fluorophore nor the alleged *"stabilizing effect"* of ascorbic acid on the nucleic acid template is in any way surprising. It does not matter from which angle Plaintiff attempts to argue for non-obviousness: Inclusion of ascorbic acid in the detection buffer had been plainly obvious.

137

Evidence: - Song et al., Biophysical Journal, Vol. 68, June 1995, 2588-2600
(Enclosure 57)

- Fuller et al., Nature Biotechnology, Vol. 27, No. 11, 1013-1023
(Enclosure 58)

- Buechler et al., *US 6,544,797 B1*
(Enclosure 59)

- Tsien and Waggoner, Fluorophores for Confocal Microscopy in Handbook of Biological Confocal Microscopy (1995), p. 267-279
(Enclosure 60)

## 2. MGI's sequencing reagent kits do not infringe EP 412 (ad act. 32 N 193-213)

Plaintiff's freshly presented 412 Eurofins Report is based on a (a) "test strip analysis" (Quantofix); (b) LC/MS analysis; and (c) the determination of the pH value; act. 32 N 199. The 412 Eurofins Report is in no way sufficient evidence to support Plaintiff's allegation for the presence of ascorbic acid.

138

Even though it is not Defendant's obligation to educate Plaintiff about which alternative antioxidants might work, it must not be forgotten that ascorbic acid is a chiral molecule, with two stereocenter. E.g., erythorbic acid (also known as *D*-Isoascorbic acid; CAS No. 89-65-6) is a stereoisomer of ascorbic acid (also known as *L*-Ascorbic acid; CAS No. 50-81-7):

139

**Ascorbic acid**
Synonym: *L*-Ascorbic acid
CAS No. 50-81-7

**Erythorbic acid**
Synonym: *D*-Isoascorbic acid
CAS No. 89-65-6

Both are approved by the European Food Safety Authority (EFSA) for use as antioxidants in the EU; they are referred to as E300 and E315, respectively. 140

Evidence: - Sigma-Aldrich product information, Ascorbic acid

(Enclosure 61)

- Sigma-Aldrich product information, D-Isoascorbic acid (Erythorbic acid)

(Enclosure 62)

As indicated by the manufacturer of the Quantofix test, the method embodied in the test strips relies on the *"[a]scorbic acid – phospomolybdenum blue"* reaction, with a color change from yellow to green/blue when the concentration of ascorbic acid increases. The yellow color is due to the phosphomolybdate ion, $[PMo_{12}O_{40}]^{3-}$. This complex, which is also known in the art as an $\alpha$-Keggin structure, can be reduced by antioxidants such as e.g. ascorbic acid, whereby a $\beta$-Keggin $[PMo_{12}O_{40}]^{7-}$ structure is formed. The latter is blue. 141

Evidence: - Product information about Quantofix Ascorbic acid test strips; www.mn-net.com

(Enclosure 63)

- Wikipedia, 'Molybdenum blue'

(Enclosure 64)

It is important to understand that this reaction is not specific to ascorbic acid. The reduction of the yellowish $\alpha$-Keggin structure to the blueish $\beta$-Keggin structure can be made with a whole lot of reducing agents / antioxidants. Even Wikipedia lists 142

ascorbic acid only as an example of many (*"This anion is then reduced by, for example, ascorbic acid or SnCl₂, [...]."*).

Ascorbic acid is the enolic form of an $\alpha$-ketolactone; thus, it can be easily oxidized to the diketo form, i.e. dehydroascorbic acid. This is the basic principle of the antioxidative / reductive effect of ascorbic acid: [143]

Ascorbic acid        Dehydroascorbic acid

Evidently, the very same mechanism underlies the reductive potential of erythorbic acid. The different stereochemistry in an unrelated side chain does not make any difference in this respect. Accordingly, it is immediately apparent that reduction of the yellowish $\alpha$-Keggin structure to the blueish $\beta$-Keggin structure will proceed in exactly the same way with erythorbic acid as it does with ascorbic acid. The Quantofix test strips just cannot differentiate between various reducing agents, in particular not between ascorbic acid and dehydroascorbic acid. [144]

This has been confirmed by the Customer Service Center of the manufacturer of the test strips by Email as follows: [145]

> *Q: Wie spezifisch ist damit die Detektion von Ascorbinsäure? [...] Konkret wäre es wichtig für mich zu verstehen, ob der Teststreifen bspw. auch auf Isoascorbinsäure (oder andere ähnlich starke Reduktionsmittel) anspricht.*
>
> *[How specific is the detection of ascorbic acid? [...] Specifically, it would be important for me to understand whether the test strip also responds to isoascorbic acid (or other similarly strong reducing agents), for example.]*

*A: Der von Ihnen genannte Test reagiert wie vermutet auch auf andere starke Reduktionsmittel positiv. Das bedeutet, wenn Ascorbinsäure und andere Reduktionsmittel parallel vorliegen[,] wird das Ergebnis verfälscht und ein zu hoher Wert angezeigt.*

*[As you suspected, the mentioned test also reacts positively to other strong reducing agents. This means that if ascorbic acid and other reducing agents are present in parallel[,] the result is distorted and a too high value is displayed.]*

Evidence: -   Emails with Macherey-Nagel Customer Service Center

(Enclosure 65)

Likewise, all stereoisomers have the *exact* same molecular weight and will thus give exactly the same result in LC/MS analysis.   146

Accordingly, Plaintiff's allegation that based on the 412 Eurofins Report the presence of ascorbic was proven is without merit. On the contrary, the presence of ascorbic acid is still no more than an unfounded allegation.   147

47

**E.    EP 412 is invalid (ad act. 32 N 214 *et seqq.*)**

**1.    Undue extension of subject-matter (ad act. 32 N 216 *et seqq.*)**

*a)    Amendments to claim 1 (ad act. 32 N 217-235)*

Plaintiff correctly recited in act. 32 N 216 that the claimed subject-matter must be *"directly and unambiguously"* (in German: *unmittelbar* und *eindeutig*) derivable from the application as filed; Art. 123(2) EPC / Art. 58(2) PatA. However, it is telling that it then takes no less than three pages (!) for Plaintiff to set forth its arguments as to why the effectively fully re-written claim meets this standard.

148

Plaintiff argues that the *"more general term 'fluorescent moiety'"* had been replaced by the *"more specific term 'fluorescently labeled nucleotide'"*. This is incorrect. A moiety is a certain chemical group; a *"fluorescently labeled nucleotide"* is a nucleotide that -- for any reason whatsoever, is fluorescent. Accordingly, the amendment is not just a change from genus to species; it rather is a shift in scope.

149

As to the feature "repeating the steps of", Plaintiff in act. 32 N 221-225 essentially only refers to paragraphs [0002] and [0029] of EP 412 (or the respective disclosure in the application as filed). However, there is just no disclosure of repeating steps a) and b) as ultimately defined in claim 1 of EP 412. One must not forget that Plaintiff tries to create a distinguishing feature from this wording over *US 420*; *cf.* below, N 159 *et seqq.* However, patentee must not benefit from an undue amendment in the assessment of patentability on the merits.

150

Further, omission of the feature that the detection step "requires repeated or prolonged exposure to intense illumination" is clearly impermissible. First, claim 1 as granted allows for determining the identity of the nucleotides by any means whatsoever, be it fluorescence or not. There is no way to construe the claim differently: Determining the identity of the nucleotides by other means would

151

literally infringe the claim. Noteworthy, Plaintiff not even comes up with a claim construction that would prevent this. On the contrary, Plaintiff merely holds that it would be "entirely out of place" that "the skilled person would consider other methods to determine the identity" of the nucleotides; act. 32 N 230. This is beside the point: Undisputedly, the identity of the nucleotides *can* be determined otherwise, and if someone did it without relying on fluorescence, this would read on step b). But it would not have read on step b) without the respective feature being deleted. Such an amendment obviously constitutes an undue extension of subject-matter.

What is more, the deleted feature was *"a detection step which requires repeated or prolonged exposure to intense illumination."* Note that this obviously refers to a single detection step (singular, *"a detection step"*). Plaintiff now implies that *"repeated"* is implicit to an SBS method because the detection step is carried out multiple times in an SBS method; act. 32 N 232 lit (c). Be that as it may, the deleted feature required the repeated (or prolonged) illumination for each single detection step – which is not the case anymore in claim 1 as granted.

*b)*   *Amendments to claim 2 (ad act. 32 N 236-242)*

Plaintiff argues that *"every college student of molecular biology knows that the nucleotides that are the substrates for incorporation into a growing nucleic acid strand by a polymerase enzyme are nucleoside triphosphates"*; act. 32, N 239. Again, this argument is detached from the subject-matter of the claim. Claim 2 requires that *"said substrate for incorporation of fluorescently labelled nucleotide is a nucleoside triphosphate."* However, there is no *"substrate"* defined in claim 1. What is more, the nucleoside triphosphate would hardly be considered as a substrate. They are added as reactants in solution, not as substrates. It is more the other way around, i.e. that the immobilized template strand might be referred to as the substrate. Accordingly, Plaintiff's reliance on what college students would know about involvement of triphosphates or not is just irrelevant.

152

153

### c) Amendments to claim 15 (ad act. 32 N 243-247)

Plaintiff construes a direct and unambiguous disclosure of the feature of a *"cleavable linker"* in *"one or more fluorescently labelled nucleotides, wherein the fluorescent label is linked to the nucleotides via a cleavable linker"* essentially only by reference to WO 2004/08493 (act. 16_32). Not even Plaintiff asserts that the mere reference to *"labile"* or *"photolabile"* linker, or linker that *"contain a disulfide linkage"* is sufficient basis for the generalization as a *"cleavable linker"*.

154

No disclosure in an application as filed could be more shaky than an incorporation by reference. This case is not an exception to the rule. Plaintiff conveniently refers to the Abstract of WO 493 and puts emphasis on *"a nucleotide or nucleoside having a base attached to a detectable label via a cleavable linker"*. However, the citation is incomplete and misleading. Noteworthy, the sentence goes on as follows:

155

> *[...],characterised in that the cleavable linker contains a moiety selected from the group comprising : Formula (I) (wherein X is selected from the group comprising O, S, NH and NQ wherein Q is a $C_{1-10}$ substituted or unsubstituted alkyl group, Y is selected from the group comprising O, S, NH and N(allyl), T is hydrogen or a C1-10 substituted or unsubstituted alkyl group and \* indicates where the moiety is connected to the remainder of the nucleotide or nucleoside).*

Formula (I) is defined as follows:

156

Clearly, incorporation of WO 493 by reference in no way provides sufficient basis in the application as filed for the generalization to a "cleavable linker" of any kind whatsoever. [157]

### d) Conclusion (ad act. 32 N 248-249)

Claims 1 and 2 extend beyond the content of the application as filed, as well as claim 15. The auxiliary requests will be dealt with below; N 179 *et seqq.* [158]

## 2. No novelty over US 420 (ad act. 32 N 250-261)

Plaintiff's only argument with respect to novelty over *US 420* is that it does not relate to an SBS method. The argument is flawed for at least two reasons: [159]

First, claim 1 of EP 412 does not refer to "SBS" or "sequencing by synthesis", and anything that Plaintiff aims to imply in this annotation is irrelevant. The subject-matter of claim 1 lacks novelty over *US 420* because all its features are disclosed therein. [160]

Secondly, *US 420* undisputedly discloses a *sequencing* method. But it also is involves *synthesis*: The fluorescence labelling of the nucleic acid strand of interest is achieved by means of direct PCT labelling, i.e. synthesis and labelling is done in one and the same step; *cf.* act. 6 N 405. Thus, Plaintiff's argument has no merit. [161]

## 3. No inventive step (ad act. 32 N 262 *et seqq.*)

### a) Preliminary remarks (ad act. 32 N 262-266)

Plaintiff's argument that it is "beside the point" that ascorbic acid had been known in imaging buffers to protect fluorophores from degradation / photobleaching is wrong and has already been dealt with above, 130 *et seqq.* First, Defendant's argument is precisely on point because it provides any motivation for the skilled person to include ascorbic acid in the detection buffer. Secondly, even if the alleged [162]

*"stabilizing effect"* on the nucleic acid template was decisive (what it is not), this has likewise been obvious.

As to US 622, it is not understood why in Plaintiff's view *"sequencing by comparative hybridization is irrelevant"*, and why it had *"no similarity to the claimed invention"*. US 622 undisputedly shows that ascorbic acid had already been proposed for use the context of a nucleic acid sequencing method, to stabilize the fluorescent dye. It just does not matter whether a *"stabilizing effect"* on the nucleic acid itself might occur in addition. US 622, as an example of many, is more than sufficient motivation to include ascorbic acid in the detection buffer of any nucleic acid sequencing method whatsoever.

163

b)   *Prior art in opposition proceedings (ad act. 32 N 267-269)*

Plaintiff apparently acknowledges that there had been *"incentives [...] in the prior art to improve sequencing by reducing photobleaching"*; it is only that this would not lead to the claimed invention, in Plaintiff's view. This has already been proven wrong; see above, N 130 *et seqq.*

164

c)   *No inventive step over either WO 770 or WO 073, in further view of Van Dijk et al., Song et al. (ad act. 32 N 270-290)*

Plaintiff essentially argues that WO 073 would only disclose DTT in the "extension medium", contrary to the presence of ascorbic acid in the "detection buffer" according to EP 412. This is misleading. There simply is no separate "detection buffer" in WO 073, i.e. the one and only buffer (referred to as extension medium) of WO 073 is also the detection buffer in the sense of EP 412 (*cf.* e.g. Fig. 10A reproduced below); a single buffer is supplied to *"the reaction zone where the sequencing procedure of the present invention is carried out"* (WO 073, page 34, lines 7 *et seqq.*):

165



Further, Plaintiff tries to discredit the disclosure in WO 073 of an incorporation of at least 13 or 14 nucleotides. This argument has no merit, the disclosure of WO 073 stands as it is. There is still no indication on file that could support Plaintiff's allegation that DTT was not suitable for e.g. 13 or 14 cycles. Accordingly, the bold statement in EP 412 that "[t]he ability to accurately sequence 10 or more consecutive nucleotides in a sequencing reaction" is a significant advance is not supported by the facts.

166

The objective technical problem to be solved has thus to be formulated less ambitious, i.e. as to provide an alternative method of sequencing nucleotides in a template nucleic acid in which light-induced chemical artefacts and detrimental effects of photobleaching are reduced (*cf.* act. 16 N 439; without mentioning of more cycles).

167

Plaintiff argues that WO 073 would teach away from using antioxidants for stabilizing fluorophores, because *"photobleaching [...] is recommended prior to incorporation of the next fluorescent nucleotide for improvement of the signal to noise ratio in the subsequent detection step."* This is only half the truth, at best. Photobleaching is only one alternative outlined in WO 073 to improve the signal to noise ratio. The other one is *"cleavage of the nucleotide and the fluorophore, e.g.,*

168

53

*cleavage of a chemical bond in the linker"*; WO 073, page 21, lines 25-28. Thus, the skilled person still has any motivation to prevent photobleaching for as long as fluorescence of high intensity is desired (and the skilled person was perfectly aware how to do that, e.g. by adding an antioxidant such as e.g. ascorbic acid; *cf.* N 130 et seqq, above), and to thereafter get rid of the fluorophore by cleaving the linker.

Further, plaintiff argues that the combination with *Van Dijk* was improper essentially because *Van Dijk* did not relate to a biochemical reaction system such as SBS. This argument is inconsistent. Elsewhere, Plaintiff constantly argues that steps a) and b) are distinct, whereby fresh fluorophores are added to the reaction system in each step a). Actually, there is nothing in claim 1 that would preclude a whole exchange of solvents and reagents between the steps. As to step b), i.e. the detection step, there just is no biochemical reaction involved. It is all about fluorescence excitation and detection, and *Van Dijk* is concerned with exactly that. Thus, combination of WO 073 with *Van Dijk et al.* is proper. 169

In addition, as outlined above in N 130 *et seqq.*, *Song et al.* provide any motivation for the skilled person to include ascorbic acid in the detection buffer, with the intention to a "stabilizing effect" on the template nucleic acid. 170

*d)*   ***No inventive step over WO 957, in further view of Van Dijk et al., Dittrich et al., Song et al. (ad act. 32 N 291-301)***

Plaintiff alleges that WO 957 relates to stabilization of fluorophores only, and not to template protection. As has been outlined above in N 130 *et seqq.*, this argument has no merit. 171

As already discussed with respect to *Van Dijk* above, N 169 *et seqq.*, it does not matter that *Dittrich et al.* does not refer to SBS. There is no biochemical magic involved in step b) of claim 1 of EP 412. It is all about fluorescence excitation and detection, and *Dittrich et al.* is concerned with exactly that. Thus, combination of WO 957 with either *Van Dijk et al.* or *Dittrich* is proper. 172

In addition, as outlined above in N 130 *et seqq.*, *Song et al.* provide any motivation for the skilled person to include ascorbic acid in the detection buffer, with the intention to a "stabilizing effect" on the template nucleic acid.

<span style="float:right">173</span>

e) *No inventive step over Braslavsky et al., in further view of Van Dijk et al. or Dietrich et al. (ad act. 32 N 302-308)*

Plaintiff holds that *Braslavsky et al.*'s teaching with respect to the use of oxygen scavengers is "ambivalent". However, there is no "ambivalence" in *Braslavsky et al.* On the contrary, *Braslavsky et al.* exemplifies that it makes perfectly sense to include an antioxidant in first place, even if at a later stage photobleaching shall be achieved (see also above, N 168, with respect to WO 073). Indeed, *Braslavsky et al.* mention that *"[t]o reduce bleaching of the fluorescent dyes, an oxygen scavenging system (27) was used during all green illumination periods"*; page 3961, right column, last sentence of first paragraph. However, *"each observation with red illumination was followed by an observation with red illumination to photobleach any incorporated Cy5 fluorophores"* (page 3962, left column, first paragraph, lines 8-11).

<span style="float:right">174</span>

Plaintiff (again) argues that *Braslavsky et al.* only concern the fluorescent activity of fluorophores. It has already been shown above, N 130 *et seqq.*, that this artificial distinction has no merit. First, the aim to prevent / reduce photobleaching provides any motivation for the skilled person to include ascorbic acid in the detection buffer. Secondly, even if the alleged *"stabilizing effect"* on the nucleic acid template was decisive (what it is not), this has likewise been obvious: As outlined above in N 130 *et seqq.*, *Song et al.* provide any motivation for the skilled person to include ascorbic acid in the detection buffer, with the intention to a "stabilizing effect" on the template nucleic acid.

<span style="float:right">175</span>

55

f) *No inventive step over any of WO 073, WO 957 or Braslavsky et al., in further view of WO 165, WO 2004/085546 and/or Parshad (ad act. 32 N 309-320)*

Again, Plaintiff essentially argues that incentives in the prior art to include ascorbic acid with the aim to reduce photobleaching of fluorescent dyes was unrelated to the invention of EP 412, and thus could not render the claimed subject-matter obvious. As outlined above in N 130 *et seqq.*, this is not correct. Accordingly, Plaintiff's arguments in this respect are moot.

176

g) *The remaining claims (ad act. 32 N 321-322)*

As to validity of the remaining dependent claims, Plaintiff merely relies on validity of claim 1 from which they depend. Plaintiff did not address any of the substantiated invalidity arguments of the Statement of Defense, act. 16 N 478 *et seqq.*

177

It is only with respect to claim 15 (kit) that Plaintiff provides some boilerplate arguments that do not address the substantiated invalidity arguments of the Statement of Defense, act. 16 N 493 *et seqq.*

178

F. **Ad auxiliary requests regarding infringement of Claim 1 of EP 412 (ad act. 32 N 323 *et seqq.*)**

a) *Invalidity of Claim 1 according to Auxiliary Requests 1-4 (ad act. 32 N 338-342)*

i) Claim 1 of Auxiliary Request 1 (AR1)

The preamble of claim 1 is amended as follows:

179

> *A method of sequencing at least two nucleotides of a template nucleic acid <u>by successive cycles of sequencing-by-synthesis</u> comprising repeating the steps of: [...]*

56

This amendment is unallowable because it renders the claim unclear, for various reasons.

First, even Plaintiff acknowledges that there is no explicit disclosure of this feature in the whole application as filed and consequently only asserts an "implicit" disclosure. However, there is none. It is perfectly unclear what sequencing-by-synthesis is supposed to mean, even more so after two exchanges of briefs in the present proceedings. Noteworthy, *US 420* undisputedly discloses a sequencing method, and it discloses a successive incorporation of fluorescent labels by a PCR method; act. 16 N 405, 412. Still, Plaintiff holds that *"the teaching of US 420 has no relevance to SBS"*; act. 32 N 254. Apparently, Plaintiff is of the opinion that there is something to SBS / sequencing-by-synthesis that is not fulfilled by a sequencing method that involves synthesis (by PCR). If that is the case, it must be included in the claim. If that is not the case, Plaintiff's arguments are wholly inconsistent.

Secondly, it is not clear whether the claim shall be understood as

or

> *The sequencing-by-synthesis [whatever that is] comprises repeating the steps (a) and (b)*

> *The sequencing by synthesis is not more precisely defined in the claim, and repeating the steps (a) and (b) is not part of what Plaintiff considers "sequencing-by-synthesis"*

Accordingly, the amendment in AR1 is unallowable; O2016_010, O2016_011.

ii)     Claim 1 of Auxiliary Request 2 (AR2)

The preamble of claim 1 is amended in the same way as in AR1. Thus, AR2 suffers from the same clarity issue and is therefore unallowable for this reason alone. Further, step (b) has been amended to read:

180

181

182

183

184

> *[...] determining the identity of the incorporated nucleotide(s) by illumination is carried out [...]*

This amendment is likewise unallowable because the amendment in no way specifies what kind of illumination (wavelength, duration, intensity, etc.) is meant. Not even the measurement principle is specified. Shall the sample be illuminated in order to record an UV/Vis spectrum? Or an IR spectrum? Or is a fluorophore to be excited? If so, how (wavelength, duration, intensity, etc.)?  185

Further, there is just no basis in the application for the general term "illumination". Accordingly, Plaintiff relies on the mentioning of "incident light" and concludes: "i.e., they generally require illumination." This is clearly not compliant with the gold standard of a clear and unambiguous disclosure in the application as filed.  186

Finally, it is unclear how to determine the identity of a nucleotide by illumination. Illumination as such does not give any indication of the identity of the nucleotide.  187

The amendments in AR2 are unallowable (*cf.* O2016_010, O2016_011).  188

iii)  Claim 1 of Auxiliary Request 3 (AR3)

The preamble of claim 1 is amended in the same way as in AR1. Thus, AR3 suffers from the same clarity issues and is therefore unallowable for this reason alone. Further, Plaintiff included an even more complex amendment in step (b) of AR3 than in AR2. It reads as follows:  189

> *[...] determining the identity of the incorporated nucleotide(s) is carried out by illumination with laser light of a wavelength specific for the fluorescent label or other suitable sources of illumination to excite the fluorescent label [...]*

Plaintiff's attempt to more precisely define the illumination fails because it includes even further clarity issues. First, the metes and bounds of "specific" remain obscure.  190

58

Secondly, the "other suitable sources of illumination to excite" could well serve as a textbook example of unclarity. The amendment actually opens the claim up to any means of excitation which has not even been remotely disclosed in the application as filed, and it does not even have to be specific for the fluorophore.

Yet again, it is unclear how the determination could be carried out by illumination. [191]

The amendments in AR3 are unallowable; O2016_010, O2016_011. [192]

iv)   Claim 1 of Auxiliary Request 4 (AR4)

The preamble of claim 1 is amended in the same way as in AR1. Thus, AR4 suffers [193] from the same clarity issue and is therefore unallowable for this reason alone. Further, step (b) has been amended over AR2 in that "intense" has been added, to read as follows:

> *[...] determining the identity of the incorporated nucleotide(s) by intense illumination is carried out [...]*

Not a single clarity issue that is discussed with respect to AR2 above, N 184 *et seqq.*, [194] is resolved thereby. Even worse, the term "intense" is obviously unclear, too. There cannot be any doubt that "intense" would not pass the EPO's clarity test under Art. 84 EPC, because it just is a relative and subjective term.

*b)*   ***No infringement of Claim 1 according to Auxiliary Requests 1-4 (ad act. 32 N 343)***

It has been established in the Statement of Defense and hereinbefore that Plaintiff [195] failed to establish infringement of claim 1 as granted. It goes without saying that this necessarily also applies to the even more limited variants of claim 1 according to any of AR1-AR4.

**G.** **Ad auxiliary requests regarding infringement of Claim 15 of EP 412 (ad act. 32 N 344 *et seqq.*)**

*a)* *Invalidity of Claim 15 according to Auxiliary Requests 5 and 6 (ad act. 32 N 347-351)*

The amendment in AR5, i.e. that the fluorescent label is linked to <u>the base of</u> the nucleotides, does not resolve any of the reasons for invalidity discussed in the Statement of Defense and hereinbefore. 196

As to AR6, there is no basis in the application as filed for "phosphine-cleavable azide-containing linkers" in general, but rather only to the extent "as described in greater detail in WO 2004/018493" (paragraph [0025] of EP 412). The intermediate generalization to any phosphine-cleavable azide-containing linkers in an unallowable intermediate generalization. 197

*b)* *No infringement of Claim 15 according to Auxiliary Requests 5 and 6 (ad act. 32 N 352-354)*

Plaintiff alleges that infringement of AR5 and AR6 was established by mere reference to the LC/MS/MS analysis. However, plaintiff is mistaken, as outlined above in any detail. Plaintiff failed to establish infringement, there is no indication whatsoever of "a fully identical structure". 198

**H.** **Lack of legal interest for prayers for relief (ad act. 32 N 355 *et seqq.*)**

Plaintiff's observations regarding the alleged definiteness of its prayers for relief are contested with reference to the arguments in the Statement of Defense, which Defendant fully maintains (*cf.* act. 16 N 498-500). 199

Prayer for relief no. 1 covers an indefinite number of compounds. Plaintiff has not explained why it should have a legal interest over the entire scope of the claim. In 200

particular, it is not apparent why Plaintiff would have a legal interest with respect to selection possibilities of R' other than hydrogen as its entire infringement allegations are limited to such selection criterion. In addition, analysing the justification of claiming patent protection over all selection possibilities would exceed the scope of the present proceedings and it is certainly not justified to put such burden on Defendant. What is more, in the present case where specific products of the MGI group are at stake, it would have been possible for Plaintiff to specify the features of the allegedly infringing products. Hence, prayer for relief no. 1 is excessive ("überschiessend") and it has to be dismissed also for this reason.

This applies even more considering that it is apparently beyond dispute between the Parties that the 3'-OH blocking group must not be too bulky. Otherwise, it would just not be compatible with the polymerase and would thus not work as intended in the context of SBS. It is not only that *Tsien et al.* (act. 16_14) and *Ju et al.* (act. 16_8) mention size limitations of the protecting group (act. 16 N 148 *et seqq.*). Even EP 578 itself acknowledges the "many limitations on the suitability of a molecule as a blocking group", one of which is that it "must be tolerated by the polymerase or other appropriate enzyme used to incorporate it into the polynucleotide chain" (EP 578, paragraph [0005]). However, prayer for relief no. 1 does not limit the size of the 3'-OH blocking group in any way. Evidently, prayer for relief no. 1 extends to nucleotides that are non-working embodiments in SBS (not just a few, but rather the vast majority of the effectively unlimited variants covered by the wording of prayer for relief no. 1), and to that extent the subject-matter of claim 1 does not involve an inventive step (T939/92). To the extent that prayer for relief no. 1 comprises such non-working embodiments, Defendant invokes a nullity plea in defense. 201

Furthermore, prayer for relief no. 1 is also not clear in a sense that mere factual inspection would be sufficient in order to detect an infringement. Note that prayer for relief no. 1 does not specify the nature of the "label", nor the way it shall be "detectable". It is thus wrong and unrealistic that it would only require a factual 202

inspection to determine whether or not the molecule comprises a "label", not to mention whether or not the label is "detectable". Rather, this will open up a whole universe of fresh factual and legal assessments.

Plaintiff argues that it has a legitimate interest in all prayers of injunctive relief because they are based on different claim combinations (act. 32 N 361). Plaintiff would like to create a fall-back position with a view to appeal proceedings, i.e. in case one claim or combination were held invalid on appeal, the other injunctions would still stand. With that, Plaintiff wants to force the first instance to already analyse all possible claims and claim combinations, which could justify an injunction, irrespective of whether it achieves the desired result based on one claim or combination. If this approach is admitted, this would also mean that every time a plaintiff bases its claims on different legal bases, a court would need to analyse all possible legal fundaments in order to create a fall-back position in view of appeal proceedings. This is clearly contrary to the current practice of the Swiss courts, including the Federal Patent Court, and would place a quite considerable burden on the court's reasoning in all future proceedings. [203]

What is more, Plaintiff's interest in a fall-back position with a view to appeal proceedings would be sufficiently met if prayers for relief covering the same subject matter would have been filed as subsidiary motions in a cascading order. In such case, if a claim or claim combination falls on appeal, the next combination would automatically have to be assessed either by the appeal instance or after remittance of the case to the first instance. An overreaching legal interest does not exist and admitting one would be disproportionate in view of an efficient functioning of the legal system. [204]

As a result, prayers for relief no. 2, 3, 5, 6, 7 and the respective auxiliary prayers for relief, must be dismissed because Plaintiff lacks a legal interest in the current form of these prayers for relief. [205]

Respectfully submitted,

Thierry Calame

Lara Dorigo

**Twofold**

**Enclosures** as listed on the separate List of Evidence

## TABLE OF CONTENT

OVERVIEW     3

I.    PROCEDURE     6

II.    ARGUMENT     6

A.    No infringing activities of Defendant in Switzerland (ad act. 32 N 13 *et seqq.*)     6

B.    No infringement of EP 578 (ad act. 32 N 35 *et seqq.*)     14

   1.    The skilled person (ad act. 32 N 35-37)     14

   2.    No infringement by any of MGI's dNTPs (ad act. 32 N 4-12, 35 *et seqq.*)     14

     a)    Testing material (ad act. 32 N 37-42)     15

     b)    Plaintiff failed to establish infringement by MGI's unlabelled dNTPs (ad act. 32 N 43-58)     15

     c)    Plaintiff failed to establish infringement by MGI's CoolMPS chemistry (ad act. 32 N 59-66)     17

     d)    Plaintiff failed to establish infringement by MGI's labelled dNTPs (ad act. 32 N 67-80)     18

       i)    The comparison of UV/Vis spectra is meaningless (ad act. 32 N 72-73)     19

       ii)    The m/z values and isotopic envelopes cannot prove a structure (ad act. 32 N 74-76)     21

       iii)    The fragmentation pattern does not allow for any conclusions with respect to the protective group (ad act. 32 N 77-80)     21

     e)    No direct infringement of claim 25 by nucleotides and kits (ad act. 32 N 81)     23

     f)    No contributory infringement of method claims 12 and 17 and product claim 29 (ad act. 32 N 82-84)     24

     g)    Conclusion (ad act. 32 N 85-86)     24

C.    EP 578 is invalid (ad act. 32 N 87 *et seqq.*)     25

   1.    Preliminary remarks (ad act. 32 N 87-94)     25

     a)    Tsien et al. is one of the most important pieces of prior art in the field of SBS at all     25

     b)    Tsien et al. explicitly point to Kraevskii et al. and Greene and Wuts as "References of Interest"     26

   2.    *Ju et al.*, the closest prior art (ad act. 32 N 95-133)     27

     a)    The protecting group shall be small (ad act. 32 N 100-102)     28

     b)    Cleavability and deprotection conditions (ad act. 32 N 103-105)     28

|   |    | c) | Denaturation (ad act. 32 N 106-113) | 28 |
|   |    | d) | No teaching away (ad act. 32 N 114-119) | 30 |
|   |    | e) | Preference for unbranched protective groups with no more than 4 atoms in the chain (ad act. 32 N 120-126) | 31 |
|   |    | f) | The MOM group is a masked hemiacetal (ad act. 32 N 127-129) | 31 |
|   |    | g) | Summary (ad act. 32 N 130-133) | 32 |
|   | 3. |    | *Greene and Wuts* (ad act. 32 N 134-152) | 32 |
|   | 4. |    | *Zavgorodny et al.* as secondary document (ad act. 32 N 153-161) | 34 |
|   | 5. |    | Gololobov and Polushin *et al.* (ad act. 32 N 162-173) | 34 |
|   | 6. |    | The subject-matter of EP 578 is obvious over Ju et al. in further view of Zavgorodny et al. (ad act. 32 N 174-176) | 35 |
|   | 7. |    | Plaintiff's criticism of the Carell Declaration is unfounded (ad act. 32 N 177-178) | 37 |
|   |    | a) | Deprotection conditions of Zavgorodny et al. (ad act. 32 N 177) | 37 |
|   |    | b) | Deprotection conditions of Polushin et al. (ad act. 32 N 178) | 40 |
|   | 8. |    | The decision of the Opposition Division is incorrect (ad act. 32 N 179) | 41 |
|   | 9. |    | The remaining claims (ad act. 32 N 180) | 41 |
| D. |   |    | **No infringement of EP 412 (ad act. 32 N 181 *et seqq.*)** | **42** |
|   | 1. |    | Preliminary remarks (ad act. 32 N 181-192) | 42 |
|   | 2. |    | MGI's sequencing reagent kits do not infringe EP 412 (ad act. 32 N 193-213) | 44 |
| E. |   |    | **EP 412 is invalid (ad act. 32 N 214 *et seqq.*)** | **48** |
|   | 1. |    | Undue extension of subject-matter (ad act. 32 N 216 *et seqq.*) | 48 |
|   |    | a) | Amendments to claim 1 (ad act. 32 N 217-235) | 48 |
|   |    | b) | Amendments to claim 2 (ad act. 32 N 236-242) | 49 |
|   |    | c) | Amendments to claim 15 (ad act. 32 N 243-247) | 50 |
|   |    | d) | Conclusion (ad act. 32 N 248-249) | 51 |
|   | 2. |    | No novelty over US 420 (ad act. 32 N 250-261) | 51 |
|   | 3. |    | No inventive step (ad act. 32 N 262 *et seqq.*) | 51 |
|   |    | a) | Preliminary remarks (ad act. 32 N 262-266) | 51 |
|   |    | b) | Prior art in opposition proceedings (ad act. 32 N 267-269) | 52 |
|   |    | c) | No inventive step over either WO 770 or WO 073, in further view of Van Dijk et al., Song et al. (ad act. 32 N 270-290) | 52 |
|   |    | d) | No inventive step over WO 957, in further view of Van Dijk et al., Dittrich et al., Song et al. (ad act. 32 N 291-301) | 54 |
|   |    | e) | No inventive step over Braslavsky et al., in further view of Van Dijk et al. or Dietrich et al. (ad act. 32 N 302-308) | 55 |

|   | f) | No inventive step over any of WO 073, WO 957 or Braslavsky et al., in further view of WO 165, WO 2004/085546 and/or Parshad (ad act. 32 N 309-320) | 56 |
|   | g) | The remaining claims (ad act. 32 N 321-322) | 56 |
| **F.** |   | **Ad auxiliary requests regarding infringement of Claim 1 of EP 412 (ad act. 32 N 323 *et seqq.*)** | **56** |
|   | a) | Invalidity of Claim 1 according to Auxiliary Requests 1-4 (ad act. 32 N 338-342) | 56 |
|   |   | i) Claim 1 of Auxiliary Request 1 (AR1) | 56 |
|   |   | ii) Claim 1 of Auxiliary Request 2 (AR2) | 57 |
|   |   | iii) Claim 1 of Auxiliary Request 3 (AR3) | 58 |
|   |   | iv) Claim 1 of Auxiliary Request 4 (AR4) | 59 |
|   | b) | No infringement of Claim 1 according to Auxiliary Requests 1-4 (ad act. 32 N 343) | 59 |
| **G.** |   | **Ad auxiliary requests regarding infringement of Claim 15 of EP 412 (ad act. 32 N 344 *et seqq.*)** | **60** |
|   | a) | Invalidity of Claim 15 according to Auxiliary Requests 5 and 6 (ad act. 32 N 347-351) | 60 |
|   | b) | No infringement of Claim 15 according to Auxiliary Requests 5 and 6 (ad act. 32 N 352-354) | 60 |
| **H.** |   | **Lack of legal interest for prayers for relief (ad act. 32 N 355 *et seqq.*)** | **60** |

## LIST OF EVIDENCE

to the **Rejoinder**

dated 25 June 2020

to the Federal Patent Court

in the matter

**O2019_007**

**Illumina Cambridge Limited vs. Latvia MGI Tech SIA**

## WITNESSES

Andis Slaitas, c/o Latvia MGI Tech SIA, General Manager

Prof. Dr. Thomas Carell, Ludwig-Maximilians-Universität München, Department Chemie

**A.  Statement of Defense of 25 November 2019**

Enclosure 1:    Excerpts from the Website of MGI Group http://en.mgitech.cn

Enclosure 2:    Illumina Press Release of 28 June 2019, "Illumina Files Patent Infringement Suits Related to BGI in Switzerland, Turkey and the US" (www.illumina.com)

Enclosure 3:    Business Wire, "Illumina Files Patent Infringement Suits Related to BGI in Switzerland, Turkey and the US", 28 June 2019 (www.businesswire.com)

Enclosure 4:    Bloomberg, "Illumina Files Patent Infringement Suits Related to BGI in Switzerland, Turkey and the US", 28 June 2019 (www.bloomberg.com)

Enclosure 5:    Interlocutory decision of the OD re EP 578, dated 9 December 2015

Enclosure 6:    Opponent's withdrawal of appeal, dated 26 July 2017

Enclosure 7:     Notification of termination of appeal proceedings, dated 2 August 2017

Enclosure 8:     Ju et al., WO 02/29003

Enclosure 9:     Odedra et al., WO 01/92284

Enclosure 10:    Oksman et al. (1992), Solution conformations and hydrolytic stability of 2'- and 3'- substituted 2',3'-Dideoxyribonucleosides, including some potential inhibitors of human immunodeficiency virus; J. Phys. Org. Chem. Vol. 5, pp 741-747

Enclosure 11:    Zavgorodny et al. (2000), S,X-Acetals in nucleoside chemistry: Synthesis of 2'- and 3'-O-Azidomethyl derivatives of ribonucleosides; Nucleosides, Nucleotides and Nucleic Acids, 19(10-12), pp 1977-1991

Enclosure 12:    Zavgorodny et al. (1991), 1-Alkylthioalkylation of Nucleoside Hydroxyl Functions and Its Synthetic Applications: A New Versatile Method in Nucleoside Chemistry; Tetrahedron Letters, Vol. 32, No. 51, pp 7593-7596

Enclosure 13:    Canard et al., 1995, Proc. Natl. Acad. Sci. USA, 92: 10859-108636

Enclosure 14:    Tsien et al., WO 91/06678

Enclosure 15:    Exhibits from Greene and Wuts, Protective Groups in Organic Synthesis; Wiley and Sons (1999)

Enclosure 16:    Kraevskii et al. (1987), ISSN 0026-8933, pp. 25-29

Enclosure 17:    Metzker et al. (1994), Termination of DNA synthesis by novel 3'-modified deoxyribonucleoside 5'-triphosphates; Nucleic Acids Research, Vol. 22, No. 20, pp. 4259-4267

Enclosure 18:    Canard and Sarfati (1994), DNA polymerase fluorescent substrates with reversible 3'-tags; Gene, Vol. 148, pp. 1-6

Enclosure 19: Balasubramanian (2011), Sequencing nucleic acids: from chemistry to medicine; ChemComm, Vol. 47, pp. 7281-7286

Enclosure 20: Balasubramanian (2014), Chemical biology on the genome; Bioorganic & Medical Chemistry (http://dx.doi.org/10.1016/j.bmc.2014.05.016)

Enclosure 21: Nishinio and Ishido (1986), Partial Protection of Carbohydrate Derivatives. Part 22. Further Improvement in Introduction of Methoymethyl Group to Hydroxyl Groups of Carbohydrate Derivatives; Journal of Carbohydrate Chemistry (https://doi.org/10.1080/07328308608062969)

Enclosure 22: Excerpt of Wikipedia, Synthon (https://de.wikipedia.org/wiki/Synthon)

Enclosure 23: Technical Opinion of Prof. Carell (incl. Annexes A, B, C)

Enclosure 24: Gololobov et al. (1992), Recent Advances in the Staudinger Reaction; Tetrahedron, Vol. 48, No. 8, pp. 1353-1406

Enclosure 25: Polushin et al. (1996), Synthesis of Oligonucleotides Containing 2'-Azido- and 2'-Amino-2'-deoxyuridine Using Phosphotriester Chemistry; Tetrahedron Letters, Vol. 37, No. 19, pp. 3227-3230

Enclosure 26: Kamal et al. (1999), A mild and Rapid Regeneration of Alcohols from their Allylic Ethers by Chlorotrimethylsilane/Sodium Iodide; Tetrahedron Letters, Vol. 40, pp. 371-372

Enclosure 27: Ireland and Varney (1986), Approach to the Total Synthesis of Chlorothricolide: Synthesis of (±)-19,20-Dihydro-24-O-methylchlorothricolide, Methyl Ester, Ethyl Carbonate; J. Org. Chem. Vol. 51, pp. 635-648

Enclosure 28: Excerpt of Wikipedia, Azide (https://de.wikipedia.org/wiki/Azide)

Enclosure 29: Cretton et al. (1991), Catabolism of 3'-Azido-3'-deoxythymidine in Hepatocytes and Liver Microsomes, with Evidence of Formation of 3'-Amino-3'-deoxythymidine, a Highly Toxic Catabolite for Human Bone Marrow Cells; Molecular Pharmacology, Vol. 39, pp. 258-266

| | |
|---|---|
| Enclosure 30: | Saxon and Bertozzi (2000), Cell Surface Engineering by a Modified Staudinger Reaction; Science, Vol. 287, pp. 2007-2010 |
| Enclosure 31: | Excerpt of Wikipedia, Fluorescence (https://en.wikipedia.org/wiki/Fluorescence) |
| Enclosure 32: | WO 2004/018493, Solexa |
| Enclosure 33: | Excerpt of Wikipedia, Chemistry of ascorbic acid (https://en.wikipedia.org/wiki/Chemistry_of_ascorbic_acid) |
| Enclosure 34: | Excerpt of the website https://www.sigmaaldrich.com/catalog/product/aldrich/z166340?lang=en&region=GB; visited 17.11.2019 |
| Enclosure 35: | WO 00/70073, Cornell Research Foundation |
| Enclosure 36: | WO 02/086165, 3M Innovative Properties |
| Enclosure 37: | Submission in EPO prosecution, dated 13 April 2011 |
| Enclosure 38: | Klausing declaration, D10 |
| Enclosure 39: | WO 00/06770, Solexa |
| Enclosure 40: | Olson et al. (2001), Electrophoresis of DNA Adsorbed to a Cationic Supported Bilayer; Langmuir, 17, 7396-7401 |
| Enclosure 41: | WO 00/18957, Applied Research Systems |
| Enclosure 42: | Interlocutory decision of the OD re EP 412, dated 30 November 2015 |
| Enclosure 43: | Notification of termination of appeal proceedings, dated 7 March 2016 |

Enclosure 44:    WO 2006/064199, Solexa

Enclosure 45:    US 6,355,420 B1, US Genomics

Enclosure 46:    US 2002/0006622, Bradley

Enclosure 47:    Braslavsky et al., (2003), Sequence information can be obtained from single DNA molecules; PNAS, Vol. 100, No. 7, pp. 3960-3964

Enclosure 48:    Van Dijk et al., (2004), Combining Optical Trapping and Single-Molecule Fluorescence Spectroscopy: Enhanced Photobleaching of Fluorophores; J. Phys. Chem. B, Vol. 108, pp. 6479-6484

Enclosure 49:    Dittrich et al., (2001), Photobleaching and stabilization of fluorophores used for single-molecule analysis with one- and two-photon excitation; Appl. Phys. B, Vol. 73, pp. 829-837

Enclosure 50:    Molecular Probes (2005), Prolong Antifade Kit, Product Information

Enclosure 51:    WO 2004/085546, Fluorotechnics

Enclosure 52:    Parshad et al. (1978), Fluorescence light-induced chromosome damage and its prevention in mouse cells in culture; PNAS, Vol. 75, No. 4, pp. 1830-33

## B.    Rejoinder of 25 June 2020

Enclosure 53:    Agreement between BGI Complete Genomics Hong Kong Co., Limited and Fondation Campus Biotech Geneva dated 2 January 2019

Enclosure 54:    NMR Services for Chemical Characterization and Analysis; www.emerypharma.com

Enclosure 55:    Citation analysis of Tsien et al. (Patbase Citation Explorer), as per 14 June 2020

Enclosure 56:    Saenger, Principles of Nucleic Acid Structure, 1984, p. 144-145

Enclosure 57:    Song et al., Biophysical Journal, Vol. 68, June 1995, 2588-2600

Enclosure 58:    Fuller et al., Nature Biotechnology, Vol. 27, No. 11, 1013-1023

Enclosure 59:    Buechler et al., *US 6,544,797 B1*

Enclosure 60:    Tsien and Waggoner, Fluorophores for Confocal Microscopy in Handbook of Biological Confocal Microscopy (1995), p. 267-279

Enclosure 61:    Sigma-Aldrich product information, Ascorbic acid

Enclosure 62:    Sigma-Aldrich product information, D-Isoascorbic acid (Erythorbic acid)

Enclosure 63:    Product information about Quantofix Ascorbic acid test strips; www.mn-net.com

Enclosure 64:    Wikipedia, 'Molybdenum blue'

Enclosure 65:    Emails with Macherey-Nagel Customer Service Center